**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**VIP AUTO GLASS, INC.**, individually, as
assignee, and on behalf of all those similarly
situated,

      Plaintiff,

Case No: 8:16-cv-2012-T-35JSS

v.

**GEICO GENERAL INSURANCE**
**COMPANY**,

      Defendant.

_____/

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Plaintiff, VIP Auto Glass, Inc. ("VIP"), individually, as assignee, and on behalf of all those similarly situated, pursuant to Federal Rule of Civil Procedure 23, moves for class certification.

## A.     PRELIMINARY STATEMENT

This case is ideal for class treatment.  The crux of this dispute is an ambiguous insurance policy provision that Defendant, GEICO General Insurance Company ("GEICO"), routinely relies on to underpay covered windshield repair and replacement claims ("Windshield Claims") from insureds who do **not** use GEICO's undisclosed partner, Safelite, or one of Safelite's network of affiliated glass shops, but instead select their own windshield repair facilities, such as VIP.  GEICO includes an ambiguous "prevailing competitive price" provision in every one of its Florida automobile insurance policies to routinely and systematically underpay its insureds' Windshield Claims. The evidence demonstrates that GEICO separately negotiated its so-called "prevailing competitive price" in an undisclosed deal with Safelite, the nation's largest operator in the automobile glass market.  As a result of this scheme, GEICO imposes on its insureds an unlawful, *de facto* deductible for the amounts GEICO refuses to pay.

The Class has been clearly ascertained, and GEICO has already identified each class member.  VIP's claims will rise or fall based on the Court's interpretation of the insurance policy and applicable Florida law, especially considering GEICO's routine business practices and its undisclosed side-deal with Safelite.  In sum, class certification of VIP's state law claims for declaratory and injunctive relief under Rule 23(b)(2) is appropriate to declare GEICO's conduct unlawful and prevent it from continuing, and VIP's damages claim for unpaid policy benefits, all of which can be easily calculated, is appropriate for certification under Rule 23(b)(3). Accordingly, VIP requests that the Court certify this Class.

## B.    FACTUAL BACKGROUND

GEICO is one of the largest automobile insurance companies. In 2014, it led all other automobile insurance carriers in Florida by premiums collected at nearly $3 billion.[1] Despite collecting billions in premiums, GEICO is, on a continuing basis, unlawfully underpaying legitimate Windshield Claims to its Florida insureds and thereby pocketing windfall profits.

Under Florida law, an insurance company is prohibited from imposing a deductible on Windshield Claims. *See* § 627.7288, Fla. Stat.[2] GEICO's standard Florida automobile insurance policies, consistent with Florida law, state that "no deductible will apply to loss to windshield." First Amended Class Action Complaint (Doc. 47; the "Complaint") at Ex. A, p. 13. Florida case law explains that a "deductible" is a form of "self-insurance," which "requires the insured to share in the risk of loss. . . ." *See, e.g., General Star Indem. Co. v. West Fla. Village Inn, Inc.*, 874 So. 2d 26, 33 (Fla. 2d DCA 2004). In other words, the deductible is a portion of an otherwise insured loss that the insured himself or herself must pay.

Despite the prohibition against imposing a deductible for Windshield Claims set forth in Section 627.7288 and its insurance policy, GEICO uses other policy language to circumvent that statutory and contractual prohibition. Specifically, GEICO's insurance policies state:

The **limit of our liability** for loss:

1.      Is the actual cash value of the property at the time of loss.

2.      Will not exceed the **prevailing competitive price** to repair or replace the property at the time of loss . . . . Although you have the right to choose any repair facility or location, **the limit of liability for repair or replacement of such property is the prevailing competitive price which is the price we can secure**

---

[1] *See* **Exhibit 1** (http://www.floir.com/siteDocuments/FastFacts.pdf, p. 8 (visited April 27, 2017)). Along with this motion, Plaintiff has contemporaneously filed a Notice of Filing Exhibits in Support of Motion for Class Certification. Plaintiff's citations to exhibits refer to the exhibit numbers assigned in that notice.

[2] "The deductible provisions of any policy of motor vehicle insurance . . . shall not be applicable to damage to the windshield of any motor vehicle."

**from a competent and conveniently located repair facility.** At your request, we will identify a repair facility that will perform the repairs or replacements at the prevailing competitive price.

Complaint at Ex. A, pp. 14-15 ("Prevailing Competitive Price Limit of Liability") (emphasis supplied). Notably, if an insurance company elects to provide coverage for Windshield Claims, nothing in Section 627.7288 (or any other statute) authorizes that insurance company to place such a limit of liability on Windshield Claims. *Cf., e.g.,* § 627.736, Fla. Stat. (authorizing PIP insurers to limit their liability to $10,000 of "reasonable" medical expenses); § 627.736(5)(a)1.a-f, Fla. Stat. (authorizing PIP insurers to limit PIP claims to a "schedule of maximum charges").[3]

While lacking any lawful authority to impose a deductible or otherwise limit its liability on Windshield Claims, GEICO's insurance policy uses an ambiguous policy provision to achieve that result. Under well-settled Florida law, a statutory or contractual provision is ambiguous whenever reasonable people can disagree over its meaning. *See, e.g., State v. Huggins,* 802 So. 2d 276, 277 (Fla. 2001) (ambiguity means "reasonable persons can find different meanings in the same language") (quoting *Forsythe v. Longboat Key Beach Erosion Control Dist.,* 604 So. 2d 452 (Fla. 1992)). Likewise, an insurance policy is ambiguous if its language is susceptible to more than one reasonable interpretation. *See, e.g., Sebo v. Am. Home Assurance Co., Inc.*, SC14-897, __ So. 3d __, 2016 WL 7013859, at *2 (Fla. Dec. 1, 2016); *Travelers Indem. Co. v. PCR Inc.,* 889 So. 2d 779, 785 (Fla. 2004); *Swire Pac. Holdings v. Zurich Ins. Co.,* 845 So. 2d 161, 165 (Fla. 2003). So, for example, if an insurance policy provision is susceptible to one reasonable interpretation that provides coverage and another that denies coverage, the provision is ambiguous as a matter of law. *Washington Nat'l Ins. Corp. v. Ruderman*, 117 So. 3d 943, 950-951 (Fla. 2013). In that event, the ambiguous policy language must be strictly construed against

---

[3] Unlike these referenced statutes that include a "reasonableness" limitation, Section 627.7288 contains no such limitation. Simply stated, the statute and GEICO's policies **prohibit** **any** **and** **all** **deductibles** on windshield losses.

the insurer and liberally construed in favor of the insured. *Sebo*, 2016 WL 7013859 at \*2; *Ruderman*, 117 So. 3d at 950-51. Moreover, "ambiguous 'exclusionary clauses are construed *even more strictly* against the insurer than coverage clauses.'" *Sebo*, 2016 WL 7013859 at \*2 (emphasis supplied).

