1             UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
2                TAMPA DIVISION

3  VIP AUTO GLASS, INC.,
    individually, as assignee, and
4  on behalf of all those
    similarly situated,
5
        Plaintiff,            Case No.:
6                      8:16-cv-02012-T-35JSS
    vs.
7
    GEICO GENERAL INSURANCE COMPANY,
8
        Defendant.
9  _____/

10

11  **VIDEOTAPED DEPOSITION OF GEICO GENERAL INSURANCE**
     **COMPANY, by and through its designated corporate**
12       **representative, RONNIE LEE FOSKEY, JR.**

13         Taken on behalf of the Plaintiff

14

15  DATE:         November 15, 2016

16  TIME:         10:04 a.m. - 4:52 p.m.

17  PLACE:        Smith, Gambrell & Russell, LLP
                  50 North Laura Street, Suite 2600
18            Jacksonville, Florida 32202

19

        Examination of the witness taken before
20  Helen A. Anderson, Registered Professional Reporter
          Florida Professional Reporter
21         Certified LiveNote Reporter

22

        Anderson Reporting Services, Inc.
23       10 South Newnan Street, Suite 1
         Jacksonville, Florida 32202
24       Andersonreporting@yahoo.com

25             - - -

1                    A P P E A R A N C E S

2

3   APPEARANCES FOR PLAINTIFF (by videoconference)

4             J. DANIEL CLARK, Esquire
              MATTHEW A. CRIST, Esquire
5               Clark Martino, P.A.
              3407 West Kennedy Boulevard
6               Tampa, Florida  33609

7            DAVID M. CALDEVILLA, Esquire
              de la Parte & Gilbert, P.A.
8               Post Office Box 2350
              Tampa, Florida  33601-2350
9

10  APPEARANCES FOR DEFENDANT (in person)

11           LINDSEY R. TROWELL, Esquire
              EDWARD K. COTTRELL, Esquire
12        Smith, Gambrell & Russell, LLP
          50 North Laura Street, Suite 2800
13          Jacksonville, Florida  32202

14

15                   ALSO PRESENT

16           DAN BISHOP, Videographer

17

18                   -  -  -

19

20

21

22

23

24

25

1                    I N D E X

2   WITNESS:                    DIRECT CROSS REDIRECT RECROSS

3   RONNIE LEE FOSKEY, JR.

4       (By Mr. Clark)              6

5

6


7                 PLAINTIFF'S EXHIBITS

8   NO.   DESCRIPTION                              PAGE

9   1     Second Amended Notice of Taking            6
          Videotaped Deposition Duces Tecum via
10        Video-Teleconference

11  2     Class Action Complaint and Demand for     13
          Jury Trial
12
    3     Defendant GEICO General Insurance         13
13        Company's Answer and Affirmative
          Defenses
14
    4     Defendant GEICO General Insurance         28
15        Company's Notice of Pendency of Other
          Actions
16
    5     Declaration of David Antonacci            28
17
    6     Defendant GEICO General Insurance         36
18        Company's Rule 26 Initial Disclosures

19  7     Defendant GEICO General Insurance         36
          Company's Responses to Plaintiff's
20        First Set of Interrogatories

21  8     Defendant GEICO General Insurance         36
          Company's Response to Plaintiff's First
22        Request for Production of Documents

23  9     Defendant GEICO General Insurance         36
          Company's Responses to Plaintiff's
24        Second Set of Interrogatories

25

1

PLAINTIFF'S EXHIBITS (CONTINUED)

2 NO. DESCRIPTION PAGE

3 10 Defendant GEICO General Insurance 36
Company's Response to Plaintiff's
4 Second Request for Production of
Documents
5
11 Defendant GEICO General Insurance 36
6 Company's Response to Plaintiff's Third
Request for Production of Documents
7
12 Declarations Page, Policy 102
8 No. 4130-92-18-04, coverage period
11/21/15 through 5/21/16
9
13 Florida Family Automobile Insurance 102
10 Policy

11 14 Document Bates-labeled GG/VIP000057 106

12 15 Document Bates-labeled GG/VIP000056 106

13 16 SGC Network Invoice Detail, Referral 106
date 2/10/16
14
17 SGC Network search results 106
15
18 Safelite Solutions referral number 106
16 299898

17 19 Documents Bates-labeled GG/VIP000059 106
through GG/VIP000062
18
20 Document Bates-labeled GG/VIP000058 106
19
21 Document Bates-labeled GG/VIP000063 106
20
22 Documents Bates-labeled GG/VIP000108 106
21 through GG/VIP000114

22 23 Document titled "GEICO Policies" 130

23 24 Florida Family Automobile Insurance 162
Policy, Bates-labeled GG/VIP000065
24 through GG/VIP000081

25

1              PLAINTIFF'S EXHIBITS (CONTINUED)

2       NO.    DESCRIPTION                                    PAGE

3       25     Florida Family Automobile Insurance            162
               Policy, Bates-labeled GG/VIP000082
4              through GG/VIP000100

5       26     GEICO glass pricing agreement dated            162
               9/11/08
6
        27     Documents Bates-labeled GG/VIP000115           184
7              through GG/VIP000122

8       28     Excerpt from Florida statutes,                 197
               Chapter 627
9
        29     Case Law on GEICO Policy                       197
10
        30     Affidavit of Steven Blome in Support of        196
11             GEICO's Motion for Summary Judgment

12

13

14                  DEFENDANT'S EXHIBITS

15                    (No exhibits)

16

17

18

19

20

21

22

23

24

25

1          THE VIDEOGRAPHER:  We're on the video

2      record November 15th, year 2016.  The time is

3      approximately 10:04 a.m.

4              RONNIE LEE FOSKEY, JR.,

5  having been produced and first duly sworn as a

6  witness, and after having responded "I do" to the

7  oath, testified as follows:

8              DIRECT EXAMINATION

9  BY MR. CLARK:

10      Q    Sir, can you state your full name for the

11  record?

12      A    My name is Ronnie Lee Foskey, Jr.

13      Q    Mr. Foskey, I'm Dan Clark, as I

14  introduced myself before we came on the record.

15          My understanding is you're appearing

16  today on behalf of GEICO pursuant to a notice of

17  taking deposition that I served laying out certain

18  areas of questioning.  Am I correct?

19      A    Yes, sir.

20      MR. CLARK:  Madam Court Reporter, if you

21      would hand the witness Exhibit No. 1.

22          (The document last-above referred to was

23      marked for identification prior to the

24      deposition as Plaintiff's Exhibit No. 1.)

25  BY MR. CLARK:

1     Q     Sir, you should have in front of you what

2  has been premarked as Exhibit No. 1 to your

3  deposition today.  It should be styled as a second

4  amended notice of taking videotaped deposition duces

5  tecum via video-teleconferencing.  Did I get it

6  right?

7     A     Yes, sir.

8     Q     Great.

9           Do you recognize this document?

10    A     Yes, sir.

11    Q     If you would turn to Page 4 of that

12 document, those numbered paragraphs from Page 4 all

13 the way through Page 8 lay out a total of 48

14 specific areas of inquiry today.  Are you aware of

15 those areas?

16    A     I've reviewed the areas on the document,

17 yes, sir.

18    Q     Okay.  And we'll get into a little bit

19 about certain areas as it comes to more specific

20 questioning.  I wanted to just be sure that you had

21 seen it before, had gone over it.

22          Tell me about your preparation.  I know

23 that you've been deposed a number of times as the

24 GEICO corporate representative.  I know you're

25 familiar with the question-and-answer process.  I'm

1  pretty sure you're aware of the objection process,

2  that is, your lawyers objecting to certain

3  questions.  I'm sure they've instructed you as to

4  what you should do during the questioning.

5        When I ask you certain questions today, I

6  do not want to know about attorney-client privileged

7  communications; that is, I will ask you what you did

8  in preparation generally, but I don't want to know

9  and I'm not asking you to tell me what you talked

10 about with your lawyers.  Is that clear?

11       A    Yes, sir.

12       Q    Okay.  Now, in preparation for your

13 deposition today, can you tell me what you did?

14 Meetings?  Discussions?  I don't want to know the

15 topics and what was discussed, but did you talk to

16 your lawyers, when you talked to them, how many

17 times, and when you had a meeting.  So let's start

18 there.

19       A    Sure.  Are you referring to in

20 preparation just for this deposition or all of my

21 depositions?

22       Q    Yes, sir.  No, just this deposition.  No,

23 that would be --

24       A    Yeah.  We were going to have to revisit

25 the food thing.

1          For this deposition, I did review the

2     claim itself.  I reviewed the documents that I

3     believe that we gave you for this deposition.  I met

4     with my attorneys last week, and I also met with my

5     attorneys yesterday in preparation.

6          Q    In the documents you reviewed, one of the

7     things that I had produced to me just last night was

8     two particular policies, one from 2015 and 2016, if

9     my -- if I am assuming certain things.

10         Those two big stacks right there are

11    those particular policies; am I correct?

12         A    These stacks?

13         Q    Yes.

14         MR. CLARK:  I would suspect that that's

15         those, E.K.; is that correct?

16         MR. COTTRELL:  Yes, that's correct.

17    BY MR. CLARK:

18         Q    I don't want to look at them.  You don't

19    need to dig through it again.  I just wanted to make

20    sure that you got those.

21         A    Yes.

22         Q    Did you review those policies as well?

23         A    Yes, sir.

24         Q    Those are policies -- what would you

25    describe those as?  Policies and training manuals,

1    or is there some other typical catch phrase?

2        A    We would just call it -- I mean, we would

3    just it call training manuals.  I don't know that we

4    would call those policies.

5        Q    And, again, you had a chance to look

6    through those as well?

7        A    Yes, sir.

8        Q    Okay.  One of the things that I also

9    asked and was part of not only the production duces

10   tecum -- that's the special word that they use to

11   describe the request for actual document production

12   in the notice of taking deposition, not to be

13   confused -- and also part of the topics to be

14   discussed today was -- and you can look at it in the

15   notice, Paragraphs 6 and 7.

16        Take a minute and read, on Page 4,

17   Page 4, Paragraph No. 6 and Paragraph No. 7.  Just

18   let me know when you're done reviewing those.

19        A    Okay.  (Examining document.)

20        Okay.

21        Q    Are you prepared to testify on those

22   topics today?

23        A    Yes, sir.

24        Q    In preparing for your deposition and

25   talking about the things that you were to review,

1    you mentioned some documents produced by GEICO.  We

2    talked about the 2015/2016 training manual.  Did you

3    happen to review any documents that would be

4    referred to or considered within either of those

5    numbered paragraphs, 6 or 7?

6         MR. TROWELL:  And just to be clear, Dan,

7         all the documents that have been produced in

8         this case have been produced up to date and

9         Mr. Foskey doesn't have anything additional to

10        provide today pursuant to the duces tecum.

11        MR. CLARK:  I understand.  This goes

12        beyond just what was produced, if he would have

13        reviewed anything outside of what was produced.

14        I was getting to the first topic.

15   BY MR. CLARK:

16        Q    I understand what you said that you

17   reviewed.  I get it.  I'm asking to the extent that

18   you reviewed anything else that has not been

19   produced that would fall into the general discussion

20   in Paragraphs 6 and 7 on Page 4.

21        A    I mean, as it pertains to this claim, I

22   do not believe so, no, sir.

23        Q    Now, my understanding is that you began

24   working at GEICO September 2015.  Is that correct?

25        A    No, sir, that's not correct.

1     Q    That must have been one of your position

2    changes, in September.

3     A    It was.

4     Q    When did you actually start working --

5    start working for GEICO?

6     A    August 2003.

7     Q    And then in September of 2015 you became

8    the centralized service project manager; is that

9    correct?

10     A    Billing and compliance manager.  That's

11    it.

12     Q    And that general description covers

13    windshield repairs?

14     A    Define what you mean by "covers."

15     Q    Well, your management of bills and the

16    process would also entail managing payment of

17    windshield repair claims?

18     A    That's correct, yes, sir.

19     Q    Okay.  So your title doesn't have

20    "windshield" in it or "auto glass" or anything like

21    that that would give somebody the clue that, "Hey,

22    this guy does manage that."  That's the point.

23     A    That's correct, yes, sir.

24     Q    Okay.  Is there a reason for that, they

25    just call it centralized service project manager?

1      A    Well, centralized services encompasses

2    emergency road service and glass. So my job as the

3    billing and compliance manager was in charge of the

4    bills for both. So that's kind of the short

5    version.

6        The actual -- my actual title was

7    centralized services emergency road service and

8    glass billing and compliance manager, but they said

9    that cost too much money for a business card, so

10   they lowered it to -- they lowered it to just

11   centralized services billing and compliance manager.

12   So that's why they did --

13      Q    Understood.

14      A    That's why they did it that way.

15      Q    Understood.

16      MR. CLARK: Madam Court Reporter, could

17    you provide the witness with Exhibit 2 and

18    Exhibit 3.

19      (The documents last-above referred to

20    were marked for identification prior to the

21    deposition as Plaintiff's Exhibits No. 2 and

22    3.)

23   BY MR. CLARK:

24      Q    You should have in front of you now

25   Exhibit 2, which is the pending class action

1    complaint, and Exhibit 3, which is the answer and

2    affirmative defenses.  Am I correct?

3        A    Yes, sir, you are.

4        Q    And have you had an opportunity to review

5    these documents before today?

6        A    (Examining documents.)

7             I'm not sure if I've reviewed these or

8    not.

9        Q    Okay.  This is -- do you recognize the

10   class action complaint?

11       A    I do recognize it, yes, sir.

12       Q    Okay.  So while you've probably generally

13   picked up, given your experience in handling

14   depositions and litigation and appearing in court,

15   you understand there's a complaint that makes

16   certain allegations against GEICO; correct?

17       A    Yes, sir.

18       Q    And you're telling me that you have not

19   reviewed those allegations?

20       A    I've not reviewed this document, no, sir.

21       Q    Okay.  And now the answer and affirmative

22   defenses of GEICO, Exhibit 3, my questions are the

23   same.  Have you reviewed that document, the

24   allegations and more specifically the defenses

25   raised by GEICO in this case?

1    A    (Examining document.)

2         Yes, sir, I have.

3    Q    What do you understand this class action

4    lawsuit to be about?

5         MR. TROWELL:  Object to the form.

6         THE WITNESS:  It's my understanding that

7         the shop, VIP Auto Glass, was paid the price

8         that GEICO can secure, which is the prevailing

9         competitive price, and VIP disagrees with that,

10        so a lawsuit was filed.  And just from my

11        understanding from class actions, my

12        understanding is that that would encompass many

13        cases into one, is what I believe.

14   BY MR. CLARK:

15        Q    Now, you indicated that you had reviewed

16   the answer and affirmative defenses.  Can you turn

17   to Page 9 of the defenses?

18        A    (Examining document.)

19             I'm there.

20        Q    Okay.  On Page 9, can you review, under

21   "Affirmative Defenses," Paragraph 2?

22        A    (Examining document.)

23             Okay.

24        Q    Do you know what that's -- do you have an

25   understanding of what that's saying?

1      A      Yes, sir.

2      Q      Could you tell me for the record what

3   your understanding is?

4      A      We have found -- through investigation of

5   our claims, we have found some fraud.  So when it

6   comes to the assignment of benefits, we have found

7   that some companies are transposing policyholder

8   signatures onto assignment of benefits.  So we're

9   going back now and reviewing all of our claims to

10  make sure that we don't have fraud on our claims on

11  a case-by-case basis.

12     Q      Who is in charge of that review?

13     A      Define what you mean by "in charge."  Are

14  you asking -- I mean, we have -- we have an SIU

15  department.  There's many -- there's many

16  departments involved in it.  But if you were to ask

17  me who was in charge of it all together, it would be

18  our VP, Lona Montgomery.

19     Q      You said your VP -- can you say that name

20  again?

21     A      Lona Montgomery.

22     Q      Do you know the status of that review as

23  you just described?

24            MR. TROWELL:  Object to the extent that

25            calls for disclosure of privileged information.

1          It's an ongoing investigation.

2    BY MR. CLARK:

3          Q    Do you know the status of it?

4          A    It's on- --

5          MR. CLARK:  You can either instruct --

6    BY MR. CLARK:

7          Q    Go ahead.

8          A    It's ongoing.

9          Q    When did it start?

10         MR. TROWELL:  Again, I object to the

11    extent that that calls for privileged

12    information.  Ongoing investigation.

13         MR. CLARK:  You either -- I appreciate

14    your objection.  You have to instruct him not

15    to answer.

16         MR. TROWELL:  Okay.  I'll instruct the

17    witness not to answer.

18    BY MR. CLARK:

19         Q    Do you know when it started?  That's a

20    "yes" or "no," and then we'll deal with whether we

21    need to go to the Court to find out anything more.

22    Do you know when it started?

23         A    I do not know the exact date, no, sir.

24         Q    Do you know what the current results have

25    been to date?

1          MR. TROWELL:  Again, same objection.

2          MR. CLARK:  I understand.  But I'm

3      asking, "Do you know," just so we don't have an

4      issue over, well, he had the knowledge and

5      therefore -- but if he says, "I don't know" --

6          MR. TROWELL:  Other than what --

7          MR. CLARK:  -- then we at least have a

8      record.

9          MR. TROWELL:  Yeah.

10         I'll instruct him not to answer, because

11     other than what we've stated in Paragraph 2 of

12     the affirmative defenses, that's the portion

13     that we're relying on in the investigation.  So

14     he's stated that for the record already.

15 BY MR. CLARK:

16     Q    Do you know the results of this review?

17 Yes or no?

18     A    You're going to have to define what you

19 mean by "results."  If you're asking me have we

20 found fraud, yes.

21     Q    Okay.  How do you -- do you know the

22 particular names of glass shops who have been

23 identified?

24         MR. TROWELL:  Again, I object to the

25     extent this calls for confidential and

1          privileged information.  It's an ongoing

2          investigation.  And I instruct the witness not

3          to answer.

4               MR. CLARK:  So I can't find out whether

5          this witness has been able to and can today

6          identify glass shops who have come up in the

7          fraud investigation with just a "yes" or "no"?

8               MR. TROWELL:  Can you answer that

9          question?

10              THE WITNESS:  No.

11    BY MR. CLARK:

12         Q    No, you do not know the names of the

13    glass shops --

14         A    I do not know --

15         Q    -- is that correct?

16         A    I do not know the names of all the glass

17    shops, no, sir.

18         Q    Who would know that?

19         A    It would be the people involved in the

20    full investigation, which would be SIU and Lona

21    Montgomery.

22              MR. CLARK:  Okay.  Well, since you've

23         raised it, Counsel, and I have asked to cover

24         that topic today, number one; number two,

25         you're raising it as a defense.  I've asked for

1    documents that support the defense, none of

2    which have been provided to me today, either a

3    witness to the topic or the documents that

4    support your defenses.  You raised it, number

5    one.

6        Two, we signed a confidentiality

7    agreement.  You can declare any portion of this

8    deposition confidential and you can mark any

9    documents confidential.

10       I specifically asked for the witness to

11   talk about the defenses, and if we're going to

12   basically just hear the witness generally

13   describe things, like "Yes, we know that

14   there's an investigation going on but we can't

15   disclose what that investigation is," how am I

16   supposed to perform any discovery on Defense

17   Paragraph No. 2?

18       MR. TROWELL:  Well, first, I believe he

19   has testified that he is aware of the

20   affirmative defense set forth in No. 2.  I

21   think he indicated on the record that, yes, we

22   have discovered the information obtained in

23   No. 2.  And he's further testified that, no,

24   he's not aware of the specific glass facilities

25   that that covers.

1          I think we're all aware of the two RICO

2     complaints, so at the very minimum we're aware

3     of those two glass facilities.  So --

4          MR. CLARK:  Are you going to provide me

5     some type of supplement to your production to

6     date that identifies the particular glass shops

7     that have been identified as committing what

8     you allege in 2?

9          MR. TROWELL:  We don't have any intention

10     to do that at this time, no.

11  BY MR. CLARK:

12     Q    Sir, on a further question, what steps is

13  GEICO taking today to identify the glass shops that

14  have been found to have committed this fraud within

15  its payment process?

16          What I mean by that, I assume if you've

17  got an ABC Glass Shop, and I'm making that name up,

18  your investigation identifies this ABC Glass Shop as

19  one that is doing what you allege in No. 2, what is

20  GEICO doing to address that within its claim

21  process?

22     A    Sure.

23          So we've made some changes to some of our

24  processes.  For example, if a -- if we receive an

25  invoice from a shop, which is what we -- before they

1    call in the first notice of loss, which would be

2    very -- a very unique claim.  It's called a skeleton

3    claim.  We used to pay those as long as we had an

4    assignment of benefits, but in -- but now, because

5    of some of the fraud we've uncovered, we actually

6    call the policyholder in these unique claims to make

7    sure that the loss details that were reported via

8    the invoice are correct.  And we will only make

9    payment on these unique claims once we have that

10   information from the policyholder.

11           So that's been one of the major things

12   that we did change.

13       Q    Do you know if VIP has been identified as

14   one of the shops that is alleged to have committed

15   some of the things that are alleged in No. 2 here?

16       A    I do not know that, no, sir.

17       Q    Who would know that?

18       A    It would be SIU and Lona Montgomery.

19       Q    In performing your review in preparation

20   today, did you go back and look at the information

21   held within GEICO's database on VIP?

22       A    No, sir.

23       Q    Are particular shops that have been

24   identified as superimposing the signature as alleged

25   in Affirmative Defense No. 2 flagged in GEICO's

1    system at all?

2            MR. TROWELL:  Object to the form.

3            If you know.

4    BY MR. CLARK:

5        Q    Going back to my example, let me see if I

6    can clarify it a little bit.  The ABC Glass Shop

7    that gets identified as this, are they flagged in

8    some way, shape or form within your database --

9        A    We do --

10       Q    -- your database being GEICO's?

11       A    We do have the ability to -- I wouldn't

12   say "flag" shops.  We do have the ability to run

13   reports every day on incoming claims from particular

14   shops.  But I'm not sure we have a way to physically

15   flag a shop.

16       Q    I'm going to ask you the same similar

17   questions for Defense No. 3.  Could you read

18   Affirmative Defense No. 3 that's found on Pages 9

19   and 10 of Exhibit 3?

20       A    (Examining document.)

21            I'm done, Mr. Dan.

22       Q    What is your understanding of this

23   allegation?

24       A    We have shops who were sending in

25   invoices stating they did the work; however, they

1   were outsourcing the work to other shops.  But they

2   were signing assignment of benefits stating that

3   they are the shop that actually did the work.

4        Q    Is it your opinion -- is it your position

5   on behalf of GEICO that a company -- again, I'll use

6   my example, ABC Glass Shop -- can't hire an

7   independent contractor to do work?  Is that what

8   you're saying?

9        MR. TROWELL:  I'm going to object to the

10       extent it calls for a legal conclusion.

11       You can answer if you --

12       THE WITNESS:  I mean, it's my

13   understanding -- I could be wrong, but it's my

14   understanding the assignment of benefits would

15       have to go to that other shop.

16       I mean, it's my understanding --

17  BY MR. CLARK:

18       Q    Do you --

19       A    It's my understanding, Mr. Dan, that you

20  can use a billing company to do your billing.

21  However, as the billing company, you can't represent

22  that you're the one who did the work, which is what

23  was happening in these claims.

24       Q    Now, what steps has GEICO taken to

25  identify those particular bills and those particular

1    shops?

2         A    The same steps as the previous one.  What

3    will happen is, we have to make out calls to the

4    policyholder to verify who actually did the work.

5         Q    And is GEICO currently doing that on old

6    claims?

7         A    That's correct, yes, sir.

8         Q    And again, you don't know the status of

9    that, what the review has been, when it started, all

10   those questions I asked you earlier?

11        A    I know the status.  The status is

12   ongoing.

13        Q    But as to when the investigation or

14   review started, what the results have been, you

15   don't know?

16        A    I don't know the exact date it started,

17   but as far as results, I mean, as Mr. Lindsey

18   stated, I mean, I know we have two RICO cases that

19   we filed.

20        Q    And again, the same question regarding

21   VIP, the plaintiff named in this particular class

22   action lawsuit:  Do you know whether VIP has been

23   identified as doing what has been alleged in No. 3

24   here in your affirmative defenses?

25        A    I do not know that, no, sir.

1      Q    Page 10, sir, Paragraph 4.

2      A    (Examining document. )

3          Okay.

4      Q    Paragraph 4. You had the opportunity to

5 review Paragraph 4 on Page 10 of the answer to

6 affirmative defenses?

7      A    Yes, sir.

8      Q    What is your understanding of this

9 allegation?

10     A    It's my understanding that this is where

11 they are submitting claims to us to be paid without

12 us having any prior knowledge of the claim or

13 calling us to see if the insured has coverage.

14     Q    Isn't that the same as a skeleton claim?

15     A    Yes, sir, which is very unique and not

16 normal claims practice.

17     Q    So Paragraph 4 or the fourth affirmative

18 defense is similar in nature to Affirmative Defense

19 No. 2; correct?

20     A    It's similar, yes, sir.

21     Q    And the same answers that you gave to

22 those questions about going back and reviewing

23 claims, calling insureds, that sort of thing, that

24 is currently being done as well for this particular

25 allegation in Paragraph 4?

1     A     Yes, sir.

2     Q     And the status is ongoing?

3     A     Yes, sir.

4     Q     And you don't know the actual results of

5     that investigation or the names of the glass shops

6     that have been identified; correct?

7     A     Other than the RICO, no, sir.

8     Q     And VIP, you don't know if they've been

9     identified as one of the glass shops alleged to have

10    committed what's put forth here in Paragraph 4;

11    correct?

12    A     I don't know if they've been identified

13    as that, no, sir.

14    Q     For any of these defenses -- so do you

15    know how many glass shops have been identified, how

16    big is the group?  If you don't know the exact, do

17    you have an estimate?

18    A     I do not have an estimate, no, sir.

19    Q     Is it a prevailing problem?  Is it a huge

20    problem, or is it just kind of a smaller, something

21    you've seen in the past?

22          MR. TROWELL:  Object to the form.

23          THE WITNESS:  I think that would be an

24          opinion on who you ask.  I mean, for me as the

25          glass claims manager, it's a huge problem if

1          it's one claim versus a million.

2     BY MR. CLARK:

3          Q     But you don't know as you sit here right

4     now the general estimate of the number of claims per

5     month, per year, that have been affected by what's

6     alleged here?

7          A     I do not know, no, sir.

8          Q     We're going to get into some of the other

9     defenses a little later with some of the documents

10    and we'll come back to this document.

11         A     Okay.

12               MR. CLARK:  If I could, Madam Court

13         Reporter, have the -- provide the witness with

14         Exhibits No. 4 and No. 5.

15               And while you do that, I'll be right

16         back.

17               (The documents last-above referred to

18         were marked for identification prior to the

19         deposition as Plaintiff's Exhibits No. 4 and

20         5.)

21               MR. CLARK:  Thank you.

22    BY MR. CLARK:

23         Q     Have you seen Exhibit 4 before?

24         A     I've not seen Exhibit 4, but I've seen

25    Exhibit 5.

1    Q    Tell me what you know about Exhibit 5 and

2    any of the information that is identified.

3    A    So I reviewed Exhibit No. 5 and it's my

4    understanding that with Exhibit No. 5 we took -- we

5    took claims for GEICO General policyholders who had

6    glass claims from 2011 -- June 1st, 2011, to

7    June 30th, 2016.  We looked at what they billed

8    versus what we paid, and after we did that, there

9    was a total of 22,064 claims where we lowered what

10   they billed to the price that we can secure.  And

11   the total sum difference of those 22,064 claims was

12   the $6.4 million figure.

13        And we excluded, I believe, claims where

14   there was already a lawsuit connected to the claim

15   and we excluded claims to where what they billed

16   versus what we paid was zero.

17        That's my understanding of the document.

18   Q    Did you happen to have the opportunity to

19   review the electronic data that was pulled to

20   evaluate and reach the numbers that are put forth in

21   this declaration?

22   A    No, sir, Mr. Dan, I did not.

23   Q    You pronounce this fellow's name

24   Antonacci?  Did I get it right?

25   A    I believe so.

1    Q    Do you know him?

2    A    I do not, no, sir.

3    Q    Paragraph 9 of that document, if you'd go

4    to it.

