1                  UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
2                        TAMPA DIVISION

3                        CASE NO. 8:15-CV-02012-MSS-JSS

4                        CLASS ACTION

5    VIP AUTO GLASS, INC.,
     individually, as assignee, and
6    on behalf of all those
     similarly situated,
7
           Plaintiff,
8
     -vs-
9
     GEICO GENERAL INSURANCE
10   COMPANY,

11         Defendant.
     _____/
12

13

14
             DEPOSITION OF MELVIN FIGUEROA RIVERA
15                NON-CONFIDENTIAL PORTIONS
               Taken By Counsel for Defendant
16                 (Pages 1-32, 46-93)

17               Wednesday, May 24, 2017
                  1:07 p.m. - 4:16 p.m.
18
                   Clark Martino, PA
19             3407 West Kennedy Boulevard
                     Tampa, Florida
20

21         -------------------------------------------

22
     Reported By:
23   Megan M. Soria
     Notary Public
24   State of Florida at Large
     Esquire Deposition Solutions - Tampa Office
25   Phone - 813.221.2535, 800.838.2814
     Esquire Job No.  580221



```
 1   APPEARANCES:

 2   J. DANIEL CLARK, ESQUIRE
     MATTHEW A. CRIST, ESQUIRE
 3   Clark Martino, PA
     3407 West Kennedy Boulevard
 4   Tampa, Florida 33609
     813.879.0700
 5
            On Behalf of Plaintiff
 6

 7

 8   JOHN P. MARINO, ESQUIRE
     LINDSEY R. TROWELL, ESQUIRE
 9   EDWARD K. COTTRELL, ESQUIRE
     Smith, Gambrell & Russell, LLP
10   50 North Laura Street, Suite 2600
     Jacksonville, Florida 33202
11   904.598.6100

12          On Behalf of Defendant

13

14                        INDEX
15   WITNESS                              PAGE

16   MELVIN FIGUEROA RIVERA
```

```
17   Direct Examination by Mr. Marino.................4

18   Cross-Examination by Mr. Clark..................79

19   Redirect Examination by Mr. Marino..............85

20   Recross-Examination by Mr. Clark................87

21   Errata Sheet....................................89

22   Certificate of Reporter.........................92

23   Certificate of Oath.............................93
```

```
24       *CONFIDENTIAL EXCERPTS BOUND UNDER SEPARATE COVER
                         PAGES 33-45
25
```



1                          EXHIBITS

2    No.                                              PAGE

3    1        Notice...................................11

4    2        First Amended Complaint..................49

5    3        Answers to Interrogatories...............50

6    4        Response to Request for Production.......50

7    5        Safelite Work Order 12/1/13..............52

8    6        Safelite Work Order 12/23/13.............56

9    7        Safelite Work Order 3/7/14..............60

10   8        Jones Work Order.........................65

11   9        Safelite Work Order......................74

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1    Deposition was taken before Megan M. Soria, Court

2    Reporter and Notary Public in and for the State of

3    Florida at Large, in the above cause.

4                   - - - - - - - - - -

5         THE COURT REPORTER:  Do you swear or affirm that

6        the testimony you're about to give will be the truth,

7        the whole truth, and nothing but the truth?

8         THE WITNESS:  Yes, I do.

9         THE COURT REPORTER:  Thank you.

10   THEREUPON,

11                    MELVIN FIGUEROA RIVERA,

12   having been duly sworn or affirmed, was examined and

13   testified as follows:

14                    DIRECT EXAMINATION

15   BY MR. MARINO:

16     Q.  Good afternoon.

17     A.  How you doing?

18     Q.  We just met.  I'm John Marino.  This is EK

19   Cottrell and that's Lindsey Trowell down there.  We are

20   here to take your depo today.  Before we get started, I

21   would like to go over some ground rules.  I will ask the

22   question.  If you don't hear or understand a question,

23   just ask me and I will rephrase it.  If you answer, we

24   will assume that you understood the question; is that

25   fair enough?



1      A.  Yes.

2      Q.  One person talks at a time.  We start talking

3  over each other, she is going to get mad at us, and we

4  don't want that to happen.  If you need a break or

5  anything, let us know.  Is there anything that could

6  affect your ability to testify today?

7      A.  No.

8      Q.  Are you under any medication or anything like

9  that that could affect your ability to testify?

10     A.  No, sir.

11     Q.  What is your full name?

12     A.  Melvin Figueroa Rivera.

13     Q.  Can you spell that for the court reporter,

14  please.

15     A.  F-i-g-u-e-r-o-a, R-i-v-e-r-a.

16     Q.  Have you ever been known by any other names?

17     A.  No.

18     Q.  What is your date of birth?

19     A.  5/31/79.

20     Q.  What is your residence address?

21     A.  8909 Water Way Drive, Tampa, Florida 33635.

22     Q.  How long have you lived there?

23     A.  Four years.

24     Q.  Is that a house?

25     A.  It's a mobile home.



1      Q.  Anybody live there with you?

2      A.  My wife, my kids.

3      Q.  What is your wife's name?

4      A.  Yaramar, Y-a-r-a-m-a-r, Cantreras,

5   C-a-n-t-r-e-r-a-s.

6      Q.  And you said your children live there with you as

7   well?

8      A.  Yes, sir.

9      Q.  How many kids do you have?

10     A.  I have four.

11     Q.  What ages?

12     A.  17, 15, 8, and 4, and one on the way.

13     Q.  You're a busy man.  What is your business

14   address?

15     A.  Same one.

16     Q.  Same as the house?

17     A.  Yes, sir.

18     Q.  There is no other business address?

19     A.  No.

20     Q.  Can you briefly describe your educational

21   background.

22     A.  Just high school.

23     Q.  When did you graduate from high school?

24     A.  '98, '99, I believe.

25     Q.  Was that here in Tampa?



1    A.  Puerto Rico.

2    Q.  How long have you been in Tampa?

3    A.  About 14 years.

4    Q.  You came from Puerto Rico?

5    A.  Yes, sir.

6    Q.  Did you attend any college?

7    A.  No.

8    Q.  So you have a high school degree from Puerto

9  Rico?

10   A.  Yes, sir.

11   Q.  Do you have any licenses or certifications or

12 anything like that other than a driver's license, any

13 kind of professional license or occupational license?

14   A.  No, sir.

15   Q.  Have you done any training or coursework for any

16 type of profession or occupation?

17   A.  No, sir.

18   Q.  What did you do when you got -- well, 14 years

19 ago when you came here, what did you do?  Were you

20 employed?

21   A.  Yes.

22   Q.  What did you do?

23   A.  Auto glass.

24   Q.  So you started doing auto glass when you came

25 here to Tampa from Puerto Rico?



1      A.   Yes, sir.

2      Q.   Had you done auto glass prior to that?

3      A.   Yes, sir.

4      Q.   You did auto glass in Puerto Rico?

5      A.   Yes, sir.

6      Q.   When you say "auto glass," what do you mean?

7      A.   Anything related in the car that has to do with

8   glass, I do.

9      Q.   What did you do in Puerto Rico?  Who did you work

10  for?

11     A.   My dad had a shop in Puerto Rico.  That's the

12  trade that I learned.

13     Q.   Your dad had a glass repair replacement shop?

14     A.   Yes, sir.

15     Q.   What was the name of that?

16     A.   Espinoza Auto Glass.

17     Q.   Is your dad still running that?

18     A.   Not no more.

19     Q.   Did you work for any other auto glass companies

20  in Puerto Rico?

21     A.   No.

22     Q.   So when you came here, who did you work for?

23     A.   For like three months, Glass Pros, and then we

24  started the business, and with a different name, and I

25  was associated with my with a relative, and then we



1   opened VIP.

2      Q.  So roughly 14 years ago you started a glass

3   repair and replacement business?

4      A.  Yes, sir.

5      Q.  What was that business?

6      A.  The prior name from VIP, 2 Extreme Auto Glass.

7      Q.  And approximately when was 2 Extreme Auto Glass

8   formed?

9      A.  I believe 2002, around there.  I don't know.  It

10  was open for probably 9, 10 years.

11     Q.  Were you the owner of 2 Extreme Auto Glass?

12     A.  Half owner.

13     Q.  Who owned the other half?

14     A.  A relative, my cousin.

15     Q.  Who is your cousin?

16     A.  Carlos Kural.

17     Q.  Can you spell Kural.

18     A.  K-u-r-a-l.

19     Q.  And did that business, 2 Extreme Auto Glass, did

20  that have a physical address?

21     A.  I had a shop in Martin Luther King, I just don't

22  remember the actual address.

23     Q.  But you actually had a standalone business

24  address?

25     A.  Yes.



1   Q.  And you said you operated that for roughly how

2   many years?

3   A.  9, 10 years.

4   Q.  Did you have any employees?

5   A.  Now?

6   Q.  No, back to 2 Extreme Auto Glass.

7   A.  Yes, sir.  I had four employees.

8   Q.  Why did you close that -- or did you close that

9   business?

10   A.  Why did I close it?

11   Q.  Let me ask you, did you close it?

12   A.  Yes.

13   Q.  Is the corporation still active?

14   A.  No.

15   Q.  Why did you close it?

16   A.  Lack of business.

17   Q.  When you were operating 2 Extreme Auto Glass, did

18   you have any other jobs or sources of income?

19   A.  No.

20   Q.  Did anybody other than you and your cousin have

21   an interest in 2 Extreme Auto Glass?

22   A.  No, sir.

23   Q.  I forgot to ask you, have you done any military

24   service?

