## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**VIP AUTO GLASS, INC.,**

      Plaintiff,

                                Case No.: 8:16-cv-2012-T-35JSS

vs

**GEICO GENERAL INSURANCE
COMPANY,**

      Defendant.

_____/

## FIRST AMENDED CLASS ACTION COMPLAINT AND
## DEMAND FOR JURY TRIAL

      Plaintiff, VIP Auto Glass, Inc., individually, as assignee, and on behalf of all those similarly situated, brings this action against Defendant, GEICO General Insurance Company, and alleges as follows:

### Jurisdiction, Parties, and Venue

      1.    This is an action asserting class action claims for declaratory relief, injunctive relief, and damages pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3).

      2.    This is an action asserting class action claims for declaratory relief, injunctive relief, and damages in excess of $15,000.00, exclusive of interest, costs and attorneys' fees.[1] .

      3.    Plaintiff is and, at all material times, has been a Florida corporation that provides automotive windshield repair and replacement services in the State of Florida to insured customers who have assigned their insurance benefits to Plaintiff.

---

[1] Plaintiff maintains that the Florida Thirteenth Judicial Circuit Court for Hillsborough County, Florida rightly has exclusive jurisdiction over this case because the amount in controversy exceeds $15,000.00, exclusive of interest, costs, and attorneys' fees, and because the Defendant has failed to demonstrate that removal to federal court is proper. *See* Plaintiff's Motion for Remand (Doc. 14).

Exhibit

2

ⓔESQUIRE

4.     Defendant is a foreign corporation doing business under the laws of the State of Florida, and at all material times, sold automobile insurance to insureds in the State of Florida who have assigned their insurance benefits for windshield repair and replacement services to Plaintiff and other windshield repair facilities in Florida.

5.     Venue is proper is Hillsborough County, Florida (Middle District of Florida) because Defendant has offices for transaction of its customary business in Hillsborough County, Florida, and one or more of the causes of action set forth below arose and accrued in Hillsborough County, Florida.

6.     All conditions precedent to this action have occurred, have been performed, or have been waived.

**Background Information Concerning Defendant's Windshield Insurance Coverage**

7.     A "deductible" is a form of self-insurance, which when applicable, relieves the insurer of responsibility for a portion of the loss and requires the insured to share in the risk of loss.

8.     In Florida, motor vehicle insurance companies, like Defendant, are statutorily prohibited from applying or imposing a deductible to a windshield repair or replacement claim. In this regard, Section 627.7288, Florida Statutes, states as follows:

> 627.7288   Comprehensive coverage; **deductible not to apply to motor vehicle glass.**—The **deductible provisions** of any policy of motor vehicle insurance, delivered or issued in this state by an authorized insurer, providing comprehensive coverage or combined additional coverage **shall not be applicable to damage to the windshield** of any motor vehicle covered under such policy.

(Emphasis supplied.)

9.     Defendant's standard automobile insurance policy issued in Florida, an exemplar of which is attached as **Exhibit A,** purports to provide windshield repair and replacement

coverage without a deductible. The policy states the following as it relates to coverage of comprehensive and collision benefits:

### *The Policy*

LOSSES WE WILL PAY

Comprehensive (Excluding Collision)

1.  We will pay for each loss, less the applicable deductible caused by collision to the owned or non-owned auto. This includes glass breakage.

    **No deductible will apply to loss to windshield glass.**

    At the option of the insured breakage of glass caused by collision may be paid under the Collision coverage, if included in the policy.

*See* Exh. A, p. 13 (emphasis supplied).

10.     The policy also contains a section that purports to limit Defendant's liability as follows:

LIMIT OF LIABILITY

The limit of our liability for loss:

1.     Is the actual cash value of the property at the time of loss.

2.     Will not exceed the **prevailing competitive price** to repair or replace the property at the time of loss, or any of its parts, including parts from non-original equipment manufacturers, with other of like kind and quality and will not include compensation for any diminution of value that is claimed to result from the loss. Although you have the right to choose any repair facility or location, **the limit of liability for repair or replacement of such property is the prevailing competitive price which is the price we can secure from a competent and conveniently located repair facility.** At your request, we will identify a repair facility that will perform the repairs or replacements at the prevailing competitive price.

3

*See* Exh. A, pp. 14-15 (emphasis supplied). Defendant contends this "Limits of Liability" section of the policy applies to windshield repair and/or replacement claims.

11.     Other than stating that the "prevailing competitive price" is the price Defendant "can secure from a competent and conveniently located repair facility," the policy does not include a definition of the term "prevailing competitive price" or a definition of the term "competent and conveniently located repair facility," or identify or adopt any particular pricing schedule or pricing methodology that cannot be exceeded.

12.     Although the policy states that Defendant will, upon the insured's request, "identify a repair facility that will perform the repairs or replacements at the prevailing competitive price," the policy does not indicate or require that the insured must make such a request or use any particular windshield repair facility, and as a result of the undefined and unauthorized "prevailing competitive price" language in the policy, Defendant has and continues to evade the no deductible mandate in Section 627.7288, Florida Statutes.

**Background Information Concerning the Insured Customer**

13.     At all times material, Deryl Jones (the **"Insured Customer"**) was insured by Defendant under an automobile insurance policy which was in full force and effect and provided coverage for windshield repair and replacement. The policy attached as Exhibit A is the Insured Customer's policy that was in full force and effect at all times material.

14.     On or about February 8, 2016, the Insured Customer's vehicle sustained physical damage to its windshield requiring repair and/or replacement of the windshield, which was covered by the insurance policy issued by Defendant to the Insured Customer.

15.     Thereafter, the Insured Customer selected Plaintiff to repair and/or replace the windshield, executed an assignment of his insurance benefits in favor of Plaintiff, and notified

4

Defendant of same. A complete, accurate, and authentic copy of the assignment of benefits is attached as **Exhibit B**.

16. Thereafter, Plaintiff repaired and replaced the Insured Customer's windshield at a price established in accordance with its agreement with the Insured Customer, and as set forth in its invoice, a complete, accurate, and authentic copy of which is attached as **Exhibit C**. The agreement on price was consistent with competitve prices in the market for automobile glass replacement and was based on factors such as Plaintiff's costs and competitive conditions in the local market.

17. Thereafter, Plaintiff submitted its request for reimbursement to Defendant.

18. Defendant, however, refused to pay the full amount of Plaintiff's charges. Complete, accurate, and authentic copies of records evidencing Defendant's payment are attached as **Composite Exhibit D**.

19. According to Defendant, the reason for the underpayment was Defendant paid what it determined was the "prevailing competitive price."

20. In addition to Defendant's underpayment for the windshield repair and replacement services which Plaintiff provided to the Insured Customer, Defendant has underpaid Plaintiff for other windshield repair and/or replacement work performed for other customers insured by Defendant.

21. Plaintiff reasonably anticipates that it will continue to perform windshield repair and/or replacement work in the future for other customers insured by Defendant.

22. In failing and/or refusing to pay the full amount of Plaintiff's charges for the windshield repair and replacement services provided to the Insured Customer and other customers insured by Defendant, Defendant has never contended that Plaintiff was not a

"competent" or "conveniently located repair facility," and has never raised any other objection concerning the windshield repair and replacement services provided by Plaintiff to Defendant's insureds.

23.     As detailed below, Defendant's "prevailing competitive price" is neither "prevailing" in the local markets nor is it a "competitive" price as those terms are generally used and understood. Rather, it is a fictitious price based on arbitrary discounts to an index price adjusted and administered by a third party that also competes with Plaintiff and other independent automobile glass replacement businesses in Florida.

**How Defendant Determines Pricing for Windshield Repair and Replacement Claims**

24.     Pursuant to a contract between Defendant and Safelite Solutions, LLC ("Safelite Solutions"), Safelite Solutions is the third-party administrator for Defendant's windshield repair and replacement claims. Plaintiff has requested a copy of this contract, but Defendant has refused to produce it.

25.     Upon information and belief, Safelite Solutions has entered into similar contracts with other automobile insurance carriers. At this time, Plaintiff does not have copies of the similar contracts.

26.     Safelite Fulfillment, Inc. ("Safelite Fulfillment") operates a chain of windshield repair and replacement facilities nationwide. Safelite Fulfillment and Safelite Solutions are related companies that are part of the "Safelite Group."

27.     Safelite Solutions enters into Participation Agreements with windshield repair and replacement facilities. Facilities that enter into Participation Agreements with Safelite Solutions become part of the "Safelite Network." *See, e.g,* **Exhibit E** (exemplar "Safelite Network Participation Agreement").

28.     Under the terms of the Participation Agreements, in order to participate in the Safelite Network, the facilities agree with Safelite Solutions to accept the prices that Defendant has agreed to pay pursuant to Safelite Solutions' contracts with Defendant.

29.     National Auto Glass Specifications ("NAGS") is a database that is published quarterly and includes, among other things, automobile glass repair and replacement pricing and estimating information, which is routinely accepted by automobile glass replacement companies throughout the United States, including Florida.

30.     The discounted prices that Defendant has negotiated with Safelite Solutions and agrees to pay Safelite Fulfillment facilities and Safelite Network facilities are an across-the-board percentage discount off of the industry standard retail prices suggested by NAGS.

31.     When a Safelite Fulfillment facility or a Safelite Network facility performs windshield repair and/or replacement work for one Defendant's insureds, the facility issues an invoice to Defendant based on the discounted pricing parameters agreed to between Defendant and Safelite Solutions and/or Safelite Fulfillment.  Defendant thereafter pays the invoice.

32.     Safelite Fulfillment facilities are Defendant's preferred vendors because they have agreed to accept the discounted prices that Defendant has negotiated to pay pursuant to the pricing parameters agreed to between Defendant and Safelite Solutions and/or Safelite Fulfillment.

33.     When Defendant's insureds contact Defendant regarding windshield repair and/or replacement claims, Defendant directs its insureds to have the repair and/or replacement work performed by its preferred vendors, *i.e.*, a Safelite Fulfillment facility.

34.     If Defendant's insured chooses a windshield repair and replacement facility that is not a Safelite Fulfillment facility or a Safelite Network facility (a "Non-Safelite Facility"), and

7

the Non-Safelite Facility submits an invoice charging more than the discounted pricing parameters that Defendant has negotiated with Safelite Solutions and/or Safelite Fulfillment, Defendant refuses to pay the Non-Safelite Facility any more than the discounted prices it would pay a Safelite Fulfillment facility or a Safelite Network facility. This results in an underpayment of the Non-Safelite Facility's invoice.

35.     In that event, the insured customer is exposed to liability for the portion of the charges that Defendant refuses to pay to the Non-Safelite Facility. The underpayment amount is therefore an unlawful *de facto* deductible and constitutes an unlawful reduction of the amount of windshield insurance coverage that Defendant's insureds are statutorily and contractually entitled to receive.

36.     There is a conflict of interest between Safelite's role as a third party administrator charged with administering and determining Defendant's "prevailing competitive price" (Safelite Solutions) and its relationship to the facilities in the Safelite Network and Safelite Fulfillment, a national chain of automobile glass repair and replacement facilities, *i.e.*, facilities that compete with Plaintiff and the members of the proposed Class for automobile glass replacement work. Defendant is aware of this conflict, adopts it, and exploits it to the detriment of its policyholders and in contravention of its own policies and Section 627.7288, Florida Statutes.

37.     When Safelite Solutions is acting as Defendant's windshield claim adjuster and submits documents to Non-Safelite Facilities in Florida, Safelite Solutions advises that Defendant "will not reimburse for deductibles not collected," even though deductibles on windshield repair and replacement claims are unlawful in Florida. *See* **Exhibit F**. In other words, Defendant's own internal claim adjustment process treats the unpaid portion of the invoice the same way it would treat a deductible in jurisdictions where one is permitted.

8

38.     Defendant does not notify its insureds, either in the policy or in separate written notifications, of its agreements with Safelite Fulfillment and/or Safelite Solutions, or its determination that the discounted prices that it unilaterally sets with Safelite Fulfillment facilities and Safelite Network facilities are what Defendant actually considers to be the "prevailing competitive price."

39.     When Defendant underpays a Non-Safelite Facility, Defendant does not provide the Non-Safelite Facility or the insured customer with any communication or notice identifying the reason for its underpayment, such as an "explanation of benefits" or an "explanation of review."

40.     In a document called the "GEICO Glass Pricing Agreement," Defendant sets forth the discounted pricing parameters agreed to between Defendant and Safelite Solutions and/or Safelite Fulfillment as of a particular date.  Examples of the GEICO Glass Pricing Agreements are attached as **Composite Exhibit G.**

41.     As of September 18, 2008, the pricing structure that applied in Florida was described in the GEICO Glass Pricing Agreement as follows:

| | | |
|---|---|---|
| NAGS Windshield: | 47.0% | Off (-) NAGS List |
| NAGS Tempered: | 47.0% | Off (-) NAGS List |
| Labor: | $40.00 | Per NAGS Hour |
| | | |
| High Modulus/ | | |
| Non-Conductive Urethane | $20.00 | 1.0 Kit |
| | $30.00 | 1.5 Kit |
| | $40.00 | 2.0 Kit |
| All other urethanes | $15.00 | per NAGS kit quantity |
| | | |
| Windshield Repairs: | $49.95 | $10 For each additional break |
| | | Maximum of 3 repairs total |

This pricing agreement applies to all invoices submitted for services performed on or after September 18, 2008 and

9

supersedes all prior pricing agreements. We reserve the right to change these prices at any time in the future. . . .

*See* Exh. G, p. 1.

42.    As of February 6, 2012, the pricing structure that applied in Florida was described in the GEICO Glass Pricing Agreements as follows:

| | | |
|---|---|---|
| NAGS Windshield: | 50.0% | Off (-) NAGS List |
| NAGS Tempered: | 50.0% | Off (-) NAGS List |
| Labor: | $40.00 | Per NAGS Hour |
| | | |
| High Modulus/ | | |
| Non-Conductive Urethane | $20.00 | 1.0 Kit |
| | $30.00 | 1.5 Kit |
| | $40.00 | 2.0 Kit |
| All other urethanes | $15.00 | per NAGS kit quantity |
| | | |
| Windshield Repairs: | $60.00 | Flat Per Windshield |
| | | |
| Molding Discount | 20% | Off (-) Precision List |

*See* Exh. G, p. 2.

**The Prices that Defendant Pays Are Not "Prevailing" and Are Not "Competitive"**

43.    Neither Defendant nor Safelite Solutions "adjusts" windshield repair or replacement claims as that term is understood in the ordinary course of handling of insurance claims. Put another way, neither Defendant nor Safelite Solutions employs insurance adjusters to investigate an insured's windshield repair and/or replacement claim to determine the amount to pay on the claim based on the circumstances of the particular loss pursuant to the terms of the applicable insurance policy, or the usual and customary prices for the windshield repair and/or replacement services and parts.

44.    Further, the amounts paid by Defendant for windshield repair and/or replacement claims are not based on an evaluation of prices that are "prevailing" or "competitive" within a particular geographic area, or prices that are reasonable, usual, or customary.

45.     Despite the provisions of its insurance policy, Defendant does not pay the price it "can secure from a competent and conveniently located repair facility."

46.     Indeed, the "prevailing competitive price" – the price Defendant agrees to pay – is not "prevailing" and it is not "competitive." Instead, it is based on a set of pricing parameters that Defendant has unilaterally set with Safelite Solutions and/or Safelite Fulfillment, without regard to the prices which are customarily charged by Non-Safelite Facilities. By unilaterally setting a "prevailing competitive price," Defendant's conduct is based on Safelite's fundamental conflict of interest as both a third party administrator for automobile windshield claims (Safelite Solutions) and an automobile windshield provider in the Florida market (Safelite Fulfillment), which conflict Defendant created, fosters, and maintains as a result of its employment of Safelite and use and adoption of its pricing policies.

47.     Defendant's identification of the amount it will pay as the "prevailing competitive price" in the insurance policy is vague, ambiguous, misleading and deceptive because the discounted pricing parameters unilaterally set between Defendant and Safelite Solutions and/or Safelite Fulfillment are neither "competitive" nor "prevailing."   The discounted pricing parameters are based on what Safelite Fulfillment facilities and Safelite Network facilities have privately agreed to accept from Defendant, in exchange for Defendant's agreement to refer its insureds to those facilities.

48.     In addition, despite being called an "agreement," the GEICO Glass Pricing Agreements are not agreements or contracts, and neither Defendant's insureds, nor Plaintiff, nor any of the class member windshield repair facilities selected by Defendant's other insureds are parties to the GEICO Glass Pricing Agreements.

11

49.     Neither the GEICO Glass Pricing Agreements, nor the price formula described

therein, nor any of the other terms and conditions described therein are contained or referenced

or alluded to in Defendant's insurance policy.

50.     The GEICO Glass Pricing Agreements acknowledge that Defendant's insureds

are not required to have their windshields repaired or replaced at any specific repair facility, but

those GEICO Glass Pricing Agreements suggest that Defendant's insureds should nonetheless

bear the costs of any windshield repair and expenses which exceed the unidentified pricing

formula which is only set forth in the GEICO Glass Pricing Agreements:

> Our policyholders have the right of personal choice and preference
> in their selection of an automotive glass shop. However, because
> we are obligated, on behalf of all of our policyholders, to pay only
> the competitive market value for glass repairs and replacement
> services, you may consider refusing the job if you are unwilling to
> provide service at the prices GEICO has offered above. Nothing
> contained in any oral or written notice received by us or our agent
> from you purporting to reject such pricing for services you may
> render for any of our insureds will be binding on us or otherwise
> require us to pay you additional sums for services rendered.
>
> If you desire to bill for more than GEICO's competitive pricing as
> stated above, you must advise our policyholders prior to initiating
> glass repair/replacement so that they can determine whether they
> are willing to pay the additional costs for your services.

*See* Exh. G, p. 1.

51.     Instead of making any investigation or determination of whether a Non-Safelite

facility used by Defendant's insureds is competent or conveniently located, or whether that

facility's prices are reasonable, usual, and customary in the geographic market they are located,

Defendant simply refuses to pay more than the amount established by Defendant under its

unilaterally set price with Safelite Solutions and/or Safelite Fulfillment as provided in the

GEICO Glass Pricing Agreements—regardless of whether the Non-Safelite facility is competent

or conveniently located to the insured, and regardless of whether the Non-Safelite facility would decline to repair or replace a windshield for the price established under the GEICO Glass Pricing Agreements.

52.     According to the GEICO Glass Pricing Agreements, a windshield repair facility may charge Defendant's insureds a higher price, as long as the windshield repair facility "advise[s] [the insureds] prior to initiating glass repair/replacement so that they can determine whether they are willing to pay the additional costs for [the] services." In other words, Defendant will limit insurance coverage for windshield repair and replacement service, even if the price established by Defendant in the GEICO Glass Pricing Agreements is less than the minimum price that the facility is willing to accept to repair or replace the insured's windshield, and in that event, Defendant expects its insured to assume liability for the additional charges that exceed the price established by the GEICO Glass Pricing Agreements.

53.     Further, the GEICO Glass Pricing Agreements disregard and do not adjust for local competitive conditions, such as local costs of operation that may vary widely across Florida.

**Nature of the Controversy**

54.     After Plaintiff and similarly situated Non-Safelite facilities in Florida have accepted Defendant's insureds as customers and after they have incurred the expense of repairing and/or replacing the damaged windshields of those insured customers, Defendant (a) routinely rejects and refuses to pay windshield repair and/or replacement prices incurred by its insureds and charged by the Non-Safelite facilities, (b) takes the position that other windshield repair facilities, *i.e.*, Safelite Network facilities or Safelite Fulfillment facilities, would have performed the repair and/or replacement at the so-called "prevailing competitive price," (c) underpays the

Non-Safelite facility based on the so-called "prevailing competitive price" that Defendant contends it "can secure" from a "competent and conveniently located repair facility," and (d) leaves an unpaid balance due and owing, for which Defendant's insured is left liable.

55.      Simply put, Defendant routinely fails and refuses to pay the full amount of windshield repair and/or replacement charges submitted for insurance reimbursement by Plaintiff and other similarly situated Non-Safelite facilities because Defendant contends that some other unidentified windshield repair facility would have made the repair and/or replacement for a lower amount than the charges incurred by Defendant's insureds.

56.      Defendant's failure to pay any Non-Safelite Facility more than the amount it would pay to a Safelite Fulfillment facility or a Safelite Network facility for the equivalent work leaves its insureds exposed to liability for the unpaid balance of the charge.  As such, Defendant's conduct imposes a *de facto* unlawful deductible upon its insureds in violation of Section 627.7288 and the express terms of its insurance policy and constitutes an unlawful reduction of the amount of windshield insurance coverage that Defendant's insureds are statutorily and contractually entitled to receive.

57.      Alternatively, Defendant is unlawfully reducing the amount of windshield insurance coverage which its insureds are statutorily and contractually entitled to receive.

58.      Alternatively, the "prevailing competitive price" limitation provision contained in Defendant's insurance policy is misleading, deceptive, vague, ambiguous, and/or susceptible to more than one interpretation, and therefore, controlling Florida principles of contract construction require that limitation provision must be liberally construed in favor of providing the highest level of benefits to the insured, such that Defendant must fully pay the price incurred by its insured for windshield repair and/or replacement services.

14

## Class Action Allegations[2]

59.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiff, together with such other persons or entities that may join this action as class representatives, hereby brings this action on its own behalf and on behalf of all those similarly situated who were unlawfully underpaid by Defendant for windshield repair or replacement services provided to Defendant's insureds.

60.     As used herein, the "**Class**" consists of and is defined as all persons or other entities who, within the five-year time period prior to the date on which this lawsuit was filed:

        a.     owned a windshield repair facility located in the State of Florida;

        b.     were hired by a person or other entity insured by Defendant in the State of Florida who was covered by an insurance policy purporting to provide windshield insurance coverage without a deductible;

        c.     provided windshield repair and/or replacement services to said insured;

        d.     own an assignment of benefits from said insured;

        e.     submitted bill(s) to Defendant for payment; and

        f.     did not receive full payment from Defendant.

Excluded from the Class are any such persons or entities whose claims otherwise described above (i) have already been fully paid by the insured or Defendant or were otherwise satisfied through litigation or settlement; and/or (ii) are the subject of pending litigation against Defendant as of the date of any class certification order or other deadline established by the Court (the "**Class**").

---

[2] For the purposes of this Amended Complaint, Plaintiff makes its class action allegations under Federal Rule of Civil Procedure 23, rather than under Florida Rule of Civil Procedure 1.220, Florida's procedural counterpart. Nonetheless, as described in its Motion for Remand, Plaintiff maintains that Defendant has failed to demonstrate that this Court has subject matter jurisdiction over this action.

Case 8:16-cv-02012-MSS-JSS   Document 71   Filed 02/11/17   Page 16 of 27 PageID 376

61.     Plaintiff reserves the right to amend the Class definition as discovery proceeds and to conform to the evidence.

62.     While the exact number of Class members is unknown at this time, Plaintiff submits that there are hundreds of potential Class members in this action. In addition, Defendant's Notice of Removal alleges that the number of Class members in this action exceeds 100. *See* Doc. 1 at ¶¶ 13-16. Accordingly, Plaintiff has a good faith reason to believe that, during the material time period described by the Class, there are hundreds of windshield repair facilities who are potential Class members in this action, and the numbers of Class members are so numerous that separate joinder of each member is impractical.

63.     This action poses questions of law and fact that are common to and affect the rights of all members of the Class, including but not limited to the following:

    a.     Whether Defendant lacks statutory and/or contractual authority to pay less than the charges incurred by its insureds for windshield repair and/or replacement services?

    b.     Whether Defendant's failure and/or refusal to pay the charges incurred by its insureds for windshield repair and/or replacement services constitutes an unlawful *de facto* deductible in violation of Section 627.7288 and/or the provision of the insurance policy which states that no deductible shall apply to a windshield damage claim?

    c.     Whether Defendant's reliance upon its agreement with Safelite Solutions and/or Safelite Fulfillment, as reflected in the GEICO Glass Pricing Agreements, to limit reimbursement to its insureds, when that agreement is not identified, or adopted, or referenced in the insurance policy or any statute, results in an unlawful reduction in the amount of windshield insurance coverage to which its insureds are statutorily and contractually entitled to receive?

    d.     Whether Defendant's description of the prices it agrees to pay in the policy as the "prevailing competitive price" is deceptive or misleading?

    e.     Whether the "prevailing competitive price" limitation provision contained in Defendant's insurance policy is vague, ambiguous, and/or susceptible to more than one interpretation, and is, therefore, required by controlling Florida principles of contract construction to be liberally construed in favor of providing the highest level of benefits to

Case 8:16-cv-02012-MSS-JSS   Document 71-9   Filed 06/13/17   Page 17 of 104 PageID 2182
Case 8:16-cv-02012-MSS-JSS   Document 37-1   Filed 01/11/17   Page 17 of 27 PageID 877
Case 8:16-cv-02012-MSS-JSS   Document 47   Filed 02/21/17   Page 17 of 27 PageID 733

the insured, such that Defendant must fully pay the price incurred by its insured for windshield repair and replacement services?

  f.  Whether Plaintiff and the Class are entitled to declaratory relief pursuant to Chapter 86, Florida Statutes, to determine the parties' respective rights and obligations concerning Section 627.7288 and/or the provisions of Defendant's insurance policy?

  g.  Whether Plaintiff and the Class are entitled to injunctive relief to require Defendant to cease and desist from continuing to unlawfully underpay for windshield damage claims?

  h.  Whether Plaintiff and the Class have incurred damages as a result of Defendant unlawfully underpay for windshield damage claims?

64.  Based on the facts and circumstances set forth herein, Plaintiff's claims are typical of the claims of the members of the Class.

65.  Further, other individual plaintiffs may elect to join this action upon such grounds as the Court may set forth and these individuals will likewise have issues that are common to those of all other Class members.

66.  Plaintiff has retained the undersigned attorneys who are well-qualified and experienced in handling class action litigation and will adequately protect the interests of the Class.

67.  With respect to Counts I and II below, Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23(b)(2) on the grounds that Defendant's actions or omissions as alleged herein are generally applicable to all Class members thereby making declaratory and/or injunctive relief concerning the class as a whole appropriate.