1.      **The Underlying Claim**

VIP is an automobile repair facility in Tampa that specializes in windshield glass. Deryl Jones took his 2013 Honda Accord to VIP to have the windshield replaced under his GEICO automobile insurance policy, which provided the claim was covered without a deductible. *See* Complaint at ¶¶ 13-15 & Ex. A, p. 13. Mr. Jones assigned to VIP the right to receive payment directly from GEICO and pursue legal action if GEICO failed to pay under the terms of his policy. *See id.* at ¶ 15 & Ex. B.

VIP replaced the windshield and invoiced GEICO $936.37, which is VIP's standard price based on the same retail price published by the National Auto Glass Specifications ("NAGS"). *See id.* at ¶¶ 16-17 & Ex. C. Despite the prohibition set forth in Section 627.7288 and the insurance policy itself against imposing a deductible for Windshield Claims, GEICO paid VIP merely $468.03, leaving a balance owed of $468.34. *See id.* at ¶ 18 & Ex. D. In addition to underpaying VIP for this work, GEICO has underpaid VIP on other windshield claims performed for other customers insured by GEICO. *See id.* at ¶ 20.

Although Section 627.7288 and GEICO's own insurance policies expressly prohibit deductibles on Windshield Claims, GEICO asserts that its underpayments are nonetheless permitted under its policy provision, which purports to cap GEICO's liability at the so-called "**prevailing competitive price**." *See id.* at ¶¶ 11-12, 19, 23 & Ex. A, pp. 14-15. But GEICO cannot cite any legal authority to impose such a cap on a Windshield Claim, and the policies do

not define the term "prevailing competitive price," other than offer a vague description that it is the price GEICO "can secure from a competent and conveniently located repair facility." *See id*. at ¶ 11. Notably, the prevailing competitive price provision does not say it is the "lowest" price that GEICO can secure, or the price that it can secure from a particular facility or preferred vendor (e.g., Safelite). Other than stating that GEICO will, upon the insured's request, "identify a repair facility that will perform the repairs or replacements at the prevailing competitive price," the policy does not require the insured to use any particular facility. *See id*. at ¶ 12. Instead, the prevailing competitive price provision of the policy expressly advises insureds that "you have the right to choose any repair facility or location. . . ." Complaint at Ex. A, pp. 14-15.

Other insurance companies, such as Liberty Mutual, Infinity, the Hartford, Chubb, Mercury, and many others, regularly pay VIP's standard pricing in full, which include charges for windshields at 100% of the NAGS benchmark price. *See* **Exhibit 2** (Declaration of Melvin Figueroa) at ¶ 10 and **Ex. 2A-1** through **2A-30** (VIP Auto invoices paid in full). In fact, even GEICO Commercial Insurance paid VIP's standard price of 100% of the NAGS benchmark. *See* **Ex. 2** at ¶ 11; **Ex. 2A-1**. Indeed, VIP's prices are certainly within GEICO's vague description of the "prevailing competitive price" because VIP's price is one that GEICO can secure from VIP, and GEICO does not dispute that VIP (and the Class members) are each "a competent and conveniently located repair facility."

## 2.    GEICO's Relationship with Safelite

Safelite Fulfillment, Inc. ("Safelite Retail") is "the largest auto glass repair and replacement organization in the U.S." with locations all over Florida.[4]  As such, Safelite Retail operates in the windshield repair and replacement retail market and competes directly against

---

[4] *See* **Exhibit 3** (https://www.safelite.com/about-safelite/safelite-autoglass-companies (visited May 9, 2017)).

independent facilities like VIP and the Class members. Although it is not mentioned anywhere in GEICO's insurance policies, Safelite Retail is GEICO's undisclosed, yet preferred vendor for Windshield Claims. *See* **Exhibit 4** (Deposition of Lee Foskey, GEICO's corporate representative ("Foskey Depo")), at p. 53:21-24. That is, if a GEICO insured calls about a Windshield Claim and has not selected a repair facility, GEICO refers the insured to Safelite Retail every time. *See* **Exhibit 5** at GG/VIP000140-142, 262; **Exhibit 6** at GG/VIP000387-389, 447-448.[5] GEICO even has access to Safelite Retail's online scheduling system and makes its insureds' appointments with Safelite Retail for them. *See* **Ex. 5** at GG/VIP000263-328; **Ex. 6** at GG/VIP000450-502.

Since 2008, under an undisclosed contract between Safelite Solutions, LLC ("Safelite Claims") and GEICO, Safelite Claims has been the third-party administrator for all of GEICO's Windshield Claims in Florida and issues payments on GEICO's behalf. *See* **Exhibit 7** (Declaration of David Antonacci) at ¶ 4, n.1; Complaint at Ex. D (records of payments on the underlying claim made to VIP Auto from Safelite Claims).[6] Under the undisclosed "Provider Agreement," *see* **Exhibits 8, 9,** and **10** (Provider Agreements),[7] ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[5] Because GEICO's documents on this topic are marked "Confidential" under the parties' Confidentiality Agreement (Doc. 38-1), they cannot be attached here. GEICO intends to file a motion for leave to file these materials under seal by May 24, 2017. For purposes of this filing, **Exhibits 5** and **6** are identified here for future reference, but will not be filed at this time.

[6] Safelite Retail and Safelite Claims are in the "Safelite Group," "the world's largest family of retail auto glass companies." *See* **Ex. 3**.

[7] Because the Provider Agreements are marked "Confidential," they cannot be attached here. GEICO intends to file a motion for leave to file these materials under seal. For purposes of this filing, **Exhibits 8, 9, and 10,** are identified here for future reference, but will not be filed at this time.

In addition to acting as a third-party administrator to GEICO, Safelite Claims also oversees a network of automobile glass repair facilities that have signed agreements to be "participants" in the "Safelite Network." Under such agreements, the "participant" agrees that

> [i]n the case of work being billed to a fleet or insurance company through Safelite, Participant **will be notified of the price established by the fleet or insurance company (whether by <u>agreement with Safelite</u> or otherwise) for the work and <u>Participant agrees to complete such work at such price</u>**.

*See* **Exhibit 12** (Safelite Network Participation Agreement) at § 2.3. By definition, none of the Class members are participants in the Safelite Network.

The prices established by GEICO that participants in the Safelite Network are required to charge GEICO are reflected in the GEICO Glass Pricing Agreements, which GEICO sends to windshield repair facilities, whether they are independent facilities (like VIP and the Class members) or "participants" in the Safelite Network. *See* **Exhibit 13** (GEICO Glass Pricing Agreements); **Ex. 4** (Foskey Depo) at pp. 184:9-196:7. According to the current Glass Pricing Agreement, which dates back to February 6, 2012, GEICO has unilaterally decided that it will pay merely 50% of the NAGS benchmark list price for windshield parts. *See* **Ex. 13** at GG/VIP000117; *see also* **Ex. 13** at GG/VIP000122 (a GEICO Glass Pricing Agreement, dated 9/18/08, in which GEICO had agreed to pay 47% off the NAGS benchmark price). This rate of 50% of the NAGS benchmark price is curious because, as GEICO's own training materials indicate, among the purposes of the NAGS reference system is to determine the actual prices for windshield replacement parts. *See* **Ex. 5** at GG/VIP000187; **Ex. 6** at GG/VIP000429.[9]

---

[8] This paragraph has been redacted because it references material that GEICO has marked "confidential." The unredacted page has been marked as **Exhibit 11** for later reference to be filed under seal. **Exhibit 11-A** is GEICO's privilege log, also marked "confidential," which describes the Provider Agreements. *See supra* n. 5 regarding GEICO's motion for leave to file under seal.