5    A    (Examining document.)

6         Okay.

7    Q    If you're there, it has -- in the

8    second-to-the-last line it has "Total number of

9    claims meeting this description was 16,980";

10   correct?

11   A    Yes.

12   Q    And the total of all those invoices and

13   paid amounts -- the difference, I should say, in the

14   invoiced and paid amounts was approximately 5.1.

15   That's what you were referring to earlier; correct?

16   A    Yes, sir.

17   Q    The claims that have been at issue in

18   GEICO's ongoing RICO lawsuits that you've described,

19   are those claims included in this 16,980?

20        MR. TROWELL:  Objection.  I think the

21        witness has already testified that the claims

22        at suit that were pending were excluded.  So I

23        think that's been asked and answered.

24        MR. CLARK:  Lindsey, I appreciate that.

25        And I know it's not your intent, but can you

1          please refrain from giving speaking objections?

2          Because you're kind of -- the objection as made

3          kind of leads this witness potentially to an

4          answer.

5              MR. TROWELL:  Well, as long as we get an

6          accurate record, I'm happy to do that.

7              MR. CLARK:  Well, you have the

8          opportunity, sir, to ask any questions if time

9          permits today, and I'll certainly allow you

10         that opportunity regardless of the hour.

11     BY MR. CLARK:

12         Q    My question still stands.  If you would

13     look at Paragraph 9, sir, Subpart 1, excluded from

14     that database was any claim that had ever been the

15     subject of a lawsuit, whether closed or still

16     pending.  And would you describe -- would you

17     include the RICO lawsuits that GEICO has filed as

18     part of that?

19         A    I would, yes, sir.

20         Q    Okay.  How about the claims that are

21     under investigation that we were talking about, the

22     fraud claims that are under review and the skeleton

23     claims that are going under review, those things we

24     talked about before, would those claims be excluded

25     from the 16,980 because they, in theory, may not

1    have been in a lawsuit, I guess, in theory; correct?

2          A    Well, if they're not in a lawsuit and

3    they don't meet the criteria as stated in this

4    document, then I do not believe they were excluded.

5          Q    So in order to determine how many claims

6    GEICO has uncovered that fall within the allegations

7    made in its defenses, which we covered already, the

8    skeleton billing and the fraudulent billing that

9    you've described, we would need to identify from

10   GEICO those particular claims, those particular

11   shops, and then subtract it from the 16,980.  Am I

12   correct in my analysis or am I wrong?

13         MR. TROWELL:  Objection.  Calls for a

14         legal conclusion, asking him to interpret the

15         class definition you've proposed.

16         MR. CLARK:  That's your second time, sir.

17         Stop giving speaking objections.  Please.

18         MR. TROWELL:  Objection.

19         MR. CLARK:  Please.

20         MR. TROWELL:  Objection to the form of

21         the question.

22         MR. CLARK:  Last I looked in the Middle

23         District, when I sat on a group that amended

24         the local rules, I'm of the belief that you can

25         state the objection to the form of the

1      question.  If I wish to understand more of your
2      form objection, I will be certain to ask you in
3      a very professional manner.  If you have an
4      instruction to the witness not to answer the
5      question, by all means that is your right.
6      Please do so.  But please stop giving speaking
7      objections.
8           Madam Court Reporter, can you read back
9      my previous question?  And then we'll go from
10     there.
11          (The question was read by the reporter.)
12          MR. TROWELL:  Object to the form.
13          THE WITNESS:  To answer your question,
14     Mr. Dan, I don't know if that's correct or not.
15     I don't know if we should take those claims out
16     or not unless we file a case for fraud against
17     them.
18          Just because we're investigating a
19     company does not mean they've committed fraud.
20     So if we file a lawsuit against them for fraud,
21     I would say we would take them out.  But based
22     on your question, I would say no.
23   BY MR. CLARK:
24     Q    But as you sit here right now, you don't
25   know -- again, the investigation as you described,

1    you don't know when it started, you know it's

2    ongoing, but you don't know the results.  Am I all

3    correct about what you've said today?

4         A    That's correct, yes, sir.

5         Q    A little bit of a twist to my question

6    earlier.  Do you know if any of the shops under

7    investigation pursuant to your defenses that we've

8    already talked about today are actual claims in

9    litigation?

10             Said differently, going back to my

11   example, ABC Auto Glass Company is under

12   investigation.  They also have a pending lawsuit for

13   underpayment or no payment or whatever.  That

14   obviously would be a pending case.

15             Do you know if any of the investigated

16   shops are actually involved in pending lawsuits?

17        A    We do have some shops, yes, sir.

18        Q    Are you able to identify those particular

19   pending claims?  Is there a database that you can go

20   to and say, "This is all of our pending litigation"?

21        A    I do not have the database.  Our legal

22   counsel does.  But they -- they can review that,

23   yes, sir.

24        Q    And, in fact, just to kind of put it all

25   back together into this declaration, that's exactly

1    what was done here in Paragraph 9, because they ran

2    the numbers, came up with the number of claims, and

3    then subtracted out those claims in litigation;

4    correct?

5        A    Yes, sir.  We have what's considered a

6    suit tracker.

7        Q    Can you tell me what you understand the

8    suit tracker to be and what's entailed in it?

9        A    I believe the suit tracker would show the

10   company name, claim number, case number.  I've never

11   seen it, but I would assume that those are the

12   parameters that are on it.  Probably some other

13   things on it as well.  But I've never personally

14   seen the suit tracker.

15       Q    Now, the suit tracker -- GEICO has most

16   certainly plenty of litigation over a variety of

17   topics.  Is the suit tracker just designed for the

18   auto glass litigation claims, or is that suit

19   tracker for every claim?

20       A    I've never seen the tracker.  I can

21   only -- I mean, I can only -- I would assume they

22   have one specifically for glass litigation, if I had

23   to guess.

24            MR. CLARK:  To make things easy, can I

25       ask the court reporter to go ahead and hand out

1        Exhibits 6 through 11?  6 through 11.

2              (The documents last-above referred to

3        were marked for identification prior to the

4        deposition as Plaintiff's Exhibits No. 6

5        through 11.)

6              THE WITNESS:  We're ready, Mr. Dan.

7              MR. CLARK:  Thank you.

8    BY MR. CLARK:

9        Q    Sir, first, would look at Exhibit 6.

10       A    (Examining document.)

11       Q    Have you seen this document before?

12       A    No, sir.

13       Q    Okay.  Let's turn to Page 2 of the

14   document, if you would.  The numbered paragraph

15   No. 2, William Bergen -- did I pronounce that right?

16       A    I assume, yes, sir.

17       Q    Okay.  It just describes this individual

18   as GEICO General claims versus your description,

19   which is glass claims manager.  Do you know this

20   individual?

21       A    No, sir.

22       Q    Do you have any information as to what he

23   knows about the claim and what his job and general

24   position is with GEICO besides what you read there?

25       A    I would have to look at the claim notes

1    itself.  He may be a glass claims agent.

2        Q    What is a glass claims agent?

3        A    The -- there's two types of glass claims

4    agents.  They're the -- the main agents take the

5    incoming phone calls, and then the other agents work

6    the Internet claims that come in as well.

7        Q    What about Paige Ham?

8        A    I do know who Paige Ham is, yes, sir.

9        Q    How do you know her?

10       A    She is a CSR-2 agent who works skeleton

11   claims when they come in without a first notice of

12   loss set up.  First notice of loss would be without

13   any notification of a claim prior to receiving

14   invoice.

15       Q    You know, you described earlier a

16   skeleton claim and how, when you get something like

17   that without somebody calling, the agent would call

18   the insured.  Did I have that understanding correct?

19       A    That's what we do today, yes, sir.

20       Q    When did that start?  When did that

21   process start?

22       A    It would have been over the past four or

23   five months.  I don't have an exact date, I'm sorry,

24   Mr. Dan.

25       Q    No, that's fine.

1     We're going to get into this a lot more

2    under how GEICO handles claims and its process and

3    procedures.  Some of the training manuals will

4    address that as well.  But isn't one of the major

5    factors, major steps taken by GEICO when it's

6    processing a claim, to actually speak to the

7    insured?

8         A    It is, yes, sir.

9         Q    So regardless if they had spoken to the

10   insured prior to the claim -- as you call it, the

11   skeleton claim -- coming in or after, it's still one

12   of the boxes to check, and you'll hear me say that

13   frequently, the boxes to check as you're processing

14   and paying the claim; you've got to speak to an

15   insured?

16        MR. TROWELL:  Object to the form.

17        THE WITNESS:  We do today.  That's one of

18        the process changes that we talked about before

19        that we changed on skeleton losses.

20   BY MR. CLARK:

21        Q    But putting aside skeleton losses or

22   claims, wasn't that and hasn't it always been

23   GEICO's policy and procedure to actually speak to

24   the insured?

25        A    Well --

1           MR. TROWELL:  Object to the form.

2           THE WITNESS:  -- I don't know if I can

3      say, that because if claims are set up online,

4      we don't physically speak to the policyholder

5      when they're set up online.  So if you're

6      asking me do we have to physically speak to

7      every policyholder, no, sir, that's not the

8      case.

9  BY MR. CLARK:

10         Q    Is that one of the steps that GEICO in

11   its training materials states --

12         A    I'm not --

13         Q    -- or do you know?

14         A    I'm not sure of that, Mr. Dan,

15   unfortunately.

16         Q    And, of course, we have your name listed

17   there as well.

18         A    Yes, sir.

19         Q    If you could go to Page 3 now.  And

20   there's a couple of bullet points.

21         A    (Examining document.)

22         Q    Tell me when you're there.

23         A    I'm there.

24         Q    It has some just general descriptions.

25   And you said you reviewed all the documents that

1    GEICO has produced in this case.  Do I have that

2    correct?

3         A    I believe so, yes, sir.

4         Q    Can you confirm under oath today that

5    GEICO has produced all documents relating to its,

6    quote, "handling, adjustment and payment of the

7    subject claim"?

8              MR. TROWELL:  Object to the form.

9              THE WITNESS:  I mean, we produced our

10             training manual.  I don't know what we would

11             have outside of that.  I mean, we don't have

12             adjusters who are adjusting claims, so, I mean,

13             you have what we have for this claim.  I mean,

14             we don't have adjusters who are adjusting each

15             claim on a claim-by-claim basis.

16   BY MR. CLARK:

17        Q    Where it says then, "Documents relating

18   to GEICO's handling, adjusting and payment of any

19   other windshield repair or replacement claim" --

20             MR. TROWELL:  Object --

21   BY MR. CLARK:

22        Q    -- do you see that?

23        A    Yes, sir.

24        Q    Do you see that reference?

25        A    Yes, sir.

1     Q    Now, besides the training manual, you

2    know of no other documents maintained or given out

3    to GEICO employees like yourself in handling claims

4    like this?

5              MR. TROWELL:  Object to the form.

6              THE WITNESS:  The only other documents

7         that we would send would be if we want to do

8         reminders of processes.  For example, if we

9         have a situation where maybe associates are

10         making mistakes with the way they're handling

11         certain claims, we will send reminders to the

12         associates letting them know, "Hey, we're

13         seeing mistakes made on this.  Here's an

14         updated vital sign.  Don't make this mistake

15         anymore, please."  Because we grade calls for

16         customer interaction and quality.

17    BY MR. CLARK:

18         Q    You said that there was a change, and you

19    described it, dealing with the skeleton claims or

20    skeleton losses.  You put it in context earlier

21    about GEICO actually speaking to its insureds.  And

22    you said about five or six months ago, I want to

23    say --

24         A    I believe it was.

25         Q    -- if I've got it correct?

1        A        I believe it was, Mr. Dan.

2        Q        That there was a change?

3        A        Yes, sir.

4        Q        And indeed you described it as a change;

5    am I correct?

6        A        That was a change, yes, sir.

7        Q        Is it literally, in your mind, given, you

8    know, you've been in your position for some time, a

9    change from GEICO not having to speak to its

10    insureds when a windshield claim comes in, GEICO

11    must speak to insureds on every windshield claim?

12            MR. TROWELL:  Object to the form.

13            THE WITNESS:  No, sir, not on every

14        windshield claim, on skeleton claims.

15    BY MR. CLARK:

16        Q        Skeleton claims only?

17        A        Yes, sir.  If we -- because on most

18    claims -- you know, as I stated before, skeleton

19    claims are very unique.  Most businesses do not do

20    business that way, because you're doing the work

21    without really verifying that the policyholder has

22    coverage or if we're even going to cover it.

23            So most claims, it's called in and

24    handled via the first notice of loss through a glass

25    agent or either the policyholder will do it online.

1    The skeleton claim, as we stated as being very

2    unique, our first notice of that is the invoice.

3    And as I stated before, used to, as long as -- we

4    would attempt to reach the policyholder, but if we

5    did not reach the policyholder, if there was an

6    assignment of benefits on file, we would go ahead

7    and pay the claim.

8         So we made the change that we cannot pay

9    that claim unless we verify the loss details because

10   that claim is so unique compared to the way that

11   most companies and GEICO do business.

12        So to answer your question, I mean, if

13   you're asking me for all claims, I mean, it depends

14   on the way you interpret that.  We speak to the

15   policyholders on every first notice of loss that

16   they call in.  And then if it's done online, we

17   don't.  But on a skeleton claim in today's world,

18   because of the change in order to make the payment,

19   we do have to verify the loss details with the

20   policyholder.

21        Q    Let me kind of just narrow down some of

22   the things that you've said.

23        A    Okay.

24        Q    It is always and has always, as far as

25   you know, been GEICO's policy or procedure to

1    attempt to speak to every insured on an auto

2    windshield glass claim --

3              MR. TROWELL:  Object to --

4    BY MR. CLARK:

5         Q    -- is that correct?

6              MR. TROWELL:  Object to the form.

7              THE WITNESS:  No, sir, that's not

8         correct.  I cannot speak to what GEICO has

9         always done.  I can only speak to what I know

10        as of now.  I can't tell you what GEICO did,

11        you know, in the -- in the distant past.  I can

12        just tell you on skeleton claims, prior to the

13        change, as long as there was assignment of

14        benefits, we would make payment on these unique

15        claims.

16   BY MR. CLARK:

17        Q    Okay.  You bring up a real good point.

18   You're here to speak -- I'm going to simplify it --

19   the last five years.  Okay?

20        A    Okay.

21        Q    Talking about the claims that we're here

22   about, the class allegations, generally describe a

23   five-year period.  Can you speak as to GEICO's

24   policies and procedures for the last five years?

25        A    Yes, sir.

Q    Now, again, I'm going to go back.  And so
"it's always been GEICO's," I'm going to reframe
that and kind of restate it as GEICO's policy within
the last five years.

A    Okay.

Q    When dealing with an auto windshield
claim, has it always been in that five-year period
GEICO's policy to, quote, "attempt," end quote, to
contact the insured?

MR. TROWELL:  Object to --

BY MR. CLARK:

Q    Yes or no?

MR. TROWELL:  Object to the form.

THE WITNESS:  Are you speaking on all
claims?

BY MR. CLARK:

Q    All glass claims.

A    I mean, we -- we do not attempt to
contact the policyholder on Internet claims, so I
can't say on all claims, no, sir.

Q    Okay.  Well, that's a good -- that's a
good exception to that.  All other claims that fall
within this time period that fall within this type
of claim that are not submitted via Internet?

MR. TROWELL:  Object to the form.

ANDERSON REPORTING SERVICES, INC.
(904) 358-0112

1          THE WITNESS:  So to your -- to your

2      point, the first notice of loss is called in on

3      almost all of the other claims.  The exception

4      would be the unique skeleton claims, and we

5      would have at least have attempted to contact

6      the policyholder.  But if there was an

7      assignment of benefits, we would have just went

8      ahead and paid it if we did not get that

9      contact.

10  BY MR. CLARK:

11      Q     Thank you.  That was real helpful.  I

12  appreciate that.

13      A     You're welcome, Mr. Dan.

14          THE WITNESS:  Mr. Dan, do you mind if I

15      take five and get another cup of coffee and use

16      the bathroom?  I'm like you.  I'm going to

17      No. 3.  So...

18          MR. CLARK:  Understood.  Thank you.

19      Let's take five.

20          THE WITNESS:  Thank you, Mr. Dan.

21          THE VIDEOGRAPHER:  We're off the record

22      at 11:01.

23          (Short break.)

24          THE VIDEOGRAPHER:  We are back on the

25      record at 11:08.

1    BY MR. CLARK:

2        Q    Taking us back to where we kind of left

3    off, sir, you spoke about reminders, kind of

4    reinforcements to policies and procedures already in

5    place if something comes up, and you talked about

6    this change or directive when dealing with skeleton

7    claims or skeleton losses.

8            Were those changes made in writing; that

9    is, did the reminders come out in writing, the

10   change or this description that you dealt with with

11   the skeleton claims come out in writing and sent to

12   people?

13       A    So when the change happened, Mr. Dan, I

14   was not in charge of the unit then.  I became in

15   charge of the glass claims unit in August of this

16   year.  But I believe that they were sent a vital

17   sign.

18       Q    And you call it a vital sign?

19       A    Yes, sir.  We call them --

20       Q    Is it the same thing as -- is it the same

21   thing as a reminder?

22       A    Yes, sir.  We call it a vital

23   sign/Tuesday tip.  We send them on every -- we send

24   them every Tuesday, that just kind of says, "Hey,

25   you guys are messing this up.  Please don't do

1    that."

2         Q    You described your change in August of

3    2016, your position?

4         A    Yes, sir.  I was rotated.  That's

5    correct, Mr. Dan.

6         Q    Walk me through the position you have

7    now, your duties and responsibilities, how that

8    differs from the position you had previous --

9         A    Sure.

10        Q    -- and then take me from there.

11        A    Sure.

12             My old position that we've discussed, I

13   was in charge of billing and compliance, so making

14   sure all of the bills were paid and paid correctly.

15             In my new position I'm in charge of what

16   we call the front-end process.  I'm in charge of the

17   agents who take the first notice of loss and -- from

18   the policyholders and set the claims up.  And I'm

19   also in charge of the CSR-2s who handle the skeleton

20   claims that we spoke about a pretty good bit this

21   morning.  My job is to make sure that we answer the

22   phone and that we put the claim in the system

23   correctly and that we show empathy to the

24   policyholder while we're doing it.

25        Q    Are you also in charge of making sure

1    those that work under you are following what is

2    described in the training manuals of how to handle

3    incoming calls?

4        A    I'm the leader of the unit, yes, sir.  I

5    have many supervisors up under me, but I'm the

6    leader of that unit, correct.

7        Q    And you can speak to today how that

8    process is when dealing with Safelite?  You can talk

9    about that today?

10       A    Yes, sir.

11       Q    Let's turn now to Exhibit No. 7, which

12    are interrogatories.

13       A    Yes, sir.  (Examining document.)

14       Q    And these are interrogatories that you

15    signed, so I'm going to take for granted that you've

16    already reviewed it and you recall what is put in

17    here.

18       A    That's correct, Mr. Dan.

19       Q    I would ask you to start with the

20    response to No. 2.  And I'll just read it into the

21    record because it caught my attention when it came

22    through.

23       A    Okay.

24       Q    It says -- and I'm quoting on Page 2 of

25    Exhibit 7, your interrogatory responses.  It says,

1  quote, "Accordingly, Defendant has a working

2  understanding of the prevailing competitive price,

3  which is the price it can secure from a competent

4  and conveniently located repair facility and also

5  the limit of defendant's liability," end quote.

6      Did I read that correctly?

7      MR. TROWELL:  Objection to the extent

8      that it's only a portion of the answer.  I

9      don't believe the witness knew where you were

10     reading from.

11     THE WITNESS:  Yeah.  I don't see where

12     you're reading from.  I'm sorry.

13  BY MR. CLARK:

14     Q    That's okay.  And that's an easy --

15  always speak up.

16         I'm reading at the bottom of Page 2, the

17  last sentence of that response, where it begins

18  "Accordingly."  Do you see it?

19     A    I've got it now.  Thank you, Mr. Dan.

20     Q    Okay.  Let me just read it, because I

21  want to be sure that I've read it correctly.

22  "Accordingly, Defendant has a working understanding

23  of the prevailing competitive price, which is the

24  price it can secure from a competent, conveniently

25  located repair facility, and also the limit of

1    defendant's liability," end quote.

2              Did I read that correctly?

3        A    You did, yes, sir.

4        Q    Are those your words?  Did you use those

5    words, "working understanding"?

6        A    I mean, I don't understand by you mean

7    "our words."  I reviewed these interrogatories with

8    my legal counsel and I signed off on the

9    interrogatory.  So, yes, sir.

10       Q    So technically this was prepared and

11   that -- you didn't write "working understanding."

12   That's not your words; that's somebody else's and

13   you approved it as GEICO's corporate representative.

14   Am I correct?

15             MR. TROWELL:  Objection to the extent it

16        calls for the disclosure of privilege,

17        attorney-client privilege.

18             You can answer.

19   BY MR. CLARK:

20       Q    You can answer if you can.

21       A    Mr. Dan, we review them together and we

22   come up with answers together.

23       Q    What is the working understanding that

24   you're describing here in this response?

25       A    So it goes back to -- I mean, you're

1    talking about one sentence in a paragraph. If you

2    were to ask me what is my working understanding of

3    the prevailing competitive price, it is the price

4    that we can secure from a competent, conveniently

5    located provider. And it's also the price that we

6    secure all day, every day, on our claims.

7         Companies who bill more than the

8    prevailing competitive price are very unique,

9    they're doing something that's outside of the norm.

10   The majority of our claims go down a path of it's

11   billed at the prevailing competitive price and it's

12   paid at the prevailing competitive price.

13   Q    We're going to talk at great length today

14   about that billing and what you're describing as

15   billing at the prevailing competitive price, so I

16   want you to focus on those words, just the billing

17   side.

18   A    Okay.

19   Q    When you say every day, every day of the

20   week, twice on Sunday, whatever you called it, you

21   talked about billing, what are you specifically

22   describing when you say the billing?

23   A    What the provider actually submits

24   through EDI or what they fax to us or -- or to be

25   paid.

1    Q   Now, are these particular glass shops

2  you're describing that are billing you?

3    A   It could be glass shops.  We do have some

4  dealerships who will bill us through EDI system or

5  send bills as well.  So it could be a combination of

6  either/or.

7    Q   Are these -- as you see from the previous

8  paragraph -- actually, I take that back.  You get

9  into talking about the SGC Network.  And you have

10  just brought up a new term, EDI.

11    A   Sure.

12    Q   You've got various terms in your --

13    A   Right.

14    Q   -- in your GEICO office.  But are you

15  describing billing from glass shops that come

16  through the network, the SGC Network?

17    A   So I'll explain it to you to make it

18  easy, Mr. Dan, because we have to do this all the

19  time, because you're right, it's easy to get

20  confused.

21       The SGC Network is just all companies in

22  this network.  Within this network you have

23  preferred, which is Safelite for us.  They're our

24  preferred partner.  You have affiliate.  And then

25  you have non-affiliate.

1          So that would mean when we talk about

2     companies who bill at the prevailing competitive

3     price, we're talking about the entire network.  We

4     have affiliates and non-affiliates who bill through

5     the EDI.

6          Your question about EDI, it's electronic

7     data invoice.  It's just a billing -- electronic

8     billing system that the glass providers can use.

9     But we also have -- as I stated before, we also have

10    dealerships who bill through the EDI system.

11    Q     When you say "bill," the actual bill

12    coming from the glass shop is billed at the

13    preferred competitive price?

14         MR. TROWELL:  Object to the form.

15    BY MR. CLARK:

16    Q     Excuse me.  Prevailing competitive price.

17    Excuse me.

18    A     Yes, sir.  The majority of the bills that

19    we receive are at the price that we can secure,

20    that's correct.

21    Q     Would your answer be the same for those

22    who are not participating in the network, the SGC

23    Network?  Say I'm an ABC Glass Shop that's not

24    within the network.

25    A     So are you referring to -- so let's go

1    back.  The SGC Network is just all of the glass

2    shops all together.  Okay?  You have --

3       Q    Does that include everybody?

4       A    Yeah.  The SGC Network is anybody who's

5    ever billed through the EDI system before.  So it

6    includes numerous companies.

7       Q    And you're saying that for a glass

8    company that's not participating in a network

9    agreement with Safelite --

10      A    Yes, sir.

11      Q    -- so you've got the preferred, which is

12   Safelite.  They're their own glass shop.  They fix

13   things, bill.  Okay.  So that's the preferred.  Then

14   you have the participating shops that have signed

15   participating agreements with Safelite.  Okay?  With

16   me so far?

17      A    I believe so, uh-huh.

18      Q    Am I correct so far, that you have

19   Safelite billing within the SGC Network, and the

20   EDI, of course?

21      A    Correct.  So Safelite and affiliate shops

22   can bill through EDI.

23      Q    When you use the term "affiliate shops,"

24   those are glass windshield shops that have entered

25   into a Safelite network participation agreement, if

1    you know?

2        A    No.  So you can enter into -- you can

3    enter into the SGC Network, and say there's a list

4    of 30 insurance companies.  The shop has the ability

5    to choose who they want to be considered affiliate

6    with.  So you can have shops who are in the SGC

7    Network as non-affiliate with GEICO but affiliate

8    with many other insurance companies.

9            So just because they're a non-affiliate

10   in our system does not mean that they're a

11   non-affiliate -- they have not signed any agreement

12   with Safelite.

13       Q    But you would agree with me that if, to

14   use your term, sign off as an affiliate shop to

15   Safelite, as you've described it, that in order to

16   do that, you must agree to bill what that insurance

17   company will accept?

18       A    Well, I don't know if they're signing

19   affiliate -- I mean, I'm not sure they're signing

20   anything saying they're an affiliate with Safelite.

21   Anything they sign with Safelite, to my

22   understanding, is just agreeing to be in the

23   network, and they have to meet certain criteria.

24           But they can pick and choose -- I guess

25   we're getting confused on the wording.  As you

1    stated, the wording's kind of all over the place.

2    But a shop can be -- a shop can be in the SGC

3    Network, meet all the criteria to be a -- to be a

4    preferred shop with GEICO, but just choose not to be

5    a preferred shop with GEICO.  But they're a

6    preferred -- I mean, they're a preferred shop in the

7    SGC Network for many other companies.

8         So I'm not -- I'm not -- I'm just

9    confused, Mr. Dan.  I'm sorry.

10   Q    No, I think you're just looking at it at

11   a bigger level and I'm being very particular.

12   A    Okay.

13   Q    Let me start over.

14   A    Okay.

15   Q    Do you know, if a glass shop enters into

16   a Safelite network participation agreement, that is,

17   ABC Glass Shop signs an agreement with Safelite,

18   what the term of that agreement are?  Yes or no, and

19   then we'll go from there.

20        MR. TROWELL:  Object to the form.

21        THE WITNESS:  The only thing I know that

22        they have to meet is the criteria to be in the

23        network.  But I don't know -- I don't have a

24        document that shows everything they need.  So,

25        no, sir, I have not seen that.

1    BY MR. CLARK:

2         Q    So you don't know that, in fact, Safelite

3    mandates when you become a participant in the SGC

4    Network that that shop must bill at the insurance

5    company's price?

6         A    If they are considered an affiliate for

7    that insurance company, yes, sir, they would.

8         Q    Okay.  Great.  So you knew that?

9         A    Yes, sir.  I'm sorry it took us so long

10   to get there, but, yes, sir.  If they're --

11        Q    That's okay.

12        A    If they're an affiliate -- if they're

13   considered in-network affiliate with GEICO, yes,

14   sir, they agree to bill at the prevailing

15   competitive price.  That is correct.

16        Q    Okay.  So let me just take this in little

17   baby steps real quick.

18        A    Okay.

19        Q    You've never seen the participation

20   agreement; correct?

21        A    What they sign with Safelite to come into

22   the network?

23        Q    Correct.

24        A    No, sir.

25        Q    You don't know the terms and conditions

1    of that agreement --

2        A    No, sir.

3        Q    -- correct?

4            You do know, however, that -- did you say

5    not correct?  You do not know the terms and

6    conditions?

7        A    You asked me if I've ever seen the

8    agreement between Safelite and the company.

9        Q    And the answer is no, you've never seen

10   it?