25   A.  No, sir.



1      Q.  Other than 2 Extreme Auto Glass and VIP -- and

2   when I say "VIP," I'm referring to VIP Auto Glass, Inc.;

3   okay?

4      A.  Yes.

5      Q.  Other than 2 Extreme Auto Glass and VIP, have you

6   had any interest in any other businesses or

7   corporations?

8      A.  No, sir.

9      Q.  Have you ever been convicted of a crime?

10     A.  Never.

11     Q.  Have you ever been charged with a crime?

12     A.  Never.

13     Q.  Have you ever been deposed before?

14     A.  Never.

15     Q.  First deposition?

16     A.  Yes, sir.

17     Q.  Have you ever testified in court before?

18     A.  Never.

19         (Defendant's Exhibit No. 1 was marked for

20     identification.)

21   BY MR. MARINO:

22     Q.  I'm showing you what has been marked as Exhibit 1

23   to your deposition.  Do you recognize that document?

24     A.  Yes, I've seen it before.

25     Q.  When did you first see it?



1     A.  I don't know the specific day, but when I was --

2  when I came to Clark, and they did all of the paperwork,

3  so I really don't know the specific day, but I actually

4  have seen it.

5     Q.  Recently?

6     A.  No.

7         MR. CLARK:  Are you talking about the amended

8     notice of taking deposition?

9         MR. MARINO:  Correct.

10 BY MR. MARINO:

11    Q.  And I take it you are appearing as a corporate

12 representative for VIP; correct?

13    A.  Correct.

14    Q.  Have you reviewed Exhibit A to Exhibit 1 to your

15 deposition?

16    A.  Yes, sir.

17    Q.  Are you prepared to testify today regarding the

18 topics listed on Exhibit A?

19    A.  Yes, sir.

20    Q.  You can give that back to her.

21        Is VIP represented by counsel in this case?

22    A.  I'm sorry, sir?

23    Q.  Is VIP represented by counsel in this case?

24    A.  What do you mean "counsel"?

25    Q.  Lawyers.



1      A.  Yes, sir.

2      Q.  Who are VIP's lawyers in this case?

3      A.  Mr. Clark and Mr. Crist.

4      Q.  Anybody else?

5      A.  There's another --

6          What is the guy's name?

7          MR. CLARK:  I can't...

8      A.  I'm sorry.  I don't remember his name.

9  BY MR. MARINO:

10      Q.  Mr. Calvedilla?

11      A.  Yes, sir.  I'm sorry.

12      Q.  That's all right.  When did you first meet Mr.

13  Clark?

14      A.  I spoke to my business lawyer, and he introduced

15  me to Mr. Clark, and we explained the situation.  I

16  don't recall the exact date, but...

17      Q.  Who is your business lawyer?

18      A.  John Murrow.

19      Q.  Has Mr. Murrow represented you in litigation as

20  well?

21      A.  In litigation?

22      Q.  Yes.

23      A.  Yes, sir.

24      Q.  How long has John Murrow been your business

25  lawyer?



1      A.   Exact years, I don't recall, but almost three and
2    a half, almost, I probably could say around there.

3      Q.   When did you first meet Mr. Crist?

4      A.   Same day that I met Mr. Clark and Calvedilla.

5      Q.   Mr. Calvedilla was there that day as well?

6      A.   Yes, he was.

7      Q.   Was Mr. Murrow there that day?

8      A.   Yes, he was.

9      Q.   You met with four lawyers?

10     A.   Yes, sir.

11     Q.   And I take it that was prior to this case being
12   filed?

13     A.   Yes, sir.

14     Q.   Other than the lawyers that you've identified, do
15   any other lawyers represent you in this case?

16     A.   I'm sorry?

17     Q.   Other than the lawyers that you have identified,
18   do any other lawyers represent you in this case?

19     A.   No, sir.

20     Q.   When I say "you," I mean VIP.

21     A.   No.  I understand.

22         MR. CLARK:  Just to be clear, our law firms
23         represent him.  That means every law firm lawyer in
24         this office does.  I don't know if that is what your
25         intent is or just the main guys.



1    BY MR. MARINO:

2       Q.   Other than the three firms, are there any other

3    lawyers that represent you in this case?

4       A.   No.

5       Q.   Does Mr. Murrow represent you in this case?

6       A.   No, sir.

7       Q.   Does VIP have other pending litigation that Mr.

8    Murrow represents you in?

9       A.   Yes, sir.

10      Q.   How many cases?

11      A.   I don't know, not right off my head.  It's over

12   40.

13      Q.   And no class actions?

14      A.   No, sir.

15      Q.   Who are those 40 cases against, if you can

16   remember?

17      A.   GEICO.

18      Q.   They are all against GEICO?

19      A.   Yes.

20      Q.   Is VIP suing any other insurance companies other

21   than GEICO at this time?

22      A.   Yes.

23      Q.   Who?

24      A.   Different insurance companies don't want to pay,

25   I don't know if USAA -- yes, USAA.



1    Q.  Any others?

2    A.  No.

3    Q.  Does Mr. Murrow represent you in all those cases?

4    A.  Some of them, yes.

5    Q.  Do you have other lawyers that represent you in

6  cases against insurance companies over auto glass?

7    A.  If I'm not mistaken, Lagrow in Orlando, Mr.

8  Lagrow, he takes care of the USAAs.  I don't exactly

9  recall his full name.

10   Q.  Lagrow?

11   A.  There you go.

12   Q.  Does Mr. Lagrow represent you in any proposed

13  class actions?

14   A.  No, sir.

15   Q.  So if I understand it, Mr. Murrow has cases

16  against GEICO and Mr. Lagrow has cases against USAA?

17   A.  Yes, sir.

18   Q.  Are there any other insurance companies that come

19  to mind that you may be suing at this time?

20   A.  Not that comes to my mind.

21   Q.  Any other lawyers other than Mr. Murrow and Mr.

22  Lagrow that represent you in individual litigation?

23   A.  Not that I remember, sir.

24   Q.  And I take it after that initial meeting where

25  you met with your Counsel in this case, is that when you



1  determined to retain and to represent you in this case?

2      A.  That is correct.

3      Q.  Did you consider any other law firms or attorneys

4  to represent you in this case?

5      A.  Excuse me?

6          MR. CLARK:  Hold on for a second.  Sometimes it

7      takes me a minute or two in my old age.

8          You're asking him, did he consider, which in

9      essence -- or talk to any other lawyers about the

10     case, about the dispute or about prosecuting the class

11     action?

12         MR. MARINO:  Prosecuting the class action.

13         MR. CLARK:  Hang on.

14         MR. MARINO:  I don't want to know the substance

15     of those conversations.

16         MR. CLARK:  No.  I'm thinking whether he did or

17     didn't -- can you circle back to that?  I need to ask

18     Matt.  Or take a break real quick.

19         MR. CLARK:  We can take a break.

20         (Recess from 1:24 p.m. to 1:26 p.m.)

21         THE COURT REPORTER:  Question, "Did you consider

22     any other law firms or attorneys to represent you in

23     this case?"

24         THE WITNESS:  No.

25  BY MR. MARINO:



1      Q.  Do you have a written retainer agreement with

2   your Counsel in this case?

3      A.  Yes, sir.

4      Q.  Are you aware that if the Defendants prevail in

5   this case, VIP could be responsible to pay costs?

6      A.  Yes, I do.

7      Q.  Does VIP have the ability to pay costs?

8          MR. CLARK:  I would instruct you not to answer

9      that question.  That would reveal confidential

10     business information.  It's privileged at this stage,

11     whether he is or isn't.

12         THE WITNESS:  Okay.

13         MR. MARINO:  So for the record, your position is

14     that whether or not VIP has the ability to pay costs

15     would constitute confidential business information?

16         MR. CLARK:  Yes, to your direct question; but

17     since your question doesn't have general descriptions

18     of what costs are, ultimately it would have to -- I

19     think I will leave it at that.  You get the point.

20     Unless you ask him, can you estimate what the cost

21     would be, and can they pay that, I would still

22     instruct him not to answer.

23         MR. MARINO:  Then I won't ask him.

24   BY MR. MARINO:

25     Q.  Did you prepare for your depo today?



1    A.  Yes, I did.

2    Q.  What did you do?

3    A.  I went through my papers.

4    Q.  What papers did you go through?

5        MR. CLARK:  You can generally describe the

6    papers.  He doesn't need to know specific documents.

7    A.  Just I went -- every single paper was given to

8    us, to me, I went through it.  I read it.  Pretty much I

9    went through it.

10   BY MR. MARINO:

11   Q.  So you reviewed documents having to do with this

12   case; correct?

13   A.  Yes, sir.

14   Q.  Did you meet with anybody to prepare for your

15   deposition?

16   A.  Yes.

17   Q.  Did you meet with your Counsel?

18   A.  Yes, sir.

19   Q.  When did you meet with your Counsel?

20   A.  I don't have specific dates.  Every time that it

21   was necessary, I did.

22   Q.  I'm asking, did you specifically meet with your

23   Counsel to prepare for your deposition today?

24   A.  Yes.

25   Q.  When did you do that?



1    A.  I don't have specific dates.  I don't recall

2    specific actual dates.  I mean, I could probably say

3    yesterday I met with them, but months behind, I don't

4    recall.  I don't have the exact dates that I came and

5    sit here with them.  That's what I'm saying.