68.  With respect to Count III below, Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23(b)(3) on the grounds that the questions of law or fact common to Plaintiff's claim and the claim each member of the Class predominate over any question of law or fact affecting only individual Class members, and class representation is

Case 8:16-cv-02012-MSS-JSS   Document 71-9   Filed 06/13/17   Page 18 of 104 PageID 2183

Case 8:16-cv-02012-MSS-JSS   Document 47   Filed 02/21/17   Page 18 of 27 PageID 736
Case 8:16-cv-02012-MSS-JSS   Document 37-1   Filed 01/11/17   Page 18 of 27 PageID 378

superior to other available methods for the fair and efficient adjudication of the controversy; or alternatively, pursuant to Rule 23(c)(4), on the grounds that Plaintiff's claims may be brought or maintained on behalf of the Class concerning particular issues.

### Count I – Class Action for Declaratory Relief

69.     This is a class action for declaratory relief pursuant to Chapter 86, Florida Statutes, brought by Plaintiff and the Class against Defendant.

70.     Plaintiff realleges and incorporates by reference paragraphs 1-67 above.

71.     Plaintiff takes the position that Defendant lacks statutory and/or contractual authority to pay less than the competitive charges incurred by its insureds for windshield repair and/or replacement services. Defendant disagrees and takes the position that it is authorized to pay less than the competitively charged amount pursuant to the "prevailing competitive price" limitation provision of the insurance policy and/or the discounted pricing parameters established under Defendant's agreement with Safelite Solutions and/or Safelite Fulfillment as reflected in the GEICO Glass Pricing Agreements.

72.     Plaintiff takes the position that Defendant's failure and/or refusal to pay the charges incurred by its insureds for windshield repair and/or replacement services constitutes an unlawful *de facto* deductible in violation of Section 627.7288 and/or the provision of the insurance policy which states that no deductible shall apply to a windshield damage claim. Defendant disagrees and takes the position that it is not imposing a deductible on its insureds by paying less than the charged amount pursuant to the "prevailing competitive price" limitation provision of the insurance policy and/or the discounted pricing parameters established under Defendant's agreement with Safelite Solutions and/or Safelite Fulfillment as reflected in the GEICO Glass Pricing Agreements, leaving its insureds responsible for paying the unpaid balance

18

Case 8:16-cv-02012-MSS-JSS   Document 37-1   Filed 01/11/17   Page 19 of 27 PageID 379

of the charge, and unlawfully reducing the amount of windshield insurance coverage that Defendant's insureds are statutorily and contractually entitled to receive.

73.    Plaintiff takes the position that Defendant's reliance on the discounted pricing parameters established under Defendant's private negotiations with Safelite Solutions and/or Safelite Fulfillment as reflected in the GEICO Glass Pricing Agreements to limit reimbursement to its insureds, when that agreement is not identified, or adopted, or referenced in the insurance policy, results in an unlawful reduction in the amount of windshield insurance coverage to which its insureds are statutorily and contractually entitled to receive. Defendant disagrees and takes the position that it is not unlawfully reducing the amount of windshield insurance coverage to which its insureds are statutorily and contractually entitled to receive by providing reimbursement pursuant to the "prevailing competitive price" limitation provision of the insurance policy and/or the discounted pricing parameters established under Defendant's private negotiations with Safelite Solutions and/or Safelite Fulfillment as reflected in the GEICO Glass Pricing Agreements.

74.    Plaintiff takes the position that the "prevailing competitive price" limitation provision contained in Defendant's insurance policy is vague, ambiguous, arbitrarily applied, and/or susceptible to more than one interpretation, and is, therefore, required by controlling Florida principles of contract construction to be liberally construed in favor of providing the highest level of benefits to the insured, such that Defendant must fully pay the price incurred by its insured for windshield repair and replacement services. Defendant disagrees and contends that its policy is clear and unambiguous, and that it can lawfully limit coverage for windshield repair and replacements services pursuant to the "prevailing competitive price" limitation provision of the insurance policy and/or the discounted pricing parameters established under

Defendant's agreement with Safelite Solutions and/or Safelite Fulfillment as reflected in the GEICO Glass Pricing Agreement.

75.      Plaintiff is in doubt concerning its rights, and a bona fide present controversy exists between Plaintiff, the Class members, and Defendant, concerning the following issues:

a.      Whether Defendant lacks statutory and/or contractual authority to pay less than the charges incurred by its insureds for windshield repair and/or replacement services?

b.      Whether Defendant's failure and/or refusal to pay the charges incurred by its insureds for windshield repair and/or replacement services constitutes an unlawful *de facto* deductible in violation of Section 627.7288 and/or the provision of the insurance policy which states that no deductible shall apply to a windshield damage claim?

c.      Whether Defendant's reliance on the discounted pricing parameters established under Defendant's private negotiations with Safelite Solutions and/or Safelite Fulfillment as reflected in the GEICO Glass Pricing Agreements to limit reimbursement to its insureds, when that agreement is not identified, or adopted, or referenced in the insurance policy, results in an unlawful reduction in the amount of windshield insurance coverage to which its insureds are statutorily and contractually entitled to receive?

d.      Whether the "prevailing competitive price" limitation provision contained in Defendant's insurance policy is vague, ambiguous, and/or susceptible to more than one interpretation, and is, therefore, required by controlling Florida principles of contract construction to be liberally construed in favor of providing the highest level of benefits to the insured, such that Defendant must fully pay the price incurred by its insured for windshield repair and replacement services?

76.      The rights, status, or other equitable or legal relations of the parties are affected by Defendant's pattern and practice of doing business, the interpretation of the Defendant's insurance policy, Section 627.7288, and/or other applicable law.  Accordingly, pursuant to Chapter 86, Florida Statutes, Plaintiff and the class members may obtain a declaration of rights, status, or other equitable or legal relations thereunder.

77.      Plaintiff does not seek a mere advisory opinion, but rather, there is a bona fide, actual, present and practical need for a declaration of the parties' respective rights, duties and obligations under Defendant's insurance policy, Section 627.7288, and/or other applicable law.

78.     Section 86.011, Florida Statutes states that this Court has "jurisdiction ... to declare rights, status, and other equitable or legal relations whether or not further relief is or could be claimed." Section 86.111, Florida Statutes states, "The existence of another adequate remedy does not preclude a judgment for declaratory relief." Thus, regardless of whether injunctive relief is available under Count II or whether damages are available to Plaintiff under Count III, this Court still has authority to determine the parties' respective rights, status, and other equitable or legal relations under Section 627.7288, the insurance policy, and/or other applicable law.

79.     Section 86.011(2), Florida Statutes states that "The court may render declaratory judgments on the existence, or nonexistence ... of any fact upon which the existence or nonexistence of such immunity, power, privilege, or right does or may depend, whether such immunity, power, privilege, or right now exists or will arise in the future." Thus, the Court has authority to determine whether Defendant's past conduct has been unlawful, in order to prevent the same unlawful conduct in the future.

80.     Section 86.021, Florida Statutes states, "Any person claiming to be interested or who may be in doubt about his or her rights under a ... contract, ... or whose rights, status, or other equitable or legal relations are affected by a statute ... may have determined any question of construction or validity arising under such statute, ... contract, ... or any part thereof, and obtain a declaration of rights, status, or other equitable or legal relations thereunder." Thus, the Court has authority to determine the rights of "any person" (such as Plaintiff) who is in doubt about its rights under the Florida law and/or Defendant's insurance policy. Because Plaintiff routinely provides windshield repair and replacement services to Defendant's insureds and

expects to continue to do so in the future, the issues raised in this declaratory relief claim affects Plaintiff on an ongoing and continuing basis.

81.     Section 86.031, Florida Statutes states, "A contract may be construed either before or after there has been a breach of it." Under this statute, the Court has authority to determine whether Defendant has breached its insurance policy by failing and refusing to properly pay claims for windshield damage, and/or whether this conduct will breach its insurance policies in the future.

82.     Section 86.051, Florida Statutes states, "Any declaratory judgment rendered pursuant to this chapter may be rendered by way of anticipation with respect to any act not yet done or any event which has not yet happened, and in such case the judgment shall have the same binding effect with respect to that future act or event, and the rights or liability to arise therefrom, as if that act or event had already been done or had already happened before the judgment was rendered." This statute confirms that the Court has authority to determine the legality of Defendant's anticipated future conduct and to prevent unlawful conduct in the future.

83.     Section 86.071, Florida Statutes states, in pertinent part, that when a declaratory action "concerns the determination of an issue of fact, the issue may be tried as issues of fact are tried in other civil actions in the court in which the proceeding is pending. To settle questions of fact necessary to be determined before judgment can be rendered, the court may direct their submission to a jury." Thus, the existence of disputed fact issues does not prevent the Court from providing declaratory relief under Chapter 86.

84.     Plaintiff has retained the undersigned counsel to prosecute this action and is entitled to recover its reasonable attorneys' fees and costs pursuant to Section 627.428, Florida Statutes.

22

Case 8:16-cv-02012-MSS-JSS   Document 37-1   Filed 01/11/17   Page 23 of 27 PageID 383

## Count II – Class Action for Injunctive Relief

85.     This is a Florida common law action for injunctive relief brought by Plaintiff and the Class against Defendant.

86.     Plaintiff realleges and incorporates by reference paragraphs 1-67 above.

87.     Plaintiff and the Class members will suffer irreparable injury if Defendant is permitted in the future to continue refusing to pay the charges incurred by its insureds for windshield repair and/or replacement services in violation of Section 627.7288 and/or the provision of the insurance policy which states that no deductible shall apply to a windshield damage claim. Examples of such irreparable injury include but are not limited to the following:

    a.     Absent injunctive relief requiring Defendant to cease and desist from such wrongful conduct in the future, Plaintiff and the Class members are left in the untenable position of having to address Defendant's continuing and ongoing wrongs with a multiplicity of lawsuits, in the various different county courts across Florida, with the risk of suffering inconsistent and varying results.

    b.     Defendant's continuing and ongoing unlawful conduct places its own insureds at risk that windshield repair facilities will seek to collect from those insureds the balance of the charges left unpaid by Defendant, and this will lead to incalculable or unascertainable losses to those insureds who have already paid premiums for windshield damage insurance without a deductible.

    c.     Defendant's continuing and ongoing unlawful conduct places its own insureds at risk that windshield repair facilities will refuse to repair or replace their damaged windshields without receiving full payment directly from the insured customer, and this will lead to incalculable or unascertainable losses to those insureds who have already paid premiums for windshield damage insurance without a deductible.

88.     Plaintiff and the Class members have a clear legal right to seek an injunction requiring that Defendant cease and desist in the future its continuing pattern and practice of unlawfully refusing to pay the charges incurred by its insureds for windshield repair and/or replacement services in violation of Section 627.7288 and/or the provision of the insurance policy which states that no deductible shall apply to a windshield damage claim.

23

89.    Plaintiff and the Class members have no other adequate remedy at law.

90.    The injunctive relief requested by Plaintiff and the Class members would not be contrary to the interest of the public generally.

91.    Plaintiff has retained the undersigned counsel to prosecute this action and is entitled to the recovery of its reasonable attorneys' fees and costs pursuant to Section 627.428, Florida Statutes.

### Count III – Class Action Claim For Benefits

92.    This is a class action claim by Plaintiff against Defendant for unpaid benefits.

93.    Plaintiff realleges and incorporates by reference paragraphs 1-66 and 68, above.

94.    Defendant unlawfully failed and/or refused to pay Plaintiff and the Class members for windshield repair and/or replacement charges incurred by the Insured Customer and other customers insured by Defendant.

95.    Defendant's underpayments violate the provisions of Section 627.7288, which prohibit insurance companies from applying a deductible to windshield damage claims.

96.    Defendant's underpayments violate the provisions of the insurance policy, which agrees to pay windshield damage claims without applying a deductible.

97.    Defendant's underpayments otherwise violate the terms of the insurance policy, which must be liberally construed in favor of providing the highest level of coverage.

98.    As a direct and proximate result of the foregoing acts and/or omissions by Defendant, Plaintiff and the Class members suffered damages.

99.    Plaintiff has retained the undersigned counsel to prosecute this action and is entitled to the recovery of its reasonable attorneys' fees and costs pursuant to Sections 627.428, Florida Statutes.

Case 8:16-cv-02012-MSS-JSS Document 37-1 Filed 02/11/17 Page 25 of 27 PageID 385

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court to award the following relief against Defendant:

a.      Issue an order certifying that Counts I and II are properly maintainable as a class action under Rule 23(b)(2), and/or that Count III is properly maintainable as a class action under Rule 23(b)(3) and/or (c)(4);

b.      Issue an order appointing Plaintiff to represent the Class defined herein, and appointing the undersigned law firms as class counsel;

c.      Issue an order granting a declaratory judgment under Count I declaring the parties' respective rights and obligations under Florida law;

d.      Issue an order granting a temporary and/or permanent injunction under Count II as set forth herein;

e.      Issue a judgment for damages against Defendant and in favor of Plaintiff and the Class under Count III, together with interest;

f.      Issue an order requiring Defendant to pay Plaintiff's reasonable attorneys' fees and costs pursuant to Sections 627.428, Florida Statutes; and

g.      Grant such other relief as this Honorable Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues triable by a jury.

**[Attorney's signature appears on the following page.]**

Respectfully submitted,

/s/ J. Daniel Clark
J. Daniel Clark, FBN 0106471
dclark@clarkmartino.com
Matthew A. Crist, FBN 0035539
mcrist@clarkmartino.com
**CLARK ◆ MARTINO, P.A.**
3407 W. Kennedy Blvd.
Tampa, Florida 33609
Telephone: (813) 879-0700
Facsimile: (813) 879-5498

and

David M. Caldevilla, FBN 654248
dcaldevilla@dgfirm.com
Donald C. P. Greiwe, FBN 118238
dgreiwe@dgfirm.com
**de la PARTE & GILBERT, P.A.**
P.O. Box 2350
Tampa, FL 33601-2350
Telephone: (813) 229-2775
Facsimile: (813) 229-2712

and

Christina K. Ramirez, FBN 0954497
Ramirez.nina@gmail.com
655 Riviera Drive
Tampa, FL 33606
Telephone: (813 263-9162

**Attorneys for Plaintiff**

26

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** on January 11, 2017, I electronically filed the foregoing with the

Clerk of Court by using this Court's CM/ECF system that will send a notice of electronic filing

to all counsel of record.

*/s/ J. Daniel Clark*
J. Daniel Clark

# EXHIBIT A

# GEICO

**ONE GEICO PLAZA**
**Washington, D. C. 20076-0001**
**Telephone: 1-800-841-3000**

# Florida
# Family
# Automobile
# Insurance
# Policy

GG/VIP000003

# YOUR POLICY INDEX

Page

Page

**SECTION I - Liability Coverages**
**Your Protection Against Claims From Others**

Definitions............................................................. 3
Losses We Will Pay For You .................................. 3
Additional Payments We Will Make Under
   The Liability Coverages....................................... 4
    Legal Expenses And Court Costs
    Bail And Appeal Bonds
    First Aid Expenses
Exclusions: When Section I Does Not Apply ........... 4
Persons Insured: Who Is Covered .......................... 5
Financial Responsibility Laws ................................ 5
Out of State Coverage .......................................... 5
Limits Of Liability ................................................. 5
Other Insurance.................................................... 5
Conditions ........................................................... 5
    Notice
    Assistance And Cooperation Of The Insured
    Action Against Us
    Subrogation

**SECTION II - Personal Injury Protection Coverage**

Personal Injury Protection (Part I)......................... 6
Definitions........................................................... 6
Payments We Will Make ....................................... 7
Exclusions  .......................................................... 8
Limits Of Liability; Application Of Deductible;
   Other Insurance.................................................. 8
Policy Period; Territory ......................................... 9
Conditions ........................................................... 9
    Notice
    Action Against The Company
    Proof Of Claim; Medical Reports and
      Examinations; Payment of Claim Withheld
    Reimbursement And Subrogation
    Special Provisions For Rented Or Leased Vehicles
Modification Of Policy Coverages (Part II) ......... 10
Provisional Premium (Part III) ............................ 10
Automobile Medical Payments Coverage
(Part IV)............................................................ 10

**SECTION III - Physical Damage Coverages**
**Your Protection For Loss Of Or Damage To Your Car**

Definitions.......................................................... 12
Losses We Will Pay ............................................ 13
    Comprehensive(Excluding Collision) ............... 13
    Collision ........................................................ 14
Additional Payments We Will Make Under The
   Physical Damage Coverages............................ 14
Car Rental If Your Car Is Stolen............................ 14

Exclusions: When The Physical Damage
   Coverages Do Not Apply................................... 14
Limit Of Liability  ............................................... 14
Other Insurance.................................................. 15
Conditions ......................................................... 15
    Notice
    Assistance And Cooperation Of The Insured
    Action Against Us
    Insured's Duties In Event Of Loss
    Appraisal
    Payment Of Loss
    No Benefit To Bailee
    Subrogation
    Assignment

**SECTION IV - Uninsured Motorists Coverage**
**Your Protection For Injuries Caused By**
**Uninsured And Hit-And-Run Motorists ............. 16**

**SECTION V - General Conditions**
**The Following Apply To All Coverages In This Policy**
Territory - Policy Period ......................................... 16
Premium............................................................. 16
Changes............................................................. 16
Assignment......................................................... 17
Cancellation By The Insured.................................. 17
Cancellation By Us.............................................. 17
Cancellation By Us Is Limited................................ 17
Renewal.............................................................. 17
Non Renewal....................................................... 18
Mediation Of Claims............................................ 18
Other Insurance.................................................. 18
Action Against Us................................................ 18
Dividend Provision .............................................. 18
Declarations........................................................ 18
Fraud And Misrepresentation ................................ 18
Examination Under Oath....................................... 18
Terms Of Policy Conformed To Statutes ............... 18
Choice of Law..................................................... 18

**SECTION VI - Amendments And Endorsements**

Special Endorsement
United States Government Employees ................. 19

Case 8:16-cv-02012-MSS-JSS   Document 37-2   Filed 04/11/17   Page 4 of 53 PageID 391

Whenever "he," "his," "him," or "himself" appears in this policy, you may read "she," "her," "hers," or "herself."

### AGREEMENT

We, the Company named in the declarations attached to this policy, make this agreement with *you*, the policyholder. Relying on the information you have furnished and the declarations attached to this policy and if *you* pay *your* premium when due, we will do the following:

---

## SECTION I - LIABILITY COVERAGES

### Bodily Injury Liability And Property Damage Liability
### *Your* Protection Against Claims From Others

---

### DEFINITIONS

The words bolded and italicized in Section I of this policy are defined below.

1. *Auto business* means the business of selling, repairing, servicing, storing, transporting or parking of autos.
2. *Bodily injury* means bodily injury to a person, caused by accident, including resulting sickness, disease or death. All claims for damages arising from bodily injury to a person from a single loss shall be considered one bodily injury.
3. *Farm auto* means a truck type vehicle with a gross vehicle weight of 15,000 pounds or less, not used for commercial purposes other than farming.
4. *Insured* means a person or organization described under **PERSONS INSURED**.
5. *Non-owned auto* means a *private passenger, farm* or *utility auto* or *trailer* not owned by, furnished or available for regular use of either *you* or *your relative*, other than a *temporary substitute auto*. An auto rented or leased for more than 30 days will be considered as furnished or available for regular use.
6. *Owned auto* means:
   (a) A vehicle described in this policy for which a premium charge is shown for these coverages;
   (b) A *trailer* owned by *you*;
   (c) A *private passenger, farm* or *utility auto*, ownership of which *you* acquire during the policy period or for which *you* enter into a lease during the policy period for a term of six months or more, if
      (i) It replaces an *owned auto* as defined in (a) above; or
      (ii) We insure all *private passenger, farm* and *utility autos* owned by *you* on the date of the acquisition, and *you* ask us to add it to the policy no more than 30 days later;
   (d) A *temporary substitute auto*.
7. *Private passenger auto* means a four-wheel private passenger, station wagon or jeep-type auto, including a *farm* or *utility auto* as defined.
8. *Relative* means a person related to *you* by blood, marriage or adoption (including a ward or foster child) who is a resident of the same household as *you*.
9. *Temporary substitute auto* means a *private passenger, farm* or *utility auto* or *trailer*, not owned by *you* or *your relative*, temporarily used with the permission of the owner. This vehicle must be used as a substitute for the *owned auto* or *trailer* when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction. This vehicle will no longer qualify as a *temporary substitute auto*:
   (a) Five (5) days after the *owned auto* is deemed by us to be a total loss, and
   (b) We pay the applicable limit of liability under Section III.
10. *Trailer* means a vehicle designed to be towed by a *private passenger auto*. If the vehicle is being used for business or commercial purposes, it is a trailer only while used with a *private passenger, farm* or *utility auto*. *Trailer* also means a farm wagon or farm implement used with a *farm auto*.
11. *Utility auto* means a vehicle, other than a *farm auto*, with gross vehicle weight of 15,000 pounds or less of the pick-up body, van or panel truck type not used for commercial purposes.
12. *War* means armed conflict between nations, whether or not declared, civil war, insurrection, rebellion or revolution.
13. *You* and *your* means the named insured shown in the declarations or his or her spouse if a resident of the same household.

### LOSSES WE WILL PAY FOR YOU

Under Section I, we will pay damages which an *insured* becomes legally obligated to pay because of:

1. *Bodily injury*, sustained by a person, and

GG/VIP000005

2. Damage to or destruction of property,

arising out of the ownership, maintenance or use of the *owned auto* or a *non-owned auto*.

We will defend any suit for damages payable under the terms of this policy. We may investigate and settle any claim   or suit. We have no duty to investigate or defend any claims which are not covered under the terms of this policy. Our duty to defend ends when the limits of liability for bodily injury liability have been exhausted by payments of judgments or settlements.

## ADDITIONAL PAYMENTS WE WILL MAKE UNDER THE LIABILITY COVERAGES

1. All investigative and legal costs incurred by us.
2. Interest calculated on that part of a judgment that is within our limit of liability and accruing:
    (a) Before the judgment, where owed by law, and until we pay, offer to pay, or deposit in court the amount due under this coverage;
    (b) After the judgment, and until we pay, offer to pay, or deposit in court, the amount due under this coverage.
3. Premiums for appeal bonds in a suit we appeal, or premiums for bonds to release attachments; but the face amount of these bonds may not exceed the applicable limit of our liability.
4. We will upon request by an *insured*, provide reimbursement for the following items:
    (a) Costs incurred by any *insured* for first aid to others at the time of an accident involving an *owned auto* or *non-owned auto.*
    (b) Loss of earnings up to $50 a day, but not other income, if we request an *insured* to attend hearings and trials.
    (c) All reasonable costs incurred by an *insured* at our request.
    (d) Premiums for bail bonds paid by an *insured* due to traffic law violations arising out of the use of an *owned auto*, not to exceed $250 per bail bond.

## EXCLUSIONS

### Section I Does Not Apply:

1. To any *bodily injury* to any *insured* or *relative* of an *insured's* family residing in the *insured's* household.
    This exclusion does not apply if the *insured* or *relative* of the *insured* is injured as a passenger in a motor vehicle insured under this policy while that vehicle is being driven by a person who is not a  *relative*, nor *you*.
2. To any vehicle used to carry passengers or goods for hire. However, a vehicle used in an ordinary car pool on a ride sharing or cost sharing basis is covered.
3. To liability coverage for any person who intentionally causes *bodily injury* or property damage.
4. To *bodily injury* or property damage that is insured under a nuclear liability policy. This exclusion applies even if the limits of that policy are exhausted.
5. To *bodily injury* or property damage arising from the operation of farm machinery.
6. To *bodily injury* to an employee of an *insured* arising out of and in the course of employment by an *insured*.
    However, *bodily injury* of a domestic employee of the *insured* is covered unless benefits are payable or are required to be provided under a workmen's compensation law.
7. To *bodily injury* to a fellow employee of an *insured* (other than *you*) injured in the course of his employment if the *bodily injury* arises from the use of an auto in the business of his employer, and if benefits are payable under a workmen's compensation policy.
8. To an *owned auto* while used by a person (other than *you* or a *relative* or *your* or *your relative's* partner, agent or employee) when he is employed or otherwise engaged in the *auto business*.
9. To a *non-owned auto* while maintained or used by a person while he is employed or otherwise engaged in any *auto business*.
    However, coverage does apply to a *non-owned private passenger auto* used by *you*, *your* chauffeur or a domestic servant, while engaged in the business of an *insured*.
10. To damage:
    (a) To property owned, or transported by an *insured*; or
    (b) To property rented to or in charge of an *insured*. This exclusion does not apply to a residence or private garage.
11. To an auto acquired by *you* during the policy term, if *you* have purchased other liability insurance for it.
12. To:
    (a) The United States of America or any of its agencies;
    (b) Any person, including *you*, if protection is afforded under the provisions of the Federal Tort Claims Act.
13. To any liability assumed under any contract or agreement.
14. To *bodily injury* or property damage caused by the *insured* in participation and/or preparation for any racing, speed, or demolition contest or stunting activity of any nature, whether or not prearranged or organized.

GG/VIP000006

Case 8:16-cv-02012-MSS-JSS   Document 37-2   Filed 02/11/17   Page 6 of 53 PageID 299

15. To punitive or exemplary damages, regardless of any other provision of this policy.

## PERSONS INSURED

Who Is Covered

Section I applies to the following as *insureds* with regard to an *owned auto*:

1. *You*;
2. Any other person using the auto with *your* permission to the extent of that permission;
3. Any other person or organization for his or its liability because of acts or omissions of an *insured* under 1. or 2. above.

Section I applies to the following as *insureds* with regard to a *non-owned auto*:

1. *You* and *your relatives* when driving the *non-owned auto*. Such use must be with the permission, or reasonably believed to be with the permission, of the owner and to the extent of that permission.
2. A person or organization, not owning or hiring the auto, regarding his or its liability because of acts or omissions of an *insured* under 1. above.

The limits of liability stated in the declarations are our maximum obligations regardless of the number of *insureds* involved in the occurrence.

## FINANCIAL RESPONSIBILITY LAWS

When this policy is certified as proof of compliance with the Florida financial responsibility law for the future, this liability insurance will comply with the provisions of that law.

## OUT OF STATE COVERAGE

When the policy applies to the operation of a motor vehicle outside of *your* state, we agree to increase *your* coverages to the extent required of out-of-state motorists by local law. We will not provide Bodily Injury Liability Coverage under this provision if that coverage is not purchased and shown in the policy declarations. This additional coverage will be reduced to the extent that *you* are protected by another insurance policy. No person can be paid more than once for any item of loss.