[9] *See supra* n. 5 regarding GEICO's motion for leave to file under seal.

Again, under GEICO's Florida insurance policies, the purported "prevailing competitive price" is "the price [GEICO] can secure from a competent and conveniently located repair facility." Based on GEICO's relationship with Safelite, it considers Safelite Retail facilities and "participants" in the Safelite Network to be "competent and conveniently located." *See* **Exhibit 14** (Responses to Plaintiff's First Set of Interrogatories) at p. 3 (Interrogatory No. 5). Moreover, as GEICO's corporate representative testified, if a facility wants to be a "participant" in the Safelite Network, it has "to bill at the . . . prevailing competitive price." *See* **Ex. 4** (Foskey Depo), p. 60:11-21. Indeed, regardless of whether a facility is a "participant" in the Safelite Network and has agreed to GEICO's price, or whether it is independent of Safelite (like VIP and the Class members), GEICO pays the same price for windshield parts, *i.e.*, merely 50% of the NAGS benchmark price. Notably, as GEICO's corporate representative testified, if GEICO issued payment to a glass shop, then it considers the facility "competent." *See* **Ex. 4** (Foskey Depo), p. 146:3-5. GEICO's corporate representative also testified that whether a facility is "conveniently located" is "the policyholder's decision." *See* **Ex. 4** (Foskey Depo), p. 133:23-25. Therefore, based on this testimony, if an insured used a particular vendor, then it is "conveniently located." Accordingly, none of the Windshield Claims at issue in this case were underpaid on the grounds that VIP and the Class members were not "competent" or were not "conveniently located."

The GEICO Glass Pricing Agreements acknowledge that GEICO insureds are not required to have their windshields repaired or replaced at any specific facility, but suggest that those insureds should nonetheless bear the costs of any Windshield Claims that exceed the unidentified pricing formula, which is only set forth in the agreements but not in the insurance policies:

> Our policyholders have the right of personal choice and preference in their selection of an automotive glass shop. . . .
>
> If you desire to bill for more than GEICO's competitive pricing as stated above, you must advise our policyholders prior to initiating glass repair/replacement so that they can determine whether they are willing to pay the additional costs for your services.

*See* Complaint at Ex. E. Likewise, GEICO concedes that its insureds are responsible for the remaining balance left unpaid by GEICO. *See* **Ex. 4** (Foskey Depo) at p. 116:25-119:25. In addition, Safelite's work orders submitted to glass shops performing Windshield Claims for GEICO's insureds state (in violation of Section 627.7288 and GEICO's insurance policies provisions) that "GEICO will not reimburse for deductibles not collected." *See* Complaint at Ex. F. Interestingly, GEICO's corporate representative testified that the work order form is used nationwide, even in Florida where windshield deductibles are prohibited. *See* **Ex. 4** (Foskey Depo) at 210:14-23. That is, GEICO's own claim handling process treats the unpaid portion of the invoice the same way it would treat a deductible in jurisdictions where one is permitted.

In summary, (a) the "prevailing competitive price" is the price GEICO "can secure from a competent and conveniently located repair facility," (b) Safelite Retail facilities and "participants" in the Safelite Network are considered "competent and conveniently located," (c) GEICO and Safelite have a confidential, undisclosed agreement with their negotiated pricing terms, and (d) the "participants" in the Safelite Network have agreed to bill GEICO at prices established by GEICO. In contrast, facilities not affiliated with Safelite (*i.e.,* VIP and the Class members), but are nonetheless "competent" and "conveniently located," who charge more than what GEICO and Safelite have separately negotiated (*i.e.*, anything more than 50% of the NAGS benchmark price), do not receive payment from GEICO at their invoiced price, even though they are within GEICO's description of "prevailing and competitive." By partnering with Safelite,

with its many windshield repair facilities "conveniently located" throughout Florida, and by reaching a pricing agreement with Safelite, GEICO apparently believes that it can underpay all invoices from non-Safelite affiliated glass shops – even when those prices are "prevailing" and "competitive" – whenever a non-Safelite affiliated glass shop charges more than 50% of the NAGS benchmark price. Indeed, as GEICO acknowledged, whether a windshield facility is a "participant" in the Safelite Network or chooses to remain independent of Safelite, "the payment is exactly the same." *See* **Ex. 4** (Foskey Depo) at 194:23-195:1. In short, GEICO uses its agreement with Safelite and the terms of its automobile insurance policies to underpay VIP and the Class members and then leaves its insureds liable for any unpaid balance, contrary to Section 627.7288 and the insurance policy provision.

GEICO's attempt to justify its Windshield Claims handling process in this case is illuminating. According to GEICO, it "periodically reviews its pricing for windshield repairs and replacements at least annually" to determine if its prices need to be adjusted. *See* **Exhibit 15** (Declaration of Lee Foskey) at ¶ 5. GEICO includes in its consideration "the availability of glass repair shops that have agreed to GEICO['s] approved pricing." *Id*. GEICO's assertion that it "reviews" its pricing by considering the prices charged by glass shops that have agreed to GEICO's pricing – in other words, Safelite Retail facilities and "participants" in the Safelite Network, **all of whom are contractually obligated to accept GEICO's prices** – to determine if its prices are "prevailing" or "competitive" is wholly disingenuous.

The mere fact that GEICO pays "participants" in the Safelite Network an agreed-upon price does not make that price "prevailing" or "competitive." According to two such shops that participate in the Safelite Network, they are required to bill GEICO at the "**price negotiated and/or determined <u>by</u> <u>GEICO</u> <u>in</u> <u>conjunction</u> <u>with</u> <u>Safelite</u>**. . . ." *See* **Exhibits 16** and **17**, at ¶

7 (Affidavits from Bryan Yarborough of Harmon AutoGlass and Daniel Knowlton of K&K Glass).  As these affidavits demonstrate, the prices that GEICO pays are not competitive in the marketplace.  Indeed, this testimony makes it clear that GEICO has a routine practice of underpaying valid claims.

Moreover, the pricing agreement separately negotiated between GEICO and Safelite is not mentioned in its insurance policies, and the policies do not require Windshield Claims to be performed by Safelite Retail, Safelite Network "participant" facilities, or anybody else.  In addition, GEICO's insurance policies do not state that GEICO will not pay any more than the prices that the Safelite Network "participant" facilities or Safelite Retail facilities have agreed to accept.  GEICO's agreement with Safelite, however, affects and establishes what GEICO considers the "prevailing competitive price" and, therefore, what GEICO pays to the Class.