11       A    Not for Safelite and the company.  I've

12   seen -- I've seen pricing to where, in 2008 and

13   2012, that we sent for people who are -- for

14   companies who are partners and non-partners.  But, I

15   mean, I've never seen the agreement.

16       Q    I understand.  You keep on jumping around

17   and my question is just very isolated.  Safelite

18   network participation agreement, there is a document

19   that I could show you today that is that agreement.

20   Okay?

21       A    Okay.

22       Q    I want you to assume that.  My question

23   is:  Do you know that one does exist?  Yes or no?

24       A    I think it would have to, yes, sir.

25       Q    You do not know, however, the terms and

1    conditions of that agreement, even though you

2    haven't seen it?  You don't know the terms and

3    conditions; correct?

4         A    To be in the SGC Network, no, sir.

5         Q    Do you know what a participating glass

6    shop must pay to Safelite in order to be a part of

7    the participation agreement?

8              MR. TROWELL:  Objection to the form.

9              THE WITNESS:  No, sir.

10   BY MR. CLARK:

11        Q    But we can agree that an affiliate of

12   Safelite who, as you described, must become a

13   participation or participant under an agreement --

14   okay? -- must bill at what the insurance company's

15   price is; correct?

16             MR. TROWELL:  Object to the form.

17             THE WITNESS:  If a shop is in the SGC

18        Network and the shop decides that they want to

19        be an affiliate with GEICO, yes, sir, they

20        would have to bill at the PCP rate --

21        prevailing competitive price.  Sorry.

22   BY MR. CLARK:

23        Q    So in that instance, the shop would have

24   to know in advance -- I think this is where you were

25   going -- what your price is; correct?

1          A     Yes, sir.

2          Q     Let's talk about Safelite, your preferred

3     glass shop.  Your training manual talks about what

4     you tell insureds about Safelite.  Do you agree?

5          A     It does, yes, sir.

6          Q     And you're in charge of making sure that

7     GEICO employees follow the training manual; correct?

8          A     Yes, sir.

9          Q     As the preferred glass shop for Safelite

10    [sic], do you know what Safelite is paid, the price?

11    Do you know the amount?

12              MR. TROWELL:  We're going to object.

13              We've objected to this prior to this

14              deposition, that we would not be talking about

15              the agreement between GEICO and Safelite as

16              that's proprietary.  We produced a writ where

17              that contract is not required to be produced

18              and it's not relevant to a breach of contract

19              claim.

20    BY MR. CLARK:

21         Q     Let me take some baby steps again, sir,

22    to get to the reason why we're asking the question.

23              Do you know what Safelite, your preferred

24    glass shop, bills GEICO for work?

25              MR. TROWELL:  Objection.  Same objection.

1          THE WITNESS:  I mean, yes, sir.  They --

2   BY MR. CLARK:

3       Q    Do you know?

4       A    They have to bill it through EDI, yes,

5   sir.

6       Q    Do you know what they bill?  Do they bill

7   the prevailing competitive price?

8               MR. TROWELL:  Same objection.

9               THE WITNESS:  It varies per claim, but

10          they actually --

11  BY MR. CLARK:

12      Q    How does -- go ahead.  I'm sorry.  I

13  interrupted you.

14      A    No worries.

15          It varies per claim, but because they're

16  our preferred partner, they're actually -- they bill

17  less than what we would -- than what we would pay

18  for an affiliate and non-affiliate who's in County

19  Code A, which is what your client is in.  So we

20  would have paid your client more than we could

21  secure from Safelite.

22      Q    Do you know how much that is per claim?

23      A    No, sir.

24      Q    For that discount, for that lower amount

25  that they will bill and be paid, do you know what

1       benefits GEICO receives in exchange from Safelite?

2               MR. TROWELL:  I'm going to raise the same

3           objection to the proprietary and trade secret

4           information and instruct the witness not to

5           answer that question.

6               MR. CLARK:  Even though we have a

7           confidentiality agreement in place?

8               MR. TROWELL:  On that topic, yes.  We're

9           not going to get into the Safelite contract.

10      BY MR. CLARK:

11          Q    Now, going back to Page 2 of your

12      interrogatory response, Exhibit 7, it speaks in a

13      couple of different ways -- the first sentence of

14      the paragraph that begins, "Moreover, when an

15      insured seeks repair or replacement of its

16      windshield" -- do you see that?

17          A    Yes, sir.

18          Q    It says "... the repair facilities are

19      chosen by insureds and wherein the insureds request

20      a recommendation, defendant will provide a

21      recommendation as to a competent, conveniently

22      located repair facility relevant to the specific

23      claim."  Do you see that?

24          A    Yes, sir.

25          Q    Did I read that correctly?

1      A      I believe so, Mr. Dan.

2      Q      When it states "defendant will provide a

3   recommendation," can I also, because I've now seen

4   your training manual, that defendant will always

5   recommend its preferred glass shop, that is,

6   Safelite?

7            MR. TROWELL:  Object to the form.

8            THE WITNESS:  So it depends on how you

9            ask that question.  The first question we ask

10           is "Do you have a shop who wants to do" -- "Do

11           you have your own" -- "Do you have a shop" --

12           or "Have you chosen a person to do the work?"

13           If they answer no, then, yes, sir we

14           would say, you know, "Well, we can offer

15           Safelite, but you're under no obligation to use

16           them."

17           So to answer your question, the first

18           question is always, "Have you chosen a repair

19           facility to do the work?"

20   BY MR. CLARK:

21     Q      Why is that?

22     A      Because --

23     Q      Why do you always ask that question?

24     A      Because the insured has a right to choose

25   any repair facility they wish.  That's per the

1    policy, as stated in Line No. 2.  They have the

2    right to choose any repair facility or location.

3         Q    Can you give me an idea of the general

4    percentage of claims that are handled or done by

5    your preferred glass shop, Safelite?

6              MR. TROWELL:  Object to the form.

7              THE WITNESS:  I don't know the actual

8         percentage, but it would be -- it would be a

9         high percentage.

10   BY MR. CLARK:

11        Q    I mean, is it -- I mean, I know you're

12   estimating and a lot of stuff.  It doesn't have to

13   be exact.  But is it like 90 percent, or is it more

14   like 50 percent or lower?

15             MR. TROWELL:  Object to the form.

16             Don't guess.

17             THE WITNESS:  I don't know the actual

18        percentage, Mr. Dan.  I just know it's a high

19        rate.

20             I mean, they're the largest glass company

21        in the U.S., so by default, they would do

22        more -- and as our preferred provider, by

23        default they would do more work than most any

24        other company.

25   BY MR. CLARK:

1    Q    I don't mean to beat that horse here to

2    death, but when you use the term "high rate," what

3    does that mean to you?  What's "high" to you when

4    you use that?

5         MR. TROWELL:  Object to the form.

6    BY MR. CLARK:

7    Q    More than 50 percent, I would assume, but

8    I don't like to assume things.

9    A    I would -- I'm strictly -- I mean, they

10   would do more than 50 percent, yes, sir, that's

11   correct.

12   Q    Is it easy to assume today, just for our

13   general discussions, that either your preferred

14   glass shop, Safelite, or an affiliate -- affiliate

15   being a glass shop that's entered into a

16   participation agreement that we kind of talked to --

17   does the majority of all the work for GEICO

18   insureds?

19        MR. TROWELL:  Object to form.

20        THE WITNESS:  I would agree to that, yes,

21   sir.

22   BY MR. CLARK:

23   Q    So what you ultimately come down to is

24   this small group, and we've done it here, of

25   approximately 16,000 claims over a five-year period,

1    give or take a few, that fall within that very small

2    minority; is that a fair statement?

3         A    If you're asking me do we have a minority

4    group who bills more than a prevailing competitive

5    price, yes, sir that's correct.

6         Q    Now, let's talk about that prevailing

7    competitive price and your working understanding.

8    Can you tell us today if you've reviewed any data or

9    information in preparation for your deposition today

10   that gives you the ability to say that the defendant

11   has a, quote, "working understanding of the

12   prevailing competitive price"?

13        MR. TROWELL:  I'm going to object to the

14        extent you're asking him to state what we

15        discussed before the deposition, the how or the

16        why that's arrived at.  He can tell you what

17        the prevailing competitive price is.

18        MR. CLARK:  Again, that's like the third

19        time, sir.  Forgive me for getting maybe a

20        little bit irritated by it, but you just gave a

21        speaking objection again.

22        MR. TROWELL:  Well, you're asking --

23        MR. CLARK:  I don't understand why you --

24        MR. TROWELL:  Well, we can have this

25        discussion off the record.

1        MR. CLARK:  I don't know why you keep

2    doing it.

3        MR. TROWELL:  I'm happy to have a

4    discussion off the record.  We've had it off

5    the record, and that question goes to something

6    we discussed.  So we can have it off the

7    record.  I'm happy to.

8        MR. CLARK:  What are you referring to as

9    a discussion off the record?

10       MR. TROWELL:  We can have a discussion

11   off the record.  Prior to the deposition, we

12   discussed the types of topics that this witness

13   would not be testifying to, and that question

14   goes right to one of those points.

15       MR. CLARK:  I disagree with the way you

16   just phrased that.  We have a number of topics

17   that we're going to question today on, and you

18   have the right to instruct him not to answer

19   the question.

20       MR. TROWELL:  Okay.

21       MR. CLARK:  So I don't -- again, if you

22   want to -- I've got my cell phone right here.

23   I'd be glad to talk to you guys.  But I've got

24   my questions, my specific questions, and I

25   definitely gave a sign to Mr. Cottrell that I

1      would be specifically asking about working

2      understanding of the prevailing competitive

3      price today.

4   BY MR. CLARK:

5      Q    So my question goes back to, sir:   In

6   preparation for your deposition today, did you

7   review any documents or data, whether within GEICO

8   or possibly given to GEICO by Safelite, that support

9   this, quote, "working understanding," end quote?  So

10  it's a yes or no to begin with.

11     A    So I have working understanding, but I've

12  not reviewed any data.

13     Q    Can you tell me how GEICO established its

14  prevailing competitive price?

15     A    So the prevailing competitive price, as

16  I'm sure you're aware, Mr. Dan, is the price that we

17  can secure.  If you look back, the logic and the

18  methodology of how we get to our prevailing

19  competitive price we know has been in place at least

20  since 2008, because I know you have the pricing

21  agreements from 2008 and 2012.  So the methodology

22  has been there we know at least since 2008.

23          And besides that, we have the majority,

24  the vast majority of our claims that go down the

25  path of it's billed and paid at the prevailing

1  competitive price or even lower from a preferred

2  partner.  So I think that alone shows exactly what

3  we can secure in -- I mean, it just shows exactly

4  what we can secure.  I mean, that's my working

5  knowledge.

6      Q    Did Safelite provide GEICO any data or

7  information to help GEICO reach its preferred

8  competitive price?

9           MR. TROWELL:  Object to the form.

10  BY MR. CLARK:

11      Q    Prevailing competitive price.

12      A    I would say you could use "PCP," but that

13  just gets bad.

14      Q    Yeah, I know.  I know.

15           Prevailing competitive price.

16      A    The data we receive from Safelite is our

17  own data, so I'm --

18      Q    What do you mean by that?

19      A    So as our third-party administrator,

20  anytime someone bills online through an EDI system,

21  that becomes our invoice and there's raw data there.

22  So we can ask for our own information from Safelite

23  and our own data from them being our TPA.  So any

24  information that we would get from Safelite is our

25  own data that we are requesting.

1          So -- but to go back to your question, if

2     you're asking me what data we looked at,

3     unfortunately I can only tell you what I know.  I

4     inquired with the people in my division and the only

5     thing I can tell you, Mr. Dan, is we've had this

6     methodology, again, since at least 2008 and this is

7     the way that we do business and this is the way the

8     majority -- the very vast majority operates with us,

9     except for unique cases that are very, very unique.

10         Q    I'd like to break that down a little bit.

11         A    Okay.

12         Q    Because -- you agree with me from your

13    investigation in preparing for your deposition today

14    that, I think what you were saying, GEICO did

15    receive data -- first step -- data from Safelite;

16    correct?

17              MR. TROWELL:  Object to the form.

18              THE WITNESS:  Received data when?

19    BY MR. CLARK:

20         Q    I don't know.  You seem to agree that

21    there was a data exchange from Safelite to GEICO in

22    the process of establishing its price.

23              MR. TROWELL:  Object to the form.

24              THE WITNESS:  No, I don't think I --

25    BY MR. CLARK:

1    Q    You don't know that to be a fact?

2    A    I don't think I agreed to that.  I simply

3  stated that any data that we would request from

4  Safelite is our own data from them.  I do not know

5  when this price was -- when the parameters around

6  what we pay were set, if we requested any

7  information from Safelite.  But we do have the

8  ability, with them being our third-party

9  administrator, to request our own data from them at

10  any time.

11         So I guess my answer to that would be no,

12  I don't agree with that, because I was not there

13  in -- well, we know of at least 2008 when the

14  methodology was there.  I don't know if that

15  methodology was set based on data -- based on our

16  own data received from Safelite.

17    Q    I truly do appreciate all the

18  information.  You're very helpful in this process.

19  So I don't want you to take my comment now to be

20  critical.

21         My questions are pretty simple and

22  they're direct.  Do you know, sir, whether GEICO

23  received any data from Safelite when it was

24  determining its price?

25         MR. TROWELL:  Object to the --

1    BY MR. CLARK:

2        Q    Yes or no?

3                MR. TROWELL:  Object to the form.

4                THE WITNESS:  No, sir, I do not know.

5    BY MR. CLARK:

6        Q    You don't know now personally and you

7    have not done any investigation to determine that?

8                MR. TROWELL:  Object to the form.

9                THE WITNESS:  Have I not done any

10               investigation to see if Safelite gives us data?

11   BY MR. CLARK:

12       Q    No.  Your answer you just gave is your

13   personal knowledge; correct?

14       A    Yes.

15       Q    Okay.  As the corporate representative

16   today, what steps have you taken, sir, to find out

17   whether or not data was sent from Safelite to GEICO?

18       A    So as the corporate rep, I mean, I did

19   not ask anyone if, when we set the parameters for

20   the prevailing competitive price, if we asked or

21   received data from Safelite.  My testimony is we

22   have the ability to ask for our own data whenever we

23   want.

24       Q    But you do not know, as the corporate

25   representative, today whether that, in fact, was

1      done; correct?

2                MR. TROWELL:  Object to the form.  Asked

3           and answered.

4                THE WITNESS:  That's correct.

5      BY MR. CLARK:

6           Q    I ask you to turn to your response to

7      No. 5, Interrogatory No. 5 -- it's again Exhibit 7

8      today -- on Page 3.

9           A    (Examining document.)

10               I'm there, Mr. Dan.

11          Q    Okay.  And we talked about this SGC

12     Network already on a very 8,000-foot level --

13          A    Yes, sir.

14          Q    -- but the description that you give in

15     the last sentence, which says, "The SGC Network has

16     a rigorous process to become affiliated."  Now, when

17     you used those words in this response, you used the

18     word "affiliated."  We talked about that a little

19     bit earlier today; correct?

20          A    Yes, sir.

21          Q    And we talked about that word

22     "affiliated" in the context of those glass shops

23     entering into a Safelite network participation

24     agreement in order to become affiliated; correct?

25               MR. TROWELL:  Objection to the form.

1          THE WITNESS:  To become affiliated with

2          anyone, that's correct, yes, sir.

3    BY MR. CLARK:

4          Q    When you say affiliated with anyone --

5          A    As we stated before, you don't -- I mean,

6    in order to become an affiliate in the Safelite

7    network, you'd have to meet those rigorous things

8    that we describe here.  But that would be regardless

9    of if you're affiliated with GEICO or any other

10   insurance company.

11         Q    I get what you're saying.  You're

12   affiliated with GEICO or affiliated with USAA or

13   some other insurance company.

14         A    Sure.

15         Q    But I think the first step, as I

16   understand, to become affiliated and a participant

17   in the SGC Network, you have to go through a process

18   which includes that glass shop signing a Safelite

19   network participation agreement.  Am I correct?

20         A    I mean, I've never seen that agreement,

21   but, I mean, I would assume, yes, sir.  I would

22   assume they sign an agreement.

23         Q    So when you talk about the SGC Network in

24   your responses here and you talk about -- and you

25   say a number of different things.  Quote, "the

1    largest networks of glass repair facilities in the

2    nation," end quote.  You talk about the SGC Network.

3    And then you talk about the rigorous process and you

4    talk about the affiliated shops.

5           That group, which would include Safelite

6    as your preferred glass shop and any of its

7    affiliates, those are all packaged together and, in

8    fact, make up the vast majority of the glass shops

9    that do work for GEICO --

10         MR. TROWELL:  Object to the form.

11   BY MR. CLARK:

12   Q     -- repairing windshields.  Agreed?

13   A     I don't know the exact numbers, but I

14   would agree that they would probably do the vast

15   majority, yes, sir.  That's correct.

16   Q     If all of that group, both your

17   preferred, Safelite, and those affiliated shops all

18   have written agreements -- Safelite has an

19   agreement -- we don't know the terms or conditions

20   and we're not allowed to talk about it today -- with

21   GEICO, and the affiliated shops all have agreements

22   with Safelite.  Am I correct in your understanding?

23         MR. TROWELL:  Object to the form.

24         THE WITNESS:  I mean, I believe so.

25   BY MR. CLARK:

1    Q    Now, putting aside the SGC Network, you

2    have the EDI system, which I would just generally

3    refer to as a billing system.

4    A    Yes, sir.

5    Q    Anytime -- if I'm an affiliate or one of

6    those minority shops that are not affiliated in the

7    network, I can still process payments and billing

8    through the EDI.  Am I correct?

9    A    If you're not an affiliate?  Is that what

10    you're asking me?

11    Q    Correct.

12    A    Yes, sir.  Anyone can bill through EDI as

13    long as they're in the SGC Network.  Correct.

14    Q    But, see, that's where you lose me at the

15    end there.  If I'm in the SGC Network, I've already

16    become an affiliated shop.

17    A    No, sir.  You can be in the SGC Network

18    and be non-affiliate.  We have non-affiliate shops

19    who bill through the EDI system at the prevailing

20    competitive price every day.  Any shop can be in the

21    SGC Network.

22    Q    So it kind of goes back to my question.

23    I can be in that minority, I think you're saying,

24    that is, I'm not affiliated, I haven't signed a

25    contract with Safelite, but I'm still in the SGC

1    Network.  Correct?

2        A    So to your point, I don't know the

3    agreements that shops sign with Safelite.  The only

4    thing I can tell you is a shop can be a

5    non-affiliate in the SGC Network and they can bill

6    through the EDI system.

7            I have no -- I don't know what they sign

8    with Safelite.  But we have non-affiliate glass

9    shops in the SGC Network who bill every day at the

10   prevailing competitive price.

11       Q    We've already dealt with those affiliated

12   that have signed the participation agreement with

13   Safelite, just to kind of summarize here, and I can

14   tell you that part of that agreement is they must

15   bill what GEICO's price is.

16           Now, the non-affiliated, those shops that

17   do not sign the participation agreement, do you know

18   if those non-affiliated shops who are in the SGC

19   Network and billing at GEICO's price must have an

20   agreement or some promise with Safelite to bill that

21   price in order to participate and be a member of the

22   network?

23           MR. TROWELL:  Object to the form.

24           THE WITNESS:  It's my understanding

25       that -- it's my understanding they don't,

1        Mr. Dan.  I mean, that's my understanding.

2   BY MR. CLARK:

3        Q     Turn to Page 4 of the interrogatory

4   responses, Exhibit 7.

5        A     (Examining document.)

6              I'm there, Mr. Dan.

7        Q     And in your response you identify John

8   Little as the drafter of the pricing agreements.  Do

9   you see that?

10       A     Yes, sir, I do.

11       Q     Have you spoken to Mr. Little in

12  preparation for your deposition today?

13       A     No, sir.

14       Q     Do you get any training in order to

15  understand the terms and conditions of the GEICO

16  glass pricing agreement or agreements, plural?

17       A     Do I get any training?

18       Q     Yeah.  When you took over in 2015 and

19  then in your position now as of August of 2016, I

20  mean, obviously you know that these pricing

21  agreements exist, but did anybody ever walk you

22  through and teach you what all this means and the

23  reasons why it has the terms and conditions like it

24  does?

25       A     Are you asking on the specific 2008 and

1    2012 documents?

2        Q    I'm asking in general.  But, yes,

3    specifically, I mean, there's the 2008 and then you

4    have the 2012.

5        A    No, sir, no one trained me on those

6    documents.

7        Q    How did you first find out that they

8    exist and are being used?

9        A    I was in a deposition when someone put

10   one in front of me from 2012.

11       Q    That's funny.

12       A    And I asked, "What is this?"  So I went

13   back and asked my -- the members in my unit,

14   centralized services, and that's when I found out

15   that when we do a pricing change, we send those out.

16   And the document that I reviewed was when we did a

17   pricing change in 2012.

18            Prior to that, I had never seen that

19   document before or had -- or heard anyone ever speak

20   about it.

21       Q    Did you ever talk to Mr. Little about it

22   directly?

23       A    No, sir.

24       Q    And one of the things that I asked in

25   this Interrogatory No. 7, the one just below it, do

1  you know how the GEICO glass pricing agreement is

2  sent out to individual shop owners?  Do you know how

3  that process works?

4      A    Are you speaking in today's world?  Are

5  you speaking like -- are you asking me if a shop

6  becomes an affiliate today, what happens?

7      Q    No.  I'm asking -- you know, clearly

8  these glass pricing agreements say -- I forgot the

9  actual -- they don't have particular names.  It just

10 says "shop owner/manager."

11     A    Right.

12     Q    And my general question is:  Do you know

13 how it's generally sent out to those shop owners?

14     A    I believe they were faxed.

15     Q    And is there a way that GEICO tracks

16 that, that, in fact, it's faxed to every shop in the

17 state of Florida, if you know?

18     A    I do not know if there's a way for us to

19 track that.  I can go back and ask, but I do not

20 know if there's a way currently.

21     Q    Do you know that this is, in fact, sent

22 out to all the shop owners in the state of Florida?

23     A    Are you talking about when there's a

24 pricing change?

25     Q    I'm talking about in general, whether

1    there's a pricing change -- I mean, clearly in 2008

2    that pricing agreement was in place for somewhat

3    about four years, and then in 2012 there was a,

4    quote, "pricing change" --

5        A    Sure.

6        Q    -- as you're describing.

7        A    Sure.

8        Q    Do you have an understanding of how that

9    2008 went out and did in fact go out and then the

10   2012?

11       A    Yes, sir, Mr. Dan.  It's my understanding

12   that they both went out via fax.

13       Q    Who sent them?  When you say "via fax,"

14   who was the responsible --

15       A    We authorized the document with Safelite

16   and Safelite sent it to the shops.

17            And to your point earlier -- I'm sorry to

18   go back, Mr. Dan, but to your point earlier, I was

19   involved in a case where we had to -- we asked if we

20   could get proof of an agreement being received and

21   we were able to pull that the fax machine on the

22   other end did actually receive it.  Whether it

23   printed or anything, we would never be able to know

24   that.

25       Q    Tell me how that all plays in together.

1  You kind of touched on it a few minutes ago. You

2  indicated -- you talked about Safelite sending out

3  the fax or this pricing agreement at GEICO's

4  direction, in essence, to find out whether this

5  particular shop wants to be an affiliated shop.

6  Tell me how that process generally works, as you

7  understand it.

8       A    So those are two different topics. So if

9  you're asking me how do we give Safelite information

10  to send out versus what a shop gets when they become

11  affiliated, those are two different topics. Which

12  one would you like me to go over first?

13      Q    Whatever you prefer.

14      A    Okay.

15      Q    It doesn't matter. Both of them.

16      A    Okay.

17      So anything that Safelite sends out, they

18  can only send it if GEICO authorizes it. So, for

19  example, the 2008 and 2012 pricing agreements that

20  were sent via fax, those came from GEICO to Safelite

21  to send to the network. That's why they're --

22  that's why they have -- one of them has John

23  Little's name on the bottom of it.

24      Now, if you're asking me what does a

25  provider get in today's world when they become an

1    affiliate, it's my understanding, Mr. Dan, that if

2    they choose to be affiliated with six insurance

3    companies, then they would get something for the

4    pricing for all six companies.

5         Q    Clearly they would need to know what the

6    price is that GEICO pays in order to send the bill

7    to GEICO to pay it; correct?

8         A    Not really.  Because even if they don't

9    have that agreement, we send work orders that have

10   the information on it every day.

11        Q    And this is just a point of reference.

12   You talked about this a little bit earlier.  In

13   response to Interrogatory No. 8, which is at Page 5,

14   where you talk about Safelite makes no decision to

15   any adjusting, pricing or payment, you talk about

16   GEICO, not Safelite, determines the prevailing

17   competitive price, all of those things.

18             What I think, and I think this is a fair

19   statement, the data, the information that GEICO

20   relies on and gets this working understanding from

21   comes from a large amount of information, and it

22   could be GEICO's own claim data from the SGC

23   Network.  Agreed?

24             MR. TROWELL:  Object to the form.

25             THE WITNESS:  We can pull our own data or

1          request it from Safelite.  So I don't know if I

2          can agree that the vast majority of GEICO's

3          data comes from Safelite.  I would 100 percent

4          disagree with that.

5     BY MR. CLARK:

6          Q    Let me just switch it up a little,

7     because I forgot about the fact that GEICO can go

8     into the SGC Network and pull data reports and

9     whatnot.  And then Safelite can do the same thing.

10    Is that what you're saying?

11              MR. TROWELL:  Object to the form.

12              THE WITNESS:  No, sir.  I'm saying at

13         GEICO we have the ability to pull data for all

14         of our own claims, or we can request our own

15         data from Safelite.  But if you're asking me

16         does the majority of the data we use come from

17         Safelite, that would be incorrect.

18    BY MR. CLARK:

19         Q    But if the majority of the glass shops

20    that are billing at GEICO's price are part of the

21    SGC Network made up of Safelite and affiliated

22    shops, then the majority of that billing would in

23    turn be coming from that majority of shops.

24         A    So I think we're talking about --

25         Q    Do you understand?

1     A     I think we're --

2           MR. TROWELL:  Object to the form.

3           THE WITNESS:  I'm sorry.

4           I think we're talking about two separate

5     things.  If you're asking me does the majority

6     of the billing come from the SGC Network, sure.

7     The majority of our shops, whether they're

8     affiliate, non-affiliate, or whatever you want

9     to call them, the majority of them all bill

10    through the SGC Network.  Only very unique

11    claims such as skeleton claims would take that

12    unique path.

13          But I still think we're talking about two

14    different things.  If you're asking me does the

15    majority of our bills from shops go through the

16    EDI system, that's a true statement.  But the

17    majority of the claims data we pull is always

18    in-house at GEICO with the ability to get

19    anything from SGC.

20          Just because somebody bills through SGC

21    does not mean that we have to ask Safelite for

22    that data.  We have to give Safelite permission

23    to pay the claim, and it's also logged in our

24    own data in our own system what we paid.  So I

25    still think we're on two different paths.

1    BY MR. CLARK:

2        Q    If you use my example, and I'm going to

3    give it to you in a second, forget about who can

4    pull it, where the data is, but the data that is --

5    that you rely upon per your working understanding

6    that we've been talking about, if you take just --

7    combine all claims all together and call it, just to

8    keep the math real low for my liberal arts training,

9    100 claims -- okay?

10       A    Okay.

11       Q    Or just imagine you.  Hypothetically your

12   working understand comes from 100 claims, but I know

13   it's bigger than that.

14       A    Sure.  Sure.

15       Q    And that 100 claims, you would agree the

16   majority of those 100 claims were billed by either

17   Safelite, your preferred shop, or an affiliated

18   shop.  Agreed?

19       A    They were billed by those shops through

20   the parameters in the EDI network that GEICO set.

21       Q    Great.

22            But those bills came from those types of

23   shops, that is, preferred shops, Safelite shops or

24   affiliated shops; correct?

25       A    Sure.  Yes, sir.  That's right, Mr. Dan.

1    Q    Okay.  So the majority of the claims that

2   are coming in to GEICO -- okay? -- that make up your

3   working understanding, those claims are submitted by

4   shops that are affiliated or the preferred Safelite

5   shops?