6        Q.  I'm not asking -- I don't think you're

7    understanding my question.  I'm not asking how many

8    times you have met with your Counsel about anything to

9    do with this case.  I'm asking how many times you have

10   met with them to prepare for your deposition in this

11   case.

12       A.  Various times.

13       Q.  You don't remember when?

14       A.  Don't remember.

15       Q.  Who did you meet with?

16       A.  Mr. Dan and Mr. Crist.

17       Q.  Anybody else?

18       A.  John Murrow was here as well.  That's it.

19       Q.  Do you recall when the meeting was that John

20   Murrow was here?

21       A.  Yesterday.

22       Q.  Was anybody else present yesterday other than Mr.

23   Clark, Mr. Crist, and Mr. Murrow?

24       A.  No, sir.

25       Q.  Did you do anything else to prepare for your



1  deposition today?

2      A.  No, sir.

3      Q.  What is a class action?

4      A.  From my understanding, I'm representing glass

5  shops that are in the same position that I'm going

6  through, same situations.  We're not getting paid in

7  full.  We are not being treated fair.  So I believe I'm

8  representing the glass industry in Florida, in court.

9      Q.  That's your understanding of a class action?

10     A.  Yes, sir.

11     Q.  What is a class representative?

12     A.  I'm sorry?

13     Q.  What is a class representative?

14     A.  That would be me, small shop.

15     Q.  Do you know whether the class representative has

16  any duties?

17     A.  Yes, I do.

18     Q.  The answer is yes?

19     A.  Yes.

20     Q.  What are those duties?

21     A.  I have to represent.  I got to attend meetings,

22  if I -- depositions, court, whatever they ask me to do,

23  I will be there.

24     Q.  Have you ever heard the term "fiduciary duty"?

25     A.  No, sir.



1      Q.  Never heard that term?

2      A.  No.

3      Q.  Did you decide to attempt to bring this case as a

4   class action?

5      A.  I'm sorry?

6      Q.  Did you decide to attempt to bring this case as a

7   class action?

8      A.  If I decide to bring this case?  Yes.

9      Q.  I'm asking, did you decide to bring it as a

10  proposed class action?

11     A.  If I decided, me, myself?

12     Q.  Yes.

13     A.  Yes.

14     Q.  Why did you decide that?

15     A.  I think I have a good chance to show that small

16  companies are being treated unfair, and I think I could

17  be a good example to the actual class action.

18     Q.  Has VIP ever sought to be a class representative

19  before, before this case?

20     A.  If VIP considered, you said?

21     Q.  Has VIP ever sought to be a class representative?

22     A.  What do you mean, "sought"?  What does that mean,

23  sir?

24     Q.  Have you ever asked a court to appoint VIP as a

25  class representative?



1      A.   Never.

2      Q.   Has VIP ever brought another proposed class

3    action?

4      A.   No, sir.

5      Q.   What about 2 Extreme?

6      A.   No, sir.

7      Q.   Have you ever had any interest in any other

8    business or entity that sought to be a class

9    representative?

10     A.   No, sir.

11     Q.   So this is your first time doing this; right?

12     A.   Yes, sir.

13     Q.   Let me go back.  I want to ask you some questions

14   about VIP.  I think you testified before, but when was

15   it formed?

16     A.   Specific date?

17     Q.   Year.

18     A.   If I'm recalling, I think it's 2013.

19     Q.   And it's a corporation; correct?

20     A.   Yes, sir.

21     Q.   And again, I think you already testified, what is

22   the business address for VIP?

23     A.   8909 Water Way Drive, Tampa, Florida 33635.

24     Q.   Did you form VIP?

25     A.   Did I form VIP?



1       Q.   Yes.

2       A.   What do you mean, if I form VIP?  What are you

3    asking me in that question?

4       Q.   Are you the person that presented materials to

5    the Secretary of State of the State of Florida to form a

6    corporation called VIP?

7       A.   It's under my wife's name, but I'm actually --

8    I'm the face of the company, if that's what you...

9       Q.   When you say, "it's under my wife's name," what

10   do you mean?

11      A.   It's under my wife's name.

12      Q.   Who owns VIP?

13      A.   My wife and me, but it's under her name.

14      Q.   Is there stock in VIP?

15      A.   Yes, sir.

16      Q.   How many shares of stock are outstanding to VIP?

17      A.   Me and her.

18      Q.   Two shares?

19      A.   Yes.

20      Q.   Do you have stock certificates?

21      A.   I do.

22      Q.   You do?  And your wife has a stock certificate?

23      A.   Yes.

24      Q.   So you and your wife are 50/50 owners of VIP; is

25   that correct?



 1      A.  Yes, sir.

 2          MR. CLARK:  She's listed as the president of the

 3      company.  That's what he meant.

 4          MR. MARINO:  Right, on the Secretary of State's

 5      records.

 6          MR. CLARK:  I figured you had that.

 7          MR. MARINO:  Yes, I did.

 8  BY MR. MARINO:

 9      Q.  Who are the officers of VIP?

10      A.  The officers?  You mean employees?

11      Q.  No.  I mean officers.  Do you know what an

12  officer of a corporation is?

13      A.  Can you explain that to me.

14      Q.  Who is the president of VIP?

15      A.  She is.

16      Q.  Do you hold any position with VIP?

17      A.  Basically I'm the manager.  I take -- I do paper,

18  I do work, and she just manage everything.  She manage

19  the accounts and all that.

20      Q.  So she's the president of VIP and you're the

21  manager?

22      A.  Pretty much, yes.

23      Q.  Pretty much, is that --

24      A.  Yes, yes, yes.

25      Q.  Have there been any other presidents of VIP since



1   it was formed in roughly 2013?

2       A.  No, sir.

3       Q.  Has anybody other than you or your wife ever had

4   an interest in VIP?

5       A.  No, sir.

6       Q.  Did your wife form VIP in 2013?

7       A.  Yes, sir.

8       Q.  You said it's under her name?

9       A.  Yes.

10      Q.  Who is Zandor, Z-a-n-d-o-r, Tavares,

11  T-a-v-a-r-e-s?

12      A.  A friend of mine.

13      Q.  Zandor Tavares never had any interest in VIP; is

14  that correct?

15      A.  At one point he opened the actually company, and

16  he sold it to us, and basically it is under my wife's.

17      Q.  So Zandor -- when you said "opened the company,"

18  he formed VIP in 2013?

19      A.  Yes, sir.

20      Q.  Who is Maria Tavares?

21      A.  I believe that's his wife.

22      Q.  So in 2013, VIP was formed.  You didn't have an

23  interest in it at that time; is that correct?

24      A.  No.

25      Q.  And your wife didn't either; is that correct?



1    A.  I believe so, yes.

2    Q.  And you said that the company was sold to you?

3    A.  Yes, sir.

4    Q.  When was it sold to you?

5    A.  I don't recall the exact date.  My accountant,

6    she did all the paperwork.  And basically it was changed

7    from their name to our name, and we changed tax IDs,

8    everything, so we could be good with the law, basically

9    paying taxes and everything had to do with that.

10   Q.  Is there a purchase and sale agreement?

11   A.  No.  It was a verbal agreement.

12   Q.  I take it you and your wife paid some money for

13   the business?

14   A.  Yes.

15   Q.  And prior to that, did you have any interest in

16   VIP?

17   A.  No, sir.  No, sir.

18   Q.  Prior to that, did you work for VIP?

19   A.  No, sir.

20   Q.  I thought you testified, maybe I'm wrong, that

21   you operated 2 Extreme up until 2013?

22   A.  It was roughly -- I just don't recall the exact

23   date.  It was roughly around that time.  I actually shut

24   2 Extreme and then I bought VIP because the tax

25   purposes, I didn't want to deal anything -- anything



1   that had to do with my cousin and the business.  I just

2   wanted to be parted and just be good with the law,

3   taxes, every single paper.  I wanted to be everything by

4   the books.

5       Q.  Was there some problem with 2 Extreme and your

6   cousin?

7       A.  No.  It just happens to be that he has his own

8   business and it was the same names.  I just didn't want

9   any conflict with tattoos and glass, because he owns a

10  tattoo shop and I own a glass shop.  So basically at one

11  point we divide.

12      Q.  So 2 Extreme did glass and tattoos?

13      A.  No.  No.  He has his corporation.  It's called 2

14  Extreme Tattoos, and I had 2 Extreme Auto Glass.  We

15  came out from the same name.  But at one point I didn't

16  want anything to do with that.

17      Q.  Do you know where Zandor and Maria Tavares are

18  now?

19      A.  Yes, I know them.  Yes.

20      Q.  Are they still in the glass business?

21      A.  I don't know who he's working for.

22      Q.  Are they here in Tampa?

23      A.  Yes.

24      Q.  Do you know their address?

25      A.  Not off the top of my head, sir.



1    Q.   Does VIP have any employees?

2    A.   Yes, sir.

3    Q.   Who are the employees?

4    A.   Just one person.

5    Q.   Who is that?

6    A.   Dariel, D-a-r-i-e-l, Aguillera,

7   A-g-u-i-l-l-e-r-a.

8    Q.   When did -- can you say that name again.

9    A.   Dariel Aguillera.

10    Q.   When did Dariel begin working for VIP?

11    A.   Roughly two years ago.

12    Q.   What does Dariel do?

13    A.   He's my helper.

14    Q.   What does Dariel do as your helper?

15    A.   He helps me with the auto glass.

16    Q.   And when I say "W2 employee," do you know what I

17   mean?