## LIMITS OF LIABILITY

Regardless of the number of autos or *trailers* to which this policy applies:

1. The limit of bodily injury liability stated in the declarations as applicable to "each person" is the limit of our liability for all damages, including damages for care and loss of services, because of *bodily injury* sustained by one person as the result of one occurrence.
2. The limit of such liability stated in the declarations as applicable to "each occurrence" is, subject to the above provision respecting each person, the total limit of our liability for all such damages, including damages for care and loss of services, because of *bodily injury* sustained by two or more persons as the result of any one occurrence.
3. The limit of property damage liability stated in the declarations as applicable to "each occurrence" is the total limit of our liability for all damages because of damage to or destruction of the property of one or more persons or organizations, including the loss of use of the property as the result of any one occurrence.
4. If this policy covers two or more autos, the LIMITS OF LIABILITY apply separately to each. An auto and attached *trailer* are considered to be one auto.

## OTHER INSURANCE

Any insurance we provide for losses arising out of the ownership, maintenance or use of a vehicle *you* do not own shall be excess over any other valid and collectible insurance.

If the *insured* has other applicable insurance against a loss covered by Section I of this policy, we will not owe more than our pro-rata share of the total coverage available.

## CONDITIONS

The following conditions apply to Section I:

1. NOTICE

   As soon as possible after an occurrence, written notice must be given us or our authorized agent stating:

   (a) The identity of the *insured*;
   (b) The time, place and details of the occurrence;
   (c) The names and addresses of the injured, and of any witnesses; and
   (d) The names of the owners and the description and location of any damaged property.

   If a claim or suit is brought against an *insured*, he must promptly send us each demand, notice, summons or other process received.

2. ASSISTANCE AND COOPERATION OF THE *INSURED*

   The *insured* will cooperate and assist us, if requested:

GG/VIP000007

(a) In the investigation of the occurrence;
(b) In making settlements;
(c) In the conduct of suits;
(d) In enforcing any right of contribution or indemnity against any legally responsible person or organization because of *bodily injury* or property damage;
(e) At trials and hearings;
(f) In securing and giving evidence; and
(g) By obtaining the attendance of witnesses.

Only at his own cost will the *insured* make a payment, assume any obligation or incur any cost other than for first aid to others.

3. ACTION AGAINST US

No suit will lie against us:
(a) Unless the *insured* has fully complied with all the policy's terms and conditions, and
(b) Until the amount of the *insured's* obligation to pay has been finally determined, either:
   (i) By a final judgment against the *insured* after actual trial; or
   (ii) By written agreement of the *insured*, the claimant and us.

A person or organization or the legal representative of either, who secures a judgment or written agreement, may then sue to recover up to the policy limits.

No person or organization, including the *insured*, has a right under this policy to make us a defendant in an action to determine the *insured's* liability.

Bankruptcy or insolvency of the *insured* or of his estate will not relieve us of our obligations.

4. SUBROGATION

When payment is made under this policy, we will be subrogated to all the *insured's* rights of recovery against others. The *insured* will help us to enforce these rights. The *insured* will do nothing after loss to prejudice these rights.

This means we will have the right to sue for or otherwise recover the loss from anyone else who may be held responsible.

When a person has been paid damages by us under this policy and also recovers from another, that person shall:
(a) Hold in trust for us the amount recovered; and
(b) Reimburse us to the extent of our payment.

## SECTION II: PART I -PERSONAL INJURY PROTECTION AND PART IV-AUTOMOBILE MEDICAL PAYMENTS

**(Automobile Medical Payments Coverage applies only if a premium amount is shown in the Policy Declarations for "Medical Payments" coverage)**

## PART I - PERSONAL INJURY PROTECTION
### DEFINITIONS

The definitions of the terms *insured* and *you* under Section I apply to Section II also.

1. *Bodily injury* means bodily injury, sickness, or disease to a person, caused by accident, including resulting sickness, disease or death resulting therefrom. All claims for damages arising from *bodily injury* to a person from a single loss shall be considered one *bodily injury*.

2. *Insured motor vehicle* means a *motor vehicle*:
   (a) Of which *you* are the *owner*, and
   (b) With respect to which security is required to be maintained under the Florida Motor Vehicle No-Fault Law, and
   (c) For which a premium is charged, or which is a trailer, other than a mobile home, designed for use with a *motor vehicle*.

3. (a) *Medical expenses* means reasonable expenses for *medically necessary* medical, surgical, x-ray, dental, ambulance, hospital, professional nursing and rehabilitative services for prosthetic devices and for necessary remedial treatment and services recognized and permitted under the laws of the state for an injured person. Reimbursement for *medical expenses* shall be limited to and shall not exceed 80% of the schedule of maximum charges as set forth in Florida Statute § 627.736(5) (a) 2.
   (b) However, the medical benefits shall provide reimbursement only for such services and care that are lawfully provided, supervised, ordered, or prescribed by a physician licensed under Florida Statutes Title 32, chapter 458 or chapter 459, a dentist licensed under Florida Statutes Title 32, chapter 466, or a chiropractic physician licensed under Florida Statutes, Title 32, chapter 460 or that are provided by any of the following persons or entities:
      1. A hospital or ambulatory surgical center licensed under Florida Statutes, Title 29, chapter 395.
      2. A person or entity licensed under Florida Statutes, Title 29, chapters 401.2101-401.45 that provides emergency transportation and treatment.

GG/VIP000008

Case 8:16-cv-02012-MSS-JSS   Document 37-2   Filed 01/11/17   Page 8 of 53 PageID 395

3. An entity wholly owned by one or more physicians licensed under Florida Statutes, Title 32, chapter 458 or chapter 459, chiropractic physicians licensed under Florida Statutes, Title 32, chapter 460, or dentists licensed under Florida Statutes, Title 32, chapter 466 or by such practitioner or practitioners and the spouse, parent, child, or sibling of that practitioner or those practitioners.

4. An entity wholly owned, directly or indirectly, by a hospital or hospitals.

5. A health care clinic licensed under Florida Statutes Title 29, chapters 400.990-400.995 that is:
    a. Accredited by the Joint Commission on Accreditation of Healthcare Organizations, the American Osteopathic Association, the Commission on Accreditation of Rehabilitation Facilities, or the Accreditation Association for Ambulatory Health Care, Inc.; or
    b. A health care clinic that:
        (I) Has a medical director licensed under chapter Florida Statutes Title 32, chapter 458, chapter 459, or chapter 460;
        (II) Has been continuously licensed for more than 3 years or is a publicly traded corporation that issues securities traded on an exchange registered with the United States Securities and Exchange Commission as a national securities exchange; and
        (III) Provides at least four of the following medical specialties:
            (A) General medicine.
            (B) Radiography.
            (C) Orthopedic medicine.
            (D) Physical medicine.
            (E) Physical therapy.
            (F) Physical rehabilitation.
            (G) Prescribing or dispensing outpatient prescription medication.
            (H) Laboratory services.

4. *Medically necessary* refers to a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:
    (a) In accordance with generally accepted standards of medical practice;
    (b) Clinically appropriate in terms of type, frequency, extent, site, and duration; and
    (c) Not primarily for the convenience of the patient, physician, or other health care provider.

5. *Motor vehicle* means any self-propelled vehicle of four or more wheels which is of a type both designed and required to be licensed for use on the highways of Florida and any trailer or semi-trailer designed for use with such vehicle.

    A *motor vehicle* does not include:
    (a) Any *motor vehicle* which is used in mass transit other than public school transportation and designed to transport more than five passengers exclusive of the operator of the *motor vehicle* and which is owned by a municipality, a transit authority, or a political subdivision of the state; or
    (b) A mobile home.

6. *Occupying* means in or upon or entering into or alighting from;

7. *Owner* means a person or organization who holds the legal title to a *motor vehicle*, and also includes:
    (a) A debtor having the right to possession, in the event a *motor vehicle* is the subject of a security agreement, and
    (b) A lessee having the right to possession, in the event a *motor vehicle* is the subject of a lease with option to purchase and such lease agreement is for a period of six months or more, and
    (c) A lessee having the right to possession, in the event a *motor vehicle* is the subject of a lease without option to purchase, and such lease agreement is for a period of six months or more, and the lease agreement provides that the lessee shall be responsible for securing insurance;

8. *Pedestrian* means a person while not an occupant of any self-propelled vehicle;

9. *Relative* means a person related to *you* by blood, marriage or adoption (including a ward or foster child) who is usually a resident of the same household as *you;*

10. *Replacement services expenses* means with respect to the period of disability of the injured person all expenses reasonably incurred in obtaining from others ordinary and necessary services in lieu of those that, but for such injury, the injured person would have performed without income for the benefit of his household;

11. *Work loss* means with respect to the period of disability of the injured person, any loss of income and earning capacity from inability to work proximately caused by the injury sustained by the injured person.

## PAYMENTS WE WILL MAKE

The Company will pay in accordance with the Florida Motor Vehicle No Fault Law (as enacted, amended, or newly enacted), and where applicable in accordance with all fee schedules contained in the Florida Motor Vehicle No Fault Law, to or for the benefit of the injured person:

(a) 80% of *medical expenses* which are *medically necessary*, pursuant to the following schedule of maximum

GGVIP000009

Case 8:16-cv-02012-MSS-JSS   Document 47-2   Filed 04/11/17   Page 9 of 53 PageID 396

charges contained in the Florida Statute § 627.736(5) (a) 2:

1. For emergency transport and treatment by providers licensed under Florida Statutes, Title 29, chapter 401, 200 percent of Medicare.
2. For emergency services and care provided by a hospital licensed under Florida Statutes, Title 29, chapter 395, 75 percent of the hospital's usual and customary charges.
3. For emergency services and care as defined by Florida Statutes Title 29, chapter 395.002(9) provided in a facility licensed under chapter 395 rendered by a physician or dentist, and related hospital inpatient services rendered by a physician or dentist, the usual and customary charges in the community.
4. For hospital inpatient services, other than emergency services and care, 200 percent of the Medicare Part A prospective payment applicable to the specific hospital providing the inpatient services.
5. For hospital outpatient services, other than emergency services and care, 200 percent of the Medicare Part A Ambulatory Payment Classification for the specific hospital providing the outpatient services.
6. For all other medical services, supplies, and care, 200 percent of the allowable amount under the participating physicians schedule of Medicare Part B. However, if such services, supplies, or care is not reimbursable under Medicare Part B, we may limit reimbursement to 80 percent of the maximum reimbursable allowance under workers' compensation, as determined under Florida Statutes Title 31, chapter 440.13 and rules adopted thereunder which are in effect at the time such services, supplies, or care is provided. Services, supplies, or care that is not reimbursable under Medicare or workers' compensation is not required to be reimbursed by us.

(b) 60% of **work loss**; and
(c) **Replacement services expenses**; and
(d) Death benefits.

The above benefits will be provided for injuries incurred as a result of **bodily injury**, caused by an accident arising out of the ownership, maintenance or use of a **motor vehicle** and sustained by:

(1) **You** or any **relative** while **occupying** a **motor vehicle** or, while a **pedestrian** through being struck by a **motor vehicle**; or
(2) Any other person while **occupying** the **insured motor vehicle** or, while a **pedestrian**, through being struck by the **insured motor vehicle**.

## EXCLUSIONS

Section II - Part I does not apply:

1. To **you** or any **relative** injured while **occupying** any **motor vehicle** owned by **you** and which is not an **insured motor vehicle** under this insurance;
2. To any person while operating the **insured motor vehicle** without **your** express or implied consent;
3. To any person, if such person's conduct contributed to his **bodily injury** under any of the following circumstances:
   (i) Causing **bodily injury** to himself intentionally;
   (ii) While committing a felony;
4. To **you** or any dependent **relative** for **work loss** if an entry in the schedule or declarations indicates such coverage does not apply;
5. To any **pedestrian**, other than **you** or any **relative**, not a legal resident of the State of Florida;
6. To any person, other than **you**, if such person is the **owner** of a **motor vehicle** with respect to which security is required under the Florida Motor Vehicle No-Fault law, as amended;
7. To any person, other than **you** or any **relative**, who is entitled to personal injury protection benefits from the **owner** or **owners** of a **motor vehicle** which is not an **insured motor vehicle** under this insurance or from the **owner's** insurer; or
8. To any person who sustains **bodily injury** while **occupying** a **motor vehicle** located for use as a residence or premises.

## LIMIT OF LIABILITY; APPLICATION OF DEDUCTIBLE; OTHER INSURANCE

Regardless of the number of persons insured, policies or bonds applicable, vehicles involved or claims made, the total aggregate limit of personal injury protection benefits available under the Florida Motor Vehicle No-Fault Law, as amended, from all sources combined, including this policy, for all loss and expense incurred by or on behalf of any one person who sustains **bodily injury** as the result of any one accident shall be $10,000; provided that payment for death benefits included in the foregoing shall be equal to the lesser of $5,000 or the remainder of unused personal injury protection benefits per individual.

After the deductible is met, each **insured** is eligible to receive up to $10,000 in total benefits described. The amount of any deductible stated in the declarations shall be deducted from all expenses or losses as described in FL Stat. § 627.736 with respect to all **medical expenses**, **replacement services expenses** and **work loss** incurred by or on behalf of each person to whom the deductible applies and who sustains **bodily injury** as the result of any one accident. Such deductible will not apply to the death benefit.

GGVIP000010

Case 8:16-cv-02012-MSS-JSS   Document 47-2   Filed 02/24/17   Page 10 of 53 PageID 797

Any amount available for payment under this insurance shall be reduced by the amount of benefits an injured person has recovered for the same elements of loss under the workmen's compensation laws of any state or the federal government.

If benefits have been received under the Florida Motor Vehicle No-Fault Law, as amended, from any insurer for the same items of loss and expense for which benefits are available under this policy, we shall not be liable to make duplicate payments to or for the benefit of the injured person, but the insurer paying such benefits shall be entitled to recover from us its equitable pro rata share of the benefits paid and expenses incurred in processing the claim.

## POLICY PERIOD - TERRITORY

The insurance under this Section applies only to accidents which occur during the policy period:

    (a) In the State of Florida;

    (b) As respects *you* or a *relative*, while *occupying* the *insured motor vehicle* outside the State of Florida but within the United States of America, its territories or possessions or Canada; and

    (c) As respects *pedestrians* injured when struck by the *insured motor vehicle* in the State of Florida, if they are not the *owner* of a *motor vehicle* for which coverage is required to be maintained under the Florida No-Fault Law.

## CONDITIONS

### 1. NOTICE

In the event of an accident, written notice of the loss must be given to us or any of our authorized agents as soon as practicable. If any injured person or his legal representatives shall institute legal action to recover damages for *bodily injury* against a third party, a copy of the summons and complaint or other process served in connection with such legal action shall be forwarded as soon as practicable to us by such injured person or his legal representative.

### 2. ACTION AGAINST THE COMPANY

No action shall lie against us unless, as a condition precedent thereto, there shall have been full compliance with all terms of this insurance, and in accordance with, and subject to the terms, conditions, and exclusions of, the Florida Motor Vehicle No-Fault Law, as amended.

### 3. PROOF OF CLAIM; MEDICAL REPORTS AND EXAMINATIONS; PAYMENT OF CLAIM WITHHELD

As soon as practicable the person making the claim shall give to us written proof of claim, under oath if required, which may include full particulars of the nature and extent of the injuries and treatment received and contemplated, and such other information as may assist us in determining the amount due and payable. Such person shall submit to mental or physical examinations in accordance with the Florida Motor Vehicle No Fault Law (as enacted, amended, or newly enacted), at our expense when and as often as we may reasonably require and a copy of the medical report shall be forwarded to such person if requested. If the person unreasonably refuses to submit to an examination, we will not be liable for subsequent personal injury protection benefits.

Whenever a person making a claim is charged with committing a felony, we shall withhold benefits until, at the trial level, the prosecution makes a formal entry on the record that it will not prosecute the case against the person, the charge is dismissed or the person is acquitted.

If requested by us an *insured* , or any other person or organization making a claim or seeking payment, must submit to examination under oath (EUO) by any person named by us when, where and as often as we may reasonably require.

This provision includes providing a copy of any documents, forms, records or material requested to be provided as part of the EUO request whether the request is made before, during or after the EUO. If requested by us an *insured* , or any other person or organization making a claim or seeking payment, if the person unreasonably refuses to submit to an EUO, we will not be liable for personal injury protection benefits.

### 4. REIMBURSEMENT AND SUBROGATION

In the event of payment to or for the benefits of any injured person under this insurance:

    (a) The Company is subrogated to the rights of the person to whom or for whose benefit such payments were made to the extent of such payments. Such person shall execute and deliver the instruments and papers and do whatever else is necessary to secure such rights. Such person shall do nothing after loss to prejudice such rights.

    (b) The Company providing personal injury protection benefits on a private passenger motor vehicle, as defined in the Florida Motor Vehicle No-Fault Law, shall be entitled to reimbursement to the extent of the payment of personal injury protection benefits from the *owner* or insurer of the *owner* of a commercial motor vehicle, as defined in the Florida Motor Vehicle No-Fault Law, if such injured person sustained the injury while *occupying*, or while a *pedestrian* through being struck by, such commercial motor vehicle.

### 5. SPECIAL PROVISION FOR RENTED OR LEASED VEHICLES

Notwithstanding any provision of this coverage to the contrary, if a person is injured while *occupying*, or through being struck by, a *motor vehicle* rented or leased under a rental or lease agreement, within the state of Florida, which does not specify otherwise in at least 10 point type on the face of such agreement, the personal injury protection coverage afforded under the lessor's policy shall be primary. Personal injury protection coverage offered under this policy will not apply to a vehicle rented, operated, used, or leased outside the state of Florida.

GGN/IP000011

Case 8:16-cv-02012-MSS-JSS   Document 47-2   Filed 01/11/17   Page 11 of 53 PageID 788

## PART II - MODIFICATION OF POLICY COVERAGES

Any Automobile Medical Payments insurance, any Uninsured Motorists coverage or any excess Underinsured Motorists coverage afforded by the policy shall be excess over any Personal Injury Protection benefits paid or available for payment or which would be available but for the application of a deductible.

Regardless of whether the full amount of Personal Injury Protection benefits have been exhausted, any Medical Payments insurance afforded by this policy shall pay the portion of any claim for Personal Injury Protection *medical expenses* which are otherwise covered but not available for payment due to the limitation of 80% of *medical expenses* contained in Part I but shall not be payable for the amount of the deductible selected.

## PART III - PROVISIONAL PREMIUM

It is agreed that in the event of any change in the rules, rates, rating plan, premiums or minimum premiums applicable to the insurance afforded, because of an adverse judicial finding as to the constitutionality of any provisions of the Florida Motor Vehicle No-Fault Law, as amended, providing for the exemption of persons from tort liability, the premium stated in the declarations for any Liability, Medical Payments and Uninsured Motorists insurance shall be deemed provisional and subject to recomputation. If this policy is a renewal policy, such recomputation shall also include a determination of the amount of any return premium previously credited or refunded to the named insured pursuant to the Florida Motor Vehicle No-Fault Law, as amended, with respect to insurance afforded under a previous policy.

If the final premium thus recomputed exceeds the premium stated in the declarations, the insured shall pay to the Company the excess as well as the amount of any return premium previously credited or refunded.

## PART IV - AUTOMOBILE MEDICAL PAYMENTS COVERAGE

**(Automobile Medical Payments coverage applies only if a premium amount is shown in the Policy Declarations for "Medical Payments" coverage)**

### DEFINITIONS

The definitions of the terms *insured* and *you* under Section I apply to Section II - Part IV also. The definitions under Section II - Part I also apply to Section II - Part IV.

*Usual and customary medical charges* as used in this Part means charges that are otherwise covered under Section II, Part I of the policy.

*Medically necessary* as used in this Part means all services which would be covered under Section II, Part I of the policy.

### PAYMENTS WE WILL MAKE

Under Automobile Medical Payments coverage, the Company will pay the *usual and customary charges* for *bodily injury*, caused by an accident arising out of the ownership, maintenance or use of a *motor vehicle* and sustained by:

(1) *You* or any *relative* while *occupying* a *motor vehicle* or, while a *pedestrian* through being struck by a *motor vehicle*; or

(2) Any other occupants of the *insured motor vehicle* injured in an accident that occurs outside the state of Florida, but within the United States of America, its territories or possessions, or Canada.

In addition, we will pay, subject to the coverage limit:

(a) The portion of any claim for Personal Injury Protection medical expense benefits otherwise covered but not payable due to the coinsurance provision of the Personal Injury Protection provision. This is the 20% of *medical expenses* not covered in Part I - Payments We Will Make, item (a);

(b) *Usual and customary charges* incurred for *medically necessary* services that exceed the Personal Injury Protection medical expense coverage paid and when Personal Injury Protection coverage is exhausted; and

(c) *Usual and customary charges* incurred by *you* or any *relative* for *medically necessary* services that result from injuries received while *occupying* a *motor vehicle* or as a *pedestrian* in an accident that occurs outside the state of Florida, but within the United States of America, its territories or possessions, or Canada.

### EXCLUSIONS

Automobile Medical Payments coverage does not apply:

1. To *you* or any *relative* injured while *occupying* any *motor vehicle* owned by *you* or a *relative* and which is not an *insured motor vehicle* under this insurance;

2. To any person while operating the *insured motor vehicle* without *your* express or implied consent;

3. To any person, if such person's conduct contributed to his *bodily injury* under any of the following circumstances:
   (i) Causing *bodily injury* to himself intentionally;
   (ii) While committing a felony;

4. To any *pedestrian*, other than *you* or any *relative*; or

5. To any person, other than *you*, if such person is the *owner* of a *motor vehicle* with respect to which security is required under the Florida Motor Vehicle No-Fault Law, as amended;

6. To any person, other than *you* or a *relative*, who is entitled to personal injury protection benefits from the *owner* or

GGNIP000012

Case 8:16-cv-02012-MSS-JSS   Document 37-2   Filed 01/11/17   Page 12 of 53 PageID 399

*owners* of a *motor vehicle* which is not an *insured motor vehicle* under this insurance or from the *owner's* insurer;

7.  To any person who sustains *bodily injury* while *occupying* a *motor vehicle* located for use as a residence or premises;

8.  To *bodily injury* sustained by *you* or a *relative* that results from war of any kind;

9.  To *bodily injury* sustained by *you* or a *relative* that results from exposure to fungi;

10.  To *bodily injury* sustained by *you* or a *relative* that results from:

     (i) Nuclear reaction;
     (ii) Radiation or radioactive contamination from any source;
     (iii) The intentional or accidental detonation of, or release of radiation from any nuclear or radioactive device;

11.  To *bodily injury* sustained by *you* or a *relative* while *occupying* a *motor vehicle*, or while a *pedestrian* through being struck by a *motor vehicle* while being employed or engaged in the business of selling, leasing, repairing, parking, storing, servicing, delivering or testing vehicles. However, this exclusion does not apply to  *you* or a *relative*, or an agent or employee of *you* or a *relative*, when using the *insured motor vehicle.*

12.  To *bodily injury* sustained by *you* or a *relative* caused by the *insured* in participation and/or preparation for any racing, speed or demolition contest or stunting activity of any nature, whether or not prearranged or organized.

## LIMITS OF LIABILITY

Regardless of the number of persons insured, policies or bonds applicable, vehicles involved or claims made, the total aggregate limit of Automobile Medical Payments benefits available from all sources combined, including this policy, for all loss and expense incurred by or on behalf of any one person who sustains *bodily injury* as the result of any one accident is the amount listed in the declarations page.

## OTHER INSURANCE

Any amount available for payment under this insurance shall be reduced by the amount of benefits an injured person has recovered for the same elements of loss under the workmen's compensation or other similar laws of any state or the federal government.

If benefits have been received under any similar coverage from any insurer for the same items of loss and expense for which benefits are available under this policy, we shall not be liable to make duplicate payments to or for the benefit of the injured person, but the insurer paying such benefits shall be entitled to recover from us its equitable pro rata share of the benefits paid and expenses incurred in processing the claim. This coverage will coordinate with any applicable Personal Injury Protection benefits but will not duplicate any benefits available for payment. The coverage of the occupied vehicle is primary.

Any Uninsured Motorist Coverage or any excess Underinsured Motorist Coverage afforded by this policy shall be excess over any Automobile Medical Payments benefits paid or available for payment or which would be available but for the application of a deductible; and subject to the terms and conditions of the Uninsured/Underinsured Motorist coverage.

## POLICY PERIOD - TERRITORY

The insurance under this Part applies only to accidents which occur during the policy period:

(a) In the State of Florida; and

(b) We will cover *you* or any *relative* for injuries incurred while *occupying* a *motor vehicle* or as a *pedestrian* in an accident that occurs outside the state of Florida, but within the United States of America, its territories or possessions, or Canada. This coverage is excess over any other valid and collectible insurance provided with respect to the occupied *motor vehicle.*

## CONDITIONS

1.  NOTICE

    In the event of an accident, written notice of the loss must be given to us or any of our authorized agents as soon as practicable. If any injured person or his legal representatives shall institute legal action to recover damages for *bodily injury* against a third party, a copy of the summons and complaint or other process served in connection with such legal action shall be forwarded as soon as practicable to us by such injured person or his legal representative.

2.  PROOF OF CLAIM; MEDICAL REPORTS AND EXAMINATIONS; PAYMENT OF CLAIM WITHHELD

    As soon as practicable the person making the claim shall give to us written proof of claim, under oath if required, which may include full particulars of the nature and extent of the  *bodily injury* and treatment received and contemplated, and such other information as may assist us in determining the amount due and payable. Such person shall submit to mental or physical examinations at our expense when and as often as we may reasonably require and a copy of the medical report shall be forwarded to such person if requested. If the person unreasonably refuses to submit to an examination, we will not be liable for subsequent Automobile Medical Payment benefits.

    Whenever a person making a claim is charged with committing a felony, we shall withhold benefits until, at the trial level, the prosecution makes a formal entry on the record that it will not prosecute the case against the person, the charge is dismissed or the person is acquitted.

GGM/IP000013

Case 8:16-cv-02012-MSS-JSS   Document 47-2   Filed 01/11/17   Page 13 of 58 PageID 700

We also have the right to determine if incurred charges and treatment are reasonable, *medically necessary* and causally related to a *bodily injury* sustained in an accident. This determination may be made by use of utilization review, peer reviews, medical bill reviews or medical examination. We will also have the right to determine if incurred charges are *usual and customary charges* and if treatment is *medically necessary*.

If requested by us an *insured*, or any other person or organization making a claim or seeking payment, must submit to examination under oath (EUO) by any person named by us when, where and as often as we may reasonably require.

This provision includes providing a copy of any documents, forms, records or material requested to be provided as part of the EUO request whether the request is made before, during or after the EUO. If requested by us an *insured*, or any other person or organization making a claim or seeking payment, if the person unreasonably refuses to submit to an EUO, we will not be liable for medical payments benefits.