GEICO testified in this case that the "auto insurance business is highly competitive," and that its agreement with Safelite Claims gives it a competitive advantage. *See* Affidavit of Beatrice de la Pena (Doc. 60) at ¶¶ 4, 7.  Interestingly, however, GEICO has also testified in this case that it receives "peer reports" **from** **Safelite** showing the amounts paid by other insurance companies for windshield claims (although the "peer report" does not identify any other insurance companies, the amounts are nonetheless provided).  *See* **Ex. 15** (Foskey Declaration) at ¶ 5.[10]  Therefore, GEICO knows exactly how much its competitors pay compared to how much it pays for Windshield Claims, and then GEICO and Safelite unilaterally agree to whatever artificial price they want to set, regardless what the laws of supply and demand would otherwise establish in the marketplace, and regardless of whether Florida law authorizes an insurer to cap its coverage for Windshield Claims.  This is far from competitive, and indeed GEICO's entire

---

[10] Plaintiff has filed the Declaration of Lee Foskey, but has not filed the exhibits (**Exhibits 15-A** and **15-B**) because GEICO marked them as "confidential." *See supra* n. 5 regarding GEICO's motion for leave to file under seal.

windshield handling process, facilitated by Safelite, is anti-competitive and deceptive. By euphemistically describing the amount it pays as the "prevailing competitive price," when that is just a privately-negotiated rate with the largest operator in the windshield repair and replacement market, GEICO engages in deceptive business practices and violates the statutory and contractual prohibitions against imposing a deductible on Windshield Claims in Florida.

3.     **State Court Litigation Between Independent Glass Repair Facilities and GEICO**

There has been a significant amount of litigation in Florida between GEICO and hundreds of independent windshield repair facilities that are not "participants" in the Safelite Network. In these cases, the facilities generally sue GEICO, pursuant to an assignment of benefits, and allege breach of contract based on GEICO's failure to pay the invoiced amount and instead underpaying based on the "prevailing competitive price." VIP estimates that there are currently hundreds, if not thousands, of these cases pending in Florida's state courts. *See* GEICO's Notice of Pendency of Other Actions (Doc. 9) ("there are numerous cases pending in Florida state courts brought by other parties against GEICO, which seek additional benefits for alleged windshield repair or replacement services"). In one case, the judge concluded that the phrase "prevailing competitive price" is "inherently ambiguous" and "fails to provide any standard or measure against which an insured or its assignee can conjure the amount it may expect to be reimbursed," which ambiguity was construed against GEICO. *See* **Exhibit 18** (Final Judgment for Plaintiff in *Superior Auto Glass of Tampa Bay, Inc. v. GEICO Gen. Ins. Co.*, No. 16-CC-7306 (Hillsborough Cty. Ct. July 28, 2016) (Berkowitz, J.)).

4.     **VIP's Allegations**

VIP alleges that GEICO's routine failure to properly pay these claims and leaving its insureds responsible for the unpaid balances constitutes an unlawful *de facto* deductible that violates Section 627.7288 and its own automobile insurance policies, and is an otherwise

unlawful reduction of insurance coverage. *See* Complaint at ¶ 35; **Exhibit 19** (Order Denying Motion to Dismiss or in the Alternative, to Stay and Compel Appraisal in *Lloyd's of Shelton Auto Glass, LLC v. Progressive Select Ins. Co.*, No. 16-CC-41610 (Hillsborough Cty. Ct. May 16, 2017) (Berkowitz, J.), ¶¶ 11-19, at pp. 4-5 (discussing legislative history, statutory interpretation; "This constitutes a *de facto* deductible, and is therefore unenforceable as being contrary to public policy as set forth by Fla. Stat. Sec 627.7288."). VIP also alleges that the phrase "prevailing competitive price" used by GEICO is misleading, deceptive, vague, and ambiguous, and must be construed strictly against GEICO. *See id.* at ¶¶ 43-52, 58; *Sebo*, 2016 WL 7013859, at *2. VIP brings state law claims for injunctive relief (Count I), declaratory relief (Count II), and policy benefits (Count III).

## C.      ARGUMENT

VIP seeks to certify the following Class under Rule 23(b)(2) and (b)(3):

> All windshield repair facilities located in the State of Florida, or all owners of such facilities that, since June 1, 2011, (a) were hired by a person or other entity insured by GEICO in Florida who was covered by an insurance policy purporting to provide windshield insurance coverage without a deductible, (b) provided windshield repair and/or replacement services to the GEICO insured, (c) own an assignment of benefits from then GEICO insured, (d) submitted one or more bills to GEICO for payment, and (e) did not receive full payment from GEICO based on its "Prevailing Competitive Price Limit of Liability" (the "Class").

> Excluded from the Class are any claims that (a) have already been fully paid by the insured or GEICO or were otherwise satisfied through litigation or settlement, and/or (b) are the subject of pending litigation against GEICO as of the date of any class certification order or other deadline established by the Court.

*See* Complaint at ¶ 60. The Court, however, is not bound by this definition, and has the discretion to modify it as necessary. *See Shin v. Cobb County Bd. of Educ.*, 248 F.3d 1061, 1065 (11th Cir. 2001).

1.      **Legal Standards Governing Class Certification**

A district court has broad discretion in determining class certification. *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992). To certify a class, "the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in [Rule] 23(a). . . ." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009). Rule 23(a) provides that a class may be certified if there is numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a); *Veal v. Crown Auto Dealerships, Inc.*, 236 F.R.D. 572, 576 (M.D. Fla. 2006) (Whittemore, J.). If Rule 23(a) is satisfied, then at least one of the three requirements of Rule 23(b) must also be satisfied. *Vega*, 564 F.3d at 1265; *State of Ala. v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 315 (5th Cir. 1978).

Here, VIP seeks certification of its declaratory relief claim in Count I and its injunctive relief claim in Count II under Rule 23(b)(2), and its damages claim for unpaid insurance benefits in Count III under Rule 23(b)(3). When both damages and equitable relief are sought, a "hybrid" Rule 23(b)(2) and (b)(3) suit may be maintained if the case "can be fairly and effectively managed." *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1158 n.10 (11th Cir.1983); *see also Williams v. Mohawk Inds.*, 568 F.3d 1350, 1359-60 (11th Cir. 2009).

"A district court must conduct a rigorous analysis of the rule 23 prerequisites before certifying a class." *Vega*, 564 F.3d at 1266. "Although the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Valley Drug*, 350 F.3d at 1188 n.15; *Babineau v. Fed. Exp. Corp.*, 576 F.3d 1183, 1190 (11th Cir. 2009) (same). Any doubt should be resolved in favor of certification. *CV Reit, Inc. v. Levy*, 144 F.R.D. 690, 695 (S.D. Fla. 1992) (certifying class).

## 2.    VIP Has Standing

The Court must first determine whether the class action plaintiff has standing. *Gen. Telephone Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (the class representative must be a part of the class, have the same interest, and suffer the same injury as the class members).  Standing involves (1) injury, (2) causation, and (3) redressability. *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1273-74 (11th Cir. 2001).