6            MR. TROWELL:  Object to the form.

7   BY MR. CLARK:

8    Q    That's what we're talking about?

9    A    I would say the majority of claims, yes,

10   sir, come from either --

11   Q    Okay.

12   A    -- Safelite or affiliate shops.

13   Q    Okay.  Those shops have agreements in

14   place that mandate that they bill GEICO at its

15   price.

16           MR. TROWELL:  Object to the form.

17   BY MR. CLARK:

18   Q    Agreed?

19   A    Those shops chose to bill GEICO at the

20   prevailing competitive price.

21   Q    Right.  They chose.  And the part of the

22   choosing was the terms and conditions of those

23   agreements in place, both for affiliated and the

24   preferred, Safelite; correct?

25           MR. TROWELL:  Object to the form.  Asked

1       and answered.

2                THE WITNESS:  I mean, I -- there's

3       non-affiliate shops who do the exact same

4       thing.  But, yes.

5   BY MR. CLARK:

6       Q    So you don't -- I mean, you clearly would

7   know that being a preferred shop, that is, Safelite,

8   they have a deal in place with GEICO that allows

9   them to make money; right?  That just makes common

10  sense; right?

11               MR. TROWELL:  Object to the form.

12               THE WITNESS:  Make money as to how?  I

13      mean, I don't understand what you're asking.

14  BY MR. CLARK:

15      Q    They're in business -- they're in

16  business to provide a service and make money doing

17  it --

18               MR. TROWELL:  Object to the form.

19  BY MR. CLARK:

20      Q    -- right?

21      A    Well, I think that would be any business,

22  yes, sir.

23      Q    That's what I'm saying, common sense.

24      A    Right.

25      Q    So you have to understand and I think you

1 would agree that Safelite is a preferred shop for

2 GEICO because of the deal that they have in place

3 that benefits both GEICO and benefits Safelite.

4    MR. TROWELL:  Object --

5 BY MR. CLARK:

6   Q Agreed?

7    MR. TROWELL:  Object to the form.  Same

8   objection.  We're not going to talk about

9   Safelite's relationship with GEICO.

10 BY MR. CLARK:

11   Q Do you agree?

12   A I don't know if I would agree to that,

13 no, sir.  I mean, I don't think -- I'm not sure if I

14 can agree that Safelite is our preferred shop

15 because of the deal we have in place.  I mean, I've

16 never seen the Safelite contract so I don't know the

17 parameters around the Safelite contract, so I can't

18 speak to that.

19   Q Well, you know that Safelite is the

20 preferred glass shop of GEICO; correct?

21   A That's correct, yes, sir.

22   Q And that's mandated from the highest

23 levels at GEICO; correct?

24    MR. TROWELL:  Object to the form.

25    THE WITNESS:  I would assume, yes, sir.

1    BY MR. CLARK:

2        Q    And GEICO [sic] has an arrangement, an

3    agreement in place, that makes them the preferred

4    shop of GEICO.  Agreed?

5            MR. TROWELL:  Same objection.

6            THE WITNESS:  I've never seen the

7        agreement, so I can't agree to that.  You're

8        asking me to only assume.

9    BY MR. CLARK:

10       Q    Going to the same scenario, an affiliate

11   shop, as you've already agreed, has an agreement in

12   place with Safelite.

13           MR. TROWELL:  Object to the form.

14   BY MR. CLARK:

15       Q    Correct?

16       A    I've -- I've never seen that agreement.

17   Again, I'm only assuming.

18       Q    But you understand that there's an

19   agreement in place that an affiliated shop also --

20   common sense -- has some benefit under an agreement

21   as affiliated member of Safelite; correct?

22           MR. TROWELL:  Object to the form.

23           THE WITNESS:  No, sir, they have no

24       benefit.  What would -- I don't understand your

25       question.  An affiliate shop has no benefit to

1    be affiliate whatsoever.  We do not allow them

2    to do signage.  We do not offer them more

3    business.  There's no -- this is what they just

4    choose to do.

5         We do not give an affiliate shop any more

6    benefit than we do a non-affiliate shop.  The

7    only minor small benefit they may receive is we

8    secure -- we try to secure affiliate shops

9    first if the policyholder does not choose

10   Safelite.

11        But other than that, there's no benefit

12   to them to be an affiliate with GEICO, which is

13   why we have many non-affiliate shops who bill

14   and get paid the prevailing competitive price

15   every day.  There's no benefit.

16   BY MR. CLARK:

17        Q    Is there any benefit to the shop provided

18   by Safelite?

19             MR. TROWELL:  Object to the form.

20             THE WITNESS:  I can't speak to the

21        relationship between the shop and Safelite.  I

22        do not work for them.

23   BY MR. CLARK:

24        Q    So you have no information, no knowledge

25   as to any benefit that Safelite provides to

1    affiliated glass shops?

2           MR. TROWELL:  Object to the form.

3           THE WITNESS:  I believe they offer them

4    EFT.  I mean, I just don't know.  I've never

5    seen that agreement.

6           MR. TROWELL:  And, Dan, the videographer

7    says that he's got to change the disk, so -- in

8    about five minutes.

9           MR. CLARK:  Let's do that.  Great.  Let's

10   go ahead and change the disk now.

11          You want to take another break, sir?

12          THE VIDEOGRAPHER:  Off the record at

13   12:07.  End of Disk No. 1.

14          (Short break.)

15          THE VIDEOGRAPHER:  We are back on the

16   record at 12:23.  Beginning of Disk No. 2.

17   BY MR. CLARK:

18       Q    What is the SV2 system?

19       A    It's a scheduling system on the GEICO

20   computers to make appointments.

21       Q    That system, that computer system that is

22   used, is that something that GEICO owns or is that

23   something that is set up by Safelite?

24       A    It is a Safelite system on the GEICO

25   computers.

1      Q      And then when you talk about the SGC

2  Network, is that another system that's on GEICO's

3  computers, or is that just a general reference, when

4  you say the network, that's what you know of?

5      A      The SGC Network is the entire network.

6      Q      And SGC stands for?

7      A      Well, SGC stands for Safelite Glass

8  Corporation.  They actually go by Safelite Solutions

9  now, but because they're known as SGC, people still

10  refer to the network as the SGC Network.  But the

11  technical name is Safelite Solutions now.  They just

12  haven't changed their headings.

13      Q      And then when you talk about the EDI, can

14  you tell me what that system is?

15      A      Electronic data invoice system.  It's

16  what the --

17      Q      Is that a -- sorry.  Go ahead.

18      A      It's a system that providers use to bill.

19      Q      Now, is that a system that is housed at

20  GEICO, or is that a system that is maintained by

21  Safelite?

22      A      The system itself is maintained by

23  Safelite.

24      Q      When you are working and overseeing the

25  employees in your department, I assume there's a

1    computer that sits in front of the various employees

2    that they click on things and open things and look

3    at different databases.  Is that a general --

4         A    Very broad, yes, sir.

5         Q    -- simple --

6         A    I would say yes to that.

7         Q    Very broad.

8         A    Yeah.

9         Q    Now, is it a program?  Is the SV2 system

10   literally a program that runs on that computer?

11        A    It is, yes, sir.

12        Q    And that program itself, is it an online

13   database, that is, you dial in -- you don't dial in

14   anymore -- but you connect to a website --

15        A    So --

16        Q    -- and then work in the database?

17        A    So, Mr. Dan, unfortunately my liberal

18   arts degree was not in information technology, so I

19   do not know exactly how that works.  The only thing

20   I can tell you is in order to get to the SV2 system,

21   you hit Launch on GEICO's ATLAS system and it takes

22   you to SV2.  And I believe it's web-based, but it

23   intertwines with our system.  It works together.

24        Q    And can you describe for the record and

25   those that will watch this video and maybe read this

1    transcript Safelite?  We've talked about them in a

2    lot of different contexts, both as a preferred glass

3    shop to a -- generally a third-party administrator,

4    and then you talked about the Safelite Solutions and

5    its network.  Can you break that down for the

6    members of the jury so they can understand Safelite

7    and how big it is, how it operates, and how it

8    interfaces with GEICO?

9         MR. TROWELL:  Object to the form.

10         THE WITNESS:  So I can't tell you the

11         inner workings of Safelite because I do not

12         work for them, but I can tell you what I know

13         if that will suffice.

14    BY MR. CLARK:

15    Q    Yes.  Mostly certainly.

16    A    Okay.

17         So Safelite Solutions is the entity under

18    Safelite.  Safelite's owned by Belron.  Safelite

19    Solutions is an entity under that.  And they are in

20    charge of the SGC Network, the EDI billing, things

21    along those lines.  Safelite Glass Company is a shop

22    within the SGC Network.

23    Q    When you say "shop," singular, within the

24    network, is Safelite shop just a general reference

25    to all of its shops?

A    Yes, sir, just the same as if there's a
company that has 30 shops.  We still just refer to
them as one company.  They're just a company within
the SGC Network.  But they could have multiple
shops.

Q    And when you talked about, you know, kind
of generally about GEICO's data versus Safelite
data, "We don't need to go to Safelite to get our
data," when you say that, can you tell me more about
how you obtain GEICO data from these systems versus
why or an example of why you would need to go to
Safelite to get some kind of more information?

MR. TROWELL:  Object to the form.

BY MR. CLARK:

Q    Do you understand my question?

A    I understand the question, so -- but, I
mean, I'll answer it the best I can.

So it's really hard to answer that
question without fully explaining the entire
process.

Q    Please do, then.

A    Okay.

So when a company bills through -- when a
provider bills through the EDI system, as soon as
they hit Submit, that becomes GEICO's data.

ANDERSON REPORTING SERVICES, INC.
(904) 358-0112

1                    It goes through a first audit table that

2      GEICO has set and given to Safelite within the EDI

3      system.  That audit table checks for any

4      discrepancies between the referral set up by GEICO

5      and what the provider is billing.

6                    For example, if the provider -- if the

7      provider bills and says the state is Georgia but we

8      have the state as Florida, it kicks out of the EDI

9      system.  When it kicks out of the EDI system, it

10     comes to GEICO to satisfy.  Okay?  And we have

11     bill-payers within GEICO who satisfy that.

12                   If it passes the first GEICO audit table,

13     it goes to the second GEICO audit table, which is

14     the parameters at which we pay, which would match

15     the work order unless they have a very unique

16     skeleton claim which is not normal.

17                   So at that point, if it passes that, it's

18     paid.  We receive an electronic transmission from

19     Safelite saying that "This has met both of the GEICO

20     audit tables.  We need to pay this claim."  We send

21     an electronic transmission back with money to pay

22     the claim and then they pay the shop.

23                   So any information we receive from

24     Safelite would be the information around the raw

25     data from that, because once the shop hits Submit

1   and it goes through the audit tables, it really just

2   becomes raw data.  So we can get the information

3   ourself or we can ask Safelite for that information.

4           That's really the -- kind of the working

5   relationship between us if we need information.

6   That's why I say any information we receive from

7   Safelite is in fact our own information.

8       Q    As it relates to a GEICO claimant and a

9   GEICO insured, in simplest form; correct?

10      A    That's correct, Mr. Dan.

11          But those, as I stated, are the

12  non-unique claims, unlike a skeleton claim.

13      Q    I'd like for you to look at the next few

14  exhibits, Exhibits 8, 9, 10 and 11.  I don't know if

15  we've marked them yet.  I believe we did.  So 9

16  through 11.

17          Just, if you would, my general questions

18  are going to be have you looked at them, have you

19  seen these before.

20      A    (Examining documents.)

21          Give me a second, Mr. Dan.  I'm looking

22  for No. 10.  Apparently I've lost it in my stack.

23          (Examining documents.)

24          I believe I'm ready.

25      Q    Okay.  If you would, my general question,

1    once you get through them, I mean, have you seen

2    these documents before?  Did you take any steps

3    yourself to work with others at GEICO to fully

4    respond to these discovery responses?

5              Discovery requests.  Excuse me.

6         A    (Examining documents.)

7              So -- are you ready, Mr. Dan?  I'm sorry.

8         Q    Yes.

9         A    So what I'll tell you, Mr. Dan, is I

10   don't know if I reviewed these -- I don't know if I

11   reviewed each of these.  But some of the answers in

12   here are part of what we've talked about through the

13   entire litigation process since I've been involved.

14        Q    Generally, did you make efforts -- were

15   you the one for GEICO that made the efforts to pull

16   the documents responsive to the requests sent, or

17   was that somebody else's job?

18        A    Anything that's sent to me, I can send it

19   to be pulled.  I don't know if we have a specific

20   person for that.  Requests can come to me, they can

21   come to my VP.  Requests can come many places.  We

22   have a programmer who can pull information for us.

23   But as far as -- I don't know if there's one person

24   that says, "This is the go-to guy to get this

25   information."  It can be requests from many places.

1          Q     Were you part of the group at GEICO that

2     was involved in pulling the training manual that's

3     been produced today?

4          A     The training department pulled the

5     training manual.

6          Q     Did you make any efforts to pull some of

7     the -- what did you call those reminders that got

8     sent out?

9          A     The good old Tuesday tips.

10         Q     Tuesday tips.

11              Did you make any efforts to pull the

12    Tuesday tips for the related policy changes or

13    updates?

14         A     No, sir.

15         Q     But you do know that there's Tuesday

16    tips -- there are some that relate to the policies

17    and procedures that we've talked about today;

18    correct?

19              MR. TROWELL:  Object to the form.

20              THE WITNESS:  So the Tuesday tips are to

21         reinforce current policies.

22    BY MR. CLARK:

23         Q     But also with respect to the skeleton

24    claims or what you talked about before, that there

25    was a Tuesday tip and change, did you make any

1    efforts to pull the documents related to that?

2         A    No, sir.

3         Q    Do you know if that was done?

4         A    I do not know if a Tuesday tip went out

5    on that process.  I was not the manager at the time

6    that that process changed.  So unfortunately,

7    Mr. Dan, I can't answer that.

8         Q    But as you review all the documents today

9    that have been produced to date by GEICO, you

10   haven't seen any such Tuesday tip on that issue,

11   have you?

12        A    Not that I'm aware of, no, sir.

13             MR. CLARK:  I'll talk to counsel off

14        record when we get to that.

15             Okay.  Let's turn to Exhibits 12 and 13,

16        if we could.

17             (The documents last-above referred to

18        were marked for identification prior to the

19        deposition as Plaintiff's Exhibits No. 12 and

20        13.)

21   BY MR. CLARK:

22        Q    Before we move on to the next two

23   exhibits --

24             MR. CLARK:  Oops, sorry.  Sorry, Madam

25        Court Reporter.

1          COURT REPORTER:  It's okay.

2          MR. CLARK:  Yeah, sorry.

3          COURT REPORTER:  It's okay.

4          Okay.  All right.

5          MR. CLARK:  Just one more second, if you

6      would.

7          MR. TROWELL:  And, Dan, just for the

8      record, it appears that Exhibits 12 and 13 are

9      basically one document together, just we're --

10     I just want to be clear.

11         MR. CLARK:  Sure.  I got that.

12         MR. TROWELL:  Okay.

13 BY MR. CLARK:

14     Q     Before we turn to those two documents, in

15 talking about, of course, the SV2 system and the SGC

16 Network and the EDI, all these things that we put

17 kind of in the larger picture when dealing with

18 Safelite, do you know whether other insurance

19 companies participate in this Safelite platform of

20 services?

21     A     I've never seen a document that showed

22 other insurance companies, but it's my understanding

23 that we are not the only one, correct.

24     Q     Are there -- to your knowledge, are there

25 other insurance companies that price at the

1      prevailing competitive price that GEICO uses?

2              MR. TROWELL:  Object to the form.

3              THE WITNESS:  I've never seen other

4          insurance companies' policies or pricing, so I

5          can't answer that.

6      BY MR. CLARK:

7          Q    Okay.  Exhibits 12 and 13, as your

8      counsel is indicating, is all one document.  It

9      consists of the declarations page and the actual

10     policy for Shauna Jones and Derryl L. Jones;

11     correct?

12         A    Yes, sir.

13         Q    And I marked this just to establish kind

14     of a framework for some later discussion.

15             Are you aware of the different policy

16     changes that have taken effect over the last five

17     years or so as it relates to payment of glass

18     windshield claims?

19         A    I'm aware that there was changes, yes,

20     sir.

21         Q    Have you specifically gone over some of

22     those changes?

23         A    Some, yes, sir.

24         Q    Have the cases that you've testified in

25     and the trials you've participated in dealt with

1     different forms of that policy, maybe the wording's

2     changed a little bit here and there?

3          A     I think, Mr. Dan, they've all just been

4     the same wording to date.

5          Q     Okay.  Let's turn to -- would it be

6     easier to look at the chronology of documents, both

7     from our client and GEICO, in one grouping so that

8     you can go back and forth?  Because the next series

9     of documents are Exhibits 14 through -- yeah, 14

10    through 22, and it basically has them in order so

11    you could, you know, really just easily move through

12    the questioning.

13          Would that be easier, or would you be

14    better served to start with what your attorney has

15    in hand as Exhibit 22, which was an internal note

16    off your -- what do you call it?  The A log?

17          MR. TROWELL:  Dan, I'm holding the

18          declarations page.  I'm sorry.

19          MR. CLARK:  Oh, I'm sorry.  It looked

20          like you were holding the A log.

21          What do you prefer, if any?

22          MR. TROWELL:  I mean, if you want to put

23          them in front of him, that's fine with us.

24          THE WITNESS:  Mr. Dan, I'll do whatever's

25          best for you.  I'm on your time.

1           MR. CLARK:  Okay.  Madam Court Reporter,

2     can you provide the witness Exhibits 14 through

3     22?  14 through 22.

4           COURT REPORTER:  Give me just a second.

5           MR. CLARK:  Yeah.  Take your time.

6           (The documents last-above referred to

7     were marked for identification prior to the

8     deposition as Plaintiff's Exhibits No. 14

9     through 22.)

10     BY MR. CLARK:

11       Q    We have marked, as best that we could,

12     Exhibits 14 through 22.  And the majority of those

13     Exhibits 14 through 21 is designed to set up almost

14     a chronology of events leading to this claim.

15           When you have used the term "skeleton

16     claim" or "skeleton loss" today, can you tell us

17     when GEICO first learned of this particular claim or

18     loss?

19           And if you look at a particular document,

20     would you let us know which document that is.

21       A    (Examining document.)

22           I'm sorry, Mr. Dan.  I'm looking at

23     Document No. -- Exhibit No. 22.  Let me know when

24     you're there.

25       Q    I am there.

1       A    So under Exhibit No. 22, you will see

2 that, as I stated earlier, I believe Mr. William

3 would have worked for our -- one of our Internet

4 units who the faxes come in to. It looks like that

5 they showed that we received the invoice from VIP

6 Auto Glass on February 10th, 2016.

7       Q    And I'm looking at Page 6, Page 6 of that

8 exhibit.

9       A    That's correct.

10       Q    But if I look at the timing, it's all

11 entered at the same time, 10:32. It says -- the

12 first entry starting at the bottom says, "Shortened

13 loss report (inbound call)." What is that referring

14 to?

15       A    It's just -- it's pre-documented through

16 our ATLAS system. It doesn't necessarily mean that

17 a call came in. It just means that we -- that we

18 received it and we did -- if you look up at the very

19 top, where it says -- what happens is when we set up

20 a claim in ATLAS, it will pre-document a bunch of

21 different things, which is what you see if you go

22 from the bottom up to the top. A lot of that, as

23 soon as the claim is set up, it's automatically

24 pre-filled in the notes.

25       But if you look at the second from the

1    top, it actually says we received a fax from VIP

2    Auto Glass and that we're going to put the fax,

3    which is the invoice, into the file.

4        Q    But then it says at -- if you start from

5    the bottom, three lines up, it says "Injury

6    Indicator has been checked" -- "changed from null to

7    No."

8        A    Yeah.  So there was no injuries on the

9    claim.

10       Q    But who would have checked it from null

11   to "No"?

12       A    It's not really something that they

13   check.  Whenever we put it in the system, the system

14   will read that it's a glass loss and not a liability

15   loss, so it automatically goes in there.  It

16   automatically pre-fills it.

17       Q    Can you determine from looking at these

18   notes that -- in response to the fax from VIP

19   whether anyone at GEICO then contacted the insured

20   or insureds?

21       A    Give me one second.  Let me review.  Do

22   you mind, Mr. Dan?

23       Q    No.  Please go right ahead.

24       A    Thank you.

25            (Examining documents.)

1          So if you look at -- are you ready?  I'm

2   sorry.

3          Q     Do you have a page?

4          A     If you go to Page 5, on the 11:20 a.m.,

5   it states that "Received invoice from VIP Auto

6   Glass."  And then if you read down, it says "Listed

7   on invoice" -- I mean, it says "Spoke with Derryl

8   Jones.  He confirmed work was done by shop of choice

9   and he verified loss details.  Advised of coverage

10  and sent work order to shop of choice reference

11  number."  So that is where Paige Ham actually made

12  contact with Derryl Jones and confirmed the loss

13  details.

14         Q     And then it says, "Also e-mailed invoice

15  to SGC at geicoinvoices@safelite.com"?

16         A     That's correct.  Yes, sir, Mr. Dan.

17         Q     What is that referring to?

18         A     So anytime we receive a faxed invoice, we

19  e-mail it to Safelite Solutions to run it through

20  the EDI system and bill it for us.

21         Q     When it says here that you were reading,

22  "Done by shop of choice and he verified loss

23  details," then it says, "Advised coverages sent" --

24  do you see that?

25         A     Yes, sir.

1    Q    And then what's the next line refer to?

2    "Without"?

3    A    Work order.

4    Q    "Work order" -- Sent" -- okay.  So

5    "Advised coverages.  Sent work order to shop of

6    choice."

7    A    Yes, sir.

8    Q    What does it mean when it's written here

9    by Paige Ham, if you know, "Advised coverages sent"?

10    A    We advise -- so the "Advised coverages,"

11    there really needs to be a period in between the

12    "coverages" and the "sent."  But it's written in

13    shorthand that people at GEICO understand just by

14    working there.  That just means that after we spoke

15    with the policyholder, we advised them that they

16    were covered.

17         Because prior to this -- because as we

18    stated, this is a very unique claim that we had no

19    notice of the first notice of loss.  So this is not

20    the way most people would do business.  So that was

21    the first time we were able to tell the policyholder

22    that they were covered because nor the -- the

23    policyholder nor the shop called us to let us know

24    anything before they did the work, which is why it's

25    very unique.

1    Q    What does "shop of choice" mean, when you

2    use "SOC" and refer to that as the shop of choice?

3    A    It means the policyholder had their shop

4    of choice.  They chose that shop.  When we -- in our

5    system, we refer to it as either Safelite or shop of

6    choice.

7    Q    Is it okay for an insured to use a shop

8    of their choice?

9    A    Absolutely.

10   Q    Okay.  Let's go back to Exhibit 14.

11   A    (Examining document.)

12   Q    When it says -- when you refer to in your

13   log in Exhibit 22 to receiving a fax, is either

14   Exhibit 14 or 15 the fax that you're referring to?

15   A    I believe so, yes, sir.

16   Q    Are both of them the fax received or just

17   one, or do you even know?

18   A    I don't know, but normally they send both

19   the work order and the invoice together.  Most shops

20   do.  I can't speak specifically to VIP, but most

21   shops like to send their own work order and the

22   invoice together.

23   Q    So take me through.  What happens next in

24   this chronology of events, based on the documents

25   that you can help explain?

1       A       So are you -- so --

2       Q       The fax comes in.

3       A       Okay.

4       Q       You took us through the chronology of --

5    you already pointed out that Paige Ham actually had

6    a conversation with the insured --

7       A       Yes, sir.

8       Q       -- at 11:20 a.m., February 10, 2016.

9       A       Okay.

10      Q       What happens next?

11      A       So Paige sent it to Safelite Solutions to

12   run through the EDI system.  It went through the

13   first audit tables and had no problem going through

14   the first audit tables.  When it went through the

15   second audit tables, which is the parameters at the

16   price that we can secure, it appears, because we're

17   here today, that we paid the price that we can

18   secure, which was lower than what VIP billed.

19              After we -- we received notification from

20   Safelite electronically that we -- that it went

21   through the first and second audit tables, and then

22   we sent information back to Safelite saying to pay

23   it and Safelite paid it for us.

24      Q       If you could turn to Exhibit 16, please.

25      A       (Examining document.)

1      Q    Is this what you were referring to as the

2  detail?

3      A    No.  I mean, this is not the actual audit

4  table.  This is just a detail of what was billed

5  versus what we pay.  So it shows the list price and

6  it shows the part price as billed with the original

7  labor and the original kit.  And then we paid the

8  price we can secure, which for a non-affiliate in

9  County Code A would have been 50 percent off of

10  NAGS.  Our labor's always at $40.  And then the kit

11  I believe is at $15 per kit, and they may have

12  billed two of them.

13       This is just an invoice detail that

14  anyone can download from the SGC Network, Mr. Dan.

15      Q    When you say "anyone," are you generally

16  referring to the fact that VIP could have --

17      A    Yes, sir.

18      Q    -- downloaded it?  Is that what you're

19  saying?

20      A    They could have.

21      Q    Okay.  Do they get sent this document or

22  is this downloadable?

23      A    It's downloadable if they have an SGC

24  log-in.  But they receive a check detail report

25  along with their check of what we paid on that

1 referral number and it's matched up with the

2 referral number.

3   Q Okay.  Can you turn to Exhibit 17?

4   A (Examining document.)

5    I'm there.

6   Q Do you know what this -- have you seen

7 this document before?

8   A I've not seen this document before, but I

9 know what it is.

10   Q And what is it?

11   A It's just a payment detail where it shows

12 the check number, the check date, the amount paid,

13 the invoice accepted date, and the -- the invoice

14 number is their invoice number, which should match

15 the invoice of theirs, along with the referral

16 number, which is our unique number, and then the

17 referral date, which is the date we would have sent

18 the referral, which I believe matches what we have

19 in our logs that we just reviewed.

20   Q Okay.  If you could turn to the next

21 document, 18.

22   A (Examining document.)

23    Yes, sir.  I'm there.

24   Q And do you know what this document is?

25   A This is a GEICO work order.

1     Q    And can I take it from the right-hand --

2  right far side -- top right, excuse me -- it's dated

3  February 10, 2016, at 11:24.  Is that the date that

4  this was created?

5     A    That's the date it was created, yes, sir.

6     Q    And would that match up to the log that

7  we looked at previously, if you cross-referenced?

8     A    I've never looked --

9     Q    Would that --

10    A    I've never looked at it, but I'll check

11  it real quick.  (Examining document.)

12         It appears to be about four minutes

13  passed when we said that we would have sent it,

14  so -- the documentation's at 11:20.  This says

15  11:24.

16    Q    Right.

17    A    But we may have documented before we

18  actually sent it.  Sometimes we'll document and then

19  send, so -- just depends on how the agent did it.

20  But they're close enough to say they're almost

21  simultaneously done.

22    Q    We're going to talk at length, once we

23  get to the pricing agreements, how the numbers work,

24  the discounts, the NAGS.  We're going to get into

25  that, so I'm not necessarily skipping it right now,

1   but --

2        A    Okay.

3        Q    -- this document does demonstrate and at

4   least express a 50 percent reduction; correct?

5        A    Yes, sir.  For this claim it does.

6        Q    And you mentioned this earlier.  You said

7   50 percent -- was it because of the particular area

8   or something else?

9        A    It's the county code, which is reflected

10  by the area, yes, sir.  A and B is always 50 percent

11  off of NAGS.

12       Q    And do the current pricing agreements

13  reflect that with the different areas?

14            MR. TROWELL:  Object to the form.

15  BY MR. CLARK:

16       Q    Would you be able to walk us through

17  that?

18       A    Yes, different areas have different

19  percentage off of NAGS, yes, sir.

20       Q    But is that represented in the pricing

21  agreements that have been produced in the case?

22       A    For 2008 and 2012?  I don't know if we

23  represented a pricing agreement for this claim

24  number, other than what we can secure.

25       Q    If the price charged by VIP, the shop of

1 choice, is above the prevailing competitive price,

2 this reduced 50 percent -- and, again, we'll get

3 into a little bit further detail later -- does GEICO

4 say anything to the insured about who must pay that

5 difference?

6    MR. TROWELL: Object to the form.

7    THE WITNESS: We tell the insured in

8    their policy that they have the right to choose

9    any repair facility they wish; however, we will

10    only pay the prevailing competitive price. And

11    then we tell them in the policy how we come to

12    the prevailing competitive price.