18    A.   Yes.

19    Q.   Is he a W2 employee?

20    A.   Yes, sir.

21    Q.   Are you a W2 employee of VIP?

22    A.   Yes, sir.

23    Q.   Is your wife a W2 employee?

24    A.   We take a check for the family, just one check.

25   Instead of me or her, just one check, it all goes under



1  her name.

2     Q.  It goes under her name?

3     A.  Yes, sir.

4     Q.  Why is that?

5     A.  No reasons.  She manages everything.

6     Q.  So does your wife receive a paycheck from VIP?

7     A.  Yes, sir.

8     Q.  And you don't receive a paycheck from VIP?

9     A.  No.

10    Q.  And again, your wife is the president; correct?

11    A.  Yes, sir.

12    Q.  Are there any directors?

13    A.  No, sir.

14    Q.  And one employee; any other employees for VIP?

15    A.  No, sir.

16    Q.  Has VIP ever had any other employees?

17    A.  No, sir.

18    Q.  Does VIP employ any third-party contractors?

19    A.  I'm sorry.  What was the question again?

20    Q.  When I say "third-party contractors" -- actually,

21 you do all of the work for VIP with your helper?

22    A.  Yes, sir.

23    Q.  Do you contract work out to anybody else like a

24 third party that is not an employee, to do work for VIP?

25    A.  At one point.



1     Q.   At what point was that?

2     A.   A year and a half ago.

3     Q.   And what type of work would you contract out?

4     A.   Auto glass, sublet auto glass.

5     Q.   When you say "sublet," basically you would hire

6   somebody else to do the work?

7     A.   Yes, sir.

8     Q.   Who was that?

9     A.   Can I say 1099?  That's basically if they have

10   their own company, it's basically a 1099.

11    Q.   I'm asking the name of the person.

12    A.   I would say...

13    Q.   Was it just one person?

14    A.   Yes, just one person.  You need the name?

15    Q.   Yes.

16    A.   Fernando Aguillera.

17    Q.   And approximately when did he do work for VIP?

18    A.   About a year and a half ago.

19    Q.   How long did he do work for VIP?

20    A.   Not long, probably three months.

21    Q.   Do you know where Fernando is now?

22    A.   No; not at all.

23    Q.   Other than Fernando, has anybody else done

24   contract work for VIP?

25    A.   No, sir.



1   Q.  Does VIP do both repair and replacement?

2   A.  Yes, sir.

3   Q.  Where are replacements performed?

4   A.  Excuse me?

5   Q.  Where are replacements performed?

6   A.  Where?

7   Q.  Yes.  Is it mobile?

8   A.  Yes, it's mobile.

9   Q.  So you go to the customer?

10  A.  Yes, sir.

11  Q.  What about repairs?

12  A.  Same.

13  Q.  It's mobile?

14  A.  Yes, sir.

15      (Beginning of confidential excerpted section.)

16

17

18

19

20

21

22

23

24

25



1  BY MR. MARINO:

2      Q.  My question was, does VIP advertise?

3      A.  No.

4      Q.  How do you obtain work?

5          MR. CLARK:  I would -- now you're getting into,

6      again, your proprietary, how you manage your -- you

7      are getting into marketing and other things.  You can

8      generally discuss it, but not in anything particular,

9      if you can.

10     A.  I don't -- that's --

11         MR. CLARK:  Can you?

12         THE WITNESS:  No, sir.

13         MR. CLARK:  Then we would object to him

14     disclosing how he gets his business at VIP as business

15     proprietary information.

16         MR. MARINO:  Are you instructing him not to

17     answer?

18         MR. CLARK:  Yes.  Whenever I raise the

19     proprietary information, we see GEICO and Safelite one

20     in the same, and they are our competitors, our

21     competitors being generally VIP, not Clark and

22     Martino.

23         MR. MARINO:  Just for the record, we don't see

24     them as the same.  All right.  So you instructed him

25     not to answer.



1  BY MR. MARINO:

2     Q.  Has VIP ever attempted to obtain customers at car

3  washes?

4     A.  Never.

5     Q.  How about car dealerships?

6     A.  Yes.

7     Q.  And how has VIP attempted to obtain customers at

8  car dealerships?

9        MR. CLARK:  Again, that would get into your

10       marketing and business proprietary information.  To

11       the extent that you and I can have a discussion about

12       how you can generally discuss that on the record based

13       on the question, I instruct you not to answer based on

14       business proprietary confidential information.  That's

15       not one to be released to what we see as the

16       competitor.

17  BY MR. MARINO:

18     Q.  What dealerships has VIP attempted to obtain

19  business from?

20       MR. CLARK:  I would instruct you not to answer

21       that question for the same confidential business

22       proprietary information.  Who your clients are or

23       other sources of business is confidential to your

24       company.

25  BY MR. MARINO:



1      Q.   The work that was done in this case, in the case

2   of Mr. Darryl Jones, that was a windshield replacement?

3      A.   Yes, sir.

4      Q.   Where did you replace that windshield?

5      A.   At the dealer.

6      Q.   What dealer?

7      A.   Courtesy Toyota.

8      Q.   Where is Courtesy Toyota?

9      A.   Brandon, Florida.

10     Q.   Is VIP licensed as a motor vehicle repair shop in

11  the State of Florida?

12     A.   Yes, sir.

13     Q.   When was that license obtained?

14     A.   I don't have the specific date.  It is current.

15     Q.   The license is current?

16     A.   Yes.

17     Q.   Have there been any lapses in the license?

18     A.   I'm sorry?

19     Q.   Between the time you first obtained the license,

20  has it always been active?

21     A.   Yes, sir.

22     Q.   Does VIP carry liability insurance?

23     A.   Yes, sir.

24     Q.   Has VIP ever been subject to any regulatory

25  complaints?



1      A.  I'm sorry?

2      Q.  Have you ever had any complaints from a

3   governmental agency or anything like that?

4      A.  No, sir.

5      Q.  Has VIP ever had any customer complaints?

6      A.  No.

7      Q.  Never?

8      A.  Never.

9      Q.  Not one customer has ever complained?

10     A.  No.

11     Q.  So I take it you have no records of any customer

12  complaints because there has never been a customer

13  complaint with regard to VIP?

14     A.  Yes, sir.  Is that shocking?

15         (Defendant's Exhibit No. 2 was marked for

16     identification.)

17  BY MR. MARINO:

18     Q.  I'm showing you what has been marked as Exhibit 2

19  to your deposition.  Do you recognize that document?

20     A.  It looks like something that I went through.

21     Q.  Do you know what that document is?

22     A.  This is the complaint.

23     Q.  The first amended complaint that you filed in

24  this case; correct?

25     A.  Yes, sir.



 1      Q.  Have you read that document?

 2      A.  Yes, sir.

 3      Q.  When did you first read that document?

 4      A.  Various times on and off.

 5      Q.  Did you read it before it was filed?

 6      A.  No.

 7          (Defendant's Exhibit No. 3 was marked for

 8      identification.)

 9  BY MR. MARINO:

10      Q.  I'm showing you what has been marked Exhibit 3 to

11  your deposition.  Do you recognize this document?

12      A.  Yes, I've seen it before.

13      Q.  These are VIP's supplemental answers to

14  interrogatories; correct?

15      A.  Yes, sir.

16      Q.  The last page of this document under

17  "verification," is that your signature?

18      A.  Yes, sir.

19      Q.  I take it you read these answers before signing

20  this document?

21      A.  That's correct.

22          (Defendant's Exhibit No. 4 was marked for

23      identification.)

24  BY MR. MARINO:

25      Q.  I'm showing you what has been marked as Exhibit 4



1  to your deposition.  Do you recognize that document?

2      A.  I've seen it before.

3      Q.  Is this VIP's response to GEICO's request for

4  production of documents in this case?

5      A.  Yes, sir.

6      Q.  Did you review this document before it was filed?

7      A.  Before it was filed?

8      Q.  Yes.

9      A.  Yes, sir.

10     Q.  Do you recall when you first reviewed this

11  document?

12     A.  No, sir.

13         MR. CLARK:  Just for the record, the discovery in

14      the Middle District is never filed.  He means served,

15      and the service date would be reflected on the last

16      page of the document.

17         MR. MARINO:  I do stand corrected.

18         Let's take a short break.

19         (Recess from 2:42 p.m. to 2:49 p.m.)

20  BY MR. MARINO:

21     Q.  Just a couple more questions about you and your

22  wife; so as I understand it, you actually do -- you

23  perform the actual work, repairs and replacements, with

24  your assistant; correct?

25     A.  Correct.



1      Q.  Does your wife do any of the work?

2      A.  No, sir.

3      Q.  What does your wife do for the company?

4      A.  She does invoicing.

5      Q.  So she sends the invoices to the insurance

6   companies?

7      A.  Yes, sir.

8      Q.  But she is not out in the field?

9      A.  No, sir.

10     Q.  She doesn't meet with customers?

11     A.  No, sir.

12         (Defendant's Exhibit No. 5 was marked for

13     identification.)

14   BY MR. MARINO:

15     Q.  I just handed you what's been marked as Exhibit

16   5.  And the reason I'm doing that is I want to go

17   chronologically through some processes.  The document

18   that I just handed you as Exhibit 5 is dated 12/1/13; is

19   that correct?

20     A.  Correct.

21     Q.  And you were operating VIP at that time; correct?

22     A.  Yes, sir.

23     Q.  What is this document?  What is the first page of

24   that document?

25     A.  It's been sent from Safelite.



1     Q.  This is something that Safelite sent to you;

2   correct?