3.  ACTION AGAINST THE COMPANY
    No action shall lie against us:
    (a) Unless the insured has fully complied with all the policy's terms and conditions; and
    (b) Until 30 days after the required notice of accident and reasonable proof of claim has been filed with us; and
    (c) Unless we receive written notice of the intent to initiate litigation and within 30 days after receipt of such notice we do not:
        (i)  Pay the claim; or
        (ii) Mail to the person filing the notice a written statement of our agreement to pay for such treatment in accordance with the notice.

    Payment or our written statement of agreement to pay for treatment shall be treated as being made on the date a draft, or other valid instrument that is equivalent payment, or the written statement of agreement to pay, is placed in the United States mail properly addressed posted envelope or if not so posted, on the date of delivery.

    The written notice of intent to initiate litigation must state that it is a demand letter for Automobile Medical Payments coverage and contain the following information:
    (a) The name of the insured for whom benefits are being sought including a copy of the assignment giving rights to the claimant if the claimant is not the insured;
    (b) The claim number and or policy number upon which the claim was originally submitted; and
    (c) To the extent applicable, the name of the medical provider who rendered the treatment, services, accommodations or supplies that form the basis of the claim, and each exact amount, the date of treatment, service or accommodation and the type of benefits claimed to be due. A health insurance claim form (CMS-1500) or UB 92 form or any other standard form approved by the Department of Financial Services, may be used as the itemized statement.

    The written notice must be delivered to us by United States Certified or Registered mail, Return Receipt Requested, at the address we have filed with and that is made available by the office of the Florida Chief Financial Officer on its internet website.

4.  SUBROGATION
    In the event of payment to or for the benefits of any injured person under this insurance the Company is subrogated to the rights of the person to whom or for whose benefit such payments were made to the extent of such payments. Such person shall execute and deliver the instruments and papers and do whatever else is necessary to secure such rights. Such person shall do nothing after loss to prejudice such rights.

    When an injured person has been paid by us and also recovers from another, the amount recovered will be held by the injured person in trust for us and reimbursed to us to the extent of our payment. If we are not reimbursed, we may pursue recovery of that amount directly against the injured person.

## SECTION III - PHYSICAL DAMAGE COVERAGES
### Your Protection For Loss Or Damage To Your Car

**DEFINITIONS**

The definitions of the terms *auto business, farm auto, non-owned auto, private passenger auto, relative, temporary substitute auto, utility auto, you, your*, and *war* under Section I apply to Section III also. Under this Section, the following special definitions apply:

1.  *Actual cash value* is the replacement cost of the auto or property less *depreciation* or *betterment*.
2.  *Betterment* is improvement of the auto or property to a value greater than its pre-loss condition.
3.  *Collision* means *loss* caused by upset of the covered auto or its collision with another object, including an attached vehicle.
4.  *Comprehensive* means *loss* caused other than by *collision* and includes the following causes:
    (a) Missiles;
    (b) Falling objects;
    (c) Fire;

   (d) Lightning;
   (e) Theft;
   (f) Larceny;
   (g) Explosion;
   (h) Earthquake;
   (i) Windstorm;
   (j) Hail;
   (k) Water;
   (l) Flood;
   (m) Malicious mischief;
   (n) Vandalism;
   (o) Riot;
   (p) Civil commotion; or
   (q) Colliding with a bird or animal.

5. *Custom parts or equipment* means paint, equipment, devices, accessories, enhancements, and changes, other than those which are original manufacturer installed, which:

   (a) Are permanently installed or attached; or
   (b) Alter the appearance or performance of a vehicle.

   This includes any electronic equipment, antennas, and other devices used exclusively to send or receive audio, visual, or data signals, or to play back recorded media, other than those which are original manufacturer installed, that are permanently installed in the *owned auto* or a newly acquired vehicle using bolts or brackets, including slide-out brackets.

6. *Depreciation* means a decrease or loss in value to the auto or property because of use, disuse, physical wear and tear, age, outdatedness, or other causes.:

7. *Insured* means:
   (a) Regarding the *owned auto*:
      (i) *You* and *your relatives;*
      (ii) A person or organization maintaining, using or having custody of the auto with *your* permission, if his use is within the extent of that permission.
   (b) Regarding a *non-owned auto, you* and *your relatives*, when driving the auto, if the actual operation or use is with the permission or reasonably believed to be with the permission of the owner and within the extent of that permission.

8. *Loss* means direct and accidental loss of or damage to:
   (a) An *owned* or *non-owned auto*, including its equipment; or
   (b) Other property insured under this section.

9. *Owned auto* means:
   (a) Any vehicle described in this policy for which a specific premium charge indicates there is physical damage coverage;
   (b) A *private passenger, farm* or *utility auto* or a *trailer*, ownership of which *you* acquire during the policy period or for which *you* enter into a lease during the policy period for a term of six months or more, if
      (i) It replaces an *owned auto* as described in (a) above, or
      (ii) We insure all *private passenger, farm*, and *utility autos* owned by *you* on the date of the acquisition and *you* ask us to add it to the policy no more than 30 days later;
   (c) A *temporary substitute auto.*

10. *Trailer* means a trailer designed to be towed by a *private passenger auto* and not used as a home, residence, office, store, display or passenger trailer. Trailer does not mean a trailer with built-in sleeping facilities designed for recreational or camping use.

## LOSSES WE WILL PAY

### Comprehensive (Excluding Collision)

1. We will pay for each *loss*, less the applicable deductible, caused other than by *collision* to the *owned* or *non-owned auto*. This includes glass breakage.

   No deductible will apply to *loss* to windshield glass.

   At the option of the *insured*, breakage of glass caused by *collision* may be paid under the Collision coverage, if included in the policy.

2. We will pay, up to $200 per occurrence, less the applicable deductible, for *loss* to personal effects due to:
   (a) Fire;
   (b) Lightning;

GG/VIP000015

Case 8:16-cv-02012-MSS-JSS   Document 47-2   Filed 01/11/17   Page 15 of 53 PageID 702

(c) Flood;

(d) Falling objects;

(e) Earthquake;

(f) Explosion; or

(g) Theft of the entire automobile.

The property must be owned by *you* or a *relative*, and must be in or upon an *owned auto*.

3. *Losses* arising out of a single occurrence shall be subject to no more than one deductible.

**Collision**

1. We will pay for *collision loss* to the *owned auto* for the amount of each *loss* less the applicable deductible and to the *non-owned auto* for the amount of each *loss* less the applicable deductible when driven by *you* or a *relative*.

2. We will pay up to $200 per occurrence, less the applicable deductible, for *loss* to personal effects due to a *collision*. The property must be owned by *you* or a *relative*, and must be in or upon an *owned auto*.

3. *Losses* involving one *owned auto*, arising out of a single occurrence shall be subject to no more than one deductible.

4. If more than one *owned auto* or *non-owned auto* is involved in a *collision loss*, any deductible will apply separately to each *owned auto* or *non-owned auto*.

## ADDITIONAL PAYMENTS WE WILL MAKE UNDER THE PHYSICAL DAMAGE COVERAGES

1. We will reimburse the *insured* for transportation expenses incurred during the period beginning 48 hours after a theft of the entire auto covered by Comprehensive coverage under this policy has been reported to us and the police. Reimbursement ends when the auto is returned to use or we pay for the *loss*.

Reimbursement will not exceed $30.00 per day nor $900.00 per *loss*.

2. We will pay general average and salvage charges for which the *insured* becomes legally liable when the auto is being transported.

## EXCLUSIONS

**Section III Does Not Apply:**

1. To an auto used to carry passengers or goods for hire is not covered. However, a vehicle used in an ordinary car pool on a ride sharing or cost sharing basis is covered.

2. To *loss* due to *war*.

3. To *loss* to a *non-owned auto* when used by the *insured* in the *auto business*.

4. To *loss* caused by and limited to wear and tear, freezing, mechanical or electrical breakdown or failure, unless that damage results from a covered theft.

5. To road damage to tires.

6. To *loss* due to radioactivity.

7. To *loss* to any tape, wire, record disc or other medium for use with a device designed for the recording and/or reproduction of sound.

8. To *loss* to any radar detector.

9. To any vehicle or *trailer* when used for business or commercial purposes other than a *farm auto*.

10. To *loss* for *custom parts or equipment* unless the existence of those *custom parts or equipment* has been previously reported to us and an endorsement to the policy has been added.

11. To any liability assumed under any contract or agreement.

12. To any *loss* resulting from:

    (a) The acquisition of a stolen vehicle;

    (b) Any governmental, legal or other action to return a vehicle to its legal, equitable, or beneficial owner, or anyone claiming an ownership interest in the vehicle; or

    (c) Any confiscation, seizure or impoundment of a vehicle by governmental authorities.

    (d) The sale of an *owned auto*.

13. To the destruction, impoundment, confiscation or seizure of a vehicle by governmental or civil authorities due to its use by *you*, a *relative* or a permissive user of the vehicle in illegal activity.

14. To any *loss* caused by the *insured* in participation and/or preparation for any racing, speed, or demolition contest or stunting activity of any nature, whether or not prearranged or organized.

## LIMIT OF LIABILITY

The limit of our liability for *loss*:

1. Is the *actual cash value* of the property at the time of the *loss*;

2. Will not exceed the prevailing competitive price to repair or replace the property at the time of *loss*, or any of its

GG/VIP000016

parts, including parts from non-original equipment manufacturers, with other of like kind and quality and will not include compensation for any diminution of value that is claimed to result from the *loss*. Although *you* have the right to choose any repair facility or location, the limit of liability for repair or replacement of such property is the prevailing competitive price which is the price we can secure from a competent and conveniently located repair facility. At *your* request, we will identify a repair facility that will perform the repairs or replacement at the prevailing competitive price;

3. To personal effects arising out of one occurrence is $200;
4. To a *trailer* not owned by *you* is $500;
5. For *custom parts or equipment* is limited to the *actual cash value* of the *custom parts or equipment*, not to exceed the *actual cash value* of the vehicle.

   *Actual cash value* or *betterment* of property will be determined at the time of the *loss* and will include an adjustment for *depreciation/betterment* and for the physical condition of the property.
6. If this policy covers two or more autos or *trailers* any deductibles will apply separately to each.

## OTHER INSURANCE

If the *insured* has other insurance against a *loss* covered by Section III, we will not owe more than our pro rata share of the total coverage available. Any insurance we provide for a vehicle *you* do not own shall be excess over any other valid and collectible insurance.

## CONDITIONS

The following conditions apply only to the Physical Damage coverages:

1. NOTICE

   As soon as possible after a *loss*, written notice must be given us or our authorized agent stating:
   (a) The identity of the *insured*;
   (b) A description of the auto or *trailer*;
   (c) The time, place and details of the *loss*; and
   (d) The names and addresses of any witnesses.

   In case of theft, the *insured* must promptly notify the police.
2. ASSISTANCE AND COOPERATION OF THE *INSURED*

   The *insured* will cooperate and assist us, if requested:
   (a) In the investigation of the *loss;*
   (b) In making settlements;
   (c) In the conduct of suits;
   (d) In enforcing any right of subrogation against any legally responsible person or organization;
   (e) At trials and hearings;
   (f) In securing and giving evidence; and
   (g) By obtaining the attendance of witnesses.
3. ACTION AGAINST US

   Suit will not lie against us unless the policy terms have been complied with and until 30 days after proof of *loss* is filed and the amount of *loss* is determined.

   If we retain salvage, we have no duty to preserve or otherwise retain the salvage for any purpose, including as evidence for any civil or criminal proceeding. If *you* ask us immediately after a *loss* to preserve the salvage for inspection, we will do so for a period not to exceed 30 days. *You* may purchase the salvage from us if *you* wish.
4. *INSURED'S* DUTIES IN EVENT OF LOSS

   In the event of *loss* the *insured* will:
   (a) Protect the auto, whether or not the *loss* is covered by this policy. Further *loss* due to the *insured's* failure to protect the auto will not be covered. Reasonable expenses incurred for this protection will be paid by us.
   (b) File with us, within 91 days after *loss*, his sworn proof of *loss* including all information we may reasonably require.
   (c) At our request, the *insured* will exhibit the damaged property and submit to examination under oath.
5. APPRAISAL

   If we and the *insured* do not agree on the amount of *loss*, either may, within 60 days after proof of *loss* is filed, request an appraisal of the *loss*. Both parties must agree to the appraisal at the time of dispute. In that event, we and the *insured* will each select a competent appraiser. The appraisers will select a competent and disinterested umpire. The appraisers will state separately the *actual cash value* and the amount of the *loss*. If they fail to agree, they will submit the dispute to the umpire. An award in writing of any two will determine the amount of *loss*. We and the *insured* will each pay his chosen appraiser and will bear equally the other expenses of the appraisal and umpire.

   We will not waive our rights by any of our acts relating to appraisal.

GG/VIP000017

Case 8:16-cv-02012-MSS-JSS   Document 47-2   Filed 01/11/17   Page 17 of 53 PageID 704

6.  PAYMENT OF *LOSS*

We may at our option:

(a) Pay for the *loss*; or

(b) Repair or replace the damaged or stolen property.

At any time before the *loss* is paid or the property replaced, we may return any stolen property to *you* or to the address shown in the declarations at our expense with payment for covered damage. We may take all or part of the property at the agreed or appraised value, but there will be no abandonment to us. We may settle claims for *loss* either with the *insured* or the owner of the property.

7.  NO BENEFIT TO BAILEE

This insurance does not apply directly or indirectly to the benefit of a carrier or other bailee for hire liable for the *loss* of the auto.

8.  SUBROGATION

When payment is made under this policy, we will be subrogated to all the *insured's* rights of recovery, to the extent of our payment against others. The *insured* will help us to enforce these rights. The *insured* will do nothing after *loss* to prejudice these rights.

This means we will have the right to sue for or otherwise recover the *loss* from anyone else who may be held responsible.

9.  ASSIGNMENT

With respect to Section III, Physical Damage Coverages, an Assignment of interest under this policy will not bind us without our consent. Any nonconforming assignment shall be void and invalid. Moreover, the assignee of a nonconforming assignment shall acquire no rights under this contract and we shall not recognize any such assignment.

## SECTION IV - UNINSURED MOTORIST COVERAGE
### Protection For *You* And *Your* Passengers For Injuries Caused By Uninsured And Hit-And-Run Motorist

UNLESS AMENDED WITH THE STACKED OR NON-STACKED UNINSURED/UNDERINSURED AMENDMENT, YOU ELECTED NOT TO PURCHASE CERTAIN VALUABLE COVERAGE, WHICH WOULD HAVE PROTECTED YOU AND YOUR FAMILY WHEN INVOLVED, IN A COVERED LOSS WITH AN UNINSURED/ UNDERINSURED MOTORIST.

**THIS POLICY DOES NOT PROVIDE UNINSURED/UNDERINSURED MOTORISTS BENEFITS.**

**Uninsured/underinsured motorist benefits are designed to provide protection when *you* or *your* family are involved in an accident with an uninsured/underinsured motorist .**

## SECTION V- GENERAL CONDITIONS
### These conditions Apply To all coverages In This Policy

1.  TERRITORY - POLICY PERIOD

This policy applies only to accidents, occurrences or losses during the policy period within the United States of America, its territories and possessions, or Canada and while an *owned auto* is being transported between ports thereof.

Unless otherwise cancelled, this policy will expire as shown in the declarations. But, it may be continued by our offer to renew and *your* acceptance prior to the expiration date. Each period will begin and expire at 12:01 A.M. local time at *your* address stated in the declarations.

2.  PREMIUM

When *you* dispose of, acquire ownership of, or replace a *private passenger, farm* or *utility auto*, any necessary premium adjustment will be made as of the date of the change and in accordance with our manuals.

3.  CHANGES

The terms and provisions of this policy cannot be waived or changed, except by an endorsement issued to form a part of this policy.

We may revise this policy during its term to provide more coverage without an increase in premium. If we do so, *your* policy will automatically include the broader coverage when effective in *your* state.

The premium for each auto is based on the information we have in *your* file. *You* agree:

(a) That we may adjust *your* policy premiums during the policy term if any of this information on which the premiums are based is incorrect, incomplete or changed.

(b) That *you* will cooperate with us in determining if this information is correct and complete.

(c) That *you* will notify us of any changes in this information.

Any calculation or recalculation of *your* premium or changes in *your* coverage will be based on the rules, rates and forms on file, if required, for our use in *your* state.

GGVIP000018

Case 8:16-cv-02012-MSS-JSS   Document 47-2   Filed 01/11/17   Page 18 of 58 PageID 705

4. ASSIGNMENT

Assignment of interest under this policy will not bind us without our consent.

If *you* die, this policy will cover:

(a) *Your* surviving spouse;

(b) The executor or administrator of *your* estate, but only while acting within the scope of his duties;

(c) Any person having proper temporary custody of the *owned auto*, as an *insured*, until the appointment and qualification of the executor or administrator of *your* estate; and

(d) Under the Medical Payments coverage, a person who was a *relative* at the time of *your* death, if a premium is shown on the Policy Declarations for Medical Payments.

5. CANCELLATION BY THE *INSURED*

*You* may cancel this policy by providing notice to us stating when, after the notice, cancellation will be effective.

However, *you* may not cancel during the first two months immediately following *your* policy's effective date except:

(a) Upon total destruction of all of the *owned autos*;

(b) Upon transfer of ownership of all of the *owned autos*;

(c) If *you* obtained a replacement policy covering an *owned auto* elsewhere; or

(d) When we notify *you* that the premium charged must be increased to comply with our rate filings or the applicable laws of Florida, *you* have the following options:

1. Upon receipt of *your* bill *you* may pay the difference in premium and keep the policy as it stands with the corrected premium; or

2. *You* may cancel this policy within 10 days from the receipt of our notice and receive a refund of any unearned premium; or

3. *Your* failure to respond timely or pay the additional premium charged will result in the cancellation of *your* policy when all paid premiums are exhausted.

If this policy is cancelled, *you* may be entitled to a premium refund. The premium refund, if any, will be computed on a pro-rated basis according to our manuals.

6. CANCELLATION BY US

We may cancel this policy by mailing to *you*, at the address shown in this policy, written notice stating when the cancellation will be effective. This notice will be mailed by United States Post Office certificate of mailing.

We will mail this notice:

(a) 10 days in advance if the proposed cancellation is for nonpayment of premium or any of its installments when due;

(b) 45 days in advance in all other cases.

The mailing or delivery of the above notice will be sufficient proof of notice. The policy will cease to be in effect as of the date and hour stated in the notice.

If this policy is cancelled, *you* may be entitled to a premium refund. The premium refund, if any, will be computed on a pro-rated basis according to our manuals.

Payment or tender of unearned premium is not a condition of cancellation.

7. CANCELLATION BY US IS LIMITED

After this policy has been in effect for 60 days or, if the policy is a renewal, effective immediately, we will not cancel unless:

(a) *You* do not pay the premiums for this policy or any installment when due to us or our agent; or

(b) Any *insured* has had his driver's license or motor vehicle registration under suspension or revocation; either:

(i) During the current policy period; or

(ii) During the preceding 180 days if this is a new policy; or

(c) There has been fraud or material misrepresentation under the policy in *your* application or in making a claim.

We will not cancel a new policy during the first 60 days immediately following the effective date of the policy for nonpayment of premium unless the reason for the cancellation is the issuance of a payment for the premium that is dishonored for any reason. If the initial payment on the policy is dishonored, we will not declare the policy void without providing *you* with notice of *your* right to cure the nonpayment as required by Florida law.

Nothing in this section will require us to renew this policy.

8. RENEWAL

We agree that we shall provide *you* at least 30 days written notice of renewal of *your* policy.

We will only non-renew this policy if:

(a) One or more of the reasons listed in Condition 7 (above), CANCELLATION BY US IS LIMITED, exists; or

(b) *You* refuse to provide us with renewal classification and rating information as we may require; or

(c) We are otherwise permitted to do so by the State of Florida.

A-30FL (03-11)  Page 17 of 19

GG/VIP000019

If *you*:

(1) do not pay the premium as required to renew this policy; or

(2) have informed us or our agent that *you* wish the policy cancelled or not renewed; or

(3) do not accept our offer to renew.

it will be construed to mean that *you* have refused our renewal offer and the policy will expire without notice.

If this policy has been in effect for five years or more we will not refuse to renew solely because an *insured* was involved in a single traffic accident.

9. NON-RENEWAL

We agree that we will not refuse to renew or continue this policy unless a written notice of *our* refusal to renew or continue is mailed to *you*, at the address shown in the policy, at least 45 days prior to the expiration notice. This notice will be mailed by United States Post Office certificate of mailing. The mailing or delivery of this notice will be sufficient proof of notice.

10. MEDIATION OF CLAIMS

In the event of a claim for *bodily injury* amounting to $10,000 or less, or any property damage claim, either party may demand mediation of the claim, provided that suit has not yet been filed. Only one mediation may be demanded for each claim, unless both parties agree to more than one mediation. Mediation is not binding on either party.

A request for mediation shall be filed with the Department of Financial Services on a form approved by the Department. The request for mediation shall state the reason for the request and the issues in dispute which are to be mediated. The Department of Financial Services will appoint the mediator to conduct the mediation. Each party may once reject the mediator selected by the Department, either originally or after the opposing side has exercised its option to reject a mediator. Each party participating in the mediation must have the authority to make a binding decision. All parties must mediate in good faith.

The cost of the mediation, as set by the Department of Financial Services, is shared equally by the parties. Costs incurred by a party in preparing for or attending the mediation are paid by the party incurring that cost.

11. OTHER INSURANCE

If other insurance is obtained on *your owned auto*, any similar insurance afforded under this policy for that auto will terminate on the effective date of the other insurance.

12. ACTION AGAINST US

Persons other than the *insured* covered by this policy, may not name us as a defendant prior to first obtaining a judgment against an *insured*.

13. DIVIDEND PROVISION

*You* are entitled to share in a distribution of the surplus of the Company as determined by its Board of Directors from time to time.

14. DECLARATIONS

By accepting this policy, *you* agree that:

(a) The statements in *your* application and in the declarations are *your* agreements and representations;

(b) This policy is issued in reliance upon the truth of these representations; and

(c) This policy, along with the application and declaration sheet, embodies all agreements relating to this insurance. The terms of this policy cannot be changed orally.

15. FRAUD AND MISREPRESENTATION

Coverage is not provided to any person who knowingly conceals or misrepresents any material fact or circumstance relating to this insurance:

1. At the time application is made; or

2. At any time during the policy period; or

3. In connection with the presentation or settlement of a claim.

16. EXAMINATION UNDER OATH (EUO)

The *insured,* or any other person or organization seeking coverage under this policy must submit to examination under oath by any person named by us when, where and as often as we may reasonably require. This provision includes providing a copy of any documents, forms, records, or materials requested to be provided as part of the EUO request whether the request is made before, during or after the EUO.

17. TERMS OF POLICY CONFORMED TO STATUTES

Any terms of this policy in conflict with the statutes of Florida are amended to conform to those statutes.

18. CHOICE OF LAW

The policy and any amendment(s) and endorsement(s) are to be interpreted pursuant to the laws of the state of Florida.

## SECTION VI- AMENDMENTS AND ENDORSEMENTS

1. SPECIAL ENDORSEMENT UNITED STATES GOVERNMENT EMPLOYEES

A. Under the Property Damage coverage of Section I, we provide coverage to United States Government employees, civilian or military, using

   1. Motor vehicles owned or leased by the United States Government or any of its agencies, or

   2. Rented motor vehicle used for United States Government business,

   when such use is with the permission of the United States Government. Subject to the limits describe in paragraph **B.** below, we will pay sums *you* are legally obligated to pay for damage to these vehicles.

B. The following limits apply to this coverage:

   1. A $100 deductible applies to each occurrence.

   2. For vehicles described in A.1. above, our liability shall not exceed the lesser of the following:

      (a) The *actual cash value* of the property at the time of the occurrence; or

      (b) The cost to repair or replace the property, or any of its parts with other of like kind and quality; or

      (c) Two months basic pay of the *insured*; or

      (d) The limit of Property Damage liability coverage stated in the declarations.

   3. For vehicles described in A.2. above, our liability shall not exceed the lesser of the following:

      (a) The *actual cash value* of the property at the time of the occurrence; or

      (b) The cost to repair or replace the property, or any of it parts with other of like kind and quality; or

      (c) The limit of Property Damage liability coverage stated in the declarations.

This insurance is excess over other valid and collectible insurance.

W. C. E. Robinson
Secretary

O. M. Nicely
President

GG/VIP000021

GG/VIP000022

# GEICO.

# Automobile Policy Amendment

*Your* policy is amended as follows:

**SECTION V - GENERAL CONDITIONS**

Item 1. - **TERRITORY - POLICY PERIOD -**   The 2nd paragraph is revised as follows:

Unless otherwise cancelled, this policy will expire as shown in the declarations.  But, it may be continued by our offer to renew and *your* acceptance by payment of the required renewal premium prior to the expiration date.  Each period will begin and expire as stated in the declarations.

We affirm this amendment.

W. C. E. Robinson
Secretary

William E. Roberts
President

A54ED (03-14)

GG/VIP000024

# GEICO.

## Automobile Policy Amendment
### FLORIDA

*Your* policy is amended as follows:

## SECTION I - LIABILITY COVERAGES
### EXCLUSIONS
#### Section I Does Not Apply:

The following exclusions are revised as follows:

1. To any *bodily injury* to any *insured* or any member of an *insured's* family residing in the *insured's* household. This exclusion does not apply if *you* or *your relative* is injured as a passenger in a motor vehicle insured under this policy while that vehicle is being driven by a person who is neither *you* nor *your relative*.

2. To *bodily injury* or property damage arising out of the ownership, maintenance, or use of any vehicle or *trailer* while being used to carry persons or property for compensation or a fee, including but not limited to the delivery of food or any other products. However, a vehicle used in an ordinary car pool is covered.

14. To *bodily injury* or property damage arising out of the *insured's* participation in and/or preparation for any racing, speed, or demolition contest or stunting activity of any nature, whether or not prearranged or organized.

## SECTION II: PART I -PERSONAL INJURY PROTECTION AND PART IV-AUTOMOBILE MEDICAL PAYMENTS
## PART IV - AUTOMOBILE MEDICAL PAYMENTS COVERAGE
### EXCLUSIONS

The following exclusion is revised:

12. To *bodily injury* sustained by *you* or a *relative* arising out of the participation in and/or preparation for any racing, speed or demolition contest or stunting activity of any nature, whether or not prearranged or organized.

## SECTION III - PHYSICAL DAMAGE COVERAGES
### DEFINITIONS

The following definition is added:

11. *Personal vehicle sharing program* means a business, organization, network or group facilitating the sharing of private passenger motor vehicles for use by individuals or businesses.