In this case, VIP has standing.  VIP and the Class members were all injured as a direct result of GEICO violating Section 627.7288 and its own insurance policies by underpaying Windshield Claims, limiting the amount of insurance coverage its insureds are entitled to, and leaving its insureds liable for the unpaid balance.  VIP and the Class members were all underpaid for work they performed for GEICO's insureds, and GEICO admits that every single underpayment at issue was based on GEICO's reliance on the "prevailing competitive price" provisions in its insurance policies.  *See* **Ex. 8** (Antonacci Declaration) at ¶ 4.  The "prevailing competitive price" provision, however, is ambiguous and must be liberally construed in favor of the insureds and strictly construed against GEICO. *See Sebo*, 2016 WL 7013859, at *2; *Ruderman*, 117 So. 3d at 950-951.  Further, GEICO's business practices violate Florida law, create a bona fide controversy under the insurance policies and Section 627.7288, and should be enjoined.  Moreover, VIP and the Class can show redressability because a favorable decision would declare GEICO's conduct unlawful, enjoin it from continuing, and entitle VIP and the Class to their losses caused by GEICO's unlawful conduct in the form of unpaid insurance benefits.  VIP and the Class have the same interest in prohibiting GEICO from continuing to violate Florida law and its insurance policies, which deprive GEICO's insureds of insurance coverage to which they are entitled.  Further, VIP and the Class have suffered the same injury.

### 3. The Class is Adequately Defined and Clearly Ascertainable

Before certifying a class under Rule 23(b)(3), the Court must determine if the proposed class is "adequately defined" and "clearly ascertainable." *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012). "Clearly ascertainable" means that the proposed class definition "contains objective criteria that allow for class members to be identified in an administratively feasible way." *Karhu v. Vital Pharm., Inc.*, 621 Fed. Appx. 945, 946 (11th Cir. 2015).

VIP has adequately defined a clearly ascertainable class. The proposed Class includes windshield repair facilities that, since June 1, 2011, (1) were selected by a GEICO insured in Florida covered by a policy purporting to provide windshield insurance coverage without a deductible, (2) provided windshield repair and/or replacement services to the GEICO insured, (3) own an assignment of benefits from the GEICO insured, (4) submitted one or more bills to GEICO for payment, and (5) did not receive full payment from GEICO based on its "Prevailing Competitive Price Limit of Liability." Not only is this Class ascertainable, but GEICO has already identified all the Class members.

In making the Antonacci Declaration, GEICO used an electronic database to identify 16,980 windshield claims between June 1, 2011 and June 1, 2016 performed by windshield repair facilities that were not affiliated with Safelite. For each claim, the work was performed for a GEICO insured in Florida, the facility submitted an invoice to GEICO under an assignment of benefits, and GEICO paid less than the invoiced amount because it exceeded the "prevailing competitive price." *See* **Ex. 8** (Antonacci Declaration) at ¶ 9. Consistent with the Class definition, GEICO excluded claims in litigation. *See id.* Based on VIP's Class definition, GEICO compiled a list of every windshield claim at issue in this class action case between June 1, 2011 and June 1, 2016, and for each of them, GEICO can access (1) the claim number, (2) the invoice date, (3) the name and contact information of each facility, (4) the invoiced

amount, (5) the paid amount, and (6) the difference between those amounts. *See id*. at ¶ 4.

GEICO can also compile this same information for claims moving forward as they are made, so

that windshield claims after June 1, 2016 can also be ascertained. *See id*. at ¶ 10.  Therefore, the

Class is adequately defined and clearly ascertainable.

**4.      The Class Meets the Requirements of Rule 23(a)**

     **A.      Numerosity**

Numerosity requires only that joinder be "impracticable." Fed. R. Civ. P. 23(a)(1).  The

Court has discretion to make assumptions regarding numerosity, and it "is not necessary that the

precise number of class members be known." *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692,

696 (S.D. Fla. 2004) (*citing Evans v. U.S. Pipe & Foundry*, 696 F.2d 925, 930 (11th Cir. 1983)).

Here, based on GEICO's allegations and testimony, numerosity is met and Rule 23(a) is

satisfied. *See* Notice of Removal (Doc. 1) at ¶¶ 13-16; **Ex. 8** (Antonacci Declaration) at ¶¶ 9-10.

     **B.      Commonality**

Commonality is satisfied when "there are common questions of law or fact among the

members of the class."  Fed. R. Civ. P. 23(a)(2); *see also Piazza v. Ebsco Indus. Inc.*, 273 F.3d

1341, 1346 (11th Cir. 2001) (contrasting commonality, which deals with the characteristics of

the class as a whole, with typicality, which deals with the individual characteristics of the class

representative compared to the class members).

Because commonality "does not require complete identity of legal claims," *Johnson v.*

*Am. Credit Co. of Ga.*, 581 F.2d 526, 532 (5th Cir. 1978), a class may be certified even if the

class representative's claim arises in a factual context that varies somewhat from that of others,

*Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986) ("Rule 23 does not

require that all the questions of law and fact raised by the dispute be common. . . . The claims

actually litigated in the suit must simply be those fairly represented by the named plaintiffs.").

Indeed, the plaintiff is not required to present "carbon copy" claims because, as Rule 23(a)(2) and the case law make clear, the court must only find a single common issue. *See, e.g., Swanson v. Mid Am, Inc.*, 186 F.R.D. 665, 668 (M.D. Fla. 1999) (commonality established when the plaintiff and the class members "received the same collection letter"); *Agan*, 222 F.R.D. at 697 ("Commonality requires at least one issue common to all members of the class, but does not require that all factual and legal questions be common.").

In *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), the Supreme Court clarified that the "common contention" underpinning a finding of commonality "must be of such a nature that it is capable of class wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

VIP seeks declaratory relief, injunctive relief, and damages in three counts: (i) declaratory relief, (ii) injunctive relief, and (iii) insurance policy benefits. As Rule 23(a)(2) and the case law explicitly state, the Court need only find a *single* common issue. VIP's claims are based on GEICO's routine practice of underpaying Windshield Claims in violation of Florida law and its insurance policies, which prohibit imposing a deductible on insureds by construing its own ambiguously drafted prevailing competitive price provision in a manner to deny or limit coverage and leave its insureds responsible for paying the unpaid balance. In addition, the claims of VIP and the Class contemplate common questions of law and fact. *See* Complaint, ¶ 63(a)-(h), at pp. 16-17.

VIP's claims will turn on these and other common legal and factual issues, and common proof will apply to VIP and the Class members to establish GEICO's liability. These common issues "are central to the case and their centrality and commonality support the policy objectives behind class certification." *Buford v. H & R Block, Inc.*, 168 F.R.D. 340, 350 (S.D. Ga. 1996),

*aff'd sub nom.*, 117 F.3d 1433 (11th Cir. 1997). That is, if the Court determines that GEICO violated Florida law, VIP and the Class members will be entitled to, among other things, declaratory relief, injunctive relief, and damages. Because the Class have these factual and legal issues in common, VIP has demonstrated commonality. *See, e.g., Klewinowski v. MFP, Inc.*, No. 8:13-cv-1204-T-33TBM, 2013 WL 5177865 (M.D. Fla. Sept. 12, 2013) (Covington, J.) (commonality was satisfied because the plaintiff and the members of the class were each subject to the defendant's common course of conduct, the claims arose from the same pattern and practice, and the claims were based on the same legal theory).