13 BY MR. CLARK:

14   Q So everything, as you've just stated,

15 told to the insured about paying the balance as I've

16 described comes from the policy, nothing else?

17   A I mean, we do have --

18    MR. TROWELL: Object to the form.

19    THE WITNESS: I'm sorry.

20    So are you referring to this claim?

21    Because this claim is not a normal claim,

22    nor --

23 BY MR. CLARK:

24   Q I'm just asking my basic question. If

25 the price that was going to be charged by a shop of

1    choice was going to be above GEICO's price, does

2    GEICO tell the insured that they're responsible for

3    the balance?

4            MR. TROWELL:  Object to the form.

5    BY MR. CLARK:

6        Q    Yes or no?  And then once you answer yes

7    or no, where do they tell the insured that?

8        A    So we do in certain situations.

9        Q    Can you tell me those certain situations?

10       A    If a policyholder wants to use a

11   dealership or a body shop, most dealerships and body

12   shops do not do glass work.  They sub it out.  So we

13   will tell the policyholder in those situations that

14   it's probably going to be more than the price we can

15   secure and we let them know that sublet fees and

16   things like that would not be part of it.  If the

17   shop is not in SV2 we have the conversation because

18   we're not capable to send a work order to the shop.

19           But in a normal situation and the way

20   normal claims are handled, a work order is sent to

21   the shop every single time.  So before the shop ever

22   does the work, they know exactly what GEICO will pay

23   per the parameters and then the shop has the ability

24   to either, A, not do the work, or, B, get the

25   overage from the policyholder.

1     Q     Is all the things you just told me
2  written anywhere in disclosures to insureds?
3          MR. TROWELL:  Object to the form.
4          THE WITNESS:  Define what you mean.  Are
5      you saying do we have anywhere written other
6      than our policy?  Can you rephrase the
7      question, Mr. Dan?  I'm sorry.
8          MR. CLARK:  Sure.
9  BY MR. CLARK:
10     Q     All the things you just said right this
11 second --
12     A     Right.
13     Q     -- what the insured's responsible for,
14 what they'll have to pay, do you send them a letter
15 about it?
16     A     No.  Other than the policy, no.
17     Q     Do you send an e-mail?  Do you send them
18 an e-mail?
19     A     No, sir.
20     Q     But for what is written in GEICO's
21 policy, there's nothing ever written and sent to an
22 insured; am I correct?
23          MR. TROWELL:  Object to the form.
24          THE WITNESS:  We let them know in the
25      policy, that's correct.

1    BY MR. CLARK:

2        Q    If you could take a look at Exhibit 18 --

3        A    Okay.

4        Q    -- which you should still be there --

5        A    I am.

6        Q    -- it says at the bottom, right above the

7    customer's signature, and I'm quoting, "GEICO will

8    not reimburse for deductibles not collected," end

9    quote.

10       A    Yes, sir.

11       Q    Do you see that?

12       A    Yes, sir.

13       Q    Did I read that correctly?

14       A    Yes, sir.

15       Q    What is that referring to?

16       A    Well, it does not refer to any claim in

17   Florida where they have comprehensive coverage

18   because there is no deductible.  But this work order

19   could go to let's just say somewhere where there is

20   a deductible.

21            What that is saying to the shop is if the

22   work is -- I'm just throwing a number out there --

23   is $1,000 and it's a $500 deductible, if they do not

24   collect the $500 deductible from the policyholder,

25   we're still -- we're not going to reimburse that.

1          But that does not pertain to any case in

2     the state of Florida with comprehensive coverage.

3          Q    Because there's no deductible --

4          A    For windshield claims.

5          Q    Correct.  Because there's no deductible

6     for windshield claims.

7          A    That's correct, yes, sir.

8          Q    And that's a -- mandated by law; correct?

9               MR. TROWELL:  Object to the form.

10    BY MR. CLARK:

11         Q    You understand that to be the law of the

12    state of Florida; correct?

13         A    I believe so, yes, sir.

14         Q    And that's what your policy states as

15    well; correct?

16              MR. TROWELL:  Object to the form.

17              THE WITNESS:  I believe so, yes, sir.

18    BY MR. CLARK:

19         Q    Can you turn to -- give me one second.

20              When you talk about -- I know that, taken

21    for what you've already said about the sentence

22    here, that GEICO will not reimburse for deductibles

23    not collected, where does it state in this document,

24    if it does, that GEICO will not pay any amounts due

25    that are above its prevailing competitive price?

1          MR. TROWELL:  Object to the form.

2          THE WITNESS:  So what we will pay is

3     clearly written on there.  And also there's a

4     line in the middle that says, "Performance of

5     service constitutes acceptance of the

6     communicated price and billing instructions."

7     BY MR. CLARK:

8          Q     Point to that language, please, or

9     just --

10         A     Under --

11         Q     -- give me some more reference.

12         A     Under "Notice," if you go to the last

13    sentence in the first paragraph under "Notice," it

14    says, "Performance of service constitutes acceptance

15    of the communicated price and billing instructions."

16              But other than that, everything that we

17    will pay is listed right here on the document.  The

18    parameters, not the actual price but the parameters.

19    There's some price for some things, but to your

20    question about the 50 percent, that's on the

21    document.

22         Q     Does GEICO require that a customer sign

23    this for every claim?

24         A     No, sir.

25         Q     Does GEICO require the customer or

1    insured to sign this document before payment is

2    made?

3         A    No, sir.

4         Q    And there's no signature in this

5    particular case; correct?

6         A    Are you talking about from the customer?

7         Q    Yes, correct.

8              This is the only one I've seen.  I

9    haven't seen any one signed by --

10        A    The signature --

11        Q    -- by the customer.

12        A    -- the signature is on the VIP's work

13   order at the very bottom.  So they didn't sign --

14   they didn't sign this work order, because this

15   work -- since this was not a normal claim and a

16   unique claim that did not follow the normal path the

17   way claims go, there was no way for a customer to

18   sign this work order because we were never given any

19   notice from the customer nor the shop.  But the

20   customer did sign the company's work order that we

21   believe was faxed to us, as we stated before, at the

22   very bottom.

23             But regardless of if it's signed or not,

24   in a skeleton claim as unique as this one, we still

25   send out -- I mean, we still call the policyholder

1    to verify the details.

2        Q    Does GEICO specifically prohibit claims

3    like this from being submitted like this, as you

4    kind of described it, skeleton claims?

5            MR. TROWELL:  Object to the form.

6            THE WITNESS:  In today's world, it's not

7        prohibited, no, sir, but it's not something

8        that's normal claims practice.  The vast

9        majority of shops would never operate this way.

10   BY MR. CLARK:

11       Q    Because the vast majority of shops are

12   either the preferred shop of GEICO, that is,

13   Safelite and its massive number of shops, or an

14   affiliated shop with Safelite; correct?

15           MR. TROWELL:  Object to the form.

16           THE WITNESS:  I don't know if I agree to

17       that.  I would think the vast majority of shops

18       would want to know up front if the customer has

19       coverage and if we're even going to pay

20       anything out.

21           I still don't know by looking at any of

22       these documents how VIP had any idea that the

23       coverage was good.  Yes, the policyholder may

24       have had their policy or either their insurance

25       card, but all that has is a before and end

1       date.  It does not constitute that there's

2       current coverage, because those are sent out at

3       the beginning of a policy.

4            So to answer your question, this is why

5       very, very few shops that I know of operate

6       this way, because there's really no real way to

7       know if it's even covered.

8   BY MR. CLARK:

9       Q    Well, if it's not covered, let's just

10  assume -- I assume you know because you're in this

11  business, but if there is coverage, you get your

12  windshield paid for, period, in Florida, no

13  deductible; correct?

14      A    If there's current coverage and it is a

15  windshield claim, yes, sir.

16      Q    The only other option -- it's pretty much

17  black or white.  If there's no coverage, since

18  there's no coverage, then you're not getting it

19  paid, so the customer's going to have to pay for it,

20  totally; correct?

21      A    That would be correct, yes, sir.

22      Q    Right.

23           So, I mean, if somebody comes in to your

24  shop, you ask -- I think what you're trying to say,

25  "Well, if the shop wants to guarantee it's going to

1    get paid, it better be sure that there's insurance

2    coverage in place before they start their process

3    and do the work."

4         A    I think that would, as you stated

5    earlier, be common sense, yes, sir, Mr. Dan.

6         Q    Okay.  Now, going back to Exhibit 18,

7    where I left off on my line of questions that sent

8    me on this route that we're on, you do not have in

9    your possession and GEICO has not produced a signed

10   copy, a customer-signed copy, of Exhibit 18 in this

11   case; correct?

12        A    That's correct.

13        Q    And GEICO does not mandate that its

14   customers sign such a document before payment is

15   made; correct?

16        A    Not this document, no, sir, we do not.

17        Q    And this document does not say that the

18   customer, also known as GEICO's insured, is

19   responsible for any difference or balance owed if

20   the price -- excuse me -- if the charge for the

21   repair or replacement exceeds the prevailing

22   competitive price that GEICO has set; correct?

23             MR. TROWELL:  Object to the form.

24             THE WITNESS:  No, sir.  The policy does.

25   BY MR. CLARK:

1     Q     Can you turn to the next exhibit,

2   Exhibit 19?

3     A     (Examining document.)

4           I'm there, Mr. Dan.

5     Q     What is this document?

6     A     It's considered an AIC invoice tracking

7   document.  It just shows everything that really

8   would be on a referral number to include payment.

9   So you have the insured's name, the vehicle.  You

10  have the date it was received, the date it was

11  installed, the date entered into the system, the

12  date billed, accepted and paid.  It shows what was

13  originally billed versus what was paid out.  And

14  then if you -- and it also has the check number.

15          And then Document 2 kind of shows the

16  same thing that we looked at earlier, which was kind

17  of a detail report.  It shows what the NAGS list

18  was, what it was billed at, and then -- with the

19  labor, and what it was adjusted to.  So it's just

20  kind of another document that shows that

21  information.

22    Q     On that second document that you're

23  referring to, you see where it says "Errors,"

24  "Pricing Approval Hold"?  What is that referring to?

25    A     I believe the "Errors" is there was no

1    EDI reject for a GEICO associate to satisfy.  As far

2    as the "Pricing Approval Hold," I'm not sure what

3    that is.

4         Q    What do you mean, there was no agent,

5    no --

6         A    So as I stated to you earlier, Mr. Dan,

7    whenever a company -- whenever either us, the

8    company or Safelite sends something through the EDI

9    system, it has to match certain criteria to get

10   through the first audit tables.  If it fails one of

11   the first audit tables, it rejects to a GEICO

12   associate to satisfy.

13        All that means in here is when this one

14   was sent through the first audit table, everything

15   matched up, so there was no error for GEICO to

16   satisfy.  Anytime there's a reject or an error, a

17   GEICO associate has to satisfy that.

18        Q    And if you would turn now to Exhibit 20.

19        A    (Examining document.)

20        I'm there, Mr. Dan.

21        Q    I assume this is part of the check that

22   was issued.  I'm not quite sure --

23        A    It is.  I'll explain it to you, Mr. Dan.

24        So whenever GEICO -- not GEICO.  Whenever

25   the Safelite Solutions issues a check to VIP, it

1    could have -- that check -- let's just say it's

2    $2,000 -- could have multiple claims from multiple

3    insurance companies on it.  So this right here is

4    just a detailed report they get with it to match up

5    with their invoice and referral number so they can

6    know what was paid on each claim.  So when they get

7    these checks, it could be encompassing many

8    insurance companies and many other claims.

9         Q    Gotcha.  And this just reflects two

10   claims?

11        A    Yeah.  It reflects the claim that we're

12   speaking about today, and then I'm not sure -- the

13   other one, I'm not sure what that is, what company

14   it is.  It could be us; it could be another company.

15   I'm just not sure.

16        Q    Oh, I see what you're saying.  Because

17   the check is issued by Safelite and VIP could have

18   done State Farm work and this was part of that check

19   as well.

20        A    Right.  So we authorize Safelite on a

21   per-claim basis to make a payment, but when they

22   make the payment to VIP, it could encompass many

23   insurance companies in that EFT.  So this just shows

24   a reference for VIP to know exactly what was paid on

25   that check.

1         MR. CLARK:  It's 1:20 right now.  Does

2    everybody want to take a short break to get

3    something to eat and then come back?

4         THE WITNESS:  Whatever you -- whatever

5    you need, Mr. Dan.

6         MR. CLARK:  So let's go off the record

7    real quick.

8         THE VIDEOGRAPHER:  We're off the record

9    at 1:19.

10        (Lunch break from 1:19 p.m. to 1:50 p.m.)

11        (Plaintiff's Exhibit No. 23 was marked

12    for identification prior to the deposition.)

13        THE VIDEOGRAPHER:  We are back on the

14    record at 1:59.

15  BY MR. CLARK:

16    Q   Sir, thank you for the short break while

17  everybody kind of grabbed something to eat real

18  quick.

19        What I've given you at this point is

20  Exhibit 23, and it is designed in the hopeful sense

21  of giving a little compilation on the first two

22  pages in a chart form of the policy language that

23  GEICO's had dating back to pre December 2002 and

24  taking us to current based on the documents produced

25  to us.  And this chart is something that we created

1   predicated on the actual excerpts taken from the

2   policy, and they all match up and cross-reference to

3   the Bates numbers.

4           So my question to you initially to

5   authenticate the policy is:  Are you aware of the

6   terms and conditions of GEICO's policy as it relates

7   to the limit of liability for auto glass windshield

8   claims?

9           MR. TROWELL:  Object -- object to the

10          form.  I mean, what time period?

11          MR. CLARK:  All of the time period that

12          has been produced today.

13          MR. TROWELL:  Okay.

14          THE WITNESS:  So I am aware that there

15          have been changes to the policy, yes, sir.

16  BY MR. CLARK:

17      Q   Okay.  And the language -- and I think

18  you said this off the record earlier, that the

19  language that you focus on deals with the prevailing

20  competitive price language in the policy; correct?

21      A   Yes, sir.

22      Q   And what we've heard so much and so often

23  about is the price that GEICO can secure from a

24  competent and conveniently located repair facility.

25  That's really what you've talked about in a ton of

1  depositions and trial testimony; correct?

2     A    Yes, sir.

3     Q    Now, the prevailing competitive price is

4  not defined in any of the insurance policies that

5  are in front of you; correct?

6          MR. TROWELL:  Object to the form.

7          THE WITNESS:  It is defined, yes, sir.

8  BY MR. CLARK:

9     Q    Okay.  Can you point -- can you state on

10  the record how it is defined --

11     A    Well, can you --

12     Q    -- by the policy?

13     A    Can you tell me what you mean by

14  "defined"?

15     Q    Defined as it has a definition in the

16  policy.

17     A    Oh, no, sir.  It's not bolded, so it does

18  not have a definition.  I apologize.

19     Q    Can you tell me what your understanding,

20  then, from the policy language, what the prevailing

21  competitive price is then?

22     A    It's the price that we can secure from a

23  competent and conveniently located provider.

24     Q    Who determines which facilities are

25  competent and conveniently located?

1      A      Well, those are two different questions.

2   Which one would you like me to go into first?

3      Q      Whichever one you prefer.

4      A      Okay.

5      Q      Both, ultimately.

6      A      So when you talk about competency, as

7   we've talked about a lot here today, GEICO secures

8   the preferred partner and affiliate partners.  Based

9   on -- based on the network that they're in, with the

10  rigorous requirements to be in that network, if

11  they're the preferred partner or the affiliate

12  partner, I mean, we're -- we're 100 percent sure

13  they're competent.

14         If you're speaking to a non-affiliate

15  partner, we really have no way up front to determine

16  competency.  We rely on the policyholder to call us

17  back if they have any issues.

18         But we only secure either preferred or

19  affiliated providers.  We do have the ability to

20  secure non-affiliate, but I haven't seen a case in

21  the state of Florida yet where we were not able to

22  secure either preferred partner or affiliate.

23         As far as -- so that's the competent.  As

24  far as conveniently located, that's the

25  policyholder's decision.

1                    THE WITNESS:  You're on mute.

2                    MR. TROWELL:  You're on mute.

3                    THE WITNESS:  You're on mute.

4                    MR. CLARK:  Sorry.

5       BY MR. CLARK:

6            Q    When you talk about securing a competent

7       and conveniently located repair facility, see if I

8       can state it a little bit different and see if

9       you'll agree with what I describe it as.

10                   The price that you're using, GEICO is

11      using, is based upon glass shops that are affiliated

12      in the SGC Network?

13                   MR. TROWELL:  Object to the form.

14      BY MR. CLARK:

15           Q    Correct or not correct?

16                   MR. TROWELL:  Object to the form.

17                   THE WITNESS:  No, sir.  The price --

18           we -- our parameters at what we pay is based on

19           what we can secure.  We secure -- we're able to

20           secure non-affiliate who meet the parameters at

21           which we pay and bill at the parameters at

22           which we pay.

23                   So I can't -- I mean, we have both

24           partner, affiliate and non-affiliate who we can

25           secure who accept our pricing.  So I can't say

1    that it's just partner and affiliate, no, sir.

2    That's not correct.

3  BY MR. CLARK:

4    Q    Who determines which facility is

5  competent when determining the prevailing

6  competitive price?

7    A    So it's based on what we can secure.  And

8  we know that we are able to secure the rate that we

9  pay from the partner or from the affiliate.  So as

10 far as competent --

11   Q    How do you --

12   A    Oh, I'm sorry.  Go ahead.

13   Q    No.  I was going to say, how do you

14 determine that the partner or non-affiliated is

15 competent?  Is that some -- what do you do to

16 determine that?

17   A    So the SGC Network, to be considered

18 affiliate, they have to meet the standards to become

19 affiliate.  What that means is they have to have

20 proper insurance, proper signage; they have to meet

21 continuing education requirements; and they have to

22 be in the SGC Network as a non-affiliate for over a

23 year and meet a 75 rating for their net promoter

24 score just to become affiliate.

25        So when we talk about partner or

1    affiliate companies which we secure, I'm very

2    confident that they are competent based on what they

3    have to go through.

4        Q    Who oversees what they have to go

5    through, GEICO or Safelite?

6        A    The Safelite Solutions oversees what they

7    have to go through, but we approve all of the

8    standards.

9        Q    When you say "we approve all of the

10   standards," what do you mean?

11       A    So we --

12       Q    What standards are you referring to?

13       A    So GEICO approves all the standards that

14   they set forth to become affiliate.  We agree that

15   those are very high standards and we agree to that.

16            We would have the ability -- we could

17   have the ability just to say, "We don't care about

18   the standards.  As long as they're in the network,

19   we can use them."  But we want the affiliate shops

20   to meet those high standards.

21       Q    GEICO agrees that those are high

22   standards, but those standards are applied, overseen

23   and checked off by Safelite when it adds a company

24   into the network?

25            MR. TROWELL:  Object to the form.

1    BY MR. CLARK:

2        Q    Agreed?

3        A    That is correct.  No matter what

4    insurance company they may be affiliate for.

5        Q    Correct.

6             So in your prevailing competitive price,

7    the competency element is, as you've described,

8    established, set, overseen by Safelite, which then

9    GEICO agrees with?

10            MR. TROWELL:  Object to the form.

11            THE WITNESS:  We agree with the standards

12        set forth, yes, sir, but -- that's correct.

13   BY MR. CLARK:

14       Q    And the -- again, the component that goes

15   into the price when dealing with conveniently

16   located, again, GEICO knows because of its business,

17   working with the SGC Network and affiliated shops,

18   that there are pretty much always a conveniently

19   located repair facility somewhere in the state of

20   Florida that is within the network and meets this

21   component element which is conveniently located as

22   well as competent.

23       A    So --

24       Q    Agreed?

25       A    So to answer your question, I've never

1   seen a case in the state of Florida where we were

2   not able to secure a partner or affiliate company.

3   That's correct.

4        Q    Because affiliated companies, however you

5   want to describe them, in the SGC Network, there's

6   numerous ones because Safelite Auto Glass is a large

7   company, you have all the affiliates that make up

8   the vast majority of this network nationally as well

9   as the state of Florida, and on top of all that,

10  they have mobile units; correct?

11            MR. TROWELL:  Object to the form.

12            THE WITNESS:  Actually, Mr. Dan, I would

13       say there's probably more non-affiliate

14       companies in the network, because you can be a

15       non-affiliate in the network just to use it for

16       billing purposes.  So if you're talking about

17       the network as a whole, there's probably

18       more -- way more non-affiliate companies than

19       there ever are affiliate.

20            Because anybody can use the SGC Network

21       just for billing purposes.  So when you ask me

22       does the SGC Network have more partner or

23       affiliate shops than any other shop, that's not

24       a correct statement.  We use more preferred or

25       affiliate shops.  We secure them.  But if

1        you're looking at the network as a whole,

2        there's far more non-affiliates than there ever

3        are affiliates.

4  BY MR. CLARK:

5      Q    But for establishing the prevailing

6  competitive price as you set the meaning based on

7  this policy language, GEICO looks to the SGC

8  Network, looks at the standards, the competency

9  level of those glass shops that have been affiliated

10  and gone through the standards that we've already

11  talked about, and knowing they are conveniently

12  located, and they use those shops and the pricing to

13  establish the, quote, "prevailing competitive

14  price"?

15        MR. TROWELL:  Object to the form.

16  BY MR. CLARK:

17      Q    Agreed?

18      A    No, I do not agree to that.  We do not do

19  that on a claim-by-claim basis.  We know, because of

20  the industry we're in and doing this every day,

21  exactly what we can secure and the parameters around

22  it.  We don't take a claim, look in the SGC Network,

23  and say, "Oh, we have four companies here who could

24  have done it for this price, so this is the price

25  we're going to pay."  We know the price that we're

1    able to pay and secure at the time of the claim.

2         And there should be no -- I mean, we put

3    it on the work order, so there should be no concern

4    from anybody as to what we will pay, because it's in

5    plain sight on every claim that we send that follows

6    the normal and non-unique path.

7         Q    The prevailing competitive price, I think

8    what you just said, is predetermined before a claim

9    is even submitted.

10        A    No, sir.

11        Q    Agreed?

12             MR. TROWELL:  Object to the form.

13             THE WITNESS:  No, sir, that's not what I

14        said.

15   BY MR. CLARK:

16        Q    Not what you said?

17        A    I said it's at the time of the claim,

18   which is why it's on the work order.  We know what

19   we can secure at the time of the claim.

20             Because the claim itself can be different

21   in many different ways.  We may approve OEM claim on

22   the claim.  We may approve more labor on the claim.

23   So, no, sir, that is not a true statement.  It's not

24   predetermined.  It's determined at the time of the

25   claim.

1    Q    And we'll get into that a little bit more

2    because of NAGS and the percentage used.  But I get

3    your point.

4         The language that you mentioned earlier

5    that was in the policy that's in writing and you

6    looked to and cited to specifically to say that an

7    insured knows that they're going to get hit with a

8    balance for -- if somebody bills more than the price

9    that GEICO has set, what language are you relying

10   on --

11        MR. TROWELL:  Object to the form.

12   BY MR. CLARK:

13   Q    -- in the policy, now that we have the

14   policy language in front of us?

15   A    So what I -- what I have stated is per

16   the policy, the policyholder has a right to choose

17   any repair facility they wish; however, we would

18   only pay the prevailing competitive price.

19        I don't understand why a company would do

20   the work without knowing exactly what we would pay.

21   I mean, I would assume, just common sense that we

22   talked about before, if a company knew they were

23   going to have to go after the customer, they would

24   have the conversation up front and the customer

25   probably would not agree to do the work.

1      Q    Does that answer my question?  Do you

2    think that answers my question?  I asked you

3    specifically what language in the policy are you

4    relying on.

5      A    The first --

6      Q    Can you cite that?

7      A    Yes, sir, Mr. Dan.  I apologize.

8           I think the first part I did answer.  I

9    mean, we advise the -- we advise the customer they

10    have the right to choose any repair facility;

11    however, we'll only pay the prevailing competitive

12    price.  And the prevailing competitive price is the

13    price that GEICO can secure.

14           In this claim we're talking about, GEICO

15    did not secure this.  The policyholder did.  So,

16    therefore, it does state to the policyholder that we

17    would pay the prevailing competitive price.

18      Q    Can you look to the chart that makes up

19    23?  And the first page of that chart you see Tab 3

20    and you carry across.  Can you read the language

21    that you're relying on so the record's clear?

22      A    So "Although you have the right to choose

23    any repair facility or location, the limit of

24    liability for repair or replacement of such property

25    is the prevailing competitive price, which is the

1      price we can secure from a competent and

2      conveniently located facility.  At your request, we

3      will identify a repair facility that will perform

4      the repairs or replacement at the prevailing

5      competitive price."

6           Q    And that's the language you completely

7      rely on to put the insured on notice that they may

8      have to pay a balance?

9                MR. TROWELL:  Hold on.

10     BY MR. CLARK:

11          Q    Am I correct?

12               MR. TROWELL:  Dan, just to be clear, that

13          Tab 3, these dates here I'm assuming are just

14          dates pulled off of the bottom of the policy

15          forms, so I'm not sure the precise effective

16          dates.  That's the date the policy -- those

17          policy forms are.

18               But that language you just had him read

19          in Tab 3 on y'all's document here, it says

20          3/2011 to 3/2015.  I think the claim in this

21          case is 2016.  I'm just -- I mean, so I'm not

22          sure if that's the policy at issue.

23               MR. CLARK:  Well, I thought the same

24          thing.  If you look at your interrogatory

25          response, you cited to that language from that

1       year.

2           Now, the claim was in -- as you just

3       stated, but I think we're dealing with a policy

4       that was issued --

5           MR. TROWELL:  Okay.

6           MR. CLARK:  -- a little further back.

7           MR. TROWELL:  All right.

8           MR. CLARK:  So that's maybe the issue.

9           But my question -- if you would, Madam

10      Court Reporter, read that last question back.

11          (The question was read by the reporter.)

12          THE WITNESS:  That is the language that

13      lets the policyholder know that we will only

14      pay the prevailing competitive price, yes, sir.

15  BY MR. CLARK:

16      Q    Is there any other document that

17  specifically states what the prevailing competitive

18  price is and the formula used that you give to

19  insureds?

20          MR. TROWELL:  Object to the form.

21          THE WITNESS:  No, sir.

22  BY MR. CLARK:

23      Q    VIP, you -- based on what I've read in

24  multiple lines of testimony you've given as well as

25  trial testimony, that for most glass companies, and

1    this would be specific to VIP, you're not -- you're

2    not suggesting that VIP is not a competent glass

3    company; correct?

4         A    On this claim I cannot dispute their

5    competency, no, sir.

6         Q    On any claim?

7         A    I've only --

8         Q    -- can you?

9         A    I've only reviewed this claim, so I can

10   only speak to this claim.

11        Q    Is that one of the steps that you require

12   your claims handlers to go through before any claim

13   is paid, that you determine that the shop being paid

14   is competent?

15        A    Is it one of the steps?

16        Q    Sure.  One of the process steps,

17   procedures, that you go through on behalf of GEICO

18   before you make payment.

19        A    No, sir.

20        Q    Then in every claim submitted by VIP, or

21   for that matter the 16,000-some-odd claims that make

22   up that declaration that we looked at earlier, all

23   of those glass companies were considered competent

24   at the time GEICO issued payment; correct?

25             MR. TROWELL:  Object to the form.

1          THE WITNESS:  So I don't think you can

2     group all of those claims together like that.

3     Each claim has different things around it.  But

4     if we made a payment on it, we did determine

5     they were competent, yes.

6  BY MR. CLARK:

7     Q    And you determined that they were

8  conveniently located; correct?

9          MR. TROWELL:  Object to the form.

10         THE WITNESS:  If the policy --

11 BY MR. CLARK:

12    Q    Because that goes -- I'm sorry.  He

13 jumped in with an objection and I was still

14 finishing the question.

15    A    I'm sorry.

16    Q    And VIP as well as that 16,000 other

17 claims and those glass companies that make up those

18 claims, they were conveniently located because, as

19 you've already indicated, clearly the insured

20 thought so --

21    A    So I will only --

22    Q    -- correct?

23    A    I can only speak to this claim.  And in

24 this claim, the policyholder -- they were

25 conveniently located.