3     A.  No.

4     Q.  No?

5     A.  No.

6     Q.  Who would they have sent this to?

7     A.  Maybe the customer had called insurance and got

8   forward to Safelite, and because they didn't want to use

9   their company, they assign it to me.

10    Q.  Who assigned it to you?

11    A.  Safelite.

12    Q.  So at this time, Safelite -- your testimony is

13  with regard to Exhibit 5, that Safelite would have

14  assigned you this job?

15    A.  That is correct.

16    Q.  Were you a member of a Safelite network at that

17  time?

18    A.  I was never part of it.

19    Q.  You have never been part of it?

20    A.  No, sir.

21    Q.  You don't recall this job with Rosalia Hernan; do

22  you?

23    A.  Not at all.

24    Q.  I'm still not understanding your testimony.  Is

25  your testimony that Safelite would have referred this



1  job to you, or that you would have obtained a customer

2  and Safelite would have sent you what I'm going to call

3  a work order?

4      A.  That is correct.  Basically, Safelite did not

5  refer that customer to me.

6      Q.  Correct.  Okay.

7      A.  Maybe the customer called in GEICO and got

8  forwarded to Safelite.  And because they didn't want to

9  use Safelite, they got my company and they send this

10  paperwork.

11      Q.  So the customer retained you; correct?

12      A.  That is correct.

13      Q.  The customer retained your company to perform the

14  glass repair; correct?

15      A.  Correct.

16      Q.  And this first page, which I'm going to refer to

17  as a work order, is something that VIP Auto Glass, Inc.

18  received from Safelite regarding the GEICO job; correct?

19      A.  Yes.

20      Q.  And I notice at the bottom where it says

21  "customer signature," was it your practice at that time

22  to have customers sign these work orders?

23      A.  When it's sent by Safelite, if they send the

24  actual work, they require this paper to be signed.

25      Q.  They required it to be signed?



1    A.  Yes, sir.

2    Q.  Safelite did?

3    A.  Yes, sir.

4    Q.  So you had the customer sign this page; correct?

5    A.  Yes, sir.

6    Q.  What is the second page?

7    A.  That would be my invoice.

8    Q.  This is the invoice that you submitted; correct?

9    A.  That is correct.

10   Q.  I'm looking down there at the bottom where it

11   says "customer signature" under "authorization to pay."

12   You would have obtained the customer's signature on this

13   document as well; correct?

14   A.  Yes, sir.

15   Q.  And under "authorization to pay," is this the

16   assignment of benefits that your company was using at

17   that time?

18   A.  Correct.

19   Q.  In the middle of that document, your invoice, am

20   I correct in reading it that you billed 50 percent of

21   NAGS?  Correct?

22   A.  Yes, sir.

23   Q.  And you billed $40 dollars per labor hour;

24   correct?

25   A.  Correct.



1      Q.  Those are both consistent with the work order

2    which is the first page of this exhibit that Safelite

3    sent you; correct?

4      A.  That is correct.

5      Q.  So in December of 2013, you billed GEICO in

6    accordance with the work order that you received from

7    Safelite; correct?

8      A.  That is correct, yes.

9         (Defendant's Exhibit No. 6 was marked for

10     identification.)

11   BY MR. MARINO:

12     Q.  I'm showing you what has been marked as Exhibit 6

13   to your deposition.  The first page of that exhibit is a

14   work order from Safelite dated 12/23/13; is that

15   correct?

16     A.  Yes, sir.

17     Q.  And at that time, I take it it was still VIP's

18   practice to have the insured sign the work order;

19   correct?

20         MR. CLARK:  Objection to form.

21         You can answer the question.

22     A.  Can you repeat it again.

23   BY MR. MARINO:

24     Q.  Did you have the customer sign this work order?

25     A.  Yes, sir.



1      Q.   And in December of 2013, was it VIP's business

2   practice to have customers sign work orders?

3      A.   Yes, sir.

4      Q.   What is a second page of this exhibit?

5      A.   The invoice.

6      Q.   This is the invoice that VIP prepared and sent

7   in; correct?

8      A.   Correct.

9      Q.   Now, I take it since the work order is dated

10   12/23/13 and the invoice is dated 12/26/13, you would

11   have received the work order before sending the invoice;

12   correct?

13      A.   That is correct.

14      Q.   Can you tell when you would have done this job?

15      A.   I'm sorry?

16      Q.   Can you tell when you would have done the work?

17      A.   When would I done the -- when the customer is

18   available.

19      Q.   Would it be before or after the invoice is

20   prepared?

21      A.   After.

22      Q.   Would it be before or after you received the work

23   order?

24      A.   It has to be after.

25      Q.   And again, according to your invoice, you would



1  have charged 50 percent of NAGS on this job; is that

2  correct?

3      A.  Yes, sir.

4      Q.  That is consistent with the work order you

5  received before you did the work; correct?

6      A.  I don't receive those often.  It might be one or

7  two or three in a month.  Whenever the customer calls

8  Safelite, that's when they save this paper.

9      Q.  Do you ever call insurance companies or is it

10 always the customer that calls?

11     A.  I call, confirm approval, verification of policy,

12 then we do the job.

13     Q.  So you call the insurance company directly?

14     A.  Correct.

15     Q.  Does your wife ever call insurance companies?

16     A.  No.

17     Q.  She just does the billing?

18     A.  Yes, sir.

19     Q.  Does she have any contact with the customers?

20     A.  No; not at all.

21     Q.  Does she have any contact with Mr. Jones?

22     A.  Not at all.

23     Q.  On the second page of this exhibit, I notice you

24 had the customer sign on the bottom as well; correct?

25     A.  That is correct.



1      Q.  You had the customer sign it and it actually

2    showed them all of the pricing; correct?

3      A.  That is correct.

4      Q.  I'm just curious on this exhibit, it doesn't look

5    like there is assignment language.

6      A.  I'll tell you why.  I don't need it, because it's

7    here.  You guys send me this.  I don't need the customer

8    to assign his benefits to us.  That's why that one

9    doesn't have the assignment of benefits.

10     Q.  But the one before, Exhibit 5, actually had an

11   assignment of benefits; correct?

12     A.  It was a different program.

13     Q.  Explain that to me.

14     A.  It might be a different program.  It might be the

15   length of the parts that it showed.  Maybe this one, it

16   was Page 1 and 2.

17     Q.  When you say a different program, what do you

18   mean by "program"?

19     A.  How we create the invoicing.

20     Q.  Like a computer program?

21     A.  Yes, sir.

22     Q.  So it could have been that Exhibit 6, the invoice

23   for Exhibit 6 was created from a different program than

24   the invoice from Exhibit 5?  Is that your testimony?

25     A.  Yes, sir.



1    Q.  That would explain why there is no assignment of

2    benefits included on Exhibit 6?  Is that your testimony?

3    A.  No.  What it says in here, the customer -- I'm

4    not asking the customer to assign the benefits.  Why?

5    Because he already made a claim through Safelite.  I

6    didn't make the claim.

7    Q.  The customer would have already made a claim?

8    A.  That is correct.

9    Q.  To GEICO or to Safelite?

10   A.  Whoever he calls.

11   Q.  You don't know who the customer calls?

12   A.  I believe he calls GEICO, but it got somehow to

13   Safelite.

14   Q.  But you don't know who the customer would have

15   called?

16   A.  I can't respond to that one.  I don't know.

17   Q.  If you don't know, that's fine.  Just tell me.

18       (Defendant's Exhibit No. 7 was marked for

19       identification.)

20   BY MR. MARINO:

21   Q.  I'm showing you what has been marked as Exhibit 7

22   to your deposition.  As we go through this chronology,

23   this document, the first page is dated 3/7/14; correct?

24   A.  Yes, sir.

25   Q.  And this would have been a work order received



1  from Safelite in connection with a GEICO job; correct?

2      A.  That is correct.

3      Q.  And again, on the bottom it appears that you had

4  the customer sign the work order; correct?

5      A.  That is correct.

6      Q.  And the customer would have signed it, looks like

7  on 3/13/2014; correct?

8      A.  That's correct, sir.

9      Q.  And then what would the second page of this

10  document be?

11      A.  It's in the bottom.  It's right here.  It's one

12  page.  It all depends what is the length of the actual

13  part that it would print a second page.

14      Q.  But this second page is your invoice; correct?

15      A.  Yes, sir.

16      Q.  And it actually lists the prices that are charged

17  on it; correct?

18      A.  That is correct.

19      Q.  And this one does have an assignment on the

20  bottom of it; correct?

21      A.  Yes, sir.

22      Q.  Is that signed by the insured?

23      A.  Correct.

24      Q.  So the assignment is always signed by the

25  insured; correct?



1    A.  Yes.

2    Q.  And I notice that this assignment is a little bit

3  different from the assignment we were talking about in

4  Exhibit 5?

5    A.  Yes.

6    Q.  So is this the assignment that you were using on

7  3/13/2014?

8    A.  That is correct.

9    Q.  And looking at this invoice, you charged GEICO 50

10  percent of NAGS; correct?

11    A.  Correct.

12    Q.  You charged them $40 per labor hour; correct?

13    A.  That is correct.

14    Q.  Do you charge them in accordance with the work

15  order received from Safelite?

16    A.  That is correct.

17        MR. MARINO:  Let me chat with these guys just a

18    second.

19        (Recess from 3:06 p.m. to 3:09 p.m.)

20  BY MR. MARINO:

21    Q.  Did you know Darryl Jones before you did the work

22  in this case?