### EXCLUSIONS
#### Section III Does Not Apply:

The following exclusions are revised as follows:

1. To *loss* arising out of the ownership, maintenance, or use of any vehicle or *trailer* while being used to carry persons or property for compensation or a fee, including but not limited to the delivery of food or any other products. However, a vehicle used in an ordinary car pool is covered.

14. To any *loss* arising out of any *insured's* participation in and/or preparation for any racing, speed or demolition contest or stunting activity of any nature, whether or not prearranged or organized.

The following exclusion is added:

15. While any motor vehicle is operated, maintained or used, other than by *you* or a *relative*, as part of personal vehicle sharing facilitated by a *personal vehicle sharing program*.

### LIMIT OF LIABILITY

Item **2.** is revised as follows:

2. Will not exceed at the time of *loss* the prevailing competitive price, which is the price we can secure from a competent and conveniently located repair facility, to repair or replace the property, or any of its parts, including damaged glass, and including parts from non-original equipment manufacturers, with other of like kind and quality and will not include compensation for any diminution of value that is claimed to result from the *loss*. Although *you* have the right to choose any repair facility or location, the limit of liability for repair or replacement of such property is the prevailing competitive price which is the price we can secure from a competent and conveniently located repair facility. At *your* request, we will identify a repair facility that will perform the repairs or replacement at the prevailing competitive price;

GG/VIP000025

## CONDITIONS

The following conditions are revised as follows:

1. **NOTICE**

   As soon as possible after a *loss*, written notice must be given to us or our authorized agent stating:

   (a) The identity of the *insured*;

   (b) A description of the auto or *trailer*;

   (c) The time, place and details of the *loss*; and

   (d) The names and addresses of any witnesses.

   In case of theft; the *insured* must promptly notify the police.

3. **ACTION AGAINST US**

   Suit will not lie against us unless the policy terms and all conditions have been fully complied with and until 30 days after proof of *loss* is filed with us and the amount of *loss* is determined by us.

   If we retain salvage, we have no duty to preserve or otherwise retain the salvage for any purpose, including as evidence for any civil or criminal proceeding. If *you* ask us immediately after a *loss* to preserve the salvage for inspection, we will do so for a period not to exceed 30 days. *You* may purchase the salvage from us if *you* wish.

4. **INSURED'S DUTIES IN EVENT OF LOSS**

   In the event of *loss* the *insured* will:

   (a) Protect the auto. Further *loss* due to the *insured's* unreasonable failure to protect the auto will not be covered. Reasonable expenses incurred for this protection will be paid by us for *loss* that is covered by this policy.

   (b) File with us, within 91 days after *loss*, his sworn proof of *loss* including all information we may reasonably require.

   (c) Permit us to inspect and appraise the damaged property, including but not limited to the glass of the *owned auto* or *non-owned auto*, before its repair, replacement and/or disposal. This means we have the right to inspect and appraise the damaged property before its repair, replacement and/or disposal and the *insured* will do nothing after *loss* to prejudice our right to inspect and appraise the damaged property, including but not limited to the glass of the *owned auto* or *non-owned auto*, before its repair, replacement and/or disposal.

   (d) If requested by us, submit to an examination under oath (EUO) by any person named by us when, where and as often as we may reasonably require. The scope of questioning during the examination under oath is limited to relevant information or information that could reasonably be expected to lead to relevant information. This provision includes providing a copy of any documents, forms, records or material requested to be provided as part of the EUO request whether the request is made before, during or after the EUO.

9. **ASSIGNMENT**

   With respect to Section III, Physical Damage Coverages, an Assignment of interest or rights under this policy will not bind us without our consent. Any nonconforming assignment shall be void and invalid. Moreover, the assignee of a nonconforming assignment shall acquire no rights under this contract and we shall not recognize any such assignment.

## SECTION V - GENERAL CONDITIONS

**These Conditions Apply To All Coverages In This Policy**

Item 4. is revised as follows:

4. **ASSIGNMENT**

   Assignment of interest or rights under this policy will not bind us without our consent.

   If *you* die, this policy will cover:

   (a) *Your* surviving spouse;

   (b) The executor or administrator of *your* estate, but only while acting within the scope of his duties;

   (c) Any person having proper temporary custody of the *owned auto*, as an *insured*, until the appointment and qualification of the executor or administrator of *your* estate; and

   (d) Under the Medical Payments coverage, a person who was a *relative* at the time of *your* death, if a premium is shown on the Policy Declarations for Medical Payments.

7. **CANCELLATION BY US IS LIMITED**

The following language has been deleted:

   If the initial payment on the policy is dishonored, we will not declare the policy void without providing *you* with notice of *your* right to cure the nonpayment as required by Florida law.

The following paragraph has been added:

   We will not cancel a policy based on the lawful use, possession, or ownership of a firearm or ammunition by the insured or a household member of the insured.

8.   RENEWAL
The following paragraph has been added:
We will not refuse to renew or continue this policy based on the lawful use, possession, or ownership of a firearm or ammunition by the insured or a household member of the insured.


We affirm this amendment.


W. C. E. Robinson
Secretary

William E. Roberts
President

GG/VIP000028

# GEICO                                    **FLORIDA POLICY AMENDMENT**

Policy Number:

*Your* policy is amended as follows:
**SECTION II - Personal Injury Protection Coverage** is replaced in its entirety with the following:
**PART I - PERSONAL INJURY PROTECTION**
**DEFINITIONS**

1. *Bodily injury* means bodily injury, sickness, or disease to a person, caused by accident, including resulting sickness, disease or death resulting therefrom. All claims for damages arising from *bodily injury* to a person from a single loss shall be considered one *bodily injury* .

2. *Disability benefits* means sixty percent (60%) of any loss of gross income and loss of earning capacity per individual from inability to work proximately caused by the injury sustained by the injured person, plus all expenses reasonably incurred in obtaining from others ordinary and necessary services in lieu of those that, but for the injury, the injured person would have performed without income for the benefit of his or her household.

3. *Emergency medical condition* means a medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following:
   (a) Serious jeopardy to patient health;
   (b) Serious impairment to bodily functions; or
   (c) Serious dysfunction of any bodily organ or part.

4. *Entity wholly owned* means a proprietorship, group practice, partnership, or corporation that provides health care services rendered by licensed health care practitioners and in which licensed health care practitioners are the business owners of all aspects of the business entity, including, but not limited to, being reflected as the business owners on the title or lease of the physical facility, filing taxes as the business owners, being account holders on the entity's bank account, being listed as the principals on all incorporation documents required by this state, and having ultimate authority over all personnel and compensation decisions relating to the entity. However, this definition does not apply to an entity that is wholly owned, directly or indirectly, by a hospital licensed under Florida Statutes, chapter 395.

5. *Insured* means:
   (a) *You* or any *relative* while *occupying* a *motor vehicle* or, while a *pedestrian* through being struck by a *motor vehicle*; or
   (b) Any other person while *occupying* the *insured-motor-vehicle* or, while a *pedestrian*, through being struck by the *insured-motor-vehicle*.

6. *Insured-motor-vehicle* means a *motor vehicle*:
   (a) Of which *you* are the *owner*, and
   (b) With respect to which security is required to be maintained under the Florida Motor Vehicle No-Fault Law, and
   (c) For which a premium is charged by us, or which is a trailer, other than a mobile home, designed for use with a *motor vehicle*.

7. *Medical benefits* means all reasonable expenses for *medically necessary* medical, surgical, X-ray, dental, and rehabilitative services, including prosthetic devices and *medically necessary* ambulance, hospital, and nursing services if the individual receives initial services and care pursuant to paragraph (a) within 14 days after the motor vehicle accident. The *medical benefits* provide reimbursement only:
   (a) For initial services and care that are lawfully provided, supervised, ordered, or prescribed by a physician licensed under Florida Statutes, chapter 458 or chapter 459, a dentist licensed under Florida Statutes, chapter 466, or a chiropractic physician licensed under Florida Statutes, chapter 460 or that are provided in a hospital or in a facility that owns, or is wholly owned by, a hospital. Initial services and care may also be provided by a person or entity licensed under part III of Florida Statutes, chapter 401 which provides emergency transportation and treatment.
   (b) Upon referral by a provider described in paragraph (a), for follow up services and care consistent with the underlying medical diagnosis rendered pursuant to paragraph (a) which may be provided, supervised, ordered, or prescribed only by a physician licensed under Florida Statutes, chapter 458 or chapter 459, a chiropractic physician licensed under Florida Statutes, chapter 460, a dentist licensed under Florida Statutes, chapter 466, or, to the extent permitted by applicable law and under the supervision of such physician, osteopathic physician, chiropractic physician, or dentist, by a physician assistant licensed under Florida Statutes, chapter 458 or chapter 459 or an advanced registered nurse practitioner licensed under Florida Statutes, chapter 464.

GG/VIP000029

(c) Follow up services and care may also be provided by any of the following persons or entities:
1. A hospital or ambulatory surgical center licensed under Florida Statutes, chapter 395.
2. An *entity wholly owned* by one or more physicians licensed under Florida Statutes, chapter 458 or chapter 459, chiropractic physicians licensed under Florida Statutes, chapter 460, or dentists licensed under Florida Statutes, chapter 466 or by such practitioners and the spouse, parent, child, or sibling of such practitioners.
3. An entity that owns or is wholly owned, directly or indirectly, by a hospital or hospitals.
4. A physical therapist licensed under Florida Statutes, under chapter 486, based upon a referral by a provider described in paragraph (b) under *medical benefits*.
5. A health care clinic licensed under Florida Statutes, part X of chapter 400 which is accredited by the Joint Commission on Accreditation of Healthcare Organizations, the American Osteopathic Association, the Commission on Accreditation of Rehabilitation Facilities, or the Accreditation Association for Ambulatory Health Care, Inc., or
   (a) Has a medical director licensed under Florida Statutes, chapter 458, chapter 459, or chapter 460;
   (b) Has been continuously licensed for more than 3 years or is a publicly traded corporation that issues securities traded on an exchange registered with the United States Securities and Exchange Commission as a national securities exchange; and
   (c) Provides at least four of the following medical specialties:
       (i) General medicine.
       (ii) Radiography.
       (iii) Orthopedic medicine.
       (iv) Physical medicine.
       (v) Physical therapy.
       (vi) Physical rehabilitation.
       (vii) Prescribing or dispensing outpatient prescription medication.
       (viii) Laboratory services.
*Medical benefits* do not include massage as defined in Florida Statutes § 480.033 or acupuncture as defined in Florida Statutes § 457.102, regardless of the person, entity, or licensee providing massage or acupuncture, and a licensed massage therapist or licensed acupuncturist will not be reimbursed for *medical benefits*.
8. *Medically necessary* refers to a medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:
   (a) In accordance with generally accepted standards of medical practice;
   (b) Clinically appropriate in terms of type, frequency, extent, site, and duration; and
   (c) Not primarily for the convenience of the patient, physician, or other health care provider.
9. *Motor vehicle* means any self-propelled vehicle of four or more wheels which is of a type both designed and required to be licensed for use on the highways of Florida and any trailer or semi-trailer designed for use with such vehicle.
   A *motor vehicle* does not include:
   (a) Any *motor vehicle* which is used in mass transit other than public school transportation and designed to transport more than five passengers exclusive of the operator of the *motor vehicle* and which is owned by a municipality, a transit authority, or a political subdivision of the state; or
   (b) A mobile home.
10. *Occupying* means in or upon or entering into or alighting from.
11. *Owner* means a person or organization who holds the legal title to a *motor vehicle*, and also includes:
    (a) A debtor having the right to possession, in the event a *motor vehicle* is the subject of a security agreement, and
    (b) A lessee having the right to possession, in the event a *motor vehicle* is the subject of a lease with option to purchase and such lease agreement is for a period of six months or more, and
    (c) A lessee having the right to possession, in the event a *motor vehicle* is the subject of a lease without option to purchase, and such lease agreement is for a period of six months or more, and the lease agreement provides that the lessee shall be responsible for securing insurance.
12. *Pedestrian* means a person while not an occupant of any self-propelled vehicle.
13. *Relative* means a person related to *you* by blood, marriage or adoption (including a ward or foster child) who is usually a resident of the same household as *you*.
14. *You* and *your* means the named insured shown in the declarations or his or her spouse if a resident of the same household.

Case 8:16-cv-02012-MSS-JSS   Document 37-2   Filed 02/11/17   Page 39 of 53 PageID 417

## PAYMENTS WE WILL MAKE

The Company will pay in accordance with the Florida Motor Vehicle No Fault Law (as enacted, amended, or newly enacted), and where applicable in accordance with all fee schedules contained in the Florida Motor Vehicle No Fault Law, to or for the benefit of the injured person:

(A) Eighty percent (80%) of *medical benefits* which are *medically necessary*, pursuant to the following schedule of maximum charges contained in the Florida Statutes § 627.736(5) (a)1., (a)2. and (a)3.:

1. For emergency transport and treatment by providers licensed under Florida Statutes, chapter 401, 200 percent of Medicare.
2. For emergency services and care provided by a hospital licensed under Florida Statutes, chapter 395, 75 percent of the hospital's usual and customary charges.
3. For emergency services and care as defined by Florida Statutes, § 395.002 provided in a facility licensed under chapter 395 rendered by a physician or dentist, and related hospital inpatient services rendered by a physician or dentist, the usual and customary charges in the community.
4. For hospital inpatient services, other than emergency services and care, 200 percent of the Medicare Part A prospective payment applicable to the specific hospital providing the inpatient services.
5. For hospital outpatient services, other than emergency services and care, 200 percent of the Medicare Part A Ambulatory Payment Classification for the specific hospital providing the outpatient services.
6. For all other medical services, supplies, and care, 200 percent of the allowable amount under:
   (I.) The participating physicians fee schedule of Medicare Part B, except as provided in sections (II.) and (III.)
   (II.) Medicare Part B, in the case of services, supplies, and care provided by ambulatory surgical centers and clinical laboratories.
   (III.)The Durable Medical Equipment Prosthetics/Orthotics and Supplies fee schedule of Medicare Part B, in the case of durable medical equipment.

However, if such services, supplies, or care is not reimbursable under Medicare Part B (as provided in section (A) 6. above), we will limit reimbursement to eighty percent (80%) of the maximum reimbursable allowance under workers' compensation, as determined under Florida Statutes, § 440.13 and rules adopted thereunder which are in effect at the time such services, supplies, or care is provided. Services, supplies, or care that is not reimbursable under Medicare or workers' compensation is not required to be reimbursed by us.

The applicable fee schedule or payment limitation under Medicare is the fee schedule or payment limitation in effect on March 1 of the year in which the services, supplies, or care is rendered and for the area in which such services, supplies, or care is rendered, and the applicable fee schedule or payment limitation applies throughout the remainder of that year, notwithstanding any subsequent change made to the fee schedule or payment limitation, except that it may not be less than the allowable amount under the applicable schedule of Medicare Part B for 2007 for medical services, supplies, and care subject to Medicare Part B.

We may use the Medicare coding policies and payment methodologies of the federal Centers for Medicare and Medicaid Services, including applicable modifiers, to determine the appropriate amount of reimbursement for medical services, supplies, or care if the coding policy or payment methodology does not constitute a utilization limit. A charge submitted by a provider, for an amount less than the amount allowed above, shall be paid in the amount of the charge submitted.

Within 30 days after receiving notice that the Medicaid program has paid *medical benefits*, we shall repay the full amount of the *medical benefits* to the Medicaid program subject to the **LIMIT OF LIABILITY** .

(B) *Disability benefits*, and

(C) Death benefits.

The above benefits will be provided for injuries incurred by an *insured* as a result of *bodily injury* caused by an accident arising out of the ownership, maintenance or use of a *motor vehicle*.

## EXCLUSIONS

Section II.- Part I does not apply:

1. To *you* or any *relative* injured while *occupying* any *motor vehicle* owned by *you* and which is not an *insured-motor-vehicle* under this insurance;
2. To any person while operating the *insured-motor-vehicle* without *your* express or implied consent;
3. To any person, if such person's conduct contributed to his *bodily injury* under any of the following circumstances:
   (i) Causing *bodily injury* to himself intentionally;

(ii) While committing a felony;

4. To **you** or any dependent **relative** for any loss of gross income and loss of earning capacity from inability to work proximately caused by the injury sustained by the injured person if an entry in the schedule or declarations indicates such coverage does not apply;

5. To any **pedestrian**, other than **you** or any **relative**, not a legal resident of the State of Florida;

6. To any person, other than **you**, if such person is the **owner** of a **motor vehicle** with respect to which security is required under the Florida Motor Vehicle No-Fault law, as amended;

7. To any person, other than **you** or any **relative**, who is entitled to personal injury protection benefits from the **owner** or **owners** of a **motor vehicle** which is not an **insured-motor-vehicle** under this insurance or from the **owner's** insurer; or

8. To any person who sustains **bodily injury** while **occupying** a **motor vehicle** located for use as a residence or premises.

### LIMIT OF LIABILITY

Regardless of the number of persons insured, policies or bonds applicable, vehicles involved or claims made, the total aggregate limit of personal injury protection benefits available under the Florida Motor Vehicle No-Fault Law (as enacted, amended or newly enacted), from all sources combined, including this policy, for all loss and expense incurred by or on behalf of any one person who sustains **bodily injury** as the result of any one accident shall be:

1. After the applicable deductible is met and subject to the **PAYMENTS WE WILL MAKE**, a combined total of $10,000 for **medical benefits** and **disability benefits.**
   **Medical benefits** are subject to the following limitations:
   (a) Reimbursement for services and care provided in paragraphs (a), (b) or (c) of the definition of **medical benefits** up to $10,000 if a physician licensed under Florida Statutes, chapter 458 or chapter 459, a dentist licensed under Florida Statutes, chapter 466, a physician assistant licensed under chapter Florida Statutes, chapter 458 or chapter 459, or an advanced registered nurse practitioner licensed under Florida Statutes, chapter 464 has determined that the injured person had an **emergency medical condition**.
   (b) Reimbursement for services and care provided in paragraphs (a), (b) or (c) of the definition of **medical benefits** is limited to $2,500 if any provider listed in paragraphs (a), (b) or (c) of the definition of **medical benefits** determines that the injured person did not have an **emergency medical condition**.

2. $5,000 for death benefits.

### APPLICATION OF DEDUCTIBLE

Pursuant to Florida Statutes § 627.739, the amount of any deductible stated in the declarations and applicable to each **insured** must be applied to 100% of all expenses or losses as described in Florida Statutes § 627.736 with respect to all **medical benefits** and **disability benefits** incurred by or on behalf of each person to whom the deductible applies and who sustains **bodily injury** as the result of any one accident. Such deductible will not apply to the death benefit.

### OTHER INSURANCE

Any amount available for payment under this insurance shall be reduced by the amount of benefits an injured person has recovered for the same elements of loss under the workers' compensation laws of any state or the federal government. If benefits have been received under the Florida Motor Vehicle No-Fault Law, as amended, from any insurer for the same items of loss and expense for which benefits are available under this policy, we shall not be liable to make duplicate payments to or for the benefit of the injured person, but the insurer paying such benefits shall be entitled to recover from us its equitable pro rata share of the benefits paid and expenses incurred in processing the claim.

### POLICY PERIOD - TERRITORY

The insurance under this Section applies only to accidents which occur during the policy period:
(a) In the State of Florida;
(b) As respects **you** or a **relative**, while **occupying** the **insured-motor-vehicle** outside the State of Florida but within the United States of America, its territories or possessions or Canada; and
(c) As respects **pedestrians** injured when struck by the **insured-motor-vehicle** in the State of Florida, if they are not the **owner** of a **motor vehicle** for which coverage is required to be maintained under the Florida No-Fault Law.

### CONDITIONS

1. NOTICE
   In the event of an accident, written notice of the loss must be given to us or any of our authorized agents as soon as practicable. If any injured person or his legal representatives shall institute legal action to recover damages for **bodily**

*injury* against a third party, a copy of the summons and complaint or other process served in connection with such legal action shall be forwarded as soon as practicable to us by such injured person or his legal representative.

2. ACTION AGAINST THE COMPANY

As a condition precedent to filing any action for benefits under this coverage, written notice of intent to initiate litigation must be provided to us pursuant to Florida Statutes § 627.736 (10). Such notice may not be sent until the claim is overdue, including any additional time the we have to pay the claim pursuant to Florida Statutes § 627.736 (4)(b). The notice must state that it is a "demand letter under s. 627.736" and state with specificity:

1. The name of the *insured* upon which such benefits are being sought, including a copy of the assignment giving rights to the claimant if the claimant is not the *insured*.

2. The claim number or policy number upon which such claim was originally submitted to us.

3. To the extent applicable, the name of any medical provider who rendered to an **insured** the treatment, services, accommodations, or supplies that form the basis of such claim; and an itemized statement specifying each exact amount, the date of treatment, service, or accommodation, and the type of benefit claimed to be due. A completed form satisfying the requirements of Florida Statutes § 627.736 (5) (d) or the lost-wage statement previously submitted may be used as the itemized statement. To the extent that the demand involves our withdrawal of payment under Florida Statutes § 627.736 (7)(a) for future treatment not yet rendered, the claimant shall attach a copy of our notice withdrawing such payment and an itemized statement of the type, frequency, and duration of future treatment claimed to be reasonable and *medically necessary.*

Each required notice must be delivered to us by United States certified or registered mail, return receipt requested. Such postal costs shall be reimbursed by us if requested by the claimant in the notice, when we pay the claim. Such notice must be sent to the person and address specified by us for the purposes of receiving notices under Florida Statutes § 627.736 (10) (c).

If, within 30 days after receipt of notice by us, the overdue claim specified in the notice is paid by us together with applicable interest and a penalty of 10 percent of the overdue amount paid by us, subject to a maximum penalty of $250, no action may be brought against us. If the demand involves our withdrawal of payment under Florida Statutes § 627.736 (7)(a) for future treatment not yet rendered, no action may be brought against us if, within 30 days after its receipt of the notice, we mail to the person filing the notice a written statement of the our agreement to pay for such treatment in accordance with the notice and to pay a penalty of 10 percent, subject to a maximum penalty of $250, when it pays for such future treatment in accordance with the requirements of Florida Statutes § 627.736 (10).

To the extent we determine not to pay any amount demanded, the penalty is not payable in any subsequent action. Payment or our agreement shall be treated as being made on the date a draft or other valid instrument that is equivalent to payment, or our written statement of agreement, is placed in the United States mail in a properly addressed, postpaid envelope, or if not so posted, on the date of delivery. We are not obligated to pay any attorney fees if we pay the claim or mail our agreement to pay for future treatment within the time prescribed by section Florida Statutes § 627.736 (10).

The applicable statute of limitation for an action under Florida Statutes § 627.736 shall be tolled for 30 business days by the mailing of the notice required by this Florida Statutes § 627.736 (10).

3. PROOF OF CLAIM AND MEDICAL REPORTS

As soon as practicable the person making the claim shall give to us written proof of claim, under oath if required, which may include full particulars of the nature and extent of the injuries and treatment received and contemplated, and such other information as may assist us in determining the amount due and payable.

4. INDEPENDENT MEDICAL EXAMINATIONS

Any person making a claim shall submit to mental or physical examinations in accordance with the Florida Motor Vehicle No-Fault Law (as enacted, amended, or newly enacted), at our expense when and as often as we may reasonably require and a copy of the medical report will be forwarded to such person if requested. If a person unreasonably refuses to submit to or fails to appear at an examination, we are no longer liable for subsequent personal injury protection benefits. An *insured's* refusal to submit to or failure to appear at two examinations raises a rebuttable presumption that the *insured's* refusal or failure was unreasonable.

5. PAYMENT OF CLAIM WITHHELD

Whenever a person making a claim is charged with committing a felony, if such person's conduct contributed to their *bodily injury*, we shall withhold benefits until, at the trial level, the prosecution makes a formal entry on the record that it will not prosecute the case against the person, the charge is dismissed or the person is acquitted.

6. EXAMINATION UNDER OATH (EUO)

If requested by us, an *insured* or omnibus insured must submit to an examination under oath (EUO) by any person named by us when, where and as often as we may reasonably require. The scope of questioning during the examination under oath is limited to relevant information or information that could reasonably be expected to lead to relevant information. This provision includes providing a copy of any documents, forms, records or material requested to be provided as part of the EUO request whether the request is made before, during or after the EUO.

Case 8:16-cv-02012-MSS-JSS   Document 47-2   Filed 01/11/17   Page 38 of 53 PageID 420

Compliance with submitting to an EUO is a condition precedent to receiving benefits. If an *insured* or omnibus insured refuses to submit to or fails to appear at an EUO, we will not be liable for personal injury protection benefits.

7. REIMBURSEMENT AND SUBROGATION

In the event of payment to or for the benefits of any injured person under this insurance:

(a) The Company may be subrogated to the rights of the person to whom or for whose benefit such payments were made to the extent of such payments. Such person shall execute and deliver the instruments and papers and do whatever else is necessary to secure such rights. Such person shall do nothing after loss to prejudice such rights.

(b) The Company providing personal injury protection benefits on a private passenger motor vehicle, as defined in the Florida Motor Vehicle No-Fault Law, shall be entitled to reimbursement to the extent of the payment of personal injury protection benefits from the *owner* or insurer of the *owner* of a commercial motor vehicle, as defined in the Florida Motor Vehicle No-Fault Law, if such injured person sustained the injury while *occupying*, or while a *pedestrian* through being struck by, such commercial motor vehicle. This does not apply to owners or registrants identified as taxi-cabs as defined in Florida Statutes §627.733(1)(b).

8. SPECIAL PROVISION FOR RENTED OR LEASED VEHICLES

Notwithstanding any provision of this coverage to the contrary, if a person is injured while *occupying*, or through being struck by, a *motor vehicle* rented or leased under a rental or lease agreement, within the state of Florida, which does not specify otherwise in at least 10 point type on the face of such agreement, the personal injury protection coverage afforded under the lessor's policy shall be primary. Personal injury protection coverage offered under this policy will not apply to a vehicle rented, operated, used, or leased outside the state of Florida.

9. REASONABLE BELIEF OF FRAUD

If we have a reasonable belief that a fraudulent insurance act, for the purposes of Florida Statutes § 626.989 or Florida Statutes § 817.234, has been committed, we shall notify the injured person, in writing, within 30 days after submission of the claim that the claim is being investigated for suspected fraud. Beginning at the end of the initial 30-day period, we have an additional 60 days to conduct our fraud investigation. No later than 90 days after the submission of the claim, we must deny the claim or pay the claim with simple interest. Interest shall be assessed from the day the claim was submitted until the day the claim is paid. All claims denied for suspected fraudulent insurance acts shall be reported to the Division of Insurance Fraud.