## C.     Typicality

Typicality requires "a nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984); Fed. R. Civ. P. 23(a)(3). "A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Id.* "Typicality, however, does not require identical claims or defenses," and a "factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class." *Id.*; *see also Veal*, 236 F.R.D. at 577. Indeed, typicality may be satisfied despite some factual distinctions between the claims of the named plaintiffs and those of the proposed class members if there is a strong similarity of legal theories. *See, e.g., Baby Neal v. Casy*, 43 F.3d 48, 57-58 (3rd Cir. 1994). Any "atypicality" or conflict between the plaintiff's claims and those of the class "must be clear" and place the interests of the class "in significant jeopardy." *Walco Investments, Inc. v. Thenen*, 168 F.R.D. 315, 326 (S.D. Fla. 1996).

Here, for the 16,980 claims in the Antonacci Declaration (and the additional Windshield

Claims since then), VIP and the Class members are all windshield repair and replacement facilities, and none of them are "participants" in the Safelite Network of glass shops. Each performed windshield repair and replacement work on behalf of a GEICO insured in Florida, submitted an invoice to GEICO under an assignment of benefits, and had GEICO underpay the invoice pursuant to the "prevailing competitive price" provision in GEICO's policies. *See* **Ex. 8** (Antonacci Declaration) at ¶ 4. This underpayment to facilities that are independent of the Safelite Network is GEICO's uniform policy for handling Windshield Claims. *See* **Ex. 4** (Foskey Depo) at 194:23-195:1 (whether a windshield facility is a "participant" in the Safelite Network or chooses to be independent, "the payment is exactly the same"). This policy limits the amount of insurance coverage that GEICO's insureds are entitled to and makes GEICO's insureds responsible for paying the difference between the invoiced amount and the "prevailing competitive price" paid by GEICO, thereby imposing an unlawful *de facto* deductible on insureds. GEICO's conduct disregards its own insurance policies and Section 627.7288, both of which expressly prohibit deductibles on Windshield Claims.

Moreover, the claims of VIP and the Class members are not antagonistic in any way, and any argument by GEICO regarding any factual differences will not defeat typicality. *See, e.g., Pottinger v. City of Miami*, 720 F. Supp. 955, 958 (S.D. Fla. 1989) (granting class certification). Further, typicality is inherent in the Class definition, as evidenced by the data collected to prepare the Antonacci Declaration. Indeed, all the underpayments at issue arise from GEICO's unilateral and artificial determination of the "prevailing competitive price." Accordingly, the required proof is the same for the claims of the Class, and there is nothing atypical about VIP's claims compared to the claims of the Class members.

GEICO's bald and unsubstantiated affirmative defenses alleging fraudulent or otherwise

improper conduct by glass shops that have submitted invoices to GEICO cannot defeat certification either. *See* Answer (Doc. 51). GEICO has failed to produce any evidence. *See* **Exhibit 20** (GEICO's Response to Plaintiff's First Request for Production of Documents) at p. 22 (objecting to Request No. 23 as overbroad and unduly burdensome); **Ex. 4** (Foskey depo), pp. 15:15-28:7 (lack of knowledge; privilege objections). GEICO has only produced two complaints purporting to support its defenses. *See* **Exhibit 21** and **Exhibit 22**.[11] At this preliminary stage of the case and based on the tenuous connection between GEICO's defenses and VIP's class action allegations and the record, the Court must not allow unsupported defenses to defeat certification. *See, e.g., Johnson v. Steven Sims Subaru, Inc.,* No. 92 C 6355, 1993 WL 761231 (N.D. Ill. June 9, 1993) (defendants cannot erect a defense lacking arguable validity solely to create a specter that such defense will destroy typicality of class representative's claim).

Accordingly, because VIP and each Class member suffered the same injury in the same way, there is a "sufficient nexus" between their claims, and the facts and law concerning the claims of VIP and the Class members are sufficiently similar to satisfy the typicality requirement of Rule 23(a)(3). *See, e.g., Veal*, 236 F.R.D. at 578.

### D. Adequacy

Adequacy requires that class representatives have common interests with the non-representative members of the proposed class and that they will vigorously prosecute the interests of the class through qualified counsel. *Piazza*, 273 F.3d at 1346; Fed. R. Civ. P. 23(a)(4). Thus, the adequacy analysis involves two inquiries: "(1) whether any substantial

---

[11] Other than these complaints, GEICO's apparent reliance on these defenses but unwillingness to produce supporting records by claiming "privilege" should not be permitted as a matter of equity. With respect to the two complaints that GEICO produced, they are irrelevant to certification because the Class does not include claims involved in pending litigation against GEICO, and GEICO testified that the claims from the shops sued in those lawsuits were not included in the 16,980 claims in the Antonacci Declaration. *See* Complaint at ¶ 60; **Ex. 4** (Foskey depo), pp. 31:12-19.

conflicts of interest exist between the representatives and the class, and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co.*, 350 F.3d at 1189; *see also Veal*, 236 F.R.D. at 578.

VIP has filed a declaration in which its representative asserts that it is authorized and willing to serve as the class representative, he understands his duties and obligations, and is willing to fulfill them. *See* **Ex. 2** (Figueroa Declaration) at ¶ 5; *Veal*, 236 F.R.D. at 578-79. The attorney competence prong involves whether representatives' counsel are qualified, experienced, and generally able to conduct the proposed litigation. VIP's counsel have filed declarations asserting their experience and abilities in this type of class action litigation. *See* **Exhibits 23, 24, and 25** (attorneys' declarations). Accordingly, VIP has met the adequacy requirement of Rule 23(a)(4).

**5.      The Court Should Certify the Equitable Relief Claims Under Rule 23(b)(2)**

VIP seeks certification for its declaratory and injunctive relief claims in Counts I and II under Rule 23(b)(2). Certification under Rule 23(b)(2) is appropriate when the defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2) generally applies when (1) the class members must have been harmed in essentially the same way by the defendant's conduct, and (2) the common injury may be addressed by class-wide injunctive relief. *See Holmes*, 706 F.2d at 1155. Where these requirements are met, the interests of the members of the class are sufficiently cohesive that absent members will be adequately represented. *Id*. at 1155 n.8.

"The injuries remedied through Rule 23(b)(2) actions are really group, as opposed to individual, remedies." *Hammett*, 203 F.R.D. at 696 (citing *Holmes*, 706 F.2d at 1155, n.8); *see also DWFII Corp. v. State Farm Mut. Auto. Ins. Co.*, 469 F. App'x 762, 765 (11th Cir. 2012).

"The members of a (b)(2) class are generally bound together through 'preexisting or continuing legal relationships' or by some significant common trait such as race or gender." *Hammett*, 203 F.R.D. at 696 (quoting *Holmes*, 706 F.2d at 1155 n.8).