1      Q    How do you reach that conclusion?

2      A    The policyholder chose them.

3      Q    In the 16,000 claims that make up the

4 declaration we looked at, would you reach that same

5 conclusion?

6           MR. TROWELL:  Object to the form.

7 BY MR. CLARK:

8      Q    If you paid the claim, the insured went

9 to those locations, got the work done, clearly they

10 were conveniently located to those insureds?

11     A    I would --

12          MR. TROWELL:  Object to the form.

13          Object to the form.

14          THE WITNESS:  I would need to look at it

15     on a per-claim basis.

16 BY MR. CLARK:

17      Q    Why is that?

18      A    Because I'm not going to speak on 16,000

19 claims that I haven't seen.

20      Q    Okay.  So is the conveniently located

21 element something that GEICO looks at, considers,

22 before payment is made?

23          MR. TROWELL:  Object to the form.

24          THE WITNESS:  So it depends on how you

25     look at it.  GEICO can secure -- if GEICO can

1          secure, then, yes.  I mean, as I stated, in the

2          state of Florida I've not seen an area where we

3          could not secure.  So we have providers that

4          are conveniently located to all policyholders.

5          So there would be no need to -- no reason to

6          look at that.

7     BY MR. CLARK:

8          Q    So much for the question that I asked

9     about competency, the competency element.

10    Convenience of the facility, that element in your

11    policy, is not something that you or GEICO look at

12    and consider before issuing payment to a particular

13    glass shop; correct?

14              MR. TROWELL:  Object to the form.

15              THE WITNESS:  No, sir, because we have

16         shops that are -- that are convenient.

17    BY MR. CLARK:

18         Q    So for VIP, walk me through it.  You get

19    the bill.  Payment is made.  Is there a step, a

20    policy procedure, that dictates that GEICO has to

21    make some determination under its policy language

22    that VIP is competent?  Yes or no?

23         A    No, sir, there's no step.  But going back

24    to what you asked me about the 16,000 claims, I

25    mean, for all we know --

ANDERSON REPORTING SERVICES, INC.
(904) 358-0112

1     Q    I'm not there yet, sir.  Hang on.  Your

2     lawyer has -- I'm just talking about VIP.  If you go

3     grouping up to this, then it makes my question and

4     the answer process a little more difficult.  Okay?

5     So stay with me.  I'll get to those 16,000.

6     A    Okay.

7     Q    Same question with respect to VIP:  Does

8     GEICO have a policy procedure or step that requires

9     to make some analysis on the conveniency of that

10    location and facility before payment is made to VIP?

11         MR. TROWELL:  Object to the form.

12         THE WITNESS:  The policyholder secured

13         them, so, no, sir.

14    BY MR. CLARK:

15    Q    Okay.  So for any facility that submitted

16    a bill and was paid, regardless, the competency and

17    the convenience of that location or facility is not

18    something that GEICO considers before issuing

19    payment --

20         MR. TROWELL:  Object to the form.

21    BY MR. CLARK:

22    Q    -- correct?

23    A    Are you speaking for a non-affiliate?

24    Q    For any glass shop that submits a bill

25    and GEICO pays.

1    A    So we rely on the policyholder, which is

2    why we can't group them together. For all we know,

3    on the 16,000 claims, on 200 of them the

4    policyholder called back and said that the work was

5    terrible. And then in that situation we would

6    indemnify the customer. That's why we're not able

7    to group them together.

8    Q    But for the general sense, before we get

9    to your 200 example, if GEICO paid a claim by a

10   glass shop, regardless of the amount and all the

11   things we're going to talk about further, it did not

12   consider the competency or the conveniency of that

13   glass shop before it issued payment; correct?

14             MR. TROWELL: Object to form.

15             THE WITNESS: We consider the competency

16        and convenience of what we could secure.

17   BY MR. CLARK:

18   Q    Not the facility that's submitting the

19   bill which you're paying; correct?

20   A    That's correct.

21   Q    Okay. Now, getting into what you were

22   jumping ahead to in the questions. I promised you I

23   was getting to it. The 16,000 or so that make up

24   the claims referenced in the declaration, you were

25   trying to add something about a possibility this is

1   why you would need to look at every claim.  Tell me

2   what you were trying to tell us.

3        A   So after we make a payment, say it's a

4   repair or replace, you can have a failed repair or a

5   failed replace to where, if the customer calls back

6   and says, "Hey," you know, "this windshield was

7   replaced.  Now it's got a crack in it," three -- you

8   know, two weeks later or whatever the time period

9   may be, that's why it's hard to group claims

10  together, because all claims are different.  And

11  just because we made a payment doesn't mean that

12  there wasn't something wrong with it at the time.

13       A policyholder can call back two weeks

14  later and say, "Hey, this windshield's peeling."

15  And then we have the ability, if it's an affiliate

16  shop, to take them out of the SGC Network if we have

17  things like that happen or go on.

18       So that's why it's very hard to group

19  16,000 claims together.  Just because we made a

20  payment doesn't mean that that claim was 100 percent

21  competent.

22       Q   When you make the statement and the

23  things you just said, did somebody tell you to say

24  that?

25            MR. TROWELL:  Object to the form.

1          THE WITNESS:  I mean, no.  That's common

2     sense.  All claims are different.

3  BY MR. CLARK:

4          Q     Well, when you say that, this is

5  something organic to you.  You came up with what you

6  just said.  Am I correct?

7          A     Yes.

8          Q     Okay.  Have you taken any steps to look

9  at whether the 16,000 or so claims that are

10  referenced in the declaration had any issue with the

11  work done?

12         A     Well --

13         Q     Before today.

14         A     Considering on the record --

15         Q     Before today.

16         A     Considering on the record we've already

17  said I haven't reviewed the data, obviously that's a

18  no.

19         Q     I didn't consider what you said earlier

20  about reviewing data that it specifically mentioned

21  to tie into what you just said now.  So I didn't

22  make that one-to-one connection.

23         So I ask you again:  The answer is no,

24  you haven't taken any steps to review any claims to

25  justify what you just said; correct?

1          MR. TROWELL:  Object to the form.

2          THE WITNESS:  On the 16,000 or in

3      general?

4  BY MR. CLARK:

5      Q    Yes.

6      A    If you're asking me for the 16,000, no,

7  sir.  But we have this happen to us in our normal

8  business procedures.

9      Q    And in the normal business procedure you

10  see instances where the work that is done, some

11  problem develops; correct?

12      A    It does happen, yes, sir.

13      Q    Okay.  For the claims that do have

14  problems and to which GEICO has paid its prevailing

15  competitive price, does GEICO step in to make sure

16  the work is done properly, repaired, whatnot?

17      A    So we don't have the ability to review

18  each repair or replace, no, sir.  But if a

19  policyholder calls us with an issue, we do have the

20  ability at that point to do an investigation.  It

21  could be done through SIU or through an auto damage

22  adjuster; it could be done through many areas.

23      Q    In a given year, do you get reports that

24  show how many such problems on claims come up?

25      A    We do have the ability to get reports

1    that are called failed repair reports and things

2    along those lines.

3        Q    Tell me about those -- what did you

4    call -- failed reports?

5        A    It's a failed repair report or failed

6    replace report.

7             We can also find reports where it had to

8    be switched from a repair to a replace.

9        Q    Why would that -- why would that be --

10   why would that happen?  Can you give me an example

11   so I can better understand?

12       A    Maybe it failed.  Maybe it -- so, for

13   example, whenever you're pressing down to put the

14   resin in the crack or whatever, sometimes it goes

15   further, the crack does, things along those lines.

16            We also have reporting that we can show

17   if we had to replace a windshield multiple times

18   over a certain period of time that we're able to

19   pull.

20       Q    The failed replacement or repair report

21   that you described, what's usually included in

22   those?  The name of the facility?

23       A    Whatever I want.

24       Q    So, in essence, you can get -- can you do

25   a search and get a report as you're describing,

1    taking the claim number or identifying number for

2    the 16,000 claims and running it against the failed

3    repair or replacement report?

4            MR. TROWELL:  Object to the form.

5            If you know.

6            THE WITNESS:  I mean, I would have to

7        check with my SAS programmer.

8    BY MR. CLARK:

9        Q    But, in essence, you could run a report

10    and do a cross-reference to see of the 16,000 claims

11    that have been identified in the declaration that

12    GEICO filed fall within this failed repair or

13    replacement report; correct?

14        A    If he is able to pull it, yes, sir.

15        Q    And what you just described as, you know,

16    failed repair or replacement situations or claims

17    that would make up a report like that, not only

18    would non-affiliated shops and claims fall within

19    that, but you have -- I'm sure you have examples of

20    those within the SGC Network affiliated shops that

21    have similar situations with their claims; correct?

22            MR. TROWELL:  Object to the form.

23            THE WITNESS:  We can pull -- we can pull

24        reports for all companies.

25    BY MR. CLARK:

1     Q    But affiliated shops within the SGC

2   Network, just because that's probably how claims

3   happen, some of those claims and those repairs do

4   fail?

5     A    Of course, yes, sir.

6     Q    Correct?

7     A    Of course.

8     Q    I mean, it's not just some awkward

9   scenario with a particular subgroup of, you know,

10  the network?

11    A    Unless it's fraudulent, that would be

12  correct.

13    Q    You know, the language in here that talks

14  about the loss will not exceed the prevailing

15  competitive price -- do you see that language?

16    A    Can you tell me where you're referring

17  to, Mr. Dan?

18    Q    Yeah.  I'm just looking at any of the

19  policy language, but it's used in different

20  locations.  But right where you were looking in

21  Exhibit 23, Tab 3, Subpart 2, quote, "Will not

22  exceed the prevailing competitive price" -- do you

23  see that?

24    A    Yes, sir.

25    Q    And that's the same pretty much

1    throughout that has that same language.

2          Is the prevailing competitive price the

3    lowest price that GEICO can secure from a competent

4    and conveniently located facility?

5          MR. TROWELL:  Object to the form.

6          THE WITNESS:  No, sir.

7    BY MR. CLARK:

8          Q    I think I asked you this before.  As you

9    sit here right now, just from your experience and

10   working in this industry, working with the claims

11   that you see, do insurance -- other insurance

12   companies pay more than GEICO's prevailing

13   competitive price?

14         MR. TROWELL:  Object to the form.

15         THE WITNESS:  I would have no idea,

16   Mr. Dan.

17   BY MR. CLARK:

18         Q    Nobody's ever asked that question, "Hey,

19   what is everybody else paying versus our price?"

20         A    I don't think anybody would be allowed to

21   tell us if anybody did ask.

22         Q    Why is that?

23         A    I mean, I know if somebody were -- if an

24   insurance company were to ask me or anybody employed

25   at GEICO what we pay, we would not be allowed to

tell them.  So, I mean, I don't work for other
insurance companies.  I can't assume.  No one's ever
asked me that.  But we would not be allowed to tell.

Because honestly, Mr. Dan, not trying to
sound rude, I mean, we pay based on what we can
secure from a competent conveniently located
provider, not what any other insurance company can.

Q    Has Safelite ever provided you data that
shows what other insurance companies are paying?

MR. TROWELL:  I'm going to object to the
form.

And to the extent it involves an exchange
within this contract, I want to instruct him
not to answer.

But if you know.

MR. CLARK:  Well, first of all, he said
he's never seen the contract.

MR. TROWELL:  Right.

MR. CLARK:  So I don't know how he would
ever fall within that.  But --

THE WITNESS:  I've --

MR. CLARK:  -- my question stands.

THE WITNESS:  Mr. Dan, I've never seen a
document from anyone that showed pricing from
another named insurance company, or another

1          company in general.

2     BY MR. CLARK:

3          Q     Have you ever heard of Safelite's market

4     conduct survey?

5          A     I've heard of it, yes, sir.

6          Q     What is that?

7          A     I'm not sure.  It's not something I

8     review.  But I have heard of it.

9          Q     You've heard of it but you don't know

10    what it is?

11         A     Yes, sir.  I mean, I --

12         Q     What is your -- what is your

13    understanding of what this market conduct survey is?

14         A     I don't have an understanding of what it

15    is.  I've never seen it.

16         Q     You just -- you've heard of this name,

17    this market conduct survey that Safelite can

18    generate, but you've never seen it and you don't

19    know what it is.  Fair enough?

20              MR. TROWELL:  Object to the form.

21              THE WITNESS:  I've never seen it, that's

22         correct.  Yes, sir.

23    BY MR. CLARK:

24         Q     Have you ever dealt with Safelite's

25    financial planning and analysis department before?

ANDERSON REPORTING SERVICES, INC.
(904) 358-0112

1      A      I don't think so, no, sir.

2      Q      When you deal with Safelite, is there a

3   particular person that you interact with, or if not

4   just one person, maybe a group of people?

5           MR. TROWELL:  Object to the form.

6           THE WITNESS:  I only have three people

7       that I would normally interact with.

8   BY MR. CLARK:

9      Q      And who are those?

10     A      One is Kenichi Oshida.  He is the claims

11  SIU director at Safelite.  Gary Strain is the

12  liaison between Safelite and GEICO.  And Gregory

13  Sams is the gentleman who's in charge of SV2.

14     Q      So for the first individual that you

15  mentioned, and I think I've got that name written

16  down here somewhere, but I could be able to --

17     A      It's Kenichi Oshida, but he goes by Ken

18  Oshida, so that should help.

19     Q      Ken.

20     A      I don't call him Kenichi.

21     Q      For that individual, how do you -- tell

22  me the situations that you interact with him.

23     A      If there is a company who we think could

24  be fraudulent based on the data that we look at, we

25  can communicate through him to set up inspections,

 1    things like that, which would also incorporate with

 2    Gregory Sams, who is the SV2 person.

 3         Q     Tell me how that comes up.  Can you give

 4    me a situation so I can get a better understanding

 5    of --

 6         A     For example, if --

 7         Q     -- how that comes up?

 8         A     Sure.

 9              So, for example, if we have a company

10    who -- maybe they're outsourcing the work but

11    they're sending a claim to us in order to -- in

12    order to get payment for it, stating that they did

13    the work and not the third party or whoever did it

14    for them, we have the ability -- we can pull reports

15    and we can speak with Ken Oshida to see if he's had

16    any investigations with the company, things like

17    that.

18              Ken Oshida really helps with more fraud

19    protection more than anything.  If we have a state

20    that maybe repair claims are up 200 percent, we're

21    able to look at that -- at that state with our own

22    data and narrow it down.  So maybe we have a company

23    who used to have no claims and now they have a whole

24    lot of claims, which would be a very unrealistic if

25    they're in the same location, to try to find fraud.

1          So he's really kind of our fraud person

2    that we speak with at Safelite.

3          MR. CLARK:  Just to make the record

4    complete, I have attached as Exhibit 24, which

5    I'll turn to in a second, the GEICO policy

6    produced.  It has a date, 2-98, and it's

7    Bates-stamped 65 through 81.  And that's going

8    to be marked as Exhibit No. 24.

9          And then 25 is another GEICO policy that

10   has a date of 3-11, and that is Bates 82

11   through 100.  If we can go ahead and mark those

12   and hand those out.

13         (The documents last-above referred to

14   were marked for identification prior to the

15   deposition as Plaintiff's Exhibits No. 24 and

16   25.)

17         MR. CLARK:  Thank you.

18         Next let's go ahead and hand out

19   Exhibit 29 -- excuse me, 26.  Sorry.  26.

20         (The document last-above referred to was

21   marked for identification prior to the

22   deposition as Plaintiff's Exhibit No. 26.)

23         MR. CLARK:  Okay.  Great.

24   BY MR. CLARK:

25         Q    Exhibit 26 is the September 11, 2008,

1    GEICO glass pricing agreement.  You got it in front

2    of you?

3         A    I do, yes, sir.

4         Q    Okay.  We've talked about it already a

5    little bit today.  And you've told us, I think --

6    I'm not going to regurgitate a lot of it -- but how

7    the percentages and prices, in essence, the formula,

8    is reached in this document.  Can you state on the

9    record now that you have, in fact, an understanding

10   of how these particular percentage points were

11   determined by GEICO?

12             MR. TROWELL:  Object to the form.

13             THE WITNESS:  No, sir.  I was not

14        involved in that.

15   BY MR. CLARK:

16        Q    Okay.  And you don't know the person who

17   would be able to speak to that on behalf of GEICO;

18   correct?

19        A    From 2008?

20        Q    Correct.

21        A    No, sir.

22        Q    Now, 2008, this pricing agreement stayed

23   in place until 2012; am I correct?

24        A    Yes, sir.

25        Q    Okay.  So while 2008 was the original

1   date of this document, is it your understanding that

2   John Little of GEICO sent this out September 11,

3   2008, and this price set forth in this document

4   stayed the same consistently based on these

5   percentages and dollar amounts until 2012?

6           MR. TROWELL:  Object to the form.

7           THE WITNESS:  Are you -- so when I look

8       at this document, it doesn't tell me some of

9       the things I would need to know.  You know, I

10      don't know what county code this was by looking

11      at the document based on 2008.  And I can't

12      speak to whether this -- whether the pricing

13      was exactly the same from 2008 to 2012.  I

14      can't speak to that.

15  BY MR. CLARK:

16      Q    Okay.  So you don't know?

17      A    I do not know.

18      Q    You don't know the answer?

19      A    No, sir.

20      Q    Do you know of any other documents that

21  would help you and us determine that?

22      A    So what I know is what I've asked.  As I

23  stated before, the methodology has been the same

24  since 2008, but the actual numbers itself, I mean,

25  I'm not sure who would know how those numbers have

1    changed from 2008 to 2012.

2        Q    What do you mean by that?  What do you

3    mean?  What numbers changed?

4        A    You asked me if these numbers -- like I'm

5    assuming you mean the 47 percent, the 40 for labor

6    and the 49.95 for windshield.  You asked me if those

7    numbers stayed the same from 2008 to 2012.  I don't

8    know who I would ask.  I would only assume that they

9    were the same for whatever county code this is,

10   which I assume would be County Code A or B.

11       Q    Is there a particular document besides

12   this one that you know of that would answer the

13   particular county code issue and state for the

14   record in absolute terms whether these -- this

15   percentage and dollar amounts stayed the same?

16       A    Only what a new affiliate shop would get

17   when they become new.  If that document is the same

18   as this one, then I would agree to that.

19       Q    Yeah, but I asked GEICO to produce all of

20   its pricing agreements, all documents that set forth

21   its price, which this case is about, would you

22   agree?  The prevailing competitive price --

23       A    Yes, sir.

24       Q    -- right?

25       A    I would say so, yes, sir.

1    Q    Okay.  And this document, as you've

2    described, is the prevailing competitive price set

3    by GEICO on this document on that date by

4    Mr. Little; correct?

5              MR. TROWELL:  Object to the form.

6              THE WITNESS:  This is the parameters,

7         yes, sir.  The price is set at the time of the

8         claim.

9    BY MR. CLARK:

10   Q    Okay.  We'll get to that in a second.

11   But the percentage points and the dollar amounts,

12   how do we determine right now if those changed at

13   all from 2008 to 2012?

14   A    If there's no other document, I would

15   only assume that they did not.

16   Q    Okay.  So I guess I have to take that

17   answer, because one of my topics today, you would

18   agree to talk about the prevailing competitive

19   price.  And this is the only document I know of

20   unless you've seen it, and you said you saw

21   everything that GEICO gave to me.  The next

22   documents we have are from 2012.  So this is it.  Do

23   you agree?

24   A    I would agree, yes, sir.

25   Q    Okay.  So when you state on the record --

1    you've said this a few times -- the price is not

2    fixed and determined until the claim is submitted --

3    do I have it right?

4        A    For the FNOL, yes, sir.

5        Q    For the F what?

6        A    First notice -- I'm sorry.  It's a GEICO

7    term.  I'm sorry, Mr. Dan.  I'm not trying to

8    confuse you.  It's -- FNOL just stands --

9        Q    You tend to do that sometimes.

10       A    FNOL just stands for first notice of

11   loss.  So at the time the claim is called in or set

12   up online, it's determined then based on the factors

13   around it.

14       Q    Correct.  The factors being the NAGS;

15   correct?

16       A    Or if we approve or -- the NAGS price is

17   a factor, yes.  Or if we approve OEM or any extra

18   labor, things like that, that we are able to

19   approve.

20       Q    Okay.

21       A    But for the --

22       Q    But what doesn't change --

23       A    Go ahead.  I'm sorry.

24       Q    Sorry.

25       A    No, I'm good.

1          Q     I interrupted you first.

2                But what does not change is the

3     percentage that is used in this document --

4     correct? -- 47 percent?

5          A     For a normal non-OEM claim, that would be

6     the price that we could secure, yes, sir.  That's

7     correct.

8          Q     And that percentage is predetermined;

9     correct?

10         A     It's the price we can secure, yes, sir.

11         Q     Now, my question was:  It's predetermined

12    by GEICO before the claim is submitted; correct?

13                MR. TROWELL:  Object to the form.

14                THE WITNESS:  If you're asking me if the

15           47 percent is determined at the bare bones, I

16           mean the parameters is determined, yes, sir,

17           but the price is set at the time of claim.

18    BY MR. CLARK:

19         Q     The 47 percent that is used in this

20    document is predetermined by GEICO and is fixed at

21    least as of 2008 until it was later changed in 2012;

22    correct?

23                MR. TROWELL:  Object to the form.

24                THE WITNESS:  Define what you mean by

25           "fixed."

1    BY MR. CLARK:

2        Q    You don't have another document that says

3    something else besides 47 percent.

4        A    So the 47 percent is the starting point

5    for the parameters, but it can change on a per-claim

6    basis.  So I answer yes with my testimony that it

7    can change on a per-claim basis.  But the 47 percent

8    is the starting point.

9        Q    The percentage changing on a per-claim

10   basis, give me an example of how the percentage

11   would change.

12       A    Well, besides OEM, if it's a part that's

13   on back order or they may have to pay for shipping

14   for it to be ordered, sometimes we can approve

15   100 percent of NAGS.  We have the ability as the

16   supervisor staff to make exceptions on any claim at

17   the claim level on a per-claim basis.

18       Q    So going back to the price that VIP

19   submitted, if you go back to the invoice and look at

20   the price, the NAGS price that they submitted, they

21   submitted at 100 percent of NAGS and were paid

22   50 percent of NAGS, give or take; correct?

23       A    They were paid -- they were paid the

24   price we could secure, which was 50 percent of NAGS,

25   yes, sir.

ANDERSON REPORTING SERVICES, INC.
(904) 358-0112

1     Q   Okay.  GEICO could have paid that full

2   bill, 100 percent of NAGS, as billed; correct?

3     A   GEICO is a limit of liability policy.

4   That would be unlimited liability.

5     Q   Then what did you just say?  I thought

6   you just said that on a claim-by-claim basis there

7   are things that you can take into consideration --

8   back order, this, that -- that allow you, "you"

9   being GEICO, to pay 100 percent of NAGS.

10     A   That's --

11     Q   Am I correct of what you just said?

12     A   Well, that's correct.  But your company

13   did not follow normal claims procedure.  There's no

14   way for the work to be on back order if they did the

15   work before they -- before they did the first notice

16   of loss.  So it's --

17     Q   Now, if -- go ahead.

18     Now, do you notify your insureds, sir,

19   that there are instances that GEICO will pay more

20   than its prevailing competitive price if certain

21   situations occur?

22     MR. TROWELL:  Object to the form.

23     THE WITNESS:  We advise an insured if

24     they're covered in full or not.  For example,

25     for OEM, we would tell them that we're

1           approving the OEM.  But there could be cases

2           where we approve OEM but not the total amount

3           for the labor.

4                For example, if they go to a dealership,

5           we may tell the policyholder, "We're going to

6           approve your EOM, but the dealership's going to

7           charge more than $40 an hour, so we're only

8           going to pay the $40 an hour."  That's why

9           everything is claim-specific.

10     BY MR. CLARK:

11          Q     And in those instances who pays the

12     difference?

13          A     The policyholder would.

14          Q     And NAGS.  Tell me what NAGS is --

15          A     I've heard it --

16          Q     -- for the record.

17          A     I've heard it two ways.  I've heard it's

18     National Auto Glass Standards and National Auto

19     Glass Specifications.  Different people call it

20     different things.  But it's the -- it's the current

21     retail price of like kind and quality glass.

22          Q     Can you turn to what I'm going to mark --

23     well, we're going to mark it later because I don't

24     want to throw my numbering off.  Can you turn to the

25     2015 -- I believe it's the '15 training manual.  And

1    if you'd go to, in that document, what is

2    Bates-stamped at the bottom GG/VIP429.  429.

3            A    (Examining document.)

4            Q    Do you see it?  429 Bates number, the

5    right-hand corner?

6            MR. TROWELL:  Dan, if you don't mind, I'm

7        going to show him what a Bates stamp is.

8            MR. CLARK:  Yeah, please.  Please do.

9            MR. TROWELL:  See that right there, that

10       GG/VIP?

11           THE WITNESS:  Oh.

12           MR. TROWELL:  What did you say?  429?

13           MR. CLARK:  Yes, sir.

14           MR. TROWELL:  So you're looking for those

15       numbers.

16           MR. CLARK:  Okay.  It must be the 2016

17       that came through.  Sorry.

18           MR. TROWELL:  Yeah.

19           MR. CLARK:  Just show him that.

20       Unfortunately, I didn't have a chance last

21       night to print out all of these.

22           Let the record reflect that the witness

23       is looking at the 2016 training manual, which

24       we'll identify by an exhibit number here

25       shortly.  But for the record, I'm asking the

1          witness to turn to Bates No. 429, which in the

2          middle of that page has a description of NAGS,

3          or National Auto Glass Specifications.

4               THE WITNESS:  (Examining document.)

5               I'm there, Mr. Dan.

6    BY MR. CLARK:

7          Q    Okay.  And there's a number of things

8    that are said about NAGS here, but can you read into

9    the record the middle paragraph that begins "NAGS

10   list prices"?

11         A    Yes, sir.

12              "NAGS list prices, which are based on

13   costs provided by parts manufacturers that are then

14   combined with estimated labor hours.  The estimated

15   labor hours are determined by actual in-shop

16   installations and field testing."

17         Q    So the NAGS -- and I've heard you use

18   this word before -- is the benchmark for costs of

19   windshields and parts and -- for pretty much every

20   manufactured piece of glass.  Do I have that right?

21              MR. TROWELL:  Object to the form.

22              THE WITNESS:  I believe it's the current

23         retail price.

24   BY MR. CLARK:

25         Q    When you say it's the retail price, it's

1    the retail price because NAGS gets the actual cost

2    from the manufacturer of the product?

3        A    I can't speak on how NAGS comes up with

4    their pricing.  It's just my understanding that NAGS

5    is the current retail price for a part.  And it also

6    shows the number of labor hours it takes to install

7    that part.

8        Q    But NAGS doesn't provide the actual labor

9    rate, that is, the dollars paid per hour; correct?

10       A    I do not believe so, no, sir.

11       Q    So the way this -- the methodology works

12   in the pricing agreement that we're looking at, 26,

13   the formula is taking the set percentage that is

14   determined by GEICO, 47 percent, applied to the NAGS

15   list for whichever product or piece of glass or

16   whatever the parts are; correct?

17            MR. TROWELL:  Object to the form.

18            THE WITNESS:  You would take the current

19        retail price in NAGS minus the 46 percent or

20        47 percent, whatever it was at that time.

21   BY MR. CLARK:

22       Q    And that's all predetermined and loaded

23   into -- that NAGS is already loaded into the

24   network, the computer program that you use at GEICO;

25   correct?

1     A     That is correct, yes, sir.  When NAGS

2  changes, it automatically updates.

3     Q     And it's my understanding that NAGS

4  updates every so many quarters, approximately --

5     A     Norm- --

6     Q     -- three or four times a year?

7     A     Normally it's every quarter, but they can

8  do updates in between quarters.

9     Q     And then the NAGS hours, the per NAGS

10  hours, that's a NAGS inputted number, same thing for

11  the NAGS list; correct?

12     A     Yes.  It would be the $40 times the

13  number of hours listed in NAGS, correct.

14     Q     And the labor rate here in this document

15  at $40, that's determined by GEICO; correct?

16     A     Yes, sir.

17     Q     So the best that you can tell us right

18  now, the best guess, is that GEICO at some point in

19  2008 used its general business knowledge and came up

20  with 47 percent and 40 bucks an hour.  Is that the

21  best we can do today?