23    A.  Yes, sir.

24    Q.  How did you know him?

25    A.  He -- at that point, he's a service advisor at



1    the dealer.

2      Q.  At what dealer?

3      A.  Courtesy Toyota.

4      Q.  So at the time that you did the work for Mr.

5    Jones in this case, he was a service advisor at Courtesy

6    Toyota?

7      A.  Yes, sir.

8      Q.  Tell me how the job came about.  Did he call you?

9    What happened?  Just walk me through it.

10     A.  He calls me, take the information, policy.  I

11   call agent from GEICO, confirm, get the job done.

12   That's it.

13     Q.  So he called you on the telephone?

14     A.  Yes, sir.

15     Q.  Said, "My windshield is broken"?

16     A.  Yes, sir.

17     Q.  And asked if you could do the job?

18     A.  Correct.

19     Q.  Then what did you do?

20     A.  I did the job.

21     Q.  You called GEICO?

22     A.  I confirmed coverage, yes.

23     Q.  So did you call GEICO to confirm coverage?

24     A.  Yes.

25     Q.  Where did you do the job?



1     A.   At the dealer.

2     Q.   Before you did the job for Mr. Jones, you knew

3   that GEICO paid 50 percent of NAGS; didn't you?

4     A.   Not really, because I don't have an agreement

5   with them.

6     Q.   I didn't ask you if you had an agreement with

7   them.  I asked you if you knew they paid 50 percent of

8   NAGS.

9     A.   No.  They pay 100 percent.

10    Q.   GEICO pays 100 percent of NAGS?

11    A.   Yes, sir.

12    Q.   GEICO has paid you 100 percent of NAGS?

13    A.   Not on that invoice, but they do.  At one point

14  they did, yes, sir.

15    Q.   At what point?

16    A.   Various times.

17    Q.   I'm asking you, before you did the job for Mr.

18  Jones, had GEICO ever paid you less than 100 percent of

19  NAGS?

20    A.   Less?

21    Q.   Yes.

22    A.   Yes, sir.

23    Q.   They had paid you 50 percent of NAGS on several

24  occasions; correct?

25    A.   Yes, sir.



1      Q.  And they paid you $40 an hour for labor on

2   several occasions; correct?

3      A.  Correct.

4      Q.  And you knew that prior to doing the job for Mr.

5   Jones; correct?

6      A.  Yes, sir.

7      Q.  Because these other exhibits we just talked

8   about, you in fact, build them 50 percent of NAGS;

9   correct?

10     A.  Yes, sir.

11         (Defendant's Exhibit No. 8 was marked for

12         identification.)

13  BY MR. MARINO:

14     Q.  I'm showing you what's been marked Exhibit 8 to

15  your deposition.  What is the first page of Exhibit 8?

16     A.  That's my work order with assignment of benefits.

17     Q.  So at this time, this is your work order with an

18  assignment of benefits on it; correct?

19     A.  Correct.

20     Q.  Is that Mr. Jones's signature on the bottom?

21     A.  Yes, sir.

22     Q.  Did you obtain that signature from him?

23     A.  Yes, sir.

24     Q.  Is it your testimony you obtained it from him on

25  2/8/2016?



1    A.  When the job was done, yes.

2    Q.  Was the job done on 2/8/2016?

3    A.  I recall, yes.

4    Q.  So I notice that the date of this is dated

5  2/8/2016.  And you're saying the job was done that same

6  day?

7    A.  I believe so, yes.

8    Q.  I notice that what you described as, I think,

9  your work order and assignment of benefits, doesn't have

10  any pricing information on it; correct?

11    A.  That is correct.

12    Q.  Why is that?

13    A.  If I'm not mistaken, it goes back to the business

14  -- what's it called?  Disclosures.  That's business...

15        MR. CLARK:  Do you have a question for me that

16     you need to ask me something?

17        THE WITNESS:  Yes, basically yes.

18        MR. MARINO:  Well, I have a question pending.

19        MR. CLARK:  You can answer it.  If you can't, you

20     need the advice of Counsel, I don't know what it would

21     be.

22        Read your question back.

23        THE COURT REPORTER:  Question, "I notice that

24     what you described as, I think, your work order and

25     assignment of benefits, doesn't have any pricing



1    information on it; correct?"

2        Answer, "Yes."

3        Question, "Why is that?"

4        MR. CLARK:  And you have a particular question

5    for me as your lawyer?

6        THE WITNESS:  Yes, sir.

7        MR. CLARK:  Before you answer that question?

8        THE WITNESS:  Yes.

9        (Recess from 3:16 p.m. to 3:20 p.m.)

10       MR. CLARK:  There was a business method of doing

11   things that he thought was confidential, but I've

12   dealt with it.  I'm allowing him to answer the

13   question.

14       THE WITNESS:  Basically the actual form, in order

15   for me to convert it to an invoice, the job needs to

16   be completed.  So basically, in the work order Mr.

17   Jones agreed to, he doesn't need a written estimate,

18   so he assigned the benefits, and that's why it becomes

19   an invoice.  And that's why it shows all the pricing.

20   BY MR. MARINO:

21   Q.  So when you say didn't want a written estimate,

22   are those Mr. Jones's initials right there that says, "I

23   do not request a written estimate"?

24   A.  Yes, sir.

25   Q.  You obtained those initials from Mr. Jones on



1  this document?

2      A.  Yes, sir.

3      Q.  Did you go over the pricing with Mr. Jones?

4      A.  No.

5      Q.  Did you tell him what you were going to charge

6  him?

7      A.  No.

8      Q.  So Mr. Jones never agreed to a specific price;

9  correct?

10     A.  That is correct.

11     Q.  Flip to the second page of Exhibit 8, please.

12  What is this document?

13     A.  Second page?

14     Q.  Yes, sir.

15     A.  That is the actual invoice.

16     Q.  That's the invoice that was sent to GEICO;

17  correct?

18     A.  That is correct.

19     Q.  You never showed this document to Mr. Jones; did

20  you?

21     A.  No.

22     Q.  I notice on the prior exhibit you actually had

23  the insureds sign the invoice; correct?

24     A.  Which one?

25     Q.  Exhibit 6.



1     A.  Exhibit 6.  Okay.  What about it?

2     Q.  You actually had the insured sign the invoice at

3  that time; correct?

4     A.  Correct.

5     Q.  But by the time you did Mr. Jones's job you no

6  longer had the insureds signing the invoices; correct?

7     A.  It was only a work order.

8     Q.  It was only a work order?

9     A.  Yes, sir.

10     Q.  The invoice was only a work order?

11     A.  No.  This one right here.

12     Q.  When you say "this one," what are you referring

13  to?

14     A.  Number 8, this one, work order.

15     Q.  The first page was a work order?

16     A.  Correct.

17     Q.  So you had them sign that one?

18     A.  Correct.

19     Q.  So are you saying that on Exhibit 6, why did you

20  have them sign the actual invoice?

21     A.  It prints out because it's already an invoice.

22  It already became as an invoice because they send the

23  actual paperwork.

24     Q.  Who sends the actual paperwork?

25     A.  Safelite.



1    Q.  I think I just asked you this, but you never

2  showed Mr. Jones the second page of Exhibit A which has

3  the actual pricing on it; correct?

4    A.  That is correct.

5    Q.  What is the third page of Exhibit 8?  Is that a

6  fax transmission sheet?

7    A.  Correct, yes.

8    Q.  Is that showing that Pages 1 and 2 were faxed to

9  GEICO?

10    A.  That is correct, sir.

11    Q.  Who would have faxed them to GEICO?

12    A.  I would.

13    Q.  You send the faxes?

14    A.  Yes.

15    Q.  Not your wife?

16    A.  At this point, I took over.

17    Q.  You did it all yourself at this point?

18    A.  Yes, sir.

19    Q.  So your wife had nothing to do with Mr. Jones?

20    A.  She does actual invoices.  I do everything.  I

21  send, and I do the labor, and I sit down and I send

22  everything, yes.

23    Q.  So in Mr. Jones's case, you actually faxed the

24  invoice to GEICO; correct?

25    A.  That is correct.



1    Q.  Did you speak with Mr. Jones after the work was

2    done?

3    A.  No.

4    Q.  So his car was just there at the dealership.  You

5    did the work then?

6    A.  I mean when I was done, I handed the keys.  He

7    checked the car.  That was it.

8    Q.  You handed Mr. Jones the keys?

9    A.  Yes, sir.

10   Q.  So he was there?

11   A.  Yes.

12   Q.  When you finished the work?

13   A.  Of course, yes.

14   Q.  Did you ever tell Mr. Jones that he would be

15   liable to VIP for any amounts between what you billed

16   and GEICO paid?

17   A.  Excuse me?

18   Q.  Did you ever tell Mr. Jones that he may be liable

19   to VIP for any amounts?

20   A.  Never.

21   Q.  No?

22   A.  Never.

23   Q.  What did you tell him?

24   A.  He don't owe me anything.  He is released

25   completely.  He doesn't owe me anything.



1    Q.  Did you do that job on February 8, 2016?

2    A.  I believe so, yes.

3    Q.  So I take it he would have called you.  You would

4  have gone and got the glass, showed up on the 8th,

5  popped it in?

6    A.  No.

7    Q.  How would that have worked?

8    A.  He probably called me the day before.  I did the

9  invoice probably in the morning, got the job done.

10   Q.  You said did the invoice in the morning.  You

11 mean prepared it?

12   A.  Yes.

13   Q.  And then you would have got the job done.  And

14 you sent it to GEICO that same day; correct?