10. NONREIMBURSIBLE CLAIMS

Claims generated as a result of activities that are unlawful pursuant to Florida Statutes § 817.505 are not reimbursable under the Florida Motor Vehicle No-Fault Law and this policy.

11. ADDITIONAL CONDITIONS

If we pay only a portion of a claim or reject a claim due to an alleged error in the claim, we, at the time of the partial payment or rejection, shall provide an itemized specification or explanation of benefits due to the specified error. Upon receiving the specification or explanation, the person making the claim, at the person's option and without waiving any other legal remedy for payment, has 15 days to submit a revised claim, which shall be considered a timely submission of written notice of a claim.

We shall create and maintain for each *insured* a log of personal injury protection benefits paid by us on behalf of the *insured*. If litigation is commenced, we shall provide to the *insured* a copy of the log within 30 days after receiving a request for the log from the insured.

In a dispute between us and the *insured* , or between an assignee of the *insured's* rights and us, upon request, we must notify the *insured* or the assignee that the policy limits under this section have been reached within 15 days after the limits have been reached.

## PART II – ADDITIONAL PERSONAL INJURY PROTECTION

**Additional Personal Injury Protection applies only if a premium amount is shown in the Policy Declarations for "Additional Personal Injury Protection" coverage. It is an optional coverage to compliment Personal Injury Protection Coverage and does not increase the limit of liability.**

The terms and conditions under **SECTION II: PART I – PERSONAL INJURY PROTECTION** apply to this coverage for **ADDITIONAL PERSONAL INJURY PROTECTION** .

However, the following revisions are made to **SECTION II: PART I - PERSONAL INJURY PROTECTION** :

The definition of *disability benefits* in **SECTION II: PART I – PERSONAL INJURY PROTECTION** is replaced in its entirety as follows:

2. *Disability benefits* means eighty-five percent (85%) of any loss of gross income and loss of earning capacity per individual from inability to work proximately caused by the injury sustained by the injured person, plus all expenses reasonably incurred in obtaining from others ordinary and necessary services in lieu of those that, but for the injury, the injured person would have performed without income for the benefit of his or her household.

Case 8:16-cv-02012-MSS-JSS   Document 37-2   Filed 01/11/17   Page 34 of 53 PageID 421

The **PAYMENTS WE WILL MAKE** Section in **SECTION II: PART I – PERSONAL INJURY PROTECTION** is replaced in its entirety with the following:

**PAYMENTS WE WILL MAKE**

The Company will pay in accordance with the Florida Motor Vehicle No Fault Law (as enacted, amended, or newly enacted), and where applicable in accordance with all fee schedules contained in the Florida Motor Vehicle No Fault Law, to or for the benefit of the injured person:

(A) One hundred percent (100%) of *medical benefits* which are *medically necessary*, pursuant to the following schedule of maximum charges contained in the Florida Statutes § 627.736(5) (a)1., (a)2. and (a)3.:

  1. For emergency transport and treatment by providers licensed under Florida Statutes, chapter 401, 200 percent of Medicare.

  2. For emergency services and care provided by a hospital licensed under Florida Statutes, chapter 395, 75 percent of the hospital's usual and customary charges.

  3. For emergency services and care as defined by Florida Statutes, § 395.002 provided in a facility licensed under chapter 395 rendered by a physician or dentist, and related hospital inpatient services rendered by a physician or dentist, the usual and customary charges in the community.

  4. For hospital inpatient services, other than emergency services and care, 200 percent of the Medicare Part A prospective payment applicable to the specific hospital providing the inpatient services.

  5. For hospital outpatient services, other than emergency services and care, 200 percent of the Medicare Part A Ambulatory Payment Classification for the specific hospital providing the outpatient services.

  6. For all other medical services, supplies, and care, 200 percent of the allowable amount under:

      (I.) The participating physicians fee schedule of Medicare Part B, except as provided in sections (II.) and (III.)

      (II.) Medicare Part B, in the case of services, supplies, and care provided by ambulatory surgical centers and clinical laboratories.

      (III.)The Durable Medical Equipment Prosthetics/Orthotics and Supplies fee schedule of Medicare Part B, in the case of durable medical equipment.

However, if such services, supplies, or care is not reimbursable under Medicare Part B (as provided in section (A) 6, above), we will limit reimbursement to eighty percent (80%) of the maximum reimbursable allowance under workers' compensation, as determined under Florida Statutes, § 440.13 and rules adopted thereunder which are in effect at the time such services, supplies, or care is provided. Services, supplies, or care that is not reimbursable under Medicare or workers' compensation is not required to be reimbursed by us.

The applicable fee schedule or payment limitation under Medicare is the fee schedule or payment limitation in effect on March 1 of the year in which the services, supplies, or care is rendered and for the area in which such services, supplies, or care is rendered, and the applicable fee schedule or payment limitation applies throughout the remainder of that year, notwithstanding any subsequent change made to the fee schedule or payment limitation, except that it may not be less than the allowable amount under the applicable schedule of Medicare Part B for 2007 for medical services, supplies, and care subject to Medicare Part B.

We may use the Medicare coding policies and payment methodologies of the federal Centers for Medicare and Medicaid Services, including applicable modifiers, to determine the appropriate amount of reimbursement for medical services, supplies, or care.

A charge submitted by a provider, for an amount less than the amount allowed above, shall be paid in the amount of the charge submitted.

Within 30 days after receiving notice that the Medicaid program has paid *medical benefits,* we shall repay the full amount of the *medical benefits* to the Medicaid program subject to the **LIMIT OF LIABILITY** .

(B) *Disability benefits,* and

(C) Death benefits.

The above benefits will be provided for injuries incurred by an *insured* as a result of *bodily injury* caused by an accident arising out of the ownership, maintenance or use of a *motor vehicle.*

The following paragraph is added to the **LIMIT OF LIABILITY** in **SECTION II: PART I – PERSONAL INJURY PROTECTION** Section:

We will not pay any benefits for *bodily injury* which the *insured* or anyone else is required to pay because of any elected basic Personal Injury Protection deductible or other payment limitation, or the portion of any loss the *insured* must share under any provision of any basic Florida Personal Injury Protection Coverage.

Case 8:16-cv-02012-MSS-JSS   Document 47-2   Filed 01/11/17   Page 35 of 58 PageID 782

## PART III - MODIFICATION OF POLICY COVERAGES

Any Automobile Medical Payments insurance, any Uninsured Motorists coverage or any excess Underinsured Motorists coverage afforded by the policy shall be excess over any Personal Injury Protection benefits paid or available for payment or which would be available but for the application of a deductible.

Regardless of whether the full amount of Personal Injury Protection benefits have been exhausted, any Medical Payments insurance afforded by this policy shall pay the portion of any claim for Personal Injury Protection **medical benefits** contained in Part I which are otherwise covered but not available for payment due to the limitation of eighty percent (80%) of **medical benefits** contained in Part I but shall not be payable for the amount of the deductible selected.

## PART IV - PROVISIONAL PREMIUM

It is agreed that in the event of any change in the rules, rates, rating plan, premiums or minimum premiums applicable to the insurance afforded, because of an adverse judicial finding as to the constitutionality of any provisions of the Florida Motor Vehicle No-Fault Law (as enacted, amended or newly enacted), providing for the exemption of persons from tort liability, the premium stated in the declarations for any Liability, Medical Payments and Uninsured Motorists insurance shall be deemed provisional and subject to recomputation. If this policy is a renewal policy, such recomputation shall also include a determination of the amount of any return premium previously credited or refunded to the named insured pursuant to the Florida Motor Vehicle No-Fault Law, as amended, with respect to insurance afforded under a previous policy.

If the final premium thus recomputed exceeds the premium stated in the declarations, the insured shall pay to the Company the excess as well as the amount of any return premium previously credited or refunded.

## PART V - AUTOMOBILE MEDICAL PAYMENTS COVERAGE

**(Automobile Medical Payments coverage applies only if a premium amount is shown in the Policy Declarations for "Medical Payments" coverage)**

The **DEFINITIONS** under **SECTION II - PART I** also apply to **SECTION II - PART V.**
**PAYMENTS WE WILL MAKE**

Under Automobile Medical Payments coverage, the Company will pay all reasonable **medically necessary medical benefits** incurred within one year of from the date of the accident for **bodily injury** caused by an accident arising out of the ownership, maintenance or use of a **motor vehicle** and sustained by **you** or any **relative** while **occupying** a **motor vehicle** or while a **pedestrian** through being struck by a **motor vehicle.**

We will pay, subject to the coverage limit shown in the policy declarations:

(a) The portion of any claim for Personal Injury Protection **medical benefits** otherwise covered but not payable due to the coinsurance provision of Personal Injury Protection. This is the twenty percent (20%) of **medical benefits** not covered in **SECTION II: PART I - PAYMENTS WE WILL MAKE** , and

(b) **Medically necessary medical benefits** that exceed the Personal Injury Protection **medical benefits** coverage paid.

Payments we will make pursuant to paragraph (b) will be paid pursuant to the following schedule of maximum charges:

1. For emergency transport and treatment by providers licensed under Florida Statutes, chapter 401, 200 percent of Medicare.
2. For emergency services and care provided by a hospital licensed under Florida Statutes, chapter 395, 75 percent of the hospital's usual and customary charges.
3. For emergency services and care as defined by Florida Statutes, § 395.002 provided in a facility licensed under chapter 395 rendered by a physician or dentist, and related hospital inpatient services rendered by a physician or dentist, the usual and customary charges in the community.
4. For hospital inpatient services, other than emergency services and care, 200 percent of the Medicare Part A prospective payment applicable to the specific hospital providing the inpatient services.
5. For hospital outpatient services, other than emergency services and care, 200 percent of the Medicare Part A Ambulatory Payment Classification for the specific hospital providing the outpatient services.
6. For all other medical services, supplies, and care, 200 percent of the allowable amount under:
   (I.) The participating physicians fee schedule of Medicare Part B, except as provided in sections (II.) and (III.)
   (II.) Medicare Part B, in the case of services, supplies, and care provided by ambulatory surgical centers and clinical laboratories.
   (III.)The Durable Medical Equipment Prosthetics/Orthotics and Supplies fee schedule of Medicare Part B, in the case of durable medical equipment.

However, if such services, supplies, or care is not reimbursable under Medicare Part B (as provided in section (A) 6. above), we will limit reimbursement to eighty percent (80%) of the maximum reimbursable allowance under workers' compensation, as determined under Florida Statutes, § 440.13 and rules adopted thereunder which are in effect at the time such services, supplies, or care is provided. Services, supplies, or care that is not reimbursable under Medicare or workers' compensation is not required to be reimbursed by us.

The applicable fee schedule or payment limitation under Medicare is the fee schedule or payment limitation in effect on March 1 of the year in which the services, supplies, or care is rendered and for the area in which such services, supplies, or care is rendered, and the applicable fee schedule or payment limitation applies throughout the remainder of that year, notwithstanding any subsequent change made to the fee schedule or payment limitation, except that it may not be less than the allowable amount under the applicable schedule of Medicare Part B for 2007 for medical services, supplies, and care subject to Medicare Part B.

We may use the Medicare coding policies and payment methodologies of the federal Centers for Medicare and Medicaid Services, including applicable modifiers, to determine the appropriate amount of reimbursement for medical services, supplies, or care.

A charge submitted by a provider, for an amount less than the amount allowed above, shall be paid in the amount of the charge submitted.

**EXCLUSIONS**

Automobile Medical Payments coverage does not apply:

1. To *you* or any *relative* injured while *occupying* any *motor vehicle* owned by *you* or a *relative* and which is not an *insured-motor-vehicle* under this insurance;
2. To any person while operating the *insured-motor-vehicle* without *your* express or implied consent;
3. To any person, if such person's conduct contributed to his *bodily injury* under any of the following circumstances:
   (i) Causing *bodily injury* to himself intentionally;
   (ii) While committing a felony;
4. To any *pedestrian*, other than *you* or any *relative*;
5. To any person, other than *you*, if such person is the *owner* of a *motor vehicle* with respect to which security is required under the Florida Motor Vehicle No-Fault Law, as amended;
6. To any person who sustains *bodily injury* while *occupying* a *motor vehicle* located for use as a residence or premises;
7. To *bodily injury* sustained by *you* or a *relative* that results from war of any kind;
8. To *bodily injury* sustained by *you* or a *relative* that results from exposure to fungi;
9. To *bodily injury* sustained by *you* or a *relative* that results from:
   (i) Nuclear reaction;
   (ii) Radiation or radioactive contamination from any source;
   (iii) The intentional or accidental detonation of, or release of radiation from any nuclear or radioactive device;
10. To *bodily injury* sustained by *you* or a *relative* while *occupying* a *motor vehicle*, or while a *pedestrian* through being struck by a *motor vehicle* while being employed or engaged in the business of selling, leasing, repairing, parking, storing, servicing, delivering or testing vehicles.
11. To *bodily injury* sustained by *you* or a *relative* caused by an auto driven in or preparing for any racing, speed or demolition contest or stunting activity of any nature, whether or not prearranged or organized.

**LIMITS OF LIABILITY**

Regardless of the number of persons insured, policies or bonds applicable, vehicles involved or claims made, the total aggregate limit of Automobile Medical Payments benefits available from all sources combined, including this policy, for all loss and expense incurred by or on behalf of any one person who sustains *bodily injury* as the result of any one accident is the amount listed in the declarations page.

**OTHER INSURANCE**

Any amount available for payment under this Insurance shall be reduced by the amount of benefits an injured person has recovered for the same elements of loss under the workers' compensation or other similar laws of any state or the federal government.

If benefits have been received under any similar coverage from any insurer for the same items of loss and expense for which benefits are available under this policy, we shall not be liable to make duplicate payments to or for the benefit of the injured person, but the insurer paying such benefits shall be entitled to recover from us its equitable pro rata share of the benefits paid and expenses incurred in processing the claim. This coverage will coordinate with any applicable Personal Injury Protection benefits but will not duplicate any benefits available for payment. The coverage of the occupied vehicle is primary.

Case 8:16-cv-02012-MSS-JSS   Document 67-2   Filed 04/11/17   Page 37 of 53 PageID 424

Any Uninsured Motorist Coverage or any excess Underinsured Motorist Coverage afforded by this policy shall be excess over any Automobile Medical Payments benefits paid or available for payment or which would be available but for the application of a deductible; and subject to the terms and conditions of the Uninsured/Underinsured Motorist coverage. This coverage is excess over any other valid and collectible insurance provided with respect to the occupied *motor vehicle*.

**POLICY PERIOD - TERRITORY**

The insurance under this Part applies only to accidents which occur during the policy period:

(a) In the State of Florida; and

(b) We will cover *you* or any *relative* for injuries incurred while *occupying* a *motor vehicle* or as a *pedestrian* in an accident that occurs outside the state of Florida, but within the United States of America, its territories or possessions, or Canada.

**CONDITIONS**

1. NOTICE

   In the event of an accident, written notice of the loss must be given to us or any of our authorized agents as soon as practicable. If any injured person or his legal representatives shall institute legal action to recover damages for *bodily injury* against a third party, a copy of the summons and complaint or other process served in connection with such legal action shall be forwarded as soon as practicable to us by such injured person or his legal representative.

2. PROOF OF CLAIM

   As soon as practicable the person making the claim shall give to us written proof of claim, under oath if required, which may include full particulars of the nature and extent of the *bodily injury* and treatment received and contemplated, and such other information as may assist us in determining the amount due and payable.

3. INDEPENDENT MEDICAL EXAMINATIONS

   Any person making a claim shall submit to mental or physical examinations at our expense when and as often as we may reasonably require and a copy of the medical report shall be forwarded to such person if requested. If a person unreasonably refuses to submit to or fails to appear at an examination, we are no longer liable for subsequent Automobile Medical Payment benefits. An *insured's* refusal to submit to, complete or failure to appear at two examinations will be considered unreasonable.

4. PAYMENT OF CLAIM WITHHELD

   Whenever a person making a claim is charged with committing a felony, if such person's conduct contributed to their *bodily injury*, we shall withhold benefits until, at the trial level, the prosecution makes a formal entry on the record that it will not prosecute the case against the person, the charge is dismissed or the person is acquitted. We also have the right to determine if incurred charges and treatment are reasonable, *medically necessary* and causally related to a *bodily injury* sustained in an accident. This determination may be made by use of utilization review, peer reviews, medical bill reviews or medical examination.

5. EXAMINATION UNDER OATH (EUO)

   If requested by us, *you* or a *relative* must submit to an examination under oath (EUO) by any person named by us when; where and as often as we may reasonably require. The scope of questioning during the examination under oath is limited to relevant information or information that could reasonably be expected to lead to relevant information. This provision includes providing a copy of any documents, forms, records or material requested to be provided as part of the EUO request whether the request is made before, during or after the EUO. Compliance with submitting to an EUO is condition precedent to receiving benefits. If *you* or a *relative* refuses to submit to or fails to appear at an EUO, we will not be liable for Automobile Medical Payments coverage.

6. ACTION AGAINST THE COMPANY

   No action shall lie against us:

   (a) Unless the *insured* has fully complied with all the policy's terms and conditions; and

   (b) Until 30 days after the required notice of accident and reasonable proof of claim has been filed with us; and

   (c) Unless we receive written notice of the intent to initiate litigation and within 30 days after receipt of such notice we do not:
   - (i) Pay the claim; or
   - (ii) Mail to the person filing the notice a written statement of our agreement to pay for such treatment in accordance with the notice.

   Payment or our written statement of agreement to pay for treatment shall be treated as being made on the date a draft, or other valid instrument that is equivalent payment, or the written statement of agreement to pay, is placed in the United States mail properly addressed posted envelope or if not so posted, on the date of delivery.

   The written notice of intent to initiate litigation must state that it is a demand letter for Automobile Medical Payments coverage and contain the following information:

Case 8:16-cv-02012-MSS-JSS   Document 47-2   Filed 01/11/17   Page 38 of 53 PageID 425

(a) The name of the *insured* for whom benefits are being sought including a copy of the assignment giving rights to the claimant if the claimant is not the *insured*;
(b) The claim number and or policy number upon which the claim was originally submitted; and
(c) To the extent applicable, the name of the medical provider who rendered the treatment, services, accommodations or supplies that form the basis of the claim, and each exact amount, the date of treatment, service or accommodation and the type of benefits claimed to be due. A health insurance claim form (CMS-1500) or UB 92 form or any other standard form approved by the Department of Financial Services, may be used as the itemized statement.

The written notice must be delivered to us by United States Certified or Registered mail, Return Receipt Requested, at the address we have filed with and that is made available by the office of the Florida Chief Financial Officer on its internet website.

We will not be liable for interest, attorneys' fees, costs, or any additional penalty.

7.  SUBROGATION

In the event of payment to or for the benefits of any injured person under this insurance the Company is subrogated to the rights of the person to whom or for whose benefit such payments were made to the extent of such payments. Such person shall execute and deliver the instruments and papers and do whatever else is necessary to secure such rights. Such person shall do nothing after loss to prejudice such rights.

When an injured person has been paid by us and also recovers from another, the amount recovered will be held by the injured person in trust for us and reimbursed to us to the extent of our payment. If we are not reimbursed, we may pursue recovery of that amount directly against the injured person.

## SECTION V – GENERAL CONDITIONS

The following conditions are revised:

### 15. FRAUD AND MISREPRESENTATION

Coverage is not provided to any person who conceals or misrepresents any material fact or circumstance relating to this insurance:
1. At the time application is made; or
2. At any time during the policy period; or
3. In connection with the presentation or settlement of a claim.

### 16. EXAMINATION UNDER OATH (EUO)

Unless otherwise modified elsewhere in the policy, if requested by us, an *insured* or omnibus insured must submit to an examination under oath (EUO) by any person named by us when, where and as often as we may reasonably require.  This provision includes providing a copy of any documents, forms, records or material requested to be provided as part of the EUO request whether the request is made before, during or after the EUO.
Compliance with submitting to an EUO is a condition precedent to receiving benefits or coverage under this policy. If an *insured* or omnibus insured refuses to submit to or fails to appear at an EUO, we will not be liable for benefits or coverage under this policy.

We affirm this amendment.

W.C. E. Robinson
Secretary

O.M. Nicely
President

GG/VIP000040

# GEICO

## Automobile Policy Amendment
## Emergency Road Service Coverage

Policy Number:

*Your* policy provisions are amended as follows:

### SECTION III

### PHYSICAL DAMAGE COVERAGES

#### Emergency Road Service

We will pay reasonable expenses an *insured* incurs for the *owned* or *non-owned auto*, for:

1. mechanical labor up to one hour at the place of breakdown;
2. lockout services up to $100 per lockout if keys to the auto are lost, broken or accidentally locked in the auto;
3. if it will not run, towing to the **nearest** repair facility where the necessary repairs can be made;
4. towing it out if it is stuck on or immediately next to a public highway;
5. delivery of gas, oil, loaned battery, or change of tire. WE DO NOT PAY FOR THE COST OF THE GAS, OIL, LOANED BATTERY, OR TIRE(S).

### OBTAINING SERVICE UNDER THIS AMENDMENT

*You* may secure service under this amendment in the following manner:

#### SIGN AND DRIVE

The first method, called sign and drive, features a toll-free number in which the *insured* calls a GEICO Emergency Road Service representative who will dispatch a service vendor. Upon verification of Emergency Road Service (ERS) coverage, reasonable and necessary charges for covered services provided will be automatically billed to the Company by the Service vendor. The *insured* need only sign a receipt at the time of service which authorizes the comp any to directly pay the service vendor. Any additional mileage, other fees not specifically addressed above, or lockout services in excess of $100 will be at the *insured's* expense.

#### HIRED SERVICES

The second method occurs when the *insured* does not use the sign and drive feature described above and hires services without prior approval from the Emergency Road Service (ERS) Department. Upon verification of Emergency Road Service (ERS) coverage, for covered services provided, up to a limit of $50 will apply. Lockout services are limited to $100. Requests for reimbursement must be accompanied by an original itemized receipt and must be submitted within 60 days of service.

There will be a limit of one reimbursement per disablement.

We affirm this amendment.

W. C. E. Robinson
Secretary

O. M. Nicely
President

GG/VIP000041

GGN/IP000042

# GEICO

## Automobile Policy Endorsement

## Mechanical Breakdown Insurance

Policy Number:

We agree with *you* as follows:

### SECTION III - PHYSICAL DAMAGE COVERAGES

Section III is amended to provide Mechanical Breakdown Insurance.

This amendment is subject to all policy conditions and definitions except as specifically modified below.

The amount of applicable deductible shown in the policy declarations shall apply to each *loss* under the Mechanical Breakdown
Insurance. A $50 deductible shall apply to glass breakage, except windshield glass, without any other damage to the auto.

#### Mechanical Breakdown Insurance

We will pay for *loss* caused other than by *collision* or under the comprehensive coverage due to the mechanical breakdown of the
*owned auto*. *Losses* from mechanical breakdown shall not be accumulated to reach the deductible.
For this coverage to be applicable, repairs may not be undertaken prior to obtaining authorization from us.

### DEFINITIONS

For the purposes of this amendment, the following special definitions apply with respect to mechanical breakdown only:

*Loss* means all risk of physical damage to the *owned auto* or its equipment.

*Owned auto* means any vehicle described in this policy for which a specific premium charge indicates there is coverage.
*Owned auto* does not mean:

    a) a newly acquired vehicle; or

    b) a replacement vehicle; or

    c) a *temporary substitute auto*.

*Proper maintenance* is the recommended vehicle maintenance as outlined in the owner's manual provided by the manufacturer.

### EXCLUSIONS

For the purposes of this amendment only, with respect to mechanical breakdown, exclusion 4 is deleted. The following exclusions are added:

(a) Oxidation and rust damage are not covered.

(b) Damage caused intentionally by *you* or any other person using an *owned auto* with *your* permission is not covered.

(c) *Loss* due to misuse, alteration, or lack of *proper maintenance* is not covered.

(d) Tire wear and other damage caused by and limited to wear and tear is not covered.

(e) Routine maintenance services and parts are not covered. This includes; but is not limited to:

    a) engine tune up;

    b) suspension alignment;

    c) wheel balancing;

    d) filters;

    e) lubrication;

    f) engine coolant;

    g) fluids;

    h) spark or glow plugs;

    i) brake pads;

    j) brake linings; and

    k) brake shoes.

(f) Any *loss* to the extent covered by warranty, recall or voluntary repair programs is not covered.

GGNIP000043

Case 8:16-cv-02012-MSS-JSS   Document 47-2   Filed 04/11/17   Page 43 of 53 PageID 430

(g)  Any *loss* to a *non-owned auto* or to a *temporary substitute auto* is not covered.

(h)  Any *loss* to a newly acquired or replacement auto is not covered.

(i)  Any pre-existing *loss* or damage to any insured auto is not covered.

## OTHER INSURANCE

For the purposes of this amendment only, if *you* have other insurance against a *loss* covered by mechanical breakdown insurance, this policy will apply as excess insurance over such other valid and collectible insurance.

## CONDITIONS

For the purposes of this amendment only, the following is added to 1. Notice

e)  the location of the *owned auto*.

The following condition is added:

## AUTOMATIC TERMINATION

Mechanical Breakdown Insurance will terminate either when the Odometer reading exceeds 100,000 miles or 7 years after the Mechanical Breakdown Insurance is added for the *owned auto*, whichever occurs earlier.

We affirm this amendment.

W. C. E. Robinson
Secretary

O. M. Nicely
President

Case 8:16-cv-02012-MSS-JSS   Document 47-2   Filed 01/11/17   Page 44 of 53 PageID 781

# GEICO

**UNINSURED MOTORISTS COVERAGE**
**NON-STACKED**
**FLORIDA**

Section IV of *your* policy is replaced by the following:

**DEFINITIONS**

The definitions of terms for Section I apply to Section IV, except for the following special definitions:

1. *Hit-and-run vehicle* means a motor vehicle causing *bodily injury* to an *insured* with or without physical contact with him or with a vehicle he is *occupying* at the time of the accident and whose operator or owner cannot be identified; provided the *insured* or someone on his behalf:

    (a) Reports the accident as soon as practicable to a police, peace or judicial officer or to the Commissioner of Motor Vehicles;

    (b) Files with us as soon as practicable a statement setting forth the facts of the accident and claiming that he has a cause of action for damages against an unidentified person.