GEICO has a routine and continuing business practice of only paying what it considers the "prevailing competitive price," which is at best ambiguous and at worst deceptive. The GEICO Glass Pricing Agreements, based on GEICO's private and undisclosed contract with Safelite, arbitrarily sets those prices at 50% of the NAGS benchmark price. When a GEICO insured selects VIP or a Class member for windshield work, and the facility invoices GEICO for more than what Safelite Retail charges or what a "participant" facility in the Safelite Network of glass shops is required to invoice GEICO, GEICO underpays the claim and asserts that the invoice exceeds the "prevailing competitive price," *i.e.*, what GEICO would have been invoiced by a Safelite Network participant. Notably, nothing about GEICO's relationship with Safelite is identified in its insurance policies, and the policies do not require GEICO's insureds to have their windshield claims performed by Safelite. GEICO's practice imposes a *de facto* deductible on its insureds and deprives them of windshield insurance coverage that they are entitled to under Section 627.7288 and the terms of their own insurance policies. Moreover, this is not a "one time" event that has already stopped occurring. Because GEICO is one of largest insurers in Florida, VIP and the Class members are repeatedly underpaid by GEICO on an ongoing basis – every time they replace or repair a windshield for a customer insured by GEICO.

Because the parties' respective claims and defenses rise and fall based on the Court's interpretation and application of GEICO's insurance policies and Section 627.7288, the cohesiveness requirement is easily met: GEICO harmed VIP and the Class members in the same way, and the only way to stop GEICO from violating Florida law is to declare its conduct

unlawful and enjoin it from continuing to underpay Windshield Claims by relying on the unlawful and ambiguous "prevailing competitive price" provision in its policies.

Consequently, the pleadings, evidence, and reasonable inferences drawn from them are sufficient at this point to demonstrate, for certification purposes, that GEICO has acted or refused to act on grounds generally applicable to all Class members. *See Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 164 (2d Cir. 2001) (court may allow Rule 23(b)(2) certification where the positive weight or value of the injunctive or declaratory relief sought is predominant even though compensatory or punitive damages are also claimed), *cert. denied*, 535 U.S. 951 (2002), *abrogated on other grounds, see Oorah, Inc. v. Schick*, 552 Fed. Appx. 20 (2d Cir. 2014); *see also Ocean's 11 Bar & Grill, Inc. v. Indemnity Ins. Corp. of DC*, No. 11-61577-CIV, 2011 WL 3843931 (S.D. Fla. Aug. 26, 2011) (a declaratory relief action under Chapter 86, Florida Statutes, may proceed based on an unambiguous insurance policy).

Finally, if the Court agrees that certification under Rule 23(b)(2) is appropriate for VIP's declaratory and injunctive relief claims, but nonetheless finds that certification under Rule 23(b)(3) is not appropriate for VIP's damages claims (as discussed in § C(6), *infra*), then the Court should still certify an injunctive and declaratory relief class pursuant to Rule 23(b)(2). *See, e.g., AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, No. 8:15-cv-2543-T-26MAP, 2017 WL 2123467 (M.D. Fla. May 16, 2017) (Lazzara, J.). In addition, the Court can also certify a Rule 23(b)(2) Class under Rule 23(c)(4), which provides that an action may be "maintained as a class action with respect to particular issues." *See, e.g., Williams*, 568 F.3d at 1359 (permitting the district court, on remand, to certify hybrid class).

**6.      The Court Should Certify the Claim for Damages Under Rule 23(b)(3)**

VIP also seeks certification of its damages claim in Count III directed at the unpaid insurance policy benefits for Windshield Claims. *See Ruderman ex rel. Schwartz v. Washington*

*Nat'l Ins. Co.*, 263 F.R.D. 670 (S.D. Fla. 2010) (granting class certification under Rule 23(b)(2) and (b)(3) where plaintiffs sought injunctive relief and damages against an insurance company alleging insurance policy was ambiguous and, therefore, must be construed in favor of coverage); *Holmes*, 706 F.2d at 1158 n.10 (maintaining simultaneous Rule 23(b)(2) and (b)(3) suits is permitted if the case "can be fairly and effectively managed"); *Mohawk Industries*, 568 F.3d at 1359-60; *Robinson*, 267 F.3d at 164; *Klewinowski*, 2013 WL 5177865 (certifying claims under Rule 23(b)(1)(A) and Rule 23(b)(3)).

Rule 23(b)(3) requires (a) predominance, *i.e.*, common questions of law and fact predominate over "any questions affecting only individual class members," and (b) superiority, *i.e.*, "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

### A. Common questions predominate.

"Common issues of fact and law predominate if they 'have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.'" *Klay v. Humana, Inc.*, 382 F.3d 1241, 1254 (11th Cir. 2004); *see also Moore v. Painewebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002) (common issues predominate "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof"). "Under Rule 23(b)(3) it is not necessary that all questions of law or fact be common, but only that some questions are common and that they predominate over the individual questions." *Klay*, 382 F.3d at 1255; *see also In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) (the rule "calls only for predominance, not exclusivity, of common questions").

The predominance inquiry looks at the evidentiary effect of adding plaintiffs to the Class. If adding more plaintiffs requires "significant amounts of new evidence," this suggests that individual issues are important, and if adding more plaintiffs leaves the evidence needed to prove the claims "relatively undisturbed," common issues likely predominate. *Klay*, 382 F.3d at 1255.

Notably, "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ("If the only issue is to determine the amount of damages which class members are entitled to receive and this determination can be accomplished almost mechanically, simple proofs similar to those used for summary judgment are often appropriate . . . especially when individual claims are small or relatively modest . . . ."); *see also In County of Monroe, Florida v. Priceline.com, Inc.*, 265 F.R.D. 659, 671 (S.D. Fla. 2010) (common questions predominate when "the defendant's conduct is the same as to all members of the putative class").

GEICO's uniform course of conduct directed at VIP and the Class is the same, *i.e.*, GEICO underpays the invoices submitted by the Class members by relying on the ambiguous provisions of its insurance policies that GEICO's liability is limited to the "prevailing competitive price" which, notably, is unilaterally and arbitrarily determined based on GEICO's confidential and undisclosed agreement with Safelite and applied to the Class members.