22     A     I mean, if you're asking me my best

23  guess, whenever the price was set in 2008, GEICO did

24  its due diligence and set the price.

25     Q     But you don't know what GEICO looked at;

1    correct?

2         A    I do not, no, sir.

3         Q    You don't know who at GEICO looked at

4    it -- correct? -- if they even looked at anything?

5              MR. TROWELL:  Object to the form.

6              THE WITNESS:  I do not know who looked --

7    I do not know who set the rate, no, sir.

8    BY MR. CLARK:

9         Q    Okay.  So whoever that person is that set

10   the rate and whatever that person did, this stayed

11   the same, there was no changes, as far as you could

12   determine as GEICO's corporate representative today,

13   until 2012; correct?

14        A    Correct.

15        Q    So the prevailing competitive price

16   remained the same for about four years --

17        A    That's an incorrect statement.

18        Q    -- based on what GEICO --

19        A    That's an incorrect statement.

20        Q    -- based on what GEICO said?

21        A    No, sir.  What you said is not correct,

22   Mr. Dan.  We do not set a price.  We set parameters.

23   So the parameters stayed the same based on what

24   we're looking at for those four years, but the price

25   could have went up or down based on NAGS.

1    So the way you -- the way you said that

2  question, that statement is not correct.  The price

3  would not have been exactly the same unless every

4  claim exactly the same way was submitted and there

5  was no change in NAGS.

6    Q    $40 stayed the same; correct?

7    A    Yes, sir.

8    Q    Labor rates stayed the same in 2008,

9  2009, 2010, 2011 and into 2012.  That's your

10  testimony?

11    A    My testimony is the $40 an hour is what

12  GEICO can secure, so, yes, sir.

13    Q    But you don't know what GEICO could

14  secure in 2008, 2009, 2010, 2011 and 2012; correct?

15    MR. TROWELL:  Object to the form.

16    THE WITNESS:  Yes, sir, I do.  It's $40.

17  BY MR. CLARK:

18    Q    What have you done to confirm that for

19  today?  As I understood, you didn't participate in

20  this.  You don't know who did.  You don't know what

21  data was used.  And now you're suggesting that you

22  could go do this.

23    A    If GEICO could have secured a lower or

24  higher rate, the rate would have changed.  So if the

25  rate stayed at $40, that is the rate GEICO could

1      have secured for the entire time.

2           Q     Wait a second.  Is that a guess, or do

3      you know that for a fact?

4           A     Well --

5           Q     Are you guessing?

6           A     No, sir.

7           Q     So you know for a fact that GEICO in

8      2008, 2009, '10, '11 and into '12, made that

9      analysis, did those things you just described, and

10     came to a determination that 40 bucks an hour should

11     stay the same?  That's your testimony today?

12               MR. TROWELL:  Object to the form.  That

13          is not what he just testified to.

14     BY MR. CLARK:

15          Q     I'm just making sure I'm crystal clear.

16          A     Mr. Dan, what I'm saying is, based on

17     what I know as the corporate rep, if GEICO could

18     have secured something different, the price would

19     have changed.  So if the price did not change, I

20     don't -- I don't know -- I mean, we could have

21     secured $40.

22          Q     Who told you that?  Who told you what you

23     just said?

24          A     What do you mean?

25          Q     You just said if GEICO could have secured

1    a different rate, it would have done so and this

2    would have changed.  That's what you basically just

3    said.

4         A    So the documents you put in front of me

5    tell me that we could have secured the $40 because

6    it did not change.

7         Q    But you're making an assumption.  You're

8    guessing.  Because you weren't there in 2008, '09,

9    '10; correct?

10        A    My testimony is I was not there, but if

11   we could have secured something differently, the

12   rate would have changed, as the NAGS rate changed in

13   2012.  And I believe that the windshield repair rate

14   also changed.

15        Q    Stick with me on the $40 an hour --

16   okay? -- for right now.  What have you done to

17   confirm what you've just said on the record today

18   under oath?

19        A    I don't understand your question.

20        Q    You keep on saying that if GEICO could

21   have secured a different rate for the hourly dollar

22   amount here, it would have done so and this would

23   have changed.

24        A    So --

25        Q    Stick with me, now.  I want to know

1    exactly what you did and the steps you took to

2    confirm what you just said.

3          A    So I stated earlier in the deposition

4    that I spoke to everyone in my department and they

5    stated to me that the methodology has been the same

6    since 2008.  So the way we conduct --

7          Q    I understand.

8               Go ahead.

9          A    Go ahead.

10          Q    Go ahead and finish.

11          A    I didn't mean to cut you off, Mr. Dan.

12    I'm sorry.  You can go ahead.

13          Q    Now, you said the methodology didn't

14    change.  I don't disagree with that.   The

15    methodology, based on the documents, has remained at

16    $40 an hour for this particular labor rate.   Okay?

17               But you're going far past that with your

18    testimony, in my opinion, so that's why I'm drilling

19    down on what you did, who you spoke to, and what

20    steps you took.  You are taking a leap, I believe,

21    that GEICO did in fact look at the rate again in

22    '09, '10, '11 and into '12 to make a determination

23    that 40 was the right rate.  That's what you're

24    saying.  And I'm asking you how you know that.

25    Isn't that a guess?

1          MR. TROWELL:  Asked and answered.

2    BY MR. CLARK:

3          Q    Go ahead.

4          A    So as I've stated, no, I was not in on

5    those meetings.  But if we could have secured

6    something differently, the rate would have changed.

7    And that's my testimony.

8          Q    If GEICO could have done something, it

9    would have changed.  But how do you know that?

10         A    Because it changed in 2012.

11         Q    Did somebody tell you that if GEICO could

12   have secured a different hourly rate, it would have

13   changed?

14         MR. TROWELL:  Object to the form.

15         THE WITNESS:  No, sir.

16   BY MR. CLARK:

17         Q    Yes or no?

18         A    No, sir.

19         Q    Did you read that if GEICO could have

20   secured a different rate, it would have changed?

21   Did you read that?

22         A    The policy states the price that we can

23   secure.  So if we could have secured something

24   differently, the rate would have changed.

25         Q    And how do you know that it didn't

1    change?

2        A    Well, as we've already stated, the labor

3    was the same from 2008 to 2012.  We know if GEICO

4    could secure something different, that the items on

5    the paper would have changed, because I believe the

6    NAGS list and the price for windshield repair

7    changed because that was the price we could secure.

8        Q    For this time period, 2008 to 2012, did

9    GEICO take any steps to reevaluate its labor rate?

10            MR. TROWELL:  Object to the form.

11            THE WITNESS:  I do not know that.

12   BY MR. CLARK:

13       Q    So as far as you know, GEICO could have

14   looked at the rate, found that it was different, and

15   decided not to change it; correct?

16       A    I don't know.

17            MR. TROWELL:  Object to the form.

18            THE WITNESS:  I don't know why they would

19       change two other things and not that one.

20   BY MR. CLARK:

21       Q    Okay.  But you don't know whether GEICO,

22   in fact, did determine in 2009, for example, or

23   2008, 2010, whatever, that the rate was different

24   and made a decision not to change it?  You can't

25   answer that, can you?

1    A    I was not there.  No, sir, I cannot.

2    Q    Now, when GEICO sends out this pricing

3    agreement, does it ask the shop owner to sign and

4    return it?

5    A    I do not believe so, no, sir.

6    Q    Does GEICO keep a record of whether or

7    not the shop owner confirms receipt?

8    A    I do not believe so, no, sir.

9    Q    Does GEICO send this document to its

10   insured?

11   A    No, sir.

12   Q    Does GEICO include this document in its

13   policy?

14   A    No, sir.

15   Q    Why not?

16        MR. TROWELL:  Object to the form.

17        THE WITNESS:  I can't answer that,

18   Mr. Dan.

19   BY MR. CLARK:

20   Q    Why doesn't GEICO include its pricing

21   structure that's here in its policy?

22        MR. TROWELL:  Object to the form.

23        THE WITNESS:  I mean, I'm not sure why we

24   would add that in to the policy.

25        MR. CLARK:  If you could turn to

1          Composite Exhibit 27, please.

2               (The documents last-above referred to

3          were marked for identification prior to the

4          deposition as Plaintiff's Composite Exhibit

5          No. 27.)

6               THE WITNESS:   (Examining document.)

7               I'm ready, Mr. Dan.

8     BY MR. CLARK:

9          Q    Okay.  Composite Exhibit No. 27 is made

10    up of Bates stamps 115 through 122.  Can you walk us

11    through this document, these documents, please, sir?

12    Given the fact that we kind of know already there

13    was the 2008 pricing agreement.  Now we have various

14    what appear to be pricing agreements, but I may be

15    making a wrong assumption.  So just walk us through,

16    if you would.

17         A    Yes, sir.  So this is the same document

18    as in 2008.  It appears that we had a pricing change

19    in 2012.  The pricing change looks like it was the

20    percentage off of NAGS that we can secure along with

21    the -- I believe the repair rate that we can secure

22    increased to $60.

23              And when you look at these, because as

24    we've stated before, there's different county codes

25    for the percentage off of NAGS based upon where the

1    provider is located, so the different pricing

2    structures would have gone out to the different

3    county codes with what their county code was.

4         So, for example, a rural area provider,

5    let's just say if they're in rural Florida, or I

6    always like to say Wyoming or Montana, their

7    percentage off of NAGS would be 26 percent, most

8    likely, because it's harder for them to get glass

9    than someone who's in a very high-level market.

10        So these show the different items that

11   were sent out.  And they also vary based on, I

12   believe, affiliate versus non-affiliate.

13   Q    Okay.  So that's kind of the first

14   question I have.  The first two documents, Bates

15   No. 115 and 116, looks like they were issued the

16   same date.  They have an effective for work

17   performed same date.  And the differences are just

18   the percentage for NAGS windshield and tempered.  Am

19   I correct?

20   A    Are you talking about the documents

21   themselves?  The only difference is the percentage

22   off of NAGS?  Is that what you're asking me?

23   Q    That's correct.  That's correct.

24        MR. TROWELL:  And you're only referring

25        to the first two pages; right?

1          MR. CLARK:  Yes, that's correct.  I'm

2     just trying to get a better understanding.

3          THE WITNESS:  I believe so, Mr. Dan.  I

4     believe you're correct.

5  BY MR. CLARK:

6          Q    Okay.  And it says, "The following rates

7  for shops in your area."  But you don't know what

8  area each of these documents is referring to;

9  correct?

10         A    What do you mean?

11         Q    Well, one has, the same date -- if you

12  look at Bates No. 115, it has the 36 percent for the

13  windshield and tempered of NAGS, and it says --

14  everything's the same, "Dear Participant," "shops in

15  your area," they're getting 36 percent.

16              The next page, Bates No. 116, same

17  language, has 26 percent.  Why the difference in the

18  percentage --

19         A    The county --

20         Q    -- if you know?

21         A    The county code would be different, so

22  the market's different.

23         Q    Correct.  County code.  How do we

24  determine which is what county code?

25         A    It's -- it's not on this piece of paper.

ANDERSON REPORTING SERVICES, INC.
(904) 358-0112

1    I just know from doing this as long as I've done it.

2    A and B is always 50 percent.  I believe C is 46 to

3    47.  I believe D is 36 and E is 26.

4        Q    And --

5        A    I could be wrong.  I mean, I'm going off

6    of memory, so...

7        MR. TROWELL:  I mean, Dan, we've got that

8        information if you want it.  I mean, right now

9        he's going to be guessing since the document

10       doesn't say.

11       THE WITNESS:  Yeah.  There's no way to

12       tell on the document itself.  But that's the

13       difference in the NAGS pricing of how they

14       would have been sent out.

15       MR. CLARK:  Okay.

16       MR. TROWELL:  If you want, we can go off

17       the record and we can tell you which ones in

18       what county code, and then you can go ahead

19       with your questions.

20       MR. CLARK:  That's all right.  We can do

21       that a little bit later.

22       MR. TROWELL:  Okay.

23       MR. CLARK:  We can come back and confirm

24       on our next break.

25    BY MR. CLARK:

1      Q     The next two documents are Bates No. 117

2    and 118.  And while the first two documents would

3    reference "Dear Participant," this one is -- these

4    are addressed, same date, "Dear Shop Owner/Manager."

5      A     Yes, sir.

6      Q     See the difference?

7      A     Yes, sir.

8      Q     Why is that?

9      A     These would have gone to non-affiliate

10   shops.

11     Q     So affiliated shops, as of January 2012,

12   are getting 36 and 26 percent of NAGS, off of NAGS?

13          MR. TROWELL:  Object to the form.

14   BY MR. CLARK:

15     Q     Is that correct?

16     A     I mean, affiliate and non-affiliate have

17   the same percentage.

18     Q     I'm lost.  117 --

19          MR. TROWELL:  I think the county codes

20          would clear it up.

21          THE WITNESS:  The county codes --

22          MR. CLARK:  Okay.  Then we need to go to

23          the county codes, because it doesn't make any

24          sense whatsoever as I look at these documents.

25          So go ahead.  Let's go off the record.

1          THE WITNESS:  Okay.

2          THE VIDEOGRAPHER:  We're off the record

3     at 3:16.

4          (Short break.)

5          THE VIDEOGRAPHER:  We are back on the

6     record at 3:22.

7  BY MR. CLARK:

8     Q    Sir, thanks.  While we took a short

9  break, we went through Composite Exhibit 27 and

10 Counsel, based on Bates number, was giving me

11 different county code information, affiliate/

12 non-affiliate.  But my questions are going to be

13 related to all of this, focus a lot on what you've

14 already told us.

15    A    Okay.

16    Q    Okay?

17    A    Yes, sir.

18    Q    All of what you told us about your

19 investigation and knowledge or lack thereof as it

20 relates to the methodology and what was looked at

21 and considered and by who at GEICO for the earlier

22 2008 pricing agreement, would your answers to those

23 questions be the same for the 2012?

24    A    So if you asked me if I know who looked

25 at the data and determined it, no, sir, I don't know

1    exactly who.

2         Q    And you don't have any additional

3    information of what was looked at and considered

4    specifically as a fact now for 2012, either;

5    correct?

6         A    I do not know, no, sir.

7         Q    And I know what you said earlier about

8    the 2008.  Did you take any steps to make any --

9    make any effort to find out who was involved, what

10   they looked at, those sort of things, in preparation

11   for your deposition today?

12        A    For the 2012 pricing change, no, sir.

13        Q    Can I ask you why not?

14        A    I mean, I'm not really sure how to answer

15   that, Mr. Dan.

16        Q    Nobody asked you to and you didn't do it.

17   Fair enough?

18             MR. TROWELL:  Objection.

19             MR. COTTRELL:  Objection.

20             MR. TROWELL:  We've objected prior to

21        this that we weren't going to be talking about

22        how they arrived at those percentages, so...

23   BY MR. CLARK:

24        Q    You -- the percentages used in these

25   documents, both the 2008 and the 2012 pricing

1   agreements, you have stated on the record and in

2   your interrogatory responses that it was based on a

3   working understanding of the prevailing competitive

4   price.  And that generally is what your statement

5   has been.

6           But you truly, as you sit here right now,

7   have no information for us of who looked at what,

8   what they looked at and actually the methodology

9   used; correct?

10          MR. TROWELL:  Object to the form.

11          THE WITNESS:  Well, the methodology is

12      what it is for 2008 and 2012.  But if you're

13      asking me who in 2008 and who in 2012 set this,

14      I do not know the exact person, no, sir.  But I

15      know that that was the price we could secure.

16  BY MR. CLARK:

17      Q   Let me go back to "that was the price we

18  could secure."  But that's just simply because

19  somebody told you that now; correct?

20          MR. TROWELL:  Object to the form.

21          THE WITNESS:  No, sir.  That's because

22      the vast majority of our claims go down this

23      path.  It's very unique for a claim not to go

24      down this path.  If that were not the price we

25      could secure, no one would do business with us.

BY MR. CLARK:

Q    You can't tell us the methodology used to reach the percentages specifically in either the 2008 or the 2012 pricing agreements; correct?

A    No, sir.

Q    You can't tell us the methodology used by GEICO to reach the $40 an hour for labor costs in 2008 and 2012; correct?

A    I was not involved in those meetings, no, sir.

MR. CLARK:  Okay.  Let's take a break. Thank you.

THE VIDEOGRAPHER:  We're off the record at 3:27.  End of Disk No. 3.

(Short break.)

THE VIDEOGRAPHER:  We are back on the record at 3:46, beginning Disk No. 4.

BY MR. CLARK:

Q    Looking at your -- any of your GEICO pricing agreements, but the one I have in my hand is the 2008, and you already pointed out the differences between the pricing agreements that are going to non-affiliated glass shops and then the ones that are going to participating or affiliated ones.  You saw the difference; right?

1          A     Yes, sir.

2          Q     Correct?

3                And the reason why you have the

4     difference, I believe, is because you put more into

5     the language of the -- what you termed the pricing

6     agreement in the body of those documents; correct?

7          A     I mean, that's --

8          Q     So, for example, if you look at the 2008,

9     in the body, after you have the formula used to

10    determine the price, you have three paragraphs;

11    correct?

12         A     Yes, sir.

13         Q     And these three photographs are for

14    non-affiliated glass jobs; correct?

15         A     So I believe, for the record, that in

16    2008 this may have gone out to everybody, versus in

17    2012 it was stipulated between affiliate and

18    non-affiliate.  But I was -- I was -- I was not

19    there when we authorized to send it out, so I'm not

20    100 percent sure.

21         Q     Well, you can also go to Composite

22    Exhibit 27 and look at the forms that are used there

23    and the concept that these three paragraphs are not

24    in the participating letters going out versus the

25    non-participating or non-affiliated.  They're

1    different.

2        A    I agree to that, Mr. Dan.  If you look

3    at -- if you look at that, then the 2008 is the --

4    it looks the same as the non-affiliated agreements

5    from 2012.  I agree to that.

6        Q    You would agree that -- you wouldn't

7    consider these pricing agreements to be binding on

8    the glass shops, would you?

9            MR. TROWELL:  Object to the form.

10   BY MR. CLARK:

11       Q    There are not signatures.  They didn't

12   accept it.  They didn't sign for it.  Agreed?

13       A    I don't understand what you mean by

14   "binding."  No matter what a shop bills, we pay what

15   we can secure.  So this just states exactly what we

16   would pay.

17       Q    And those glass shops, as you know from

18   all the litigation that has gone on about this topic

19   of which you've testified in, shops don't have to

20   accept the GEICO price; correct?

21           MR. TROWELL:  Object to the form.

22           THE WITNESS:  So I don't understand what

23       you mean by "accept."  Shops can choose whether

24       to be affiliate or non-affiliate, but whether

25       they're affiliate or non-affiliate, the payment

1    is exactly the same.  So whether they choose to

2    accept it or not, the price we can secure does

3    not change.

4  BY MR. CLARK:

5    Q    And the price that you're going to pay is

6  not going to change, either; correct?

7    A    Not between affiliate and non-affiliate.

8    Q    And the fact remains that, as it states

9  here in this document, if, in fact, a shop bills

10  more than GEICO's price, the insured's on the hook

11  for it?

12          MR. TROWELL:  Object to the form.

13  BY MR. CLARK:

14    Q    Correct?

15    A    That would be up to the shop.  That's

16  not -- we don't determine that.  The shop determines

17  that.

18    Q    But I thought you said the policy

19  language sets forth that if I don't go to one of

20  your preferred facilities, that I'm going to be on

21  the hook for anything owed.

22    A    The policy language states that we will

23  pay the price we can secure.  If the shop -- if the

24  shop wants to go after the policyholder after what

25  we pay, that's between the shop and the

1    policyholder.  We don't set forth that.  We do not

2    make a shop do the work, nor do we make a shop go

3    after the policyholder for what -- for us paying

4    what we can secure.  That would be shop-specific.

5    Some shops may go after the policyholder; some may

6    not.  That's really their determination because

7    we've paid, per our policy, what we can secure.

8         MR. CLARK:  Now, if you will take a look

9         at what I'll mark as Exhibit 30.

10         Let's go ahead and hand the witness

11         Exhibit 30.

12         (The document last-above referred to was

13         marked for identification prior to the

14         deposition as Plaintiff's Exhibit No. 30.)

15         MR. TROWELL:  So, Dan, for the record,

16         there's no -- at this time in the record

17         there's no 28 or 29.

18         MR. CLARK:  Oh, I'm sorry.  It was 29

19         that I meant to mark, not -- did I just say 30?

20         THE WITNESS:  You said 30, yes, sir.

21         MR. CLARK:  Let's leave 30 as it is for

22         now.  I am going to come to that.  But 29 -- we

23         can go ahead and hand out 28 as well.  It's

24         just the statute.

25         COURT REPORTER:  Okay.

1          (The documents last-above referred to

2     were marked prior to the deposition for

3     identification as Plaintiff's Exhibits No. 28

4     and 29.)

5          (Off-the-record discussion.)

6          THE WITNESS:  We're ready, Mr. Dan.

7  BY MR. CLARK:

8     Q    Okay.  So -- sorry for my screw-up a

9  little earlier.  Exhibit 29 is a composite exhibit,

10 and it has a chart of a few opinions, one out of

11 Hernando County, three out of Hillsborough and one

12 out of Broward County, and it has the applicable

13 opinions.  Do you see that?

14    A    Yes, sir.

15    Q    Okay.  I believe you testified in person

16 in one of these.  I believe it was the *Superior Auto*

17 *versus GEICO* case in front of Judge Berkowitz.  I

18 believe I've seen your testimony.  Do you recall

19 that?

20    A    Yes, sir.

21    Q    Okay.  So we have -- going off of what

22 you just said, there are county court decisions

23 you're aware of that have found that the prevailing

24 competitive price and the policy is ambiguous and

25 GEICO was responsible for paying the balance owed on

1    many of these glass shops that we've been talking

2    about; correct?

3              MR. TROWELL:  Object to the form.  Asking

4         him for a legal conclusion.

5              MR. CLARK:  That he's aware of rulings?

6              MR. TROWELL:  Well --

7    BY MR. CLARK:

8         Q    My question stands, sir.  Go ahead.

9         A    I'm aware of the rulings, yes, sir.

10        Q    Okay.  Has GEICO taken steps to make

11   changes in the way that it's processing claims and

12   it's pricing?

13        A    No, sir, not at this time.

14        Q    Does it have any intent to make changes

15   moving forward, to change its policy language and

16   its reliance on the prevailing competitive price?

17             MR. TROWELL:  Object to the form.

18             THE WITNESS:  I can't speak to the intent

19        moving forward.  I know what I know as of

20        today.

21   BY MR. CLARK:

22        Q    You haven't been instructed and you

23   haven't heard in any of those Tuesday things that

24   you were talking about earlier, no changes coming

25   down the pike?

1      A     The Tuesday tip would never have anything

2   involving pricing.

3      Q     Can you tell me how shop owners, glass

4   shop owners, within the network and otherwise, are

5   going to find out and did find out about the pricing

6   change that GEICO was willing to pay that took

7   into -- came into effect in 2012?

8      A     It's my understanding that they were

9   faxed to the fax numbers on record.

10      Q     And it is your testimony that on or about

11   the time of 2012, January, that the prevailing

12   competitive price and the bills that GEICO was

13   receiving were at this price of 50 percent off of

14   NAGS?

15          Do you understand my question?

16      A     So I believe the pricing --

17      Q     I've got to be specific.  For county

18   codes A and B, affiliated/non-affiliated, because

19   we've got that criteria.

20      A     Right.  Right.

21      Q     But as of about January 2012, is it your

22   testimony, based on what you said today, that GEICO

23   was getting billed by competent, conveniently

24   located glass facilities at 50 percent off of NAGS?

25      A     The pricing change was in January 31st of

1    2012, per -- per the order.  I mean, I can't tell

2    you what companies were billing at that time.  I can

3    tell you what we can secure, which would have been

4    what the pricing change was.

5        Q    Well, if I understand the process that

6    you have testified today, the prevailing competitive

7    price, at least in the general sense, the 47 percent

8    off of NAGS, is based upon the billing received by

9    glass shops, that is, the bills that come in and the

10   price point that they bill for work done.

11            MR. TROWELL:  Object to the form.

12   BY MR. CLARK:

13       Q    Is that accurate?

14       A    I don't -- I don't think that was my

15   testimony.  My testimony was I was not in the

16   meetings to determine what we actually used to

17   determine those pricings.

18       Q    But if the prevailing competitive price

19   is the price that GEICO can secure from those

20   competent, conveniently located facilities and that

21   price is 47 percent off of NAGS -- right? -- then

22   that -- I believe what you said is you've reached

23   that price because of the bills that come in on

24   claims.  Did I misunderstand that?

25       A    I believe --

1          MR. TROWELL:  Yes.  Objection to the

2     form.

3          THE WITNESS:  I believe so.  I don't

4     think I ever said that.

5  BY MR. CLARK:

6     Q    So then how does GEICO in 2012 determine

7  that it can go out and secure 50 percent off of NAGS

8  from a competent, conveniently located facility?

9     A    Mr. Dan, as we've stated, I was not

10  involved in those meetings.  But normally when we

11  look at anything, we review all of our claims.

12     Q    Okay.  So you were not in the meetings.

13  You don't know what they looked at.  So I could have

14  sworn that you said that you -- in understanding the

15  market, you know what facilities are billing, and,

16  therefore, GEICO can reach a determination of what

17  its prevailing competitive price should be.  So

18  that's not what you said today?

19          MR. TROWELL:  Object to the form.

20          THE WITNESS:  I don't believe so, no,

21     sir.

22  BY MR. CLARK:

23     Q    Okay.  So you can't tell us anything

24  whatsoever about the methodology, what was looked

25  at, the data considered or, for that matter, what

1    GEICO's working understanding is for reaching its

2    47 percent off of NAGS in 2008 as well as, for this

3    particular County Code A and B, its 50 percent off

4    of NAGS in January of 2012; correct?

5              MR. TROWELL:  Object to the form.

6              THE WITNESS:  What I can tell you,

7         Mr. Dan, is I was not involved in those

8         meetings, but I'm 100 percent confident that

9         that is the price we could secure because so

10        many companies bill at that price.  Not billing

11        at the price -- not billing at the price we can

12        secure is a very small section.  So if we could

13        not secure that, no one would have billed at

14        that price.  So I'm very confident -- although

15        I was not in those meetings, I'm 100 percent

16        confident that that is the price we could

17        secure.

18   BY MR. CLARK:

19        Q    And it's the price you can secure because

20   Safelite has promised GEICO that and affiliated

21   shops within the network have promised to bill that;

22   correct?

23             MR. TROWELL:  Object to the form.

24             THE WITNESS:  No, sir, that's not it at

25        all.

1    BY MR. CLARK:

2        Q    Does an affiliated shop within the

3    network have to bill at the price you tell them?

4            MR. TROWELL:  Object to the form.

5            THE WITNESS:  The affiliated shop chooses

6            to bill at the price we tell them.  It chooses

7            to be affiliated.  We do not make a shop be an

8            affiliate.

9    BY MR. CLARK:

10        Q    But if they want to be an affiliate and

11    get the business, that is, more referrals, they have

12    to agree to bill GEICO at that price; correct?

13            MR. TROWELL:  Object to the form.

14            THE WITNESS:  I can't testify that they

15            get more referrals.  There is a chance that

16            they -- there's a chance they could get more

17            referrals, but I can't testify that they would

18            get more referrals.

19    BY MR. CLARK:

20        Q    Isn't it true you've clearly stated under

21    oath previous to today that an affiliated shop, the

22    benefit to that shop is it gets more referrals

23    within the network?

24        A    The --

25            MR. TROWELL:  Object to the form.

1          THE WITNESS:  The benefit to that shop is

2      we secure affiliate first.  So there is a

3      chance they could get more referrals, yes, sir.

4      But there's no guarantee that they will get

5      more from us.

6  BY MR. CLARK:

7      Q    GEICO can secure its price because GEICO

8  has set the discount to 47 percent off of NAGS and

9  the affiliate shops accept the price; correct?

10         MR. TROWELL:  Object to the form.

11         THE WITNESS:  The affiliate shops choose

12     to bill at that price, yes, sir.