15   A.  That is correct.

16   Q.  On the 8th; correct?

17   A.  Yes, sir.

18   Q.  Where did you obtain the glass for this job from?

19        MR. CLARK:  Your suppliers of glass, in my

20     opinion, would be considered business proprietary

21     confidential information.  But to the extent that you

22     just disclose the name of suppliers you use, I'm okay

23     with the general knowledge of, but no details.  With

24     that instruction, you can answer.

25        THE WITNESS:  Just part of the -- you want me to



1    tell them?

2         MR. CLARK:  The name.

3         MR. MARINO:  The name of the company.

4         MR. CLARK:  Or generally the names of any glass

5    suppliers.

6    A.  Well, I mean, I don't recall exactly which one it

7   was.  I have different suppliers.

8         MR. CLARK:  All I'm asking you to do, without

9    getting into the details of the proprietary

10    relationships you may have, the name or names of those

11    suppliers.  That's it.

12    A.  Mygrant, Pilkington, PGW, either one of them; I

13   don't recall which one it was.

14   BY MR. MARINO:

15    Q.  You don't recall which one you retained the glass

16   from for this job?

17    A.  No.

18    Q.  I know you're going to instruct him, but how much

19   did you pay for the glass in this claim?

20         MR. CLARK:  I will instruct you not to answer

21    that particular question or anything subsequently, no

22    response whatsoever because of the proprietary

23    business information to you that is confidential in

24    this context, given GEICO's and Safelite's competitive

25    nature against you.



1  BY MR. MARINO:

2      Q.  Have you ever bought glass from Safelite?

3      A.  Never.

4          (Defendant's Exhibit No. 9 was marked for

5      identification.)

6  BY MR. MARINO:

7      Q.  I'm showing you what has been marked as Exhibit

8  9.  Do you recognize this document?

9      A.  Not at all.

10     Q.  You don't recognize it?

11     A.  Not at all.

12     Q.  Is it a work order?

13     A.  It looks like it.

14     Q.  Did you receive this document from Safelite?

15     A.  To be honest with you, no.

16     Q.  You did not?  So I take it since your testimony

17 is you didn't receive this document, you certainly

18 wouldn't have had Mr. Jones execute the bottom of it;

19 would you?

20     A.  I'm sorry?

21     Q.  Since your testimony is that you never received

22 this document, I take it that explains why there is no

23 signature on the bottom of it?

24     A.  He wouldn't need to sign this.

25     Q.  Why not?



1    A.  Because he wasn't referred by Safelite.

2    Q.  Because he contacted you directly?

3    A.  That is correct.

4    Q.  But at any rate, you never received this Exhibit

5  9; correct?

6    A.  I never seen it.

7    Q.  Have you talked to Mr. Jones since this case was

8  filed?

9    A.  No, sir.

10   Q.  Let me go back.  Did you or anybody else from VIP

11  report this claim to GEICO before the work was actually

12  performed?

13       MR. CLARK:  Objection to form.  I think he's

14    already testified to a certain extent to the question

15    you have asked, so it's asked and answered, but go

16    ahead.

17       THE WITNESS:  Can you say the question again.

18  BY MR. MARINO:

19   Q.  Did you or anybody else from VIP report this

20  claim to GEICO before the work was actually performed?

21       MR. CLARK:  Same objection.

22       You can answer.

23   A.  No.

24  BY MR. MARINO:

25   Q.  I think the other question I had was, have you



 1  talked to Darryl Jones since this case was filed?

 2      A.  No.

 3      Q.  Have you talked to him since he picked up his

 4  car?

 5      A.  No, sir.

 6      Q.  After you performed the windshield replacement?

 7      A.  No, sir.

 8      Q.  Have you communicated with anybody about this

 9  case other than your attorneys?

10      A.  No, sir.

11      Q.  You haven't talked to anybody about it?

12      A.  No, sir.

13      Q.  Your wife?  Nobody?

14      A.  No.

15      Q.  So I take it you haven't talked to any possible

16  class members; correct?

17      A.  What do you mean?

18      Q.  Do you know what a class member is?

19      A.  Can you explain that.

20      Q.  I'm asking you whether you know what a class

21  member is.

22      A.  I just don't know the answer because I don't

23  understand that question.

24          MR. CLARK:  Let's take a short break.  I might

25      not have too much more.



1           (Recess from 3:35 p.m. to 3:40 p.m.)

2    BY MR. MARINO:

3       Q.  I just want to go back and make sure I understand

4    your testimony on a certain subject.  When you refer to

5    a Safelite referral, as I understand that, that means a

6    customer had contacted you, and then they contacted the

7    insurance company, and said VIP is my shop, and then you

8    received a work order from Safelite; correct?

9       A.  That is correct.

10      Q.  So that is what you meant when you said a

11   referral from Safelite?

12      A.  Correct.

13      Q.  You never just got an assignment from Safelite

14   where you hadn't had prior contact with the customer and

15   the customer hadn't chose you as their shop; correct?

16      A.  What do you mean?

17      Q.  You have never been a member of Safelite network;

18   correct?

19      A.  Correct.

20      Q.  Safelite has never assigned you work; correct?

21      A.  That is correct.

22      Q.  Have you talked about this case with any other

23   owners of glass shops?

24      A.  No.

25      Q.  Have you talked about pricing with other owners



1   of glass shops?  Do you discuss what you charge with

2   other owners of glass shops?

3       MR. CLARK:  How is that not a disclosure of...

4       MR. MARINO:  I don't see how it would be

5    proprietary if he has discussed it with his

6    competitors.

7       MR. CLARK:  I will let him answer yes or no,

8    because that is kind of your point, but it's just yes

9    or no; why you did, anything like that, so let the --

10   will you read back the question.

11      THE COURT REPORTER:  Question, "Have you talked

12   about pricing with other owners of glass shops?  Do

13   you discuss what you charge with other owners of glass

14   shops?"

15   A.  Yes.

16  BY MR. MARINO:

17   Q.  Which glass shops?

18   A.  Mobile Auto Glass, superior Auto Glass, that's

19  about it.

20   Q.  Who is the owner of Mobile Auto Glass?

21   A.  Rob.

22   Q.  Do you know Rob's last name?

23   A.  No; not by heart.

24   Q.  So you can't remember it as you sit here today?

25   A.  No.



1      Q.  Who is the owner of Superior Auto Glass?

2      A.  Linda.

3      Q.  You don't remember Linda's last name?

4      A.  No, sir.

5      Q.  Are you a member of any associations or groups of

6    auto glass shop owners?

7      A.  No.

8          MR. MARINO:  I don't think I have anything

9      further.

10          MR. CLARK:  Let me talk to Matt real quick.

11          (Recess from 3:44 p.m. to 4 p.m.)

12                    CROSS-EXAMINATION

13   BY MR. CLARK:

14      Q.  Sir, we took a short break there.  Class member

15   and what it means, we have talked about you being a

16   class representative in this case already; correct?

17      A.  That is correct.

18      Q.  And seeking class certification for this class,

19   you remember talking about that with Counsel's

20   questions?

21          MR. MARINO:  Let me object to the form of your

22      first question.  He's seeking to be a class

23      representative.  He's not one already.

24          MR. CLARK:  That is correct.  I'm sure Judge

25      Scriven and Judge Sneed will have a say on that.



1  BY MR. CLARK:

2     Q.  And we talked about class members.

3     A.  Okay.

4     Q.  And you seek, and we talked about this.  I'm not

5  really wanting to talk about it again because we all

6  want to leave.  The glass shops that make up your

7  proposed class as you described it already on the

8  record, do you remember talking about that?

9     A.  Can you repeat it.

10    Q.  Sure.  Glass shops like you.

11    A.  Okay.

12    Q.  You're seeking to certify a class of those

13  similar glass shops?

14    A.  Okay.

15    Q.  When Counsel was talking about class members,

16  he's describing those members, that being the glass

17  shops; does that make sense?

18        MR. MARINO:  Object to form.

19    A.  Yes.

20  BY MR. CLARK:

21    Q.  And the point I'm trying to get to in all this

22  lead up is, have you talked to any potential class

23  members, potential class members because your case is

24  not certified, as Counsel pointed out, about this class

25  action?  Yes or no?



1    A.  No.

2    Q.  The lawsuits, the first complaint, do you

3    remember filing the original lawsuit in this case back

4    about a year ago?

5    A.  Yes, sir.

6    Q.  Now, we talked about the actual complaint, the

7    formal complaint.  One of the amendments was marked as

8    Exhibit 2.  But do you recall reviewing with your

9    Counsel, including myself, rough drafts, drafts of that

10   final product?

11   A.  Yes, sir.

12   Q.  And we got your permission, after reviewing,

13   going over those rough drafts, to file your lawsuit?

14       MR. MARINO:  Object to the form.

15   BY MR. CLARK:

16   Q.  Am I accurate?

17       MR. MARINO:  I think he's kind of leading, but go

18   ahead.

19       MR. CLARK:  I'm technically on cross.

20   A.  Yes, sir.

21   BY MR. CLARK:

22   Q.  Did we have your permission to file the original

23   and amended complaints in this lawsuit on your behalf?

24   A.  Yes, sir.

25   Q.  You reviewed rough drafts; did you not?



1    A.  Yes, I did.

2    Q.  When you talked earlier that I think Counsel said

3  something to the effect, did you review this particular

4  document before it was filed?  We can all be rest

5  assured that we had your permission to file it?