2. *Insured* means:

    (a) *You;*
    (b) *Your relatives;*
    (c) Any other person while *occupying* an *insured auto;*
    (d) Any person who is entitled to recover damages because of *bodily injury* sustained by an *insured* under (a), (b), and (c) above.

    If there is more than one *insured,* our limits of liability will not be increased.

3. *Insured auto* is an auto:

    (a) Described in the declarations and covered by the Bodily Injury Liability coverage of this policy;
    (b) Temporarily substituted for an *insured auto* when withdrawn from normal use because of its breakdown,repair, servicing, loss or destruction;
    (c) Operated by *you* or *your* spouse if a resident of the same household.

    But the term *insured auto* does not include:

    (i)   An *insured auto* when used to carry passengers or goods for hire, except in a car-pool;
    (ii)  An auto being used without the owner's permission; or
    (iii) Under subparagraphs (b) and (c) above, an auto owned by or available for the regular use of an *insured.*

4. *Occupying* means in, upon, entering into or alighting from.

5. *State* includes the District of Columbia, the territories and possessions of the United States, and the Provinces of Canada.

6. *Uninsured auto* is an auto:

    (a) Which has no liability bond or insurance policy applicable with liability limits complying with the Financial Responsibility Law of the *state* in which the *insured auto* is principally garaged at the time of the accident; or
    (b) For which the total of all bodily injury liability insurance available in the event of an accident is less than the damages sustained in an accident by an *insured;* or
    (c) A *hit-and-run vehicle*.
    (d) This term also includes an auto whose insurer is or becomes insolvent or denies coverage.

    The term *uninsured auto* does not include:

    (a) An *insured auto;*
    (b) A land motor vehicle or trailer operated on rails or crawler treads or located for use as a residence or premises; and
    (c) A farm-type tractor or equipment designed for use principally off public roads, except while used upon public roads.

GG/VIP000045

## LOSSES WE PAY

Under the Uninsured Motorists coverage we will pay damages for *bodily injury*, sustained by an *insured*, caused by accident which the *insured* is legally entitled to recover from the owner or operator of an *uninsured auto* arising out of the ownership, maintenance or use of that auto.

## EXCLUSIONS

Section IV Does Not Apply:

1. To *bodily injury* to an *insured* if the *insured* or his legal representative has made a settlement or has been awarded a judgment of his claim without our prior written consent and such settlement prejudices our right to recover.

2. To *bodily injury* to an *insured* while *occupying* or when struck by any motor vehicle or motorcycle owned by an *insured* or a *relative*, which is not insured under the Liability Coverages section of this policy.

3. To *bodily injury* to a person not an *insured*.

4. To benefit any workmen's compensation insurer, self insurer, or disability benefits insurer.

5. To the United States of America or any of its agencies as an insured, a third party beneficiary or otherwise.

6. To any damages for pain and suffering that the *insured* may be legally entitled to recover against an uninsured motorist unless the injury or disease caused by the uninsured motorist accident resulted in:
   (a) Significant and permanent loss of an important bodily function; or
   (b) Permanent injury within a reasonable degree of medical probability, other than scarring or disfigurement; or
   (c) Significant and permanent scarring or disfigurement; or
   (d) Death.

7. To punitive or exemplary damages, regardless of any other provision of this policy.

8. To any liability assumed under any contract or agreement.

9. To damage caused by the *insured* in participation in and/or preparation for any racing, speed or demolition contest or stunting activity of any nature, whether prearranged or organized.

## LIMITS OF LIABILITY

The limit of liability for Uninsured Motorists coverage stated in the declarations as applicable to "each person" is the limit of our liability for all damages, including those for care or loss of services, due to *bodily injury* sustained by one person as the result of one accident. The limit of liability stated in the declarations as applicable to "each accident" is, subject to the above provision respecting each person, the total limit of our liability for all such damages, including damages for care and loss of services, because of *bodily injury* sustained by two or more persons as the result of one accident.

These limits are the maximum we will pay for any one accident regardless of the number of claims made, Uninsured Motorists coverage premiums paid, vehicles or persons stated in the declarations, or vehicles involved in the accident.

Subject to the above:

1. When coverage is afforded to two or more autos, the limits of liability shall apply separately to each auto as stated in the declarations.

2. If at the time of the accident the injured person is *occupying* an auto insured by us, the amount of coverage available to the injured person is the limit specified in the declarations for the occupied vehicle.

3. If at the time of the accident the injured person is *occupying* a motor vehicle which is not owned by him or by a family member residing with him, he is entitled to the highest limits of Uninsured Motorists coverage afforded for any one vehicle as to which he is the named insured or *insured* family member. Such coverage shall be excess over the coverage on the vehicle he is *occupying*.

4. If at the time of the accident the injured person is not *occupying* a motor vehicle, he is entitled to select any one limit of Uninsured Motorists coverage for any one vehicle afforded by a policy under which he is insured as a named insured or as a *relative*.

   If separate non-stacked policies with us are in effect for *you* or any person in *your* household, they may not be combined to increase the limit of liability for a loss.

   If separate stacked policies with us are in effect, the stacked policies may be combined to increase the limit of liability for *you* or *your relatives*.

5. The limit of liability for Uninsured Motorists coverage shall be over and above, but shall not duplicate the benefits available to an *insured* under any:
   (a) Workers' compensation law;
   (b) Personal injury protection benefits;

    (c) Disability benefits law or similar law; or

    (d) Automobile medical expense coverage.

6. The limit of liability for Uninsured Motorists coverage shall be over and above, but shall not duplicate any amount paid or payable:

    (a) Under any motor vehicle liability insurance coverages; or

    (b) By or on behalf of the owner or operator of the uninsured motor vehicle or any other person or organization jointly or severally liable together with such owner or operator for the accident.

## OTHER INSURANCE

Coverage provided by this section is intended to be excess over and above any other valid and collectable liability coverage.

When an *insured occupies* an auto not described in this policy, and not owned by that *insured* or a *relative*, this insurance is excess over any other similar insurance available to the *insured* and the insurance which applies to the *occupied* auto is primary.

If the *insured* has other insurance against a loss covered by the Uninsured Motorists provisions of this policy, we will not be liable for more than our pro-rata share of the total coverage available.

## DISPUTES BETWEEN US AND AN *INSURED*

1. Disputes between an *insured* and us as to damages may be submitted to arbitration. Arbitration must be agreed to in writing between the *insured* and us.

   If arbitration is agreed upon, each party shall select an impartial arbitrator. These arbitrators shall select a third one.

   The cost of the arbitration and any expenses for experts shall be paid by the party who hired them. The cost of the third arbitrator shall be paid equally by the parties.

2. If the *insured* and we cannot agree to arbitrate or agree to a third arbitrator, the *insured* shall:

   (a) Sue the owner or driver of the *uninsured auto* and us in a court of competent jurisdiction. If the owner or driver is unknown, name us as the defendant.

   (b) When suit is filed, immediately give us copies of the suit papers.

3. If the *insured* agrees to settle with another insurer, the *insured* must submit to us in writing by certified or registered mail a copy of the proposed settlement

4. If within 30 days after receipt of the proposed settlement agreement, we do not:

   (a) Approve the proposed settlement and the signing of the full release

   (b) Waive our subrogation rights; and

   (c) Agree to arbitrate the claim,

   the *insured* shall then file suit against us and the person(s) legally liable.

   The *insured* may not dismiss a defendant from such lawsuit without our prior written consent.

5. Any award against us shall be binding and conclusive against us and the *insured* up to our coverage limit.

## TRUST AGREEMENT

Whenever we make a payment under this coverage:

1. We will be entitled to repayment of that amount out of any settlement or judgment the *insured* recovers from any person or organization legally responsible for the *bodily injury*.

2. The *insured* will hold in trust for our benefit all rights of recovery which he may have against any person or organization responsible for these damages. He will do whatever is necessary to secure all rights of recovery and will do nothing after the loss to prejudice these rights.

3. At our written request, the *insured*, in his own name, will take through a designated representative appropriate actions necessary to recover payment for damages from the legally responsible person or organization. The *insured* will pay us out of the recovery for our expenses, costs and attorney's fees.

4. The *insured* will execute and furnish us with any needed documents to secure his and our rights and obligations.

## CONDITIONS

The following conditions apply only to the Uninsured Motorists coverage. We will have no duty to provide coverage under this policy, and suit will not lie against us unless the *insured* or his legal representative have fully complied with all the policy terms and conditions below:

1. NOTICE

   As soon as possible after an accident, notice must be given us or our authorized agent stating:

   (a) The identity of the *insured*;

GG/VIP000047

(b)  The time, place and details of the accident; and

(c)  The names and addresses of the injured, and of any witnesses.

If the *insured* or his legal representative files suit before we make a settlement under this coverage, he must immediately provide us with a copy of the pleadings.

**2.**  ASSISTANCE AND COOPERATION OF THE *INSURED*

After we receive notice of a claim, we may require the *insured* to take any action necessary to preserve his recovery rights against any allegedly legally responsible person or organization. We may require the *insured* to make that person or organization a defendant in any action against us. The *insured* must cooperate with other reasonable requests for information or assistance made by us. The *insured* may not agree to dismiss any allegedly legally responsible person(s) or organization(s) from any action without our prior written agreement.

**3.**  PROOF OF CLAIM

If requested by us, an *insured* must:

(a)  EXAMINATION UNDER OATH (EUO)

Submit to examination under oath by any person named by us when, where and as often as we may reasonably require. This provision includes providing a copy of any documents, forms, records or material requested to be provided as part of the EUO request whether the request for this information is made before, during or after the EUO.

(b)  INDEPENDENT MEDICAL OR MENTAL EXAMINATION

Submit to examination by doctors, or other health care providers chosen by us, at our expense, where and as often as we may reasonably require. The scope of the examination(s) may be as broad as we may reasonably require, including but not limited to physical and mental examinations.

(c)  DOCUMENT REQUEST

Timely comply with all requests for information made by us including but not limited to requests for medical, employment, educational, financial and other pertinent records. If requested by us, the *insured* must provide written authorization, in a form acceptable to us, to obtain information and documents requested under this paragraph. In the event of the *insured's* incapacity or death, his representative must comply with this paragraph.

**4.**  ACTION AGAINST US

Suit will not lie against us unless the *insured* or his legal representative have fully complied with all the policy terms.

**5.**  PAYMENT OF LOSS

Any amount due is payable:

(a)  To the *insured* or his authorized representative;

(b)  If the *insured* is a minor, to his parent or guardian; or

(c)  If the *insured* is deceased, to his surviving spouse; otherwise

(d)  To a person authorized by law to receive the payment; or to a person legally entitled to recover payment for the damages.

We may, at our option, pay an amount due in accordance with (d) above.

We affirm this amendment.

W. C. E. Robinson
Secretary

O. M. Nicely
President

GG/VIP000048

# GEICO

# Automobile Policy Endorsement

## Rental Reimbursement Endorsement

Policy Number:

We agree with **you** that the policy is amended as follows:

### SECTION III - PHYSICAL DAMAGE COVERAGES

The following coverage is added:

#### Coverage-Rental Reimbursement

When there is a **loss** to an **owned auto** for which a specific premium charge indicates that rental reimbursement coverage is afforded:

We will reimburse the **insured** toward costs the **insured** incurs to rent an auto. Reimbursement will not exceed the limits described in the declarations and payment will be limited to a reasonable and necessary period of time required to repair or replace the **owned auto**. This coverage applies only if:

1. The **owned auto** is withdrawn from use for more than 24 consecutive hours, and
2. The **loss** to the **owned auto** is covered under comprehensive or collision coverage of this policy.

When there is a total theft of the entire auto, we will reimburse the **insured** toward costs the **insured** incurs to rent an auto, subject to the following limitations:

1. This coverage will reimburse the **insured** for reasonable rental expenses beginning 48 hours after a theft of the entire vehicle covered under the comprehensive coverage of this policy; and
2. This coverage may be used to reimburse reasonable rental expenses in excess of those provided by Section III of the policy if and to the extent the coverage limits under rental reimbursement exceed those provided in Section III of the policy. In that event, the amount payable under this endorsement is the amount by which this coverage exceeds those described in Section III of the policy; and
3. Subject to number 2 above, in no event shall the total amount payable under both this coverage and the supplemental coverage in Section III of the policy exceed the daily limit of coverage provided by this endorsement.

Reimbursement for rental charges shall end the earliest of when the **owned auto** has been:

1. Returned to **you**; or
2. Repaired; or
3. Replaced; or
4. Deemed a total loss by us:
   (a) Seventy-two (72) hours after we pay the applicable limit of liability under Section III; or
   (b) Seventy-two (72) hours after our initial settlement offer;
   whichever comes first.

However, when there is a total theft of an **owned auto**, reimbursement for rental charges shall end the earliest of:

1. The date the auto is returned to use if the vehicle is recovered before payment of the total theft claim to **you** or the owner of the vehicle; or if the vehicle is not recovered,
2. Seventy-two (72) hours after our initial settlement offer of the **actual cash value** of the **owned auto**.
3. Seventy-two (72) hours after the failure to provide either a proof of loss or recorded statement if requested by us.

No deductible applies to this coverage.

### CONDITIONS

In the case of theft of the entire auto, the **insured** must promptly notify the police that the vehicle was stolen. To be eligible as a covered **loss**, the police report must acknowledge and classify the report as theft of a motor vehicle. The **insured** must cooperate fully: with the policy investigation, with the prosecution of any person(s) charged with theft and any civil suit brought by us against the person(s) responsible to recover for the **loss**.

The coverage provided by this endorsement is subject to all the provisions and conditions of SECTION III of the policy.

The COMPANY affirms this endorsement.

W. C. E. Robinson
Secretary

O. M. Nicely
President

A-431 (05-11)

GG/VIP000049

GG/VIP000050

ENDORSEMENT

## LOSS PAYABLE CLAUSE

The Policy Number and Effective Date need be completed only when this endorsement is issued subsequent to preparation of the policy.

GG/VIP000052

# IMPORTANT NOTICE

### FEE SCHEDULE ENDORSEMENT
### USE OF MEDICAL FEE SCHEDULE FOR PERSONAL INJURY PROTECTION CLAIMS
### THIS NOTICE IS ENCLOSED IN COMPLIANCE WITH FLORIDA STATUTE 627.736
### Effective January 1, 2013

The Company will limit reimbursement of medical expenses to 80 percent of a properly billed reasonable charge, but in no event will the Company pay more than 80 percent of the following schedule of maximum charges:

1. For emergency transport and treatment by providers licensed under Chapter 401, Florida Statutes, 200 percent of Medicare.

2. For emergency services and care provided by a hospital licensed under Chapter 395, Florida Statutes, 75 percent of the hospital's usual and customary charges.

3. For emergency services and care as defined by Florida Statutes § 395.002 provided in a facility licensed under Chapter 395, Florida Statutes rendered by a physician or dentist, and related hospital inpatient services rendered by a physician or dentist, the usual and customary charges in the community.

4. For hospital inpatient services, other than emergency services and care, 200 percent of the Medicare Part A prospective payment applicable to the specific hospital providing the inpatient services.

5. For hospital outpatient services, other than emergency services and care, 200 percent of the Medicare Part A Ambulatory Payment Classification for the specific hospital providing the outpatient services.

6. For all other medical services, supplies, and care, 200 percent of the allowable amount under:

   (I.) The participating physicians fee schedule of Medicare Part B, except as provided in sections (II.) and (III.)

   (II.) Medicare Part B, in the case of services, supplies, and care provided by ambulatory surgical centers and clinical laboratories.

   (III.)The Durable Medical Equipment Prosthetics/Orthotics and Supplies fee schedule of Medicare Part B, in the case of durable medical equipment.

   However, if such services, supplies, or care is not reimbursable under Medicare Part B (as provided in section 6. above), we will limit reimbursement to eighty percent (80%) of the maximum reimbursable allowance under workers' compensation, as determined under Florida Statutes, § 440.13 and rules adopted thereunder which are in effect at the time such services, supplies, or care is provided. Services, supplies, or care that is not reimbursable under Medicare or workers' compensation is not required to be reimbursed by us.

The applicable fee schedule or payment limitation under Medicare is the fee schedule or payment limitation in effect on March 1 of the year in which the services, supplies, or care is rendered and for the area in which such services, supplies, or care is rendered, and the applicable fee schedule or payment limitation applies throughout the remainder of that year, notwithstanding any subsequent change made to the fee schedule or payment limitation, except that it may not be less than the allowable amount under the applicable schedule of Medicare Part B for 2007 for medical services, supplies, and care subject to Medicare Part B.

Personal Injury Protection Coverage is subject to the terms, conditions and exclusions in your policy. Please read your policy carefully.

GGA/IP000054

Case 8:16-cv-02012-MSS-JSS   Document 71-9   Filed 06/13/17   Page 81 of 104 PageID 2246

Case 8:16-cv-02012-MSS-JSS   Document 47-2   Filed 02/21/17   Page 1 of 2 PageID 799
Case 8:16-cv-02012-MSS-JSS   Document 37-3   Filed 01/11/17   Page 1 of 2 PageID 441

# EXHIBIT B

# V I P  AUTO GLASS INC
8909 WATERWAY DR
TAMPA, FL 33635
Phone: 813-280-9021  Fax: 813-280-9118

| Customer Service Rep: | Installer: | | Location: In-Shop | W/O # 5872 | W/O Date: 2/8/2016 | Today's Date: 2/8/2016 | Paid Date: |
|---|---|---|---|---|---|---|---|

| BILL TO: | CUSTOMER: | AGRSS INFO: |
|---|---|---|
| GEICO INSURANCE COMPANY | JONES, DERYL<br>9210 ADAMO DR<br>TAMPA, FL, 33619 | Temperature:<br>Humidity:<br>Safe drive-<br>away time: |
| W: 800-841-3000, F: 202-354-5295 | H: 954-773-6496 | |

### INSURANCE INFORMATION

| Agent: | Policy #: 4130921804/01288 | Loss Date: 2/8/2016 |
|---|---|---|
| Contact: | Claim #: | Loss Type: |
| Dispatch #: | Deductible: $ 0.00 | Region/Dist: |

### VEHICLE INFORMATION

| Year: 2013 | VIN: 1HGCR2F32DA174766 | PO #: |
|---|---|---|
| Make: Honda | Odometer: 0 | R.O #: |
| Model: Accord | License #: | Stock #: |
| Body: 4 Door Sedan | | |

| Qty | Part/service | Description | List Price | Disc % | Net Price | Labor | Total |
|---|---|---|---|---|---|---|---|
| 1 | FW03647GTNN<br>DOT #: | (W/Third Visor Frit)/Green Tint<br>Adhesive Type: | | | Lot #: | | |
| 1 | HAH000448 | 2.0 Adhesive (Fast-Cure<br>Urethane/Dam/Primer) | | | | | |
| 1 | MW03647 BLT | Moulding | | | | | |

Customer Signature:

Assignment of benifits: I hereby assign any and all insurance rights, benefits and proceeds under any applicable insurance policies to V I P AUTO GLASS INC. I make this assignment in consideration of V I P  AUTO GLASS INC agreement to perform services and supply materials and otherwise perform its obligations under this contract, including not requiring full payment at the time of service. If payment made directly to insured, owner, and or agent by an insurer it shall be endorse over to V I P AUTO GLASS INC with in three days. V I P AUTO GLASS INC promises to release the insured from any obligations to pay the difference between the amounts the insurer agreed to pay pursuant to the terms and conditions of the policy and applicable law, and prices charged by   V I P AUTO GLASS INC. I hereby direct any insurance carrier to release any and all information requested by V I P AUTO GLASS INC and to accept notice of claim from V I P AUTO GLASS INC.

PLEASE READ CAREFULLY, CHECK ONE OF THE STATEMENTS BELOW AND SIGN
   I REQUEST A WRITTEN ESTIMATE

   I DO NOT REQUEST A WRITTEN ESTIMATE AS LONG AS THE REPAIR COST DO NOT EXCEED

$       , THE SHOP MAY NOT EXCEED THIS AMOUNT WITH OUT WRITTEN OR ORAL APPROVAL.

[X] I DO NOT REQUEST A WRITTEN ESTIMATE

I acknowledge the above assignment and that the good and / or service have been provide to my complete satisfaction

Signature: Deryl Jones          Date: 2/8/16

Page 1 of 2

# EXHIBIT C

# V I P AUTO GLASS INC

8909 WATERWAY DR
TAMPA, FL 33635
Phone: 813-280-9021 Fax: 813-280-9118
Federal Tax ID: ▓▓▓▓▓▓

| Customer Service Rep: | Installer: | Location: | Invoice # | Invoice Date: | Today's Date: | Paid Date: |
|---|---|---|---|---|---|---|
| | | In-Shop | 5873 | 2/8/2016 | 2/8/2016 | |

| BILL TO: | CUSTOMER: | AGRSS INFO: |
|---|---|---|
| GEICO INSURANCE COMPANY | JONES, DERYL | Temperature: |
| | 9210 ADAMO DR | Humidity: |
| | TAMPA, FL, 33619 | Safe drive- |
| | | away time: |
| W: 800-841-3000, F: 202-354-5295 | H: 954-773-6496 | |

### INSURANCE INFORMATION

| Agent: | Policy #: 4130921804/01288 | Loss Date: 2/8/2016 |
|---|---|---|
| Contact: | Claim #: | Loss Type: |
| Dispatch #: | Deductible: $ 0.00 | Reolen/Platt |

### VEHICLE INFORMATION

| Year: | 2013 | VIN: | 1HGCR2F32DA174766 | PO #: | |
|---|---|---|---|---|---|
| Make: | Honda | Odometer: | 0 | RO #: | |
| Model: | Accord | License #: | | Stock #: | |
| Body: | 4 Door Sedan | | | | |

| Qty | Part/Service | Description | List Price | Disc % | Net Price | Labor | Total |
|---|---|---|---|---|---|---|---|
| 1 | FW03647GTNN DOT #: | (W/Third Visor Frit)/Green Tint Adhesive Type: Lot #: | $ 481.60 | 0 | $ 481.60 | $ 331.50 | $813.10 |
| 1 | HAH000448 | 2.0 Adhesive (Fast-Cure Urethane/Dam/Primer) | $ 96.00 | -48 | $ 50.00 | $ 0.00 | $50.00 |
| 1 | MW03647 BLT | Moulding | $ 12.01 | 0 | $ 12.01 | $ 0.00 | $12.01 |

| | |
|---|---|
| Total Parts: | $543.61 |
| Total Labor: | $331.50 |
| Subtotal: | $875.11 |
| FL SALES TAX @ 7.000%: | $61.26 |
| Total: | $936.37 |
| Less Deductible: | 0.00 |
| Amount Due: | $936.37 |

Page 1 of 2

# EXHIBIT D

**SGCNetwork.com**

Shop View   User: S053052 (S)   Shop Number: 053052   Shop Name: VIP AUTO GLASS INC

Member | Invoices | Referrals | Checks | Shops | Help

Checks
Search
Adv. Search

Transfer results displayed below to Plain Text     Print

### Check Search Results

**Quick Date Range Search :**

○ Last 7 days.  ○ Last 14 days.  ○ Last 30 days.  ○ Last 60 days.  ○ Last 90 days.
○ Last 120 days.

○
New
Date     Check / EFT
Search   Begin Date    04/13/2016        Check / EFT
         (MM/DD/YYYY)                    End Date      04/13/2016       New Date Search
                                         (MM/DD/YYYY)

Encrypted

Select any option from the Quick Date Range Search or manually enter a
search of 120 days or less.

Note: Please use Esc Key or click elsewhere on the page to close calendar

| Check / EFT Number | Check / EFT Date | Amount Paid | Invoice Accepted | Invoice Number | Referral Number | Referral Date |
|---|---|---|---|---|---|---|
| ▓▓▓▓▓▓▓▓ | 02/19/2016 | 468.03 | 02/13/2016 | 5872 | 299898 | 02/10/2016 |

© 2003 - 2016 Safelite® Group, Inc.  All rights reserved.  Additional Terms.  Corporate Info.  Credits.

Case 8:16-cv-02012-MSS-JSS   Document 37-5   Filed 01/11/17   Page 3 of 3 PageID 447
Document 47-4   Filed 02/21/17   Page 3 of 3 PageID 805



Invoice Detail

| Referral Date: 02/10/2016 | | Shop: 053052 VIP AUTO GLASS INC | |
|---|---|---|---|
| Referral Number | 299898 | Deductible | 0.00 |
| Program ID | 529287 | Amount Submitted | 936.37 |
| Shop Invoice Number | 5872 | Amount Paid | 468.03 |
| Date Installed | 02/08/2016 | Check / EFT Number | |
| Date Received | 02/10/2016 | Date Accepted | 02/13/2016 |
| Date Paid | 02/19/2016 | Date Billed Insurance Company | 02/15/2016 |

| Part Num | List Price | Part Price | Orig Labor | Orig Kit | Adj Part | Adj Labor | Adj Kit |
|---|---|---|---|---|---|---|---|
| FW03647 GTN | 478.80 | 481.60 | 331.50 | 50.00 | 239.40 | 156.00 | 30.00 |
| MISCMOLD | 12.01 | 12.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

© 2003 - 2016 Safelite® Group, Inc.  All rights reserved.  Additional Terms.  Corporate Info.  Credits.

# EXHIBIT E

Case 8:16-cv-02012-MSS-JSS   Document 43-56   Filed 01/11/17   Page 2 of 12 PageID 649

060505A
91-0344
98-09-01-483

# SAFELITE NETWORK
## PARTICIPATION AGREEMENT

Safelite Network Participation Agreement made to be effective as of _____, by and between Safelite Solutions LLC, a Delaware limited liability company (hereinafter "Safelite"); and _____, a _____ [state] (legal name of participant) (form of business) (hereinafter "Participant").

WHEREAS, Safelite operates a network of independent automotive glass replacement and/or repair shops to which Safelite, from time to time, may refer work; and,

WHEREAS, Participant desires to participate in Safelite's network on the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual promises and covenants contained herein, Safelite and Participant, intending to be legally bound, hereby agree as follows:

1.    Repair/Replacement of Automotive Glass

1.1    Participant will perform all automotive glass repair or replacement work requested by any customer referred to Participant by Safelite. All such work shall be performed in a professional and workmanlike manner, in strict accordance with the provisions of this Agreement.

1.2    If Participant is unable to provide any requested service, Participant will so notify Safelite at the time of referral and, in such instance, at Safelite's option, the customer may be referred to another provider.

1.3    Participant shall follow all practices and procedures recommended by the manufacturer of the adhesive used by Participant in performing work for customers referred to Participant by Safelite.

1.4    Participant will complete any paperwork specified by Safelite in connection with work performed for customers referred to Participant by Safelite, and will review all relevant information with the customers before releasing the vehicles.