Importantly for predominance purposes, for every Windshield Claim at issue, the same pattern presents: the facility, which is not a "participant" in the Safelite Network, performed work for a GEICO insured under an assignment of benefits, invoiced GEICO, and GEICO underpaid the invoices consistent with the GEICO Glass Pricing Agreements stating that GEICO will only pay 50% of the NAGS rate. As GEICO stated, for the 16,980 claims described in the

Antonacci Declaration, GEICO underpaid these invoices because they exceeded the "prevailing competitive price." Clearly, this methodology of underpaying invoices that exceed 50% of the NAGS rate is embedded into GEICO's process of handling Windshield Claims from non-Safelite facilities. Put another way, the common issue addressing GEICO's underpayments based on the "prevailing competitive price" limitation in its insurance policies predominates because it directly impacts every Class member's effort to establish liability against GEICO. That is, an adjudication that GEICO's underpayments are unlawful under Section 627.7288, violate the terms of its insurance policies, are an unlawful deprivation of insurance coverage, and/or constitute a *de facto* deductible would involve the evaluation of generalized proof and, if GEICO were found liable, would entitle the Class to relief based on VIP's claims for insurance policy benefits under Count III. As VIP argued above, GEICO's course of conduct gives rise to numerous common questions of law and fact. *See supra* at § C(4)(B) ("Commonality"). Not only do these common questions, when answered, directly impact each Class members' claims for liability and damages, but also based on the Antonacci Declaration, conclusively determining the amounts of the damages claims only requires simple proof and can be calculated mechanically using the information GEICO has ready access to. *See* **Ex. 8** (Antonacci Declaration) at ¶ 9 (calculating the total amount of the Class members' damages); *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1252 (11th Cir. 2003) (plaintiff is entitled to restitution for any consideration paid in connection with an illegal contract); *Klewinowski*, 2013 WL 5177865 at *4 (because plaintiff and all of the members of the class were the subject of the same collection activity from the defendant and received substantially similar standardized collection letters, common questions predominate). Indeed, the monetary relief Plaintiff seeks is "incidental to the requested injunctive or declaratory relief." *Murray v. Auslander*, 244 F.3d 807, 812 (11th

Cir. 2011). That is, the declaratory and injunctive relief claims are necessary to stop GEICO's ongoing unlawful conduct from continuing into the future, but the damages only address the unlawful conduct that GEICO has already perpetrated.

**B.     A class action is superior to other available methods.**

Under Rule 23(b)(3), "the more common issues predominate over individual issues, the more desirable a class action" is to resolve the claims. *See Klay*, 382 F.3d at 1269. If "issues common to all class members predominate over individual issues, then a class action will likely be more manageable than and superior to individual actions." *Williams*, 568 F.3d at 1358.

The superiority inquiry is a "comparative analysis between judicial remedies and does not contemplate the possibility that no action at all might be superior to a class action in a given case." *Brown v. Cameron-Brown*, 92 F.R.D. 32, 49 (E.D. Va. 1981). Thus, a class action is obviously superior to the alternative that would leave the class without any redress. *Lai v. Anthony*, No. 88-00565MP, 1991 WL 208443, *8 (D. Haw. July 5, 1991).

Superiority is based on four factors: (a) the class members' interests in individually controlling the prosecution of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

Both the general principles relevant to superiority and the four specific factors establish that there is superiority here. Because this case potentially will involve relatively small individual claims compared to the cost of litigating alleged statutory and contract violations, interest in individual control of separate actions is negligible. *See* Fed. R. Civ. P. 23(b)(3)(A). In addition, GEICO has not identified and VIP is not aware of any other similar class actions

against GEICO in Florida, so there is no threat of inconsistent adjudications. *See* Fed. R. Civ. P. 23(b)(3)(B). To the contrary, if a class is not certified, the only recourse available to the class members is to continue to litigate the individual claims in the county courts across Florida, with the inherent risk of conflicting decisions and outcomes.

With respect to Rule 23(b)(3)(C), "there are typically three main reasons why it is desirable to litigate multiple parties' claims in a single forum": (1) class actions offer substantial economies of time, effort, and expense for the litigants and the Court; (2) class actions often involve an aggregation of small individual claims, where a large number of claims are required to make it economical to bring suit; and (3) it is desirable to concentrate claims in a particular forum when that forum has already handled several preliminary matters. *Klay*, 382 F.3d at 1270.

Litigating this action in one forum will allow the parties and the Court, because of the number of potential claimants, to conserve resources, prevent duplication of effort, provide for efficient resolution, and prevent inconsistent results. Moreover, the Court will likely resolve several dispositive issues relevant to certification issues, such as whether GEICO's reliance on the "prevailing competitive price" provision of its insurance policies results in an unlawful *de facto* deductible under Section 627.7288 and the insurance policy, and/or whether that provision is ambiguous and must be construed against GEICO. Further, if the Court does not certify the Class and resolve these issues regarding GEICO's conduct, then VIP and the Class members will be required to continue to litigate these issues piecemeal throughout Florida, which would waste judicial resources and not deter or stop GEICO's conduct. *See American Pipe & Constr., Co. v. Utah*, 414 U.S. 538, 550 (1974). Indeed, so far, hundreds of lawsuits have not deterred or stopped GEICO.

Finally, while some manageability issues are inherent in any class action, this action largely addresses issues of fact and law common to all Class members and will employ class-wide proof of most, if not all, elements of VIP's claims. In addition, based on the data that GEICO and Safelite regularly gather, damages calculations can be made mechanically without the need for individual proof. *See* **Ex. 8** (Antonacci Declaration) at ¶ 9; *Murray*, 244 F.3d at 812. Therefore, there are no manageability problems that would preclude class certification, and neither the size of the Class, nor the possibility of individual damages determinations, are unusually large or unmanageable. Further, there are potentially thousands of Class members that would not likely pursue individual lawsuits, and the amount in controversy for each individual potential class member is minimal compared to the vast amount of litigation costs, attorneys' fees, and judicial resources required to prosecute the individual claims. *See Williams v. Wells Fargo Bank, N.A.*, No. 1:11-CIV-21233-SCOLA, 2012 WL 566067, *9 (S.D. Fla. Feb. 21, 2012).

## D.     CONCLUSION

VIP requests that (1) the Court certify Counts I and II under Rule 23(b)(2) and certify Count III under Rule 23(b)(3), (2) VIP be designated Class representative, (3) VIP's counsel be designated as Class counsel, and (4) reasonable and adequate notice be provided to the Class at GEICO's expense under Rule 23(c).

Respectfully submitted,

/s/ *J. Daniel Clark*
J. Daniel Clark, FBN 0106471
dclark@clarkmartino.com
Christina Ramirez (Of Counsel), FBN 0954497
Ramirez.nina@gmail.com
**CLARK ♦ MARTINO, P.A.**
3407 W. Kennedy Blvd.
Tampa, Florida  33609
Telephone: (813) 879-0700
Facsimile: (813) 879-5498

David M. Caldevilla, FBN 654248
dcaldevilla@dgfirm.com
Donald C. P. Greiwe, FBN 118238
dgreiwe@dgfirm.com
**de la PARTE & GILBERT, P.A.**
P.O. Box 2350
Tampa, FL  33601-2350
Telephone: (813) 229-2775
Facsimile: (813) 229-2712

Matthew A. Crist, FBN 0035539
cristm@cristlegal.com
**CRIST LEGAL | PA**
400 North Ashley Drive, Suite 2540
Tampa, Florida 33602
Telephone: (813) 575-5200
Facsimile: (813) 575-2520

**Attorneys For Plaintiff**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** on May 19, 2016, I electronically filed the foregoing with the Clerk of Court by using this Court's CM/ECF system that will send a notice of electronic filing to all counsel of record.

/s/ *J. Daniel Clark*
J. Daniel Clark