13  BY MR. CLARK:

14     Q    In order to become an affiliate, again,

15  you must accept the price and bill the price;

16  correct?

17         MR. TROWELL:  Object to the form.

18         THE WITNESS:  They choose to.

19  BY MR. CLARK:

20     Q    They choose to accept the price set by

21  GEICO; correct?

22         MR. TROWELL:  Object to the form.

23         THE WITNESS:  They choose, yes, sir.

24  BY MR. CLARK:

25     Q    And if GEICO was to change that price, as

1       it did in 2012, then actually affiliated shops are

2       now getting more -- correct? --

3               MR. TROWELL:  Object to the form.

4       BY MR. CLARK:

5           Q       -- from 47 to 50 percent?

6           A       The -- there was an increase from 47 to

7       50, yes, sir, for both affiliate and non-affiliate.

8           Q       Does a Safelite network participating

9       facility have to pay a fee to Safelite to be a

10      participant?

11          A       I do not know the answer to that.

12          Q       Does a Safelite network participating

13      glass shop have to agree to bill at whatever price

14      is set by an insurance company like GEICO in order

15      to participate in the network?

16              MR. TROWELL:  Object to the form.

17              THE WITNESS:  Not to participate in the

18              network, but to be considered affiliate, they

19              choose to bill at the prevailing competitive

20              price.

21      BY MR. CLARK:

22          Q       In order to be an affiliate, you have to

23      sign an agreement with Safelite?

24          A       I do not know the answer to that.

25          Q       Are there any benefits that GEICO

1 provides to insureds who get their glass repaired or

2 replaced at a preferred shop like a Safelite shop?

3     A    So I'm not sure if there's a benefit that

4 GEICO provides, but Safelite does warranty the work.

5     Q    And do you tell your insureds that when

6 you refer them to a Safelite shop?

7     A    If the insured does not have a shop of

8 choice, we can have a conversation that the work is

9 warranted.

10     Q    Can you pull back out that -- I believe

11 it's the 2016 -- 2016 training manual.

12     Can you turn to Page 387?

13     A    (Examining documents.)

14     I'm getting there.  Sorry.

15     Q    No problem.

16     A    (Examining documents.)

17     I believe I'm there, Mr. Dan.

18     Q    Okay.  So this should be Bates No. 387.

19 It actually has a policy page number of 14 as well.

20     Can you read that page, the next page,

21 which is Bates 388, on to 389?  And let me know when

22 you're done reviewing that.

23     MR. TROWELL:  You want him to read it to

24     himself -- right? -- not on --

25     MR. CLARK:  Yeah.

1          MR. TROWELL:  Okay.

2     BY MR. CLARK:

3          Q     Just review it.  And if you've already

4     reviewed it, then you don't need to read every word

5     again.

6          A     (Examining document.)

7               Just Page 388, Mr. Dan?

8          Q     387, 388 and 389.

9          A     Oh, I'm sorry.

10              (Examining documents.)

11              I think I'm done, Mr. Dan.  I'm sorry it

12    took so long.

13         Q     Okay.  No, no worries.  It's getting late

14    in the day and you've been asked a few questions

15    today.

16         A     Just a couple.

17         Q     Just a couple.  You're doing great there.

18    Hang on.  I'm almost done.

19              So you've reviewed, from the 2016

20    training manual, Bates No. 387 through 389.  The

21    first section describes it as L, "What does a glass

22    specialist do?"  Did you read that?

23         A     Yes.

24         Q     And then it moves on and onto the second

25    page it talks about "Explain Safelite on every

1    call." Did you see that?

2        A    Yes, sir.

3        Q    And then the third page that actually

4    reads 389, it talks about "Offer to set up

5    appointment with Safelite." Do you see that?

6        A    Yes, sir.

7        Q    Does all of this accurately reflect what

8    GEICO sets as its training policies and procedures?

9        A    These three pages?

10       Q    Is it --

11       A    These three pages --

12       Q    Are these -- for these three pages and

13   the topics covered, is this accurate?

14       A    I would say it's accurate, yes, sir.

15       Q    Okay. And this is, in fact, how GEICO

16   employees are trained on these particular topics

17   that are addressed in these three pages; correct?

18       A    If the policyholder does not have a shop

19   of choice, yes, sir.

20       Q    And that's part of the page I wanted to

21   address. It's 388, where it has a what I call

22   bubble-out. It says, "Some states have passed laws

23   which prohibit from offering Safelite to a

24   policyholder who already has a glass shop of

25   choice."

1          Now, is it your understanding that

2     Florida has such a law?

3          A     I apologize.  It was my under- -- it was

4     my understanding I thought we could not steer in any

5     state.

6          Q     Okay.  Well, is it your -- is it your

7     testimony today that GEICO is or is not steering

8     customers, insureds when they call, to Safelite?

9               MR. TROWELL:  Object to the form.

10              THE WITNESS:  My testimony is if -- the

11              first question we ask is do they have a shop of

12              choice.  If they do not have a shop of choice,

13              we offer Safelite with the benefits and we

14              explain to them they're under no obligation to

15              use them.  So, no, we do not steer to Safelite.

16    BY MR. CLARK:

17         Q     Okay.  As set forth in these three

18    documents, all of this is still accurate for your

19    division which oversees Florida; correct?

20         A     These three documents are accurate if the

21    policyholder does not have a shop of choice.

22         Q     That's not what it says, though; correct?

23         A     That's not what these three pages say,

24    no, sir.

25         Q     Do you know of any other pages or

1    documents that say otherwise?

2        A    I can't point to you in the training

3    manual, but I can tell you as the leader of this

4    division we do not offer Safelite if the

5    policyholder has a shop of choice.

6        Q    How is it offered when you go online and

7    submit a claim?

8        A    It asks do you have a -- it asks do you

9    have a shop you want to use first.  No matter how --

10   with the exception of the unique skeleton claim

11   that's very unique and not normally done, if it's

12   done via phone call or online, it asks first, "Do

13   you have a shop you would like to use?"

14       Q    Can you turn to Exhibit 18?  Something we

15   covered earlier.

16       A    (Examining documents.)

17            I'm there.

18       Q    Is this a document that's used all

19   throughout the state of Florida?

20       A    It's a work order that's used in every

21   state.

22       Q    Including the state of Florida; correct?

23       A    Yes, sir.

24       Q    And if you could turn to -- I believe it

25   is Exhibit 19, where we had the AIC invoice tracking

1    information?

2         A    (Examining document.)

3              You're correct, Mr. Dan, yes, sir.

4         Q    This document and your AIC tracking

5    system captures in every case, in every claim, the

6    original invoice amount, the paid invoice amount,

7    the original tax and adjusted tax, in every claim;

8    correct?

9         A    For every claim billed through SGC.  So

10   if we pay a policyholder via reimbursement, we would

11   not have this.

12        Q    For a policyholder, that is, direct to

13   the insured?

14        A    Or any shop that we may make a one-time

15   exception to just bill -- or to pay directly.  Any

16   shop that has billed through SGC, we would have

17   this.

18        Q    For purposes of VIP, you have this;

19   correct?

20        A    Clearly, yes, sir.

21        Q    Did they -- they didn't bill through SGC;

22   they faxed you an invoice.  Correct?

23        A    But we ran it through the EDI system.

24        Q    So do you do that in every case?

25        A    If -- yes, sir.  If it's sent to us, we

1  have the ability to still continue to run it through

2  the EDI, whether the shop run it through or not.

3  That way we can run it through the GEICO audit

4  tables that we have set.

5      Q    So regardless of the state of Florida,

6  you get through the system and get a tracking --

7  tracking information like I just outlined for

8  everybody?

9           MR. TROWELL:  Object to the form.

10 BY MR. CLARK:

11     Q    Except policyholders that you pay direct.

12     A    If it's run through the EDI system.

13 Because we have some shops that we may make a

14 one-time exception and pay them directly, but we

15 will tell them, "In order to do business with us,

16 you have to receive a check from SGC, because that's

17 the way we do business."

18     Q    Okay.  So then you go back to this.  As

19 referenced in the declaration, Exhibit 5, where it

20 talks about -- you can turn to it, if you like --

21 the 16,980 claims, the way the systems work, the

22 computer information that is captured in the

23 database, you're able to identify every claim, every

24 glass shop, how much was invoiced, how much was

25 paid, and then the difference; correct?

1      A    It's my understanding the way he pulled

2  it is the way that it's read on there.

3      Q    Right.  So you capture the data for all

4  claims and can provide this breakdown for every

5  shop?

6          MR. TROWELL:  Object to the form.

7  BY MR. CLARK:

8      Q    Correct?

9      A    If it -- if we ran it through the EDI or

10  the SGC, I see no reason why we could not.  But, I

11  mean, I -- I believe we could.  I'm not really sure.

12     Q    But again, we would have to ask

13  Mr. Antonacci that specifically, because you didn't

14  participate -- you didn't do any of the workup of

15  putting this together; correct?

16     A    I was not involved in his document, no,

17  sir.

18     Q    Or looking at the data to figure out

19  whether all the claims were captured as you

20  understood it and as you read it right now in this

21  declaration; correct?

22     A    I was not involved, but I have

23  100 percent confidence it's correct.

24     Q    Now, can you turn to Exhibit 30?  Sorry

25  to skip around on you.

1     A     You're okay.  I've just got a big mess in
2     front of me, so hold on.  (Examining documents.)
3            I think I have it.
4     Q     Great.
5            This is an affidavit filed by Steven
6     Blome.  And you know Mr. Blome; correct?
7     A     He was the previous glass manager.  Yes,
8     sir, I do know him.
9     Q     Is he still with the company?
10    A     He is with the company in a different
11    role, yes, sir.
12    Q     Have you spoken to him in preparation for
13    your deposition today?
14    A     No, sir.
15    Q     When's the last time you spoke to him?
16    A     Define what you mean, "spoke."  I've told
17    him "Hey" --
18    Q     Last time you talked to him.
19    A     I've told him "Hey" in the hallway.  I
20    mean, I'm not trying -- you know, I'm not trying to
21    be funny.  I mean -- I mean, we're not --
22    Q     I get it.
23    A     We're not friends or anything.  Just put
24    it that way.
25    Q     Understood.

1          Now, he filed this affidavit.  And I'm

2  more particular about the exhibits attached.

3      A    Okay.

4      Q    Can you flip a look at the exhibits?

5          If you look through Exhibit 1 in the

6  document attached -- and when you get there to

7  Exhibit 1, tell me when you're there.

8      A    (Examining document.)

9          I'm at Exhibit 1, yes, sir.

10     Q    Okay.  Exhibit 1, the first document is

11 that same September 11, 2008, pricing agreement;

12 correct?

13     A    Yes, sir.

14     Q    Okay.  Then turn to the next page.  It's

15 a new document that I hadn't seen -- doesn't mean it

16 doesn't exist out there -- a December 24, 2008,

17 document.  December 24.  Do you see that?

18     A    Yes, sir, I do.

19     Q    And it seems like there's a lot of these

20 darn things kicking around here.  I don't know why

21 this was not produced or what the problem was,

22 but --

23          MR. TROWELL:  Dan, for a second, just

24     so -- GEICO did produce it.  It's at Bates

25     label 121.  It's in the Composite Exhibit 27.

1          It's already in the record.

2                    MR. CLARK:  Did I miss it?

3                    MR. TROWELL:  It's already in the record.

4                    MR. CLARK:  Did I miss it?

5                    You've got the Bates number.  Read out

6          the Bates number.

7                    MR. TROWELL:  It's Bates GG/VIP000121.

8                    MR. CLARK:  Awesome.  Thank you.

9                    MR. TROWELL:  Yeah.

10                   MR. CLARK:  My apologies.  My apologies.

11    BY MR. CLARK:

12         Q    Now, the next document, it's titled...

13         A    Are you referring to the -- are you

14    referring to the tiny document?

15         Q    I'm not sure what you call it.  It starts

16    at the top, "Safelite Solutions," "Network

17    Operations."

18                   Are you there?

19         A    Oh, yeah.  I think I've got it, yes, sir.

20         Q    Okay.  Great.

21                   Just can you tell me what this document

22    is?

23         A    I believe it's a participation agreement

24    for being in the network.

25         Q    You've got to help me out.  I don't know.

1    I don't know what you mean by "participating

2    agreement."

3            This is a chart that has at the top

4    "Safelite Solutions, LLC," "Network Operations,"

5    "GEICO," and then it has a Page 10 at the bottom and

6    has very small print, but I'm trying to make it out.

7            And in the first column it has a shop

8    name, address, and then it has a chart underneath.

9    Can you tell me what that chart is?

10       A    So this chart shows what the different

11   pricing structure is for the different county codes

12   that we've reviewed before.  And it appears this

13   document is just a different -- it shows the

14   difference in price changes from September 2010

15   through August 2013.

16       Q    How does it show that?

17       A    Well, it says it.  It says time frame

18   September 2010 through August 2013.  Then if you

19   look at the different sections, you can see where

20   September of 2008 was the 47 percent for County

21   Code A or B.  And then 2009 it was the same thing.

22   And then in 2012 it jumps to 50, which should match

23   what we already have and discussed.

24       Q    I got it.  So this is just I guess a

25   simplified chart that you can print out in the

1    Safelite Solutions software?

2        A    I believe so.  I don't know how else they

3    would have it.  They would have to get it from

4    Safelite Solutions.

5        Q    And what this describes is, if you look

6    at Blome's affidavit, he says Exhibit 2 is a chart

7    setting forth competent glass vendors that are

8    conveniently located who accept the prevailing

9    competitive price, kind of what we talked about

10   today.  So you can break down by a particular area

11   and print out a chart like this of pricing for a

12   particular area and a particular time that shows a

13   particular glass shop that accepts the pricing?

14            MR. TROWELL:  Object to the form.

15            THE WITNESS:  I mean, we have the ability

16        to -- I mean, the pricing is the pricing, so

17        I'm not sure what you're asking.  I mean, I

18        think we can clearly see that we can show what

19        pricing was in 2008 and 2012 and what pricing

20        is today.

21   BY MR. CLARK:

22       Q    I got that.

23       A    Yeah.  So, I mean, I -- I think we can

24   absolutely do that.

25       Q    But this has different per glass shop

1    names that are on this document.

2         A    Where are you at, Mr. Dan?  I'm sorry.

3    What paragraph?

4         Q    I'm on Page 10, the same thing, Exhibit 2

5    that we returned to.

6         A    (Examining document.)

7              I don't know if this is different

8    companies.  This appears to be just Superior Auto

9    Glass of Tampa Bay.  I'm not sure this is different

10   companies.  Maybe I'm reading it wrong.  But this

11   appears to be Superior Auto Glass of Tampa Bay's

12   pricing for these different -- for these different

13   years.

14             Because I don't see another company name

15   on here.  I mean, it's very small, so it's hard for

16   me to see, but --

17        Q    Yeah, I agree.

18        A    But it's my understanding that this is

19   Superior Auto Glass of Tampa's pricing.  I mean, I

20   could be wrong, but --

21        Q    If you look at Page -- yeah.  Look at

22   Page 5, and what it's saying is that -- the names

23   are kind of bolded out, but it says Bay Auto Glass

24   and K&K Glass are among the many competent glass

25   vendors located in the particular insured's area --

1      A    Sure.

2      Q    -- who will accept the prevailing

3 competitive prices.  It's almost showing a couple of

4 examples of other --

5      A    Right.

6           I mean, so what we have the ability --

7 what we have the ability to do -- I mean, I can't

8 really speak 100 percent for this affidavit.  I

9 didn't sign it, was not involved in it.  But we do

10 have the ability to look and see, for a particular

11 part number in a particular area, did anybody do

12 that part, affiliate or non-affiliate, what was the

13 price they billed, and if they billed at the

14 prevailing competitive price, to show there's

15 companies in that area who bill and accept and we

16 pay.

17           So I can only assume that's what they

18 were trying to say.  I don't know think that that

19 really -- that exhibit is what that is for, though.

20      Q    But can you print out for a particular

21 area a chart like this that has those affiliated

22 companies that have agreed to the pricing and have

23 agreed to bill that pricing to GEICO?

24      A    For any ZIP code, we have the ability to

25 request any affiliate company who services that ZIP

1    code.

2         Q    And then you could print out a chart like

3    this that would then just simply summarize exactly

4    what we see here as the pricing in the chart?

5         A    Well, the pricing would be the same for

6    everybody, so there would be no need for that.

7         Q    Well, it's a little different here for

8    the different areas --

9         A    Well, right.  The county --

10        Q    -- and depends on the time frames?

11        A    The county codes are different.

12             COURT REPORTER:  I missed what you just

13        said.

14             THE WITNESS:  Okay.

15             COURT REPORTER:  It's okay.

16             What was it that...

17             THE WITNESS:  She's talking to you,

18        Mr. Dan.

19             COURT REPORTER:  Mr. Clark --

20             MR. CLARK:  Yeah.

21             COURT REPORTER:  -- I missed what you

22        said.

23             MR. CLARK:  Sorry.  It's getting late in

24        the day.

25    BY MR. CLARK:

1    Q    What this -- I think if you look at the

2    pricing, you're right, the pricing is all that we've

3    talked about, and then it gives the different time

4    periods.  It just starts with the 47 percent and

5    then it ends with that 50 percent.

6    A    Right.  And that's also the difference --

7    you see the difference in the years.  So February

8    2012 it went to 50.

9         So to your point, we can get that

10   information, but the pricing itself would be the

11   same whether you're affiliate or non-affiliate,

12   so...

13   Q    When you talked about the warranty that

14   is offered, you indicated that there was a warranty

15   if an insured used the preferred shop of Safelite.

16   What's the benefit of a warranty on a product to an

17   insured that already has coverage in place if it

18   breaks?

19        MR. TROWELL:  Object to the form.

20   BY MR. CLARK:

21   Q    Let me say it a different way.

22        You remember talking about the warranty

23   that you get if you get a Safelite glass shop to do

24   the work, GEICO's preferred shop?

25   A    Yes, sir.

1    Q    You remember talking about the warranty?

2    A    Yes, sir.

3    Q    And that's only -- you get that warranty

4    only when you use a Safelite glass shop that is

5    preferred by GEICO; correct?

6          MR. TROWELL:  Object to the form.

7          THE WITNESS:  Well, I mean, that's the

8          only warranty that I know of.  I don't know if

9          other companies issue a warranty, but I know

10         Safelite does.

11         The benefit, to your question, would be

12         you don't set up a separate claim.  The

13         warranty's under the same claim.  So in a

14         normal world, if a policyholder uses any glass

15         shop and then, say, three months later it

16         breaks and we deem it's a failed repair,

17         sometimes we may have to set up a separate

18         claim, versus under Safelite, I mean, it

19         wouldn't be a separate claim.  So that would be

20         the benefit.

21         But I understand what you're saying.  If

22         they have coverage, technically it's covered.

23    BY MR. CLARK:

24    Q    You do understand, because I think I read

25    some questions and answers, that some shops out

1    there that are not affiliated and within the network

2    feel that there's a conflict of interest between

3    GEICO and having to deal with their third-party

4    administrator, Safelite?

5           MR. TROWELL:  Object to --

6    BY MR. CLARK:

7    Q    Are you aware of that?

8    A    I've not --

9           MR. TROWELL:  Object to the form.

10          THE WITNESS:  I've not spoken to shops

11      about that.

12   BY MR. CLARK:

13   Q    Well, Safelite is one of the biggest

14   glass shops repairing and replacing in the state of

15   Florida; correct?

16   A    I would assume any state, yes, sir.

17   Q    Not just Florida.

18          And it administers all of GEICO's claims;

19   correct?

20          MR. TROWELL:  Object to the form.

21          THE WITNESS:  Not all, no, sir.

22   BY MR. CLARK:

23   Q    Say that again?

24   A    Not all claims.

25   Q    It doesn't administer --

1    A    Not all claims, no, sir.

2    Q    How is that?

3    A    Well, policyholder claims do not go

4    through SGC.  It does not go through that network.

5    Sometimes we'll pay dealers directly without going

6    through the SGC Network.

7         If you're asking me do claims that we

8    submit through EDI or either the company submits

9    through EDI, yes, sir, those would be paid out by

10   Safelite Solutions.  But you stated all claims.  All

11   claims do not -- are not administered by Safelite.

12   Q    Well, the lion's share, the majority of

13   all claims processed by GEICO, in fact, go through

14   its third-party administrator, Safelite; correct?

15   A    If you put it that way, yes, sir, that's

16   correct.

17   Q    Okay.  And you understand that glass

18   shops throughout the state of Florida do compete

19   against Safelite; correct?

20   A    I mean, I've never spoken to them, so I

21   can't speak for what glass shops in the state of

22   Florida do.  What I will tell is we do not make a

23   shop do work for GEICO.  So if they don't want to do

24   business the way we do business, we do not make them

25   handle our claims.  They choose to handle our

1    claims.

2        Q    Well, in order to get paid by GEICO, you

3    must bill GEICO's price; correct?

4            MR. TROWELL:  Object to the form.

5            THE WITNESS:  No, sir.  You can bill

6        whatever you would like.  We will pay the price

7        that we can secure.

8    BY MR. CLARK:

9        Q    Which is you're going to pay the price

10   you're going to pay and that's it; correct?

11       A    The price --

12           MR. TROWELL:  Object to the form.

13           THE WITNESS:  I'm sorry, Lindsey.

14           The price we can secure.

15   BY MR. CLARK:

16       Q    Are you aware of any other benchmark

17   sources like NAGS out there?

18           MR. TROWELL:  Object to the form.

19           THE WITNESS:  I'm aware of what we use,

20       and we use NAGS as the starting retail price.

21   BY MR. CLARK:

22       Q    But you don't know of any other pricing

23   benchmarks out there?

24       A    I've never looked into any.

25       Q    When you stated earlier that GEICO will

1    pay dealers direct -- I think that's what you were

2    saying --

3         A    Sometimes, as a --

4         Q    -- depending on the circumstances?

5         A    Sometimes, as a one-time exception, we

6    will, yes, sir.

7              (Off-the-record discussion.)

8              THE VIDEOGRAPHER:  We're off the record

9         at 4:37.

10             THE WITNESS:  I mean, if you're mad at

11        me, you ain't got to hang up.

12   BY MR. CLARK:

13        Q    I thought you said yes.  You still there

14   now?

15        A    I was just -- I was just messing with

16   you.  I was saying if you're mad at me, you don't

17   have to hang up.

18        Q    No, we're not mad.  I hit the wrong

19   button.  Sorry about that, partner.

20             We were talking about paying dealers

21   direct?

22        A    Yes, sir.

23        Q    Remember talking about that?

24             How much do -- how much does GEICO pay

25   dealers?  Is it different than the prevailing

1   competitive price?

2        A     No matter who we pay, we pay the

3   prevailing competitive price.

4             MR. CLARK:  Let's take a five-minute

5        break and then I think I'm about done.

6             THE VIDEOGRAPHER:  We're off the record

7        at 4:38.

8             MR. CLARK:  Thank you.

9             (Short break.)

10            THE VIDEOGRAPHER:  We are back on the

11       record at 4:43.

12  BY MR. CLARK:

13       Q     Who's your immediate boss?

14       A     Beatrice Dela Pena, D-e-l-a P-e-n-a.

15       Q     And what is her title?

16       A     She is the emergency road service and

17  glass director.

18       Q     Steve Walker, who is that?

19       A     Steve Walker is an accident tow lead

20  supervisor.

21       Q     Anything relating to auto glass work?

22       A     Not currently, no, sir.

23       Q     Do you know if Safelite Auto shops and

24  affiliated shops within the network charge GEICO's

25  prevailing competitive price to all customers, even

1    if they're not GEICO insureds?

2            MR. TROWELL:  Object to the form.

3            THE WITNESS:  I only worry about GEICO

4        customers, so I do not know.

5    BY MR. CLARK:

6        Q    If an insured pays for a windshield

7    themselves, does GEICO only pay that insured, that

8    policyholder, back based upon the prevailing

9    competitive price that we talked about today or the

10   actual price paid?

11       A    We pay the prevailing competitive price

12   unless a supervisor approves more.

13           MR. CLARK:  Okay, guys.  That's it for

14       me.

15           We'll order, of course.

16           Thank you for your time.  I appreciate

17       your patience.

18           MR. TROWELL:  Okay.  If we can -- go

19       ahead.

20           MR. CLARK:  No, I was done.

21           MR. TROWELL:  Okay.

22           Yeah, if we can take a quick break,

23   review my notes and see if I've got anything.

24           THE VIDEOGRAPHER:  We're off the record.

25           MR. CLARK:  Okay.

1          THE VIDEOGRAPHER:  4:46.

2          (Short break.)

3          THE VIDEOGRAPHER:  We're on the record.

4     The time is 4:51.

5          MR. TROWELL:  And the defense has no

6     questions at this time for the witness.

7          MR. CLARK:  Okay.  Thanks.

8          Videographer, I'll call you.

9          Thank you again, guys.

10         MR. TROWELL:  Thanks, Dan.

11         THE WITNESS:  Thanks, Dan.

12         THE VIDEOGRAPHER:  This concludes the

13    videotaped deposition of the corporate rep of

14    GEICO General Insurance Company.  The time is

15    approximately 4:52 p.m. on November 15th, year

16    2016.

17         (The deposition concluded at 4:52 p.m.)

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2    STATE OF FLORIDA      )
                           )
3    COUNTY OF DUVAL       )

4              I, Helen A. Anderson, Registered

5    Professional Reporter, Florida Professional Reporter

6    and Notary Public, certify that I was authorized to

7    and did stenographically report the deposition of

8    RONNIE LEE FOSKEY, JR.; that a review of the

9    transcript was requested; and that the transcript is

10   a true and complete record of my stenographic notes.

11             I further certify that I am not a

12   relative, employee, attorney, or counsel of any of

13   the parties, nor am I a relative of any of the

14   parties' attorneys or counsel connected with the

15   action, nor am I financially interested in the

16   action.

17             DATED this 30th day of November, 2016.

18

19

20             _Helen A. Anderson_____
               Helen A. Anderson, RPR, FPR
21

22

23

24

25


                 ANDERSON REPORTING SERVICES, INC.
                        (904) 358-0112

1          C E R T I F I C A T E   O F   O A T H

2     STATE OF FLORIDA      )
                            )
3     COUNTY OF DUVAL       )

4              I, the undersigned authority, certify

5     that RONNIE LEE FOSKEY, JR., the witness, personally

6     appeared before me and was duly sworn.

7              WITNESS by hand and official seal this

8     15th day of November, 2016.

9

10

11                 _Helen A. Anderson_
                   Helen A. Anderson
                   Registered Professional Reporter
12                 Florida Professional Reporter
                   Notary Public - State of Florida
13                 My Commission No. EE875241
                   Expires:  May 16, 2017

14

15    IDENTIFICATION:                    HELEN A. ANDERSON
                                   MY COMMISSION # EE 875241
16    Provided driver's license    EXPIRES: May 16, 2017
                                   Bonded Thru Budget Notary Services
17

18

19

20

21

22

23

24

25

1　　　　　　　　　**E R R A T A   S H E E T**

2　　　**DO NOT WRITE ON TRANSCRIPT – ENTER CHANGES BELOW**

3　　　IN RE:　　VIP AUTO GLASS v. GEICO
　　　　　　　　　CASE NO.:　8:16-cv-02012-T-35JSS
4　　　　　　　　　WITNESS:　RONNIE LEE FOSKEY, JR.
　　　　　　　　　DATE TAKEN:　November 15, 2016

5

6　　PAGE　　LINE　　CHANGE　　　　　　　REASON

7　　_____　　_____　　_____

8　　_____　　_____　　_____

9　　_____　　_____　　_____

10　_____　　_____　　_____

11　_____　　_____　　_____

12　_____　　_____　　_____

13　_____　　_____　　_____

14　_____　　_____　　_____

15　_____　　_____　　_____

16　_____　　_____　　_____

17　_____　　_____　　_____

18　_____　　_____　　_____

19　_____　　_____　　_____

20　_____　　_____　　_____

21　_____　　_____　　_____

22　Under penalties of perjury, I declare that I have
　　read the foregoing document and that the facts
23　stated in it are true.

24

25　_____　　　_____
　　DATE　　　　　　　　　　　　　　　　RONNIE LEE FOSKEY, JR.

　　　　　　　ANDERSON REPORTING SERVICES, INC.
　　　　　　　　　　　(904) 358-0112