6    A.  That is correct.

7    Q.  And that you reviewed the document, at least

8  final drafts of it before it was filed?

9    A.  That is correct.

10   Q.  I hate when my record is not clear that I have

11 done something without the highest regard for the

12 process.

13       MR. MARINO:  Is that a question?

14       MR. CLARK:  No.  It's a statement to you guys.

15 BY MR. CLARK:

16   Q.  I'm going to show you what is marked as Exhibit

17 6.  Exhibit 6, can you explain in your own words how

18 this particular work came about?  And act like we are

19 simple lay people here, and those that may read this

20 transcript, a jury, a magistrate judge, or for that

21 matter, our district court judge may read this

22 transcript.  Can you explain how this comes about as we

23 see it here?

24   A.  Yes, sir.  Explain?

25   Q.  Yes.



1       A.  Get a call from Safelite, basically in this

2  particular one is Taylor Goodwin, is actually requesting

3  my shop.  And in order for me to get this particular

4  paperwork from their referral, I have to set pricing.

5       Q.  So in these scenarios, as you understand, a

6  Safelite representative is calling you on the phone?

7       A.  Yes, sir.

8       Q.  One of their -- a GEICO insured, somebody out

9  there, Tyler Goodwin, has somehow gotten your name and

10  number as the shop they want to use?

11      A.  That is correct.

12      Q.  And you don't know how, just thinking back now?

13  You wouldn't know how that occurred for his particular

14  person?

15      A.  That is correct.

16          MR. MARINO:  Object to form.

17  BY MR. CLARK:

18      Q.  Then Safelite, do you know how it comes about

19  that the GEICO customer ends up talking to a Safelite

20  representative, then the Safelite person calls you?

21          MR. MARINO:  Object to form.

22  BY MR. CLARK:

23      Q.  Do you know?

24      A.  Yes.

25      Q.  Can you tell me.



1     A.   Yes.

2     Q.   Please do.

3     A.   Customer gets his ID card, called a 1-800 number,

4   calls GEICO, GEICO sends them to Safelite, and they

5   don't agree to do the job with Safelite.  They want to

6   do the job with VIP.  Basically, they tell the customer,

7   I'm not part of the network.  If anything else from

8   pricing is different from what's a competitive pricing,

9   they call it, is different, they need to pay out of

10  pocket, out of expenses, if I'm correctly saying it.

11  Basically they don't -- they can't guarantee our job,

12  and basically you're on the hook if you go with them.

13    Q.   So Safelite, in this process, calls you, and you

14  agree to do this particular job in this particular

15  instance on or about December 23rd, 2013.  Let the

16  record reflect it is two days before Christmas.

17         Why did you agree to do this job at this point

18  for this amount?

19    A.   Lack of work, probably didn't have anything -- I

20  was no job, no work.  I have to take it.

21    Q.   For Darryl Jones, I can't remember the way it was

22  phrased by Counsel about whether you called GEICO or

23  not.  You said earlier today that when you get a new

24  customer that calls, you call and confirm coverage?

25    A.   That is correct.



1    Q.  Did you call and confirm coverage for the Darryl

2  Jones job?

3    A.  Yes, sir.

4    Q.  Who did you call to confirm coverage?

5    A.  GEICO's agent.

6    Q.  And how did you get that information?

7    A.  From his policy card.

8    Q.  Can you just kind of generally describe it for

9  the record, how that happens.  I assume you show up at a

10  job and he shows you an insurance card of some sort?

11    A.  That is correct.

12    Q.  Is what you're saying that there is a number and

13  name of somebody to call on that card?

14    A.  That is correct.

15        MR. CLARK:  That's all I have.

16        MR. MARINO:  Just a couple minutes.

17        (Recess from 4:10 p.m. to 4:12 p.m.)

18              REDIRECT EXAMINATION

19  BY MR. MARINO:

20    Q.  Your Counsel was asking you about Exhibit 6.  I

21  want to understand your testimony.  Is it your testimony

22  that you had had no contact with the insured in this

23  case, Tyler Goodwin, at all prior to receiving this work

24  order from Safelite?  Is that your testimony?

25    A.  That is correct.



1    Q.  So the first you learned of this job, Safelite

2  just sent you this work order; correct?

3    A.  Yes, sir.

4    Q.  And I think you testified as to what you assumed

5  was a conversation between the insured and GEICO.  You

6  weren't a party to any of those conversations; were you?

7    A.  I don't recall.  Can you say the question again,

8  see if I understand exactly what you're saying.

9    Q.  Well, you just testified, and I think you just

10  recently testified that you had no prior contact with

11  Tyler Goodwin before receiving this work order from

12  Safelite; correct?

13    A.  That's correct.

14    Q.  And Safelite just basically referred you this

15  job; correct?

16    A.  Maybe Tyler wanted to use my shop and happens to

17  -- he calls his insurance first, and he had to go

18  through Safelite.

19    Q.  But you don't know that; do you?  You don't know

20  that Tyler Goodwin called the insurance company?

21    A.  I can guarantee you that if I would have talked

22  to him before, this paper wouldn't be here.

23    Q.  What paper?

24    A.  This referral.

25    Q.  So your testimony under oath, sir, is that you



1   had nothing to do with obtaining this job; correct?

2       A.  That is correct.

3       Q.  But once you got this work order, you decided to

4   do the job didn't; you?

5       A.  Yes, sir.

6       Q.  I think you testified that you assumed that the

7   insured had a call with GEICO; correct?

8       A.  No.  I don't assume.  I know for the fact.

9       Q.  You weren't a party to that call; were you?

10      A.  No.

11      Q.  But you just know; correct?

12      A.  Yes.

13          MR. CLARK:  Just one quick clarification.

14                      RECROSS-EXAMINATION

15  BY MR. CLARK:

16      Q.  In these scenarios, Safelite calls you on your

17  phone first?

18      A.  Yes, sir.

19          MR. CLARK:  I have nothing further.  He will read

20      and sign.  You can send everything to me.  I'd like

21      the whole boat plus electronic.

22          MR. MARINO:  We have it expedited for Friday.  I

23      take it you want to designate.

24          MR. CLARK:  I think we're pretty good on

25      sections.



1   MR. MARINO:   It should be pretty easy.

2   (Deposition concluded at 4:16 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    DEPOSITION ERRATA SHEET

2

3

4   Our Assignment No. 580221

5   Case Caption: VIP Auto Glass vs. GEICO

6

7

8          DECLARATION UNDER PENALTY OF PERJURY

9        I declare under penalty of perjury that I have

10    read the entire transcript of my Deposition taken in

11    the captioned matter or the same has been read to me,

12    and the same is true and accurate, save and except for

13    changes and/or corrections, if any, as indicated by me

14    on the DEPOSITION ERRATA SHEET hereof, with the

15    understanding that I offer these changes as if still

16    under oath.

17

18

19

20        Signed on the _____ day of _____, 20___.

21    _____.

22    MELVIN FIGUEROA RIVERA.

23

24

25



```
 1  │              DEPOSITION ERRATA SHEET

 2  │   Page No._____Line No._____Change to:_____

 3  │   _____

 4  │   Reason for change:_____

 5  │   Page No._____Line No._____Change to:_____

 6  │   _____

 7  │   Reason for change:_____

 8  │   Page No._____Line No._____Change to:_____

 9  │   _____

10  │   Reason for change:_____

11  │   Page No._____Line No._____Change to:_____

12  │   _____

13  │   Reason for change:_____

14  │   Page No._____Line No._____Change to:_____

15  │   _____

16  │   Reason for change:_____

17  │   Page No._____Line No._____Change to:_____

18  │   _____

19  │   Reason for change:_____

20  │   Page No._____Line No._____Change to:_____

21  │   _____

22  │   Reason for change:_____

23  │

24  │   SIGNATURE:_____DATE:_____

25  │   MELVIN FIGUEROA RIVERA
```



1        DEPOSITION ERRATA SHEET

2   Page No._____Line No._____Change to:_____

3   _____

4   Reason for change:_____

5   Page No._____Line No._____Change to:_____

6   _____

7   Reason for change:_____

8   Page No._____Line No._____Change to:_____

9   _____

10  Reason for change:_____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change:_____

23

24  SIGNATURE:_____DATE:_____

25  MELVIN FIGUEROA RIVERA



1                    CERTIFICATE OF REPORTER

2

3   STATE OF FLORIDA      )

4   COUNTY OF HILLSBOROUGH)

5

6      I, Megan M. Soria, certify that I was authorized to

7   and did stenographically report the deposition; that a

8   review of the transcript was requested; and that the

9   foregoing pages are a true and complete record of my

10  stenographic notes taken during said deposition.

11

12     I further certify that I am not a relative, employee,

13  attorney, or counsel of any of the parties, nor am I a

14  relative or employee of any of the parties' attorneys or

15  counsel connected with the action, nor am I financially

16  interested in the action.

17

18     Dated this 26th day of May, 2017.

19

20

21                    

22

23                    Megan M. Soria

24

25

```
 1                    CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA      )

 4   COUNTY OF HILLSBOROUGH)

 5

 6

 7

 8      I, the undersigned authority, certify that

 9   the witness in this matter personally appeared before me

10   and was duly sworn on the 24th day of May, 2017.

11

12      WITNESS my hand and official seal this 26th of May,

13   2017.

14

15

16              Megan M. Soria

17

18              Megan M. Soria,
                Notary Public
19              State of Florida at Large
                My Commission Number:  FF934013
20              Expires:  6/18/2017

21

22

23

24

25
```