1.5    If Participant is asked to perform a windshield repair for a customer, Participant shall perform such repair provided it can be done safely in accordance with industry standards. Participant will notify Safelite in those instances where Participant determines that a repair is not appropriate and Safelite will handle the matter with the customer.

REV 09-2008

1

Case 8:16-cv-02012-MSS-JSS   Document 43-5   Filed 01/11/17   Page 33 of 22 PageID 650

1.6   Participant shall comply with all laws and regulations of government and public authorities, including, but not limited to the requirements of Federal Motor Vehicle Safety Standard 205 (including ANSI Z26.1, as therein incorporated), as may be amended from time to time.

1.7   Participant guarantees that all installation methods and practices shall be safe and in full compliance with recommended procedures. In the event of any inconsistency or conflict in recommendations, Participant shall use the procedure recommended by the manufacturer of the product involved, or, if none, the motor vehicle manufacturer. If none of these is applicable, Participant should look to trade and industry standards for guidance. Upon request, Participant shall provide evidence of ongoing training and certification as to safe installation procedures and proper use of windshield adhesives.

1.8   Participant shall complete and retain all work-related records in order to validate the consistency of Participant's quality services and workmanship.

1.9   Participant shall use only new and unused glass products on all work performed for customers referred to Participant by Safelite.

1.10   Participant shall comply with each applicable insurance and/or fleet company's program requirements or marketing guidelines, whether communicated by the company or by Safelite orally or in writing. Further, Participant shall not offer, directly or indirectly, to any insurance agent or its personnel anything of value in consideration for the referral of work paid for from the proceeds of an automobile insurance policy.

2.   **Invoices; Payment for Work; Fees**

2.1   Participant will submit invoices, along with other necessary documentation, in a timely manner to Safelite, which will pay approved invoices upon receipt of funds. Participant agrees that all invoices for work for customers referred to Participant by Safelite or being billed to any fleet or insurance company whose customers or insureds Participant is available to service under this Agreement (e.g., walk-ins) will be submitted directly to Safelite only.

2.2   Participant shall submit invoices and other billing documents to Safelite in a format designated by Safelite.

2.3   In the case of work being billed to a fleet or insurance company through Safelite, Participant will be notified of the price established by the fleet or insurance company (whether by agreement with Safelite or otherwise) for the work and Participant agrees to complete such work at such price. Participant is free to refuse to perform such work at the established price only by giving written notice thereof to Safelite. No later than five (5) business days from receipt of such notice by Safelite, Participant will be removed from Safelite's list of shops available to service customers or insureds of that particular fleet or insurance company.

2

REV 09/2008

NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, PARTICIPANT'S COMMENCEMENT OF WORK SHALL BE DEEMED PARTICIPANT'S EXPRESS AND UNCONDITIONAL APPROVAL AND AGREEMENT TO PERFORM SUCH WORK FOR THE ESTABLISHED PRICE AND PARTICIPANT HEREBY WAIVES ALL CLAIMS AGAINST SAFELITE AND ANY PAYOR COMPANY FOR ANY AMOUNTS IN EXCESS OF THE ESTABLISHED PRICE. In the event that Participant submits an invoice for auto glass repair and/or replacement work containing errors or deficiencies, Participant must so notify Safelite within thirty (30) days of receipt of payment for such work. Should Participant fail to do so, Participant will forfeit any balance claimed relating to the work and Safelite will not submit the revised invoice to the insurance or fleet company for additional payment and Participant shall not seek reimbursement directly from the policyholder or fleet company.

2.4     Participant agrees to pay a billing service charge to Safelite, and authorizes Safelite to deduct said charge from any payment to be made to Participant. Said charge will be:

         For EDI or Web Billing:      No fee

         For Manual Billing:          $15.00 per invoice for replacements
                                      and $12.00 per invoice for repairs

The invoice amount is the amount shown as due without deduction of any applicable deductible or fee. Manual billing shall include all forms of billing not conducted by electronic data interchange, such as facsimile or mail billing.

2.5     The full amount of any applicable deductible will be deducted from the payment to Participant, unless it is waived by the insurance company. Participant agrees to collect the full amount of any deductible from the customer. If the net price of any job is lower than the applicable deductible, Participant shall be obligated to collect the applicable portion of the deductible directly from the customer, and to promptly remit the applicable service charge to Safelite in full payment. Failure of Participant to pay Safelite as provided herein is a material breach of this Agreement, and, in addition to any other remedies available hereunder or as provided by applicable law, Safelite may apply all or any portion of any payment owed to Participant by Safelite for any reason to the amount due hereunder, and deduct that amount due from any such payment owed to Participant by Safelite.

2.6     Payments will be disbursed to Participant via Electronic Funds Transfer (EFT) upon Participant's submission to Safelite of information necessary to issue EFT payments. If Participant elects to receive payment via manual check, Participant agrees to pay a manual payment fee of 1.0% of the payment amount and hereby authorizes Safelite to deduct such fee from the payment. Participant further agrees not to charge any customer or insurance or fleet company for such fee.

3

### 3.   Warranty

3.1   Participant warrants that all repairs and installations will be free from defects in material and workmanship, for as long as the customer owns the motor vehicle on which the work was performed.

3.2   Participant agrees to resolve all customer complaints within 24-hours of notice (or any longer period that is acceptable to the customer) and to perform all warranty work required for any Safelite-referred jobs that Participant originally completed.

3.3   Participant shall be responsible for the cost and administration of all warranty work required in connection with work performed by Participant, whether performed by Participant or another glass shop due to timing, customer request, logistics or any other reasonable basis. Safelite shall have the absolute right to recover the reasonable market cost or value of the warranty work from Participant, whether by set-off against amounts owed to Participant or otherwise.

### 4.   Records

4.1   Participant shall maintain full and complete records of all transactions arising out of or relating to this Agreement, and other books and records as are customarily maintained in the ordinary course of business, for a period of at least seven (7) years. Safelite, or any insurance or fleet company for whose customers or insureds Participant has rendered services hereunder, shall have the right to audit such transactions, books and records for verifying quality and compliance with the terms of this Agreement.

4.2   Participant shall submit any records requested hereunder for audit within five (5) business days of the request, unless otherwise mutually agreed by the parties. Should Participant fail to provide the records required to be maintained hereunder, Safelite shall be entitled to terminate Participant's use of its electronic invoicing solutions and shall be entitled to a refund of any payment comprised of insurance policy proceeds that Participant can not prove was assigned to Participant for work performed, which payment Safelite will submit back to the applicable insurance company. Participant hereby authorizes Safelite to recover any such payment by means of set-off against amounts owed to Participant or otherwise. The aforementioned remedies will not be the exclusive remedies for any breach of this Agreement but will be in addition to all other remedies available at law or equity to Safelite.

### 5.   Insurance Coverage

5.1   Participant must carry worker's compensation insurance with statutory limits in any state where it has employees and employer's liability insurance (minimum $500,000, bodily injury by accident or disease).

4

REV 09/2008

5.2     Participant must carry commercial general liability insurance, including contractual liability and products/completed operations coverage, with limits of not less than $500,000 each occurrence/combined single limit for property damage, bodily injury, and personal injury liability.

5.3     Participant must carry automobile liability insurance with limits of not less than $500,000 each occurrence/combined single limit for property damage and bodily injury.

5.4     Participant agrees to deliver to Safelite a certificate of insurance, and said certificate shall be updated at the time of any renewal or change in coverage. Safelite shall be notified in writing at least thirty (30) days in advance should such coverage be cancelled or revoked for any reason.

5.5     All insurance carriers used by Participant to comply with the provisions of this section shall carry an A.M. Best rating of B+ or better.

6.      **Liability for Damages; Release and Indemnification**

6.1     Participant agrees to absolve Safelite and hereby assumes the entire risk of loss or damage with respect to all work performed and materials used in completing work for customers referred to Participant by Safelite. It is acknowledged by Participant that adequate cure time and other requirements for the adhesives used for replacement work is an important aspect of a quality job, and that all relevant factors will be explained by Participant's installer to the customer before the motor vehicle is released. Any release of a motor vehicle by Participant before the cure time must be based on Participant's evaluation of all the facts and circumstances; must be documented by Participant, and shall be the sole decision and responsibility of Participant. Without intending to limit the coverage of sections 6.2 and 6.3 below, it is specifically agreed that such provisions are fully applicable and cover any issues that arise due to an early release of a motor vehicle by Participant.

6.2     Participant hereby releases and discharges Safelite, and all of its successors, assigns, directors, officers, agents, employees, and parent and affiliated companies, from and against all claims, demands, liabilities, or causes of action of any kind or type whatsoever, including those arising from the partial or sole negligence of any indemnified party, whether arising by operation of law, contract, warranty, tort, or otherwise, that Participant ever had, has, or may in the future have against any indemnified party arising from, related to, or connected with work generated pursuant to this Agreement or any act or omission in the performance of such work by Participant,

6.3     Participant further agrees to indemnify, defend, and hold Safelite, and all of its successors, assigns, directors, officers, agents, employees, and parent and affiliated companies, harmless from any claims, costs, and expenses, including attorney fees, that may be asserted against or

REV 09/2008

incurred by any of them as a result of claims, including those arising from the partial or sole negligence of any indemnified party, by any other party or entity alleging damage or claims of any kind or nature, including punitive damages, that arise out of, are related to, or are connected with work generated pursuant to this Agreement or any act or omission in the performance of such work by Participant.

7.   Duration of Agreement and Termination

7.1   This Agreement shall remain in effect until terminated by: (i) either Participant or Safelite, with or without cause, and for any reason whatsoever, by giving written notice of non-renewal to a representative designated by the non-terminating party at least ten (10) days in advance of the termination date; or (ii) as otherwise provided in this Agreement. Notwithstanding anything in this Agreement to the contrary, Safelite may terminate this Agreement immediately upon written notice to Participant that Participant is in material breach of this Agreement.

7.2   In the event of termination or nonrenewal, Participant agrees that Participant will no longer represent to customers that Participant is a participant in Safelite's network. Whether or not this Agreement is in effect, Participant will refrain from using any signage, promotional material, or literature that refers to Safelite and/or its network.

7.3   Notwithstanding any nonrenewal or other termination of this Agreement, Participant agrees to perform any warranty work that is required in connection with work performed by Participant while in Safelite's network. If Participant refuses to perform such warranty work as provided for herein, Safelite may refer the work to another participant or perform the work itself and shall be entitled to reimbursement from Participant therefor.

7.4   It is understood that various aspects of the Safelite program, some of which may be referred to in this Agreement, may from time to time be altered or modified at the sole discretion of Safelite and for any reason whatsoever. These changes may be made without the consent or approval of Participant. It is agreed that such changes shall be binding upon Participant, unless within ten (10) days of the receipt of notice of the change, Participant notifies Safelite in writing of its objection to the change and Participant's election to terminate this Agreement as of the effective date of the change.

8.   Referrals and Non-Exclusivity

8.1   Participant understands and acknowledges that participation in the Safelite network is non-exclusive. Safelite may contract with other participants in the same geographic area, and may provide customers with a choice of one or more participants in any geographic area. Participant expressly acknowledges that neither Safelite nor any other person or entity acting on its behalf has made any commitments as to the volume or type of work that it may refer to Participant hereunder, and that Participant shall not acquire any proprietary right to any

6

Case 8:16-cv-02012-MSS-JSS   Document 37-6   Filed 02/11/17   Page 8 of 12 PageID 455

customers by virtue of participation in Safelite's network.

## 9.   Independent Contractor

9.1   Participant is an independent contractor for all purposes hereunder, and shall not be deemed an employee, partner, agent, or joint venturer of or with Safelite for or under any circumstances. Participant at all times shall be responsible for the payment of any and all insurance premiums and other business expenses that Participant may incur in connection with Participant's performance of this Agreement. Participant acknowledges that Safelite shall have no obligations to Participant other than as specifically provided for in this Agreement.

## 10.   Subcontracting

10.1   The services to be provided by Participant may not be subcontracted or otherwise delegated to any third party.

## 11.   Notices

11.1   Any notices, except those that this Agreement expressly requires to be in writing, can be delivered by mail, telephone, EDI, or facsimile and all notices shall be considered delivered when received by the recipient or proof of delivery can be established by the sender.

## 12.   Waiver

12.1   The waiver by either party of any rights or of any defaults by the other party hereunder in a particular instance shall not be deemed a waiver of the same or different rights or defaults in subsequent instances.

## 13.   Confidentiality

13.1   As used in this Agreement, the term "Confidential Information" shall mean any trade secrets and proprietary information concerning Safelite or any client of Safelite, and their business and affairs, including customer information, pricing and other financial or sales information, fees, business volume, computer technology, and any other computer information, personnel information, and any other proprietary information, however documented, that has been or may hereafter be provided to the Participant (which, for the purposes of this section, shall include Participant's agents, independent contractors, employees, representatives, owners, directors or officers) or is otherwise obtained by the Participant irrespective of the form of the communication, and also includes all notes, analyses, compilations, studies, summaries, and other material prepared by the Participant containing or based, in whole or in part, on any information included in the foregoing.

7

13.2    Participant acknowledges the confidential and proprietary nature of the Confidential Information and agrees that the Confidential Information: (a) will be kept confidential by the Participant, and will be used only for the purpose of performing services under this Agreement; and (b) will not be used or disclosed by the Participant other than for the purpose of performing services under this Agreement except with the specific prior written consent of Safelite. Upon termination of this Agreement for any reason, Participant will promptly deliver to Safelite all documents or other materials constituting Confidential Information.

13.3    In the event of any breach or threatened breach of this section, Safelite shall be entitled to equitable relief, including injunctive relief and specific performance. Such remedies will not be the exclusive remedies for any breach of this Agreement but will be in addition to all other remedies available at law or equity to Safelite.

14.    **Non-Assignment by Participant**

14.1    Participant may not assign any or all of its rights hereunder, including the right to receive money.

15.    **Taxes**

15.1    Participant agrees to collect all local, state, federal, and other governmental taxes or charges of any kind or type whatsoever that are imposed upon its services or sale of product. Participant will pay all such taxes or charges to the appropriate governmental entity as and when due, and will release and indemnify Safelite for any claims arising from failure to fully comply with this section.

16.    **Severability**

16.1    Any judicial determination that any portion of this Agreement is unlawful or unenforceable shall not affect the validity or enforceability of the remaining provisions.

17.    **Governing Law and Venue**

17.1    This Agreement shall be governed by and interpreted under the laws of the state of Ohio without regard to its conflict of laws provisions. The obligations of Participant set forth herein shall run directly to and for the benefit of Safelite, and may be enforced against Participant by Safelite in any manner provided by law or this Agreement. All claims relating to this Agreement will be resolved in the state and federal courts located in Franklin County, Ohio, and Participant consents to that venue and the exclusive jurisdiction of such courts.

18.    **Entire Agreement**

18.1    It is the intent of the parties that this Agreement is the "complete agreement" between them

REV 09/2008

with respect to the subject matter hereof. In the event there have been oral representations or written materials, including, but not limited to, pamphlets, brochures, or binders, that are in any way contrary to or inconsistent with this Agreement, it is agreed that the terms and provisions of this Agreement shall govern and control.

IN WITNESS WHEREOF, this Agreement has been executed to be effective as of the date first written above.

SAFELITE:                                         PARTICIPANT:

Safelite Solutions LLC,                           _____

a Delaware limited liability company              a(n) _____

By: _____                   By: _____

   Name: David B. McPhaden                            Name: _____

   Title: Manager, Western Region                     Title: _____

                                                  Address:

2400 Farmers Drive                                _____

5th Floor                                         _____

Columbus, Ohio   43235                            _____

9

REV 02/2006

# SGC NETWORK
## INFORMATION SHEET

| PRIMARY STORE INFORMATION | PAYMENT REMIT TO: |
|---|---|
| Name: _____ | To: _____ |
| Address: _____ | Address: _____ |
| City: _____ | City: _____ |
| State: _____ Zip: _____ | State: _____ Zip: _____ |
| Manager: _____ | Fed ID or SSN _____ |
| Phone: (_____)_____ | E-Mail: _____ |
| Fax #: (_____)_____ | |

## PLEASE COMPLETE THE FOLLOWING QUESTIONS:

How long have you been in business? _____ years and _____ months

Number of storefront locations: _____ (Attach store list if more than one)

Mobile Service:_____ Yes / No   Mobile Range: _____ Miles   In Shop:_____ Yes / No

Do you replace windshields? _____ Yes / No   Do you repair windshields? _____ Yes / No

If so, what repair system do you use? _____

Hours of Operation: Mon-Fri ____am ____pm Sat ____am ____pm Sun ____am ____pm

Can you send invoices via EDI? _____   EDI Software Vendor _____

NGA member: Yes _____ No_____   Number of NGA certified installers: _____

Urethane supplier: _____   Number of urethane certified installers: _____

Member Of BBB: Yes_____ No_____   If Yes, What Is Your Rating:_____

My preferred method of contact is

Email _____ Or  Fax_____
       (valid E-MAIL address)         (primary FAX number)

Completed by:_____   Title: _____

Signature:_____   Date: _____

## RETURN COMPLETED INFORMATION TO:

SGC NETWORK, DATABASE, PO BOX 182277, COLUMBUS, OHIO 43218-2277
OR FAX TO: 614-210-9504

Case 8:16-cv-02012-MSS-JSS   Document 37-5   Filed 01/11/17   Page 12 of 12 PageID 459

## ADDENDUM

Addendum effective July 26, 2012 to that certain Safelite Network Participation Agreement/Safelite® Solutions Network Participation Agreement (the "Agreement") between Safelite Solutions LLC (hereinafter "Safelite Solutions") and the notified party ("Participant").

In accordance with Provision 7.4 of the Agreement, the following changes to the Agreement shall be binding upon Participant, unless within ten (10) days of the receipt of this addendum, Participant notifies Safelite in writing of its objection to the change and Participant's election to terminate this Agreement as of the effective date of the change:

1.      The Agreement is hereby amended by replacing Provision 1.10 in its entirety with the following:

1.10    Participant shall comply with each applicable insurance and/or fleet company's program requirements or marketing guidelines, whether communicated by the company or by Safelite Solutions orally or in writing.  Notwithstanding, Participant agrees and acknowledges that unauthorized use of insurance or fleet company trademarks, logos, or other intellectual property is prohibited.  Further, Participant shall not offer, directly or indirectly, to any insurance agent or its personnel anything of value in consideration for the referral of work paid for from the proceeds of an automobile insurance policy.

2.      The Agreement is hereby amended by adding Provision 1.12 as follows:

1.12    Participant agrees that Participant shall not, nor shall it knowingly permit any of its employees or permitted contractors to, perform jobs pursuant to this Agreement if the individual is a convicted felon or could pose a risk of harm to others.  Participant and each of its employees and/or permitted contractors shall meet any or all background check criteria communicated from time to time.

3.      The Agreement is hereby amended by replacing Provision 5.4 in its entirety with the following:

5.4     Participant agrees to deliver to Safelite Solutions a certificate of insurance designating Safelite Solutions as a certificate holder, and said certificate shall be updated at the time of any renewal or change in coverage. Safelite Solutions shall be notified in writing at least thirty (30) days in advance should such coverage be cancelled or revoked for any reason.

# EXHIBIT F

```
Bobcat   |------------------------------------|      Date: 02/10/16
  F7     |  S A F E L I T E   S O L U T I O N S  |    Time: 11:24:23


To:      VIP AUTO GLASS INC        Shop#: 053052   |
         8909 WATERWAY DR          Fax:   813-280-9118 |   Referral#
         TAMPA FL 33635            Tel:   813 280 9021  |    299898
---------------------------------------------------------|
Customer: JONES, SHAUNA            Home:  863-298-6674 |
          603 7TH ST NE            Bus:    0- 0-  0   |  Date of loss:
          FORT MEADE FL 33841                         |   02/08/2016
----------------------------------------------------------------------

Vehicle:  2013 HONDA ACCORD 4 DOOR SED
Type of Loss: REPLACE  WINDSHIELD .................................
Deductible:     $.00
----------------------------------------------------------------------

W/S LIST: -50.0% LABR:  $40.00 PER HOUR
C/T LIST: -50.0% LABR:  $40.00 PER HOUR
 Molding Discounts: Precision: -20.0%
KITS: W/S 1.0 $15.00; 2.0 $30.00  H/M 1.0 $20.00; 2.0 $40.00  F/C 2.0 $30.00
- If the cost exceeds $2000, call GEICO at 800-510-2291 BEFORE
beginning any work on the vehicle.
--------------------------- Notice:----------------------------------
Please contact Safelite at 1-614-602-2120 prior to beginning the work for any
part not priced by NAGS, including but not limited to RV, sunroofs, OEM,
dealer, net priced, premium, other charges and any molding parts. Performance
of services constitutes acceptance of the communicated price and billing
instructions.
Please contact Shop Care to update and approve the part, if the part used
does not match the order.
----------------------------------------------------------------------

INSHOP SERVICE
IF THE GLASS BEING REPLACED IS NOT A WINDSHIELD, CALL GEICO 800 510-2291
PRO
COMPANY: GEICO                    ID#: 09043  EDI MAILBOX: SAFL  SAFL107
-------------------------- Billing Instructions ----------------------

 Sold To: JONES, SHAUNA           Please Show On Your Invoice
 Bill To: GEICO                   1) Referral#: 299898
 Address: PO BOX 182277           2) Full Vehicle Vin Number
          COLUMBUS, OH 43218-2277 3) Valid NAGS Part Numbers
 Invoice Online at SGCNetwork.com 4) Customer's Signature
- You must include sales tax on your invoice if applicable.
- Please complete and submit a W9 with your first invoice.
- Payment will be rendered upon receipt of funds from the client.
- Invoices should be submitted within 10 days of installation.
- GEICO will not reimburse for deductibles not collected.
Customer Signature _____ Date _____
Please return your invoice signed by the customer, along with this signed fax
```

GG/VIP000055

Case 8:16-cv-02012-MSS-JSS   Document 71-9   Filed 06/13/17   Page 102 of 104 PageID 2267

Case 8:16-cv-02012-MSS-JSS   Document 37-8   Filed 01/11/17   Page 1 of 3 PageID 462
Case 8:16-cv-02012-MSS-JSS   Document 47-7   Filed 02/21/17   Page 1 of 3 PageID 820

# EXHIBIT G

# GEICO

Thursday, September 11, 2008

Re:  GEICO Glass Pricing Agreement

Dear Shop Owner/Manager:

We appreciate the glass service you provide to GEICO insureds. We are writing to inform you of GEICO's new pricing agreement that will apply to glass service provided in your local market. These rates are competitive for your market. These prices are not the lowest available to us. All pricing is based on the most current published NAGS benchmark list. Invoices from you that are accurate and not exceeding this pricing structure will be paid promptly as submitted. All future invoices will be honored in accordance with these established rates. The pricing structure is as follows effective for services performed on or after September 18, 2008:

| NAGS Windshield: | 47.0% | Off (-) NAGS List |
| NAGS Tempered: | 47.0% | Off (-) NAGS List |
| Labor: | $40.00 | Per NAGS Hour |
| | | |
| High Modulus/ | | |
| Non-Conductive Urethane | $20.00 | 1.0 Kit |
| | $30.00 | 1.5 Kit |
| | $40.00 | 2.0 Kit |
| All other urethanes: | $15.00 | per NAGS kit quantity |
| | | |
| Windshield Repairs: | $49.95 | +$10 For each additional break Maximum of 3 repairs total |

This pricing agreement applies to all invoices submitted for services performed on or after September 18, 2008 and supersedes all prior pricing agreements. We reserve the right to change these rates at any time in the future. If you perform glass replacement or repair services for any GEICO customer after the effective date, it is understood that these services are being performed in accordance with the terms of this letter.

Our policyholders have the right of personal choice and preference in their selection of an automotive glass shop. However, because we are obligated, on behalf of all of our policyholders, to pay only the competitive market value for glass repairs and replacement services, you may consider refusing the job if you are unwilling to provide service at the prices GEICO has offered above. Nothing contained in any oral or written notice received by us or our agent from you purporting to reject such pricing for services you may render for any of our insureds will be binding on us or otherwise require us to pay you additional sums for services rendered.

If you desire to bill for more than GEICO's competitive pricing as stated above, you must advise our policyholders prior to initiating glass repair/replacement so that they can determine whether they are willing to pay the additional costs for your services.

The SGC Network is administering our glass program. To ensure expedited processing, please submit your invoices to:
                    GEICO
                    P.O. Box 182276
                    Columbus, OH  43218-2276
We look forward to working with you in providing glass service to our customers. If you have any questions, please call 800-841-9160x1912.

If you send your invoice via EDI, please use mailbox SAFL107 and program ID 09043. If you do not have EDI capability, you may use SGCNetwork.com to send invoices electronically free of charge, which will help facilitate the timely payment of your invoice.

Sincerely,

John Little
Assistant Vice President
GEICO

Page 8

Case 8:16-cv-02012-MSS-JSS   Document 71-9   Filed 06/13/17   Page 104 of 104 PageID 2269
Case 8:16-cv-02012-MSS-JSS   Document 37-8-7   Filed 01/11/17   Page 3 of 3 PageID 464
Filed 02/21/17   Page 3 of 3 PageID 822

Tuesday, January 31, 2012

Dear Participant,

GEICO has announced revised pricing for the participation program. GEICO has
established the following rates for shops in your area effective for work performed on or
after **February 6, 2012:**

| | | |
|---|---|---|
| **NAGS Windshield:** | 50.0% | Off (-) NAGS List |
| **NAGS Tempered:** | 50.0% | Off (-) NAGS List |
| **Labor:** | $40.00 | Per NAGS Hour |
| **High Modulus/** | | |
| **Non-Conductive Urethane** | $20.00 | 1.0 Kit |
| | $30.00 | 1.5 Kit |
| | $40.00 | 2.0 Kit |
| **All other urethanes:** | $15.00 | per NAGS kit quantity |
| **Windshield Repairs:** | $60.00 | Flat Per Windshield |
| **Molding Discount:** | 20% | Off (-) Precision List |

The prices above supersede any prior pricing for GEICO. All invoices should be billed to
GEICO at the following address:

> GEICO
> PO Box 182277
> Columbus, Ohio 43218-2277

If you send your invoice via EDI, please use mailbox SAFL107 and program ID 09043.
If you do not have EDI capability, you may use SGCNetwork.com to send invoices
electronically free of charge, which will help facilitate the timely payment of your
invoice.

Sincerely,
Contract Management
Fax: 614-210-9504
www.sgcnetwork.com

GGN/IP